No. 24-50

### In the United States Court of Appeals for the Ninth Circuit

SMALL BUSINESS FINANCE ASSOCIATION,

*Plaintiff-Appellant*,

v.

CLOTHILDE HEWLETT, SOLELY IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
District Court Case No. 22-cv-8775-RGK-SK

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 5 of 6**

Benjamin H. Brodsky, Esq.
BRODSKY FOTIU-WOJTOWICZ, PLLC
*Counsel for Appellant*
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: 305-503-5054
Fax: 786-749-7644
bbrodsky@bfwlegal.com
docketing@bfwlegal.com

## OFFER SUMMARY - Sales-Based Financing

| | | |
|---|---|---|
| **Funding Provided** | *$15,305.00* | This is how much funding Forward Financing will provide. |
| | | Due to deductions or payments to others, the total funds that will be provided to you directly is *$15,305.00*. For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed". |
| **Estimated Annual Percentage Rate (APR)** | *241.03%* | APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through the Approved Account will be *$31,468.07*. Since your actual income may vary from our estimate, your effective APR may also vary. |
| | | APR is not an interest rate. The cost of this financing is based upon the discount taken on the amount of the future receivables you sell and fees charged by Forward Financing rather than interest that accrues over time. |
| **Finance Charge** | *$7,305.00* | This is the dollar cost of your financing. |
| | | Your finance charge will not increase if you take longer than estimated to deliver the receivables we purchased. |
| **Estimated Total Payment Amount** | *$24,000.00* | This is the total dollar amount of receivables you will deliver to Forward Financing under this contract if your business generates all of the receivables we purchased. |
| **Estimated Monthly Cost** | *$5,034.89* | Although you will not deliver receivables to Forward Financing on a monthly basis, this is our calculation of your average monthly cost based on the estimated term assuming that your business generates receivables in equal amounts each month. |
| **Estimated Payment** | *$241.78/Daily* | |
| | This is an estimate required by California law. It may differ from your actual remittance (payment) amount. For the actual remittance (payment) amount, see the first page of your contract. | |
| **Payment Terms** | Daily remittances (payments) are required each Business Day (defined as all weekdays, excluding Federal Reserve holidays). | |
| | We based your preset daily remittances (payments) of *$241.78* upon our estimate of *16 %* of your total income, based upon average monthly income of *$31,468.07* from the bank statements you provided. | |
| | You have the right to reduce daily remittances (payments) or receive refunds of all or part of your payments if you demonstrate that your payments have exceeded *16 %* of your total income during any given month. For more details on your rights, see paragraph 1(b) of your contract. | |
| **Estimated Term** | *144* Days | This is our estimate of how long it will take to collect amounts due to us under the contract based upon the assumption that you will receive *$31,468.07* through the Approved Account. |
| **Prepayment** | If you pay off the financing faster than required, you still must pay all or a portion of the finance charge, up to *$6,985.00* based upon our estimates. | |
| | If you pay off the financing faster than required, you will not be required to pay additional fees. | |

**Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.**

███████████████████                          Jul 05, 2023
_____                   _____
**Recipient Signature**                      **Date**

CONFIDENTIAL                    SBFA 02705

**Exhibit 13-214**                           **ER811**

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| 1. Amount Given Directly to You | *$15,305.00* |
| 2. Prepaid Finance Charges: Processing Fee | *$695.00* |
| 3. Amount Provided to You or on Your Behalf (1 + 2) | *$16,000.00* |
| 4. Amount Financed (1 + 2) | *$16,000.00* |

CONFIDENTIAL                          SBFA 02706

**Exhibit 13-215**                          **ER812**

FORWARD FINANCING LLC

FUTURE RECEIPTS
SALE AGREEMENT

Effective Date: July 3, 2023

This Future Receipts Sale Agreement ("Agreement") dated above, is made by and between Forward Financing LLC, a Delaware limited liability company (together with its successors and/or assigns, "Purchaser" or "Forward Financing"), and Customer and Principal(s) (as identified below).

CUSTOMER INFORMATION:
Customer Legal Name ("Customer"):
DBA Name:
Physical Address:
Type of Entity:

PRINCIPAL(S) INFORMATION:
Name of Principal (1):
Address:

KEY TERMS:

| | |
|---|---|
| **Amount Sold:** **The total dollar amount of Future Receipts being sold by Customer.** | **$24,000.00** |
| Purchase Price: The dollar amount Purchaser is paying to Customer for the Amount Sold. | $16,000.00 |
| Processing Fee: The administrative fee associated with processing the transaction. This is deducted from the Purchase Price paid to Customer. | $695.00 |
| **Net Purchase Price:** **The net Purchase Price after the Processing Fee is deducted from the Purchase Price paid to Customer.** | **$15,305.00** |
| Minus funds used to satisfy prior transaction entered with Forward Financing (if any) | $0.00 |
| **TOTAL AMOUNT TO BE DEPOSITED INTO CUSTOMER'S BANK ACCOUNT** (minus $95 if Customer elects to receive funds by wire) | **$15,305.00** |
| Monthly Percentage: The percentage of Customer's Future Receipts that Purchaser may collect each month. | 16% |
| Daily Amount: The dollar amount of Future Receipts that Customer authorizes Purchaser to collect each Monday through Friday (excluding Federal Reserve holidays) (each a "Business Day"). | $240.00 |

**Customer hereby sells, assigns and transfers the total "Amount Sold" to Purchaser (making Purchaser the absolute owner), in exchange for the "Net Purchase Price."**

1

**Referring third party (unrelated to Forward Financing):**
Lendio

Initial here on behalf of Customer X _____

CONFIDENTIAL

SBFA 02707

Exhibit 13-216

ER813

In order to simplify Customer's delivery to Purchaser of the "<u>Monthly Percentage</u>" of Customer's Future Receipts and reduce administrative costs, Customer authorizes Purchaser to ACH debit the "<u>Daily Amount</u>" each "<u>Business Day</u>" from the bank account (the "<u>Approved Account</u>") into which all of Customer's "<u>Future Receipts</u>" are deposited, until the earlier of: (a) the date on which the full Amount Sold, and any other fees or amounts due under this Agreement, have been received by Purchaser; or (b) the date that is three years from the Effective Date of this Agreement.  The parties agree that, based upon information provided by Customer, Purchaser's debiting of the Daily Amount each Business Day should result in Purchaser receiving an amount of Future Receipts each month that is approximately equal to the Monthly Percentage of Customer's Future Receipts. "<u>Future Receipts</u>" as used in this Agreement means any payments received from customers and other third-party payors in exchange for Customer's goods or services, including payments received in any form including, but not limited to, cash, check, payment card and electronic transfers.

The Approved Account is identified in the Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments (ACH Debits), attached hereto and incorporated herein by reference.

CUSTOMER ACKNOWLEDGES THAT:

- It is selling a portion of its Future Receipts to Forward Financing at a discount, not borrowing money from Forward Financing.  THIS PURCHASE OF FUTURE RECEIPTS IS NOT A LOAN.  There is no interest rate associated with this transaction, and no time period during which the Amount Sold must be collected because the Daily Amount is subject to adjustment based on the Future Receipts actually generated by Customer.  Accordingly, there is no fixed term associated with this transaction.

- <u>This financing may be more expensive than a traditional bank loan</u>.  Please review the financial figures listed on the preceding page under "KEY TERMS," and all other terms in this contract.

- The Daily Amount is intended to equal the amount of Future Receipts that Purchaser may collect each Business Day in order to collect the Monthly Percentage of Future Receipts each month.  If Customer's revenues decline so that collection of the Daily Amount will result in Purchaser collecting more than the Monthly Percentage of Customer's Future Receipts during a given month, *Customer must contact Forward Financing to request an adjustment of the Daily Amount pursuant to Paragraph 1(b)(2) below*.

- In the event Customer (a) diverts Future Receipts away from the Approved Account; (b) allows its account to incur four (4) insufficient funds bounces without providing Purchaser with bank statements demonstrating lack of revenues; or (c) blocks its bank account from Purchaser's access for ACH debits, Principal(s) shall be liable for such actions, as more particularly set out in Paragraph 2 below.

- It is not a breach of this Agreement if Customer generates no further Future Receipts or generates Future Receipts less quickly than projected at the time this Agreement is executed, provided that Customer has not breached any other provision of this Agreement.

- Forward Financing is entering into this Agreement knowing the risks that Customer's business may slow down or ultimately fail, and assumes these risks based on Customer's representations, warranties and covenants in this Agreement, which are intended to provide Forward Financing with a reasonable and fair opportunity to receive the benefit of its bargain.

This Agreement is by and between Forward Financing and Customer/Principal(s).  Any broker or independent sales organization that acted as an intermediary between Forward Financing and Customer/Principal(s) is in no way authorized to act as an agent of Forward Financing, or bind Forward Financing in any way.  *CUSTOMER AND EACH PRINCIPAL ACKNOWLEDGES AND AGREES THAT IT IS NOT ENTERING THIS TRANSACTION BASED ON ANY REPRESENTATIONS OR STATEMENTS MADE BY ANY BROKER, INDEPENDENT SALES ORGANIZATION, INTERMEDIARY OR OTHER PERSON (INCLUDING BUT NOT LIMITED TO ANY THIRD PARTY LISTED AS "REFERRING THIRD PARTY" IN THE LOWER LEFT CORNER*

2

Initial here on behalf of Customer X

OF PAGE 1 OF THIS CONTRACT), AND THAT IT IS RELYING SOLELY ON THE TERMS SET FORTH IN THIS AGREEMENT IN DECIDING TO ENTER INTO THIS TRANSACTION.

Customer represents and warrants that it is not prohibited from entering this transaction by any other agreement to which Customer or any Principal is a party, including but not limited to any other sale of future receipts agreement, any loan agreement, any organizational documents or otherwise. If Customer or any Principal is found to be in breach of this representation and warranty, the indemnification provisions set forth in Paragraph 9 below shall apply.

This Future Receipts Sale Agreement is further governed by the following "Terms & Conditions":

## TERMS & CONDITIONS

1    Collection of Daily Amount  Monthly Reconciliation and Adjustment of Daily Amount.

(a)    Collection of Daily Amount.  Customer authorizes Purchaser to collect from the Approved Account the Daily Amount each Business Day (defined as all weekdays, excluding Federal Reserve holidays) until the earlier of: (a) the date on which the full Amount Sold, and any other fees or amounts due under this Agreement, have been received by Purchaser; or (b) the date that is three years from the Effective Date of this Agreement. Customer agrees to complete all necessary forms to establish and maintain the Approved Account and agrees to deposit or cause to be deposited all funds arising from Future Receipts into the Approved Account. Customer agrees not to deposit any funds into the Approved Account other than funds arising from Future Receipts.

(b)    Reconciliations.

(1)    Return of Overages.  Customer agrees that, as of the Effective Date of this Agreement, the Daily Amount represents the parties' best estimate of the amount of Future Receipts that Purchaser is entitled to collect each Business Day in order to collect the Monthly Percentage of Future Receipts each month. Customer agrees that it is impossible for Purchaser to know the exact amount of Customer's Future Receipts in any given calendar month without first obtaining such information from Customer. Customer therefore agrees to notify Purchaser if the Daily Amounts collected by or delivered to Purchaser during any given calendar month exceed the Monthly Percentage of Future Receipts actually generated during that calendar month ("Overage") by sending complete bank statements for that calendar month to Purchaser's designated email address (reconciliation@ forwardfinancing.com) (the "Designated Email") by the 90th day following the end of the relevant month ("Reconciliation Notice"). If Customer provides a timely Reconciliation Notice to Purchaser at the Designated Email, and Purchaser confirms there is an Overage, then Purchaser will reconcile Customer's Approved Account by initiating an ACH credit to the Approved Account in an amount equal to the Overage ("Monthly Reconciliation") within ten (10) Business Days of receiving the Reconciliation Notice. If Customer does not provide a timely Reconciliation Notice to the Designated Email, Customer will have waived its rights to any Monthly Reconciliation for that calendar month.

(2)    Adjustment of Daily Amount.  Customer is responsible for ensuring that the Daily Amount continues to result in Purchaser receiving an amount of Future Receipts each month that is approximately equal to the Monthly Percentage of Customer's Future Receipts. If Customer believes that its actual Future Receipts have decreased such that Purchaser will be receiving an amount of Future Receipts each month that varies from the Monthly Percentage of Customer's Future Receipts, then Customer shall request an adjustment of the Daily Amount ("Adjusted Daily Amount") and send to the Designated Email (reconciliation@forwardfinancing. com) full copies of monthly bank statements from all bank accounts, and any other statements evidencing customer receipts, for the prior three months. Provided that the information provided by the Customer supports the requested Adjusted Daily Amount, Purchaser shall make the adjustment for a period of 14 days. Customer shall be entitled to continue remitting the Adjusted Daily Amount for as long as it continues to provide bank statements warranting the adjustment every 14 days thereafter. If at the end of any 14 day period, the Customer has not provided updated financial statements demonstrating a continued adjustment is warranted, the Daily Amount will revert back to the amount stated under the "KEY TERMS" section of this Agreement.

2    Principal(s)'s Guarantee of Performance and Liability For Breach of Representation, Warranty or Covenant.  Each Principal signing this Agreement agrees that it shall not undertake any action to divert Customer's revenues or deprive Purchaser of the value of assets purchased. Accordingly, each Principal irrevocably and unconditionally guarantees to Purchaser prompt and complete performance of the following Customer obligations: (a) not to deposit customer receipts anywhere other than the Approved Account (per Paragraphs 6(iv) and 6(v) below); (b) not to block Purchaser's access to the Approved Account (per Paragraph 6(vi) below); (c) to provide Purchaser with bank or other financial statements demonstrating a decrease in revenues in the event there are four (4) or more consecutive Returned Item Events, as described in Paragraphs 5(c) and 6(vii) below; (d) to provide truthful, accurate, and complete information as required by this Agreement; and (e) to comply with all Customer obligations related to any sale of the business, as outlined in paragraph 6(x). In the event a breach of any of the above listed obligations occurs, Principal(s) assume and jointly and severally

3

Initial here on behalf of Customer X ▮▮▮▮▮

guarantee the full, complete and timely performance of Customer's obligations hereunder. **The parties agree that, provided that Customer has not violated any of the representations, warranties or covenants in this Agreement, it shall not constitute a breach of this Agreement if Customer generates no further Future Receipts and therefore has no funds to remit the Amount Sold.**

3.    Authorization to File UCC Financing Statements.  Customer acknowledges that it is selling its Future Receipts to Purchaser, and as such, hereby authorizes Purchaser to file a financing statement pursuant to the Uniform Commercial Code ("UCC") to evidence such sale.  The UCC financing statement may state that the sale of the Future Receipts is intended to be a sale and not an assignment for security.  Customer and each Principal agree to execute any documents or take any action in connection with this Agreement that Purchaser deems necessary to perfect or maintain Purchaser's interest in the Future Receipts purchased pursuant to this Agreement.

4.    Right to Cancel.  Customer may cancel this transaction at any time prior to midnight of the second Business Day after Purchaser forwards the Net Purchase Price to Customer ("Cancellation Deadline").  To cancel the transaction, Customer must return the full Purchase Price to Purchaser by the Cancellation Deadline.  Upon the Purchase Price being returned, all Parties to this Agreement shall be deemed to have released each other from any claims or liabilities related to this Agreement.

5.    Fees and Damages.
      (a)    Processing Fee.  Customer agrees to pay Purchaser the Processing Fee listed under the "KEY TERMS" section of this Agreement to reimburse Purchaser for expenses incurred in processing Customer's application and providing toll-free access to customer service representatives.  Purchaser will deduct the amount of the Processing Fee from the Purchase Price that is to be paid to Customer.
      (b)    Bank Wire Fee.  Customer may request to receive payment of the Net Purchase Price by wire transfer.  Purchaser shall have sole discretion in determining whether it will agree to pay the Net Purchase Price by wire transfer.  In the event Purchaser pays the Purchase Price by wire transfer, Customer agrees to pay Purchaser a fee of $95, which covers the administrative, technological and banking costs for paying the Purchase Price by wire transfer.  Purchaser will deduct the amount of the Bank Wire Fee from the Purchase Price that is to be paid to Customer.
      (c)    Returned Item Fee.  To the extent not prohibited by applicable law, Customer agrees to pay Purchaser promptly upon demand a returned item fee of $35 (a "Returned Item Fee") if an electronic debit is returned unpaid or cannot be processed, or if a check, draft or similar instrument issued by Customer or any individual that signs this Agreement is not honored or cannot be processed (either of which is a "Returned Item Event").  At Purchaser's option, Purchaser will assess this fee any time a debit is not honored or paid, even if it is later honored or paid following resubmission.  Customer and any individual that signs this Agreement authorize Purchaser to

resubmit returned debits in its discretion.  Any check, draft or similar instrument may be collected electronically if returned for insufficient or uncollected funds.  Customer will be in breach of the covenant set forth in Paragraph 6(vii) of this Agreement if it accumulates four (4) consecutive Returned Item Fees during the term of the Agreement, and does not provide Purchaser with bank statements demonstrating decreased revenues within five (5) calendar days of the first Returned Item Fee. **It is expressly agreed that if Customer is not generating sufficient Future Receipts to satisfy the Daily Amount, Customer has the obligation to request a reconciliation of the Daily Amount, as provided for in Paragraph 1(b)(2) above, rather than incur Returned Item Fees.**
      (d)    Blocked Account Damages.  If Customer puts a block on the Approved Account or takes any such action that would prevent Purchaser from debiting the Approved Account as permitted by this Agreement, which action will constitute Customer's breach of the covenant set forth in Paragraph 6(vi) below, Customer agrees to pay Purchaser the sum of $2,500, plus the Amount Sold then outstanding on this Agreement, as liquidated damages.  The parties agree that these damages are a good faith estimate of the damages caused by such a breach of the Agreement, including the increased resources required to be expended by Purchaser to respond to the breach, the increased cost of funds to Purchaser caused by the failure to receive expected funds, the risk to Purchaser's ability to request ACH debits through the NACHA system caused by initiating rejected ACHs, and other damages and expenses caused by the breach.

6.    Customer's Representations, Warranties and Covenants.  Customer represents, warrants and covenants that as of the Effective Date of, and during the term of, this Agreement:

(i)    The Future Receipts are freely assignable to Purchaser and are not subject to any claims, charges, liens, restrictions, encumbrances or security interests of any nature whatsoever;

(ii)    Customer will not sell any Future Receipts to, or obtain a loan secured by any Future Receipts from, any other person or entity (an act commonly referred to as "stacking") without Purchaser's prior written consent;

(iii)    This Agreement does not violate the terms of any other agreement to which Customer or any Principal is subject (including but not limited to any other sale of future receipts agreement, any loan agreement, organizational documents, etc.);

(iv)    Customer will not take any action to reduce, discourage, or prevent the deposit of all Future Receipts into the Approved Account;

(v)    Customer will not deposit funds arising from Future Receipts into a bank account other than the Approved Account without Purchaser's prior written consent;

4

Initial here on behalf of Customer X

(8 of 295), Page 8 of 295     Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 8 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-15   Filed 09/27/23   Page 7 of 15   Page ID
#:1022

(vi) Customer will not block Purchaser from, and will provide Purchaser with full access to, the Approved Account, as described in Paragraph 8 below;

(vii) Because it is Customer's responsibility to alert Purchaser if it is generating Future Receipts insufficient to pay the Daily Amount, in the event that the Approved Account accumulates four (4) consecutive Returned Item Events, Customer will provide Purchaser with bank statements demonstrating a decrease in revenues within five (5) calendar days of the first Returned Item Event (as defined in Paragraph 5(c) above);

(viii) Customer will provide Purchaser legible, complete and unredacted copies of all statements from Customer's banks, credit card processors and other Receivables Recipients (as that term is defined in Paragraph 12 below) within five (5) calendar days of a request by Purchaser;

(ix) Customer will permit Purchaser to conduct a site inspection of Customer's business, including an inspection of Customer's credit card terminals, at any reasonable time during the term of this Agreement with or without notice to Customer;

(x) Because Purchaser has entered into this Agreement based on the current operations of Customer, Customer will not undertake any transaction involving the sale of Customer, either by an issuance, sale or transfer of ownership interests in Customer that results in a change in ownership or voting control of Customer, or by a sale or transfer of substantially all of the assets of Customer, without 1) prior written notice to Purchaser and 2) obtaining the new majority owner(s)'s signed agreement to perform the obligations of principal(s) and otherwise abide by all terms of this Agreement;

(xi) All information provided by Customer to Purchaser in this Agreement, Customer's funding application, Customer's interview with Purchaser or otherwise, and all of Customer's financial statements and other financial documents provided to Purchaser, are true, correct, complete and accurately reflect Customer's financial condition and results of operations at the time such information and materials were provided to Purchaser;

(xii) Customer will advise Purchaser of any material change in Customer's financial condition or operations within ten (10) days of such material change;

(xiii) Customer is in compliance with all laws applicable to Customer's business and has all permits, licenses, approvals, consents and authorizations necessary to conduct its business and will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes;

(xiv) As of the Effective Date of this Agreement, Customer is not contemplating the filing of a bankruptcy proceeding, closing Customer's business, winding down Customer's business operations, or selling Customer's business, and has no reason to believe that a bankruptcy petition or other proceeding will be filed or brought against it. Customer agrees that, in the event that it goes out of business or is the subject of a voluntary or involuntary filing for protection under the United States Bankruptcy Code within forty-five (45) days of Purchaser delivering the Purchase Price to Customer, there shall be a rebuttable presumption that these representations were materially untrue when made;

(xv) Customer will use the Purchase Price solely for legal business purposes and will not use the Purchase Price for personal, family or household purposes;

(xvi) Customer and Principal(s) have full power and authority to enter into and perform the obligations under this Agreement; and

(xvii) Customer and Principal(s) have not committed, and will not commit, fraud in connection with the negotiation or execution of, or performance under, this Agreement.

The violation by Customer of any of the representations, warranties and covenants in this Paragraph 6 will constitute a breach of the Agreement by the Customer, *provided that* if Customer breaches subparagraph 6(vi) (blocked accounts) due to a decrease in receivables, then customer shall have 5 days to cure such breach by contacting Purchaser and further complying with the provisions of Paragraph 1(b)(2).

7.     Telephone Monitoring, Recording and Contacts.
(a)     As part of the consideration for the Purchase Price, Customer and each Principal agrees that Purchaser may contact Customer or any Principal using any kind of telecommunications technology including, but not limited to, telephone, cellular telephone, automatic telephone dialing systems, artificial or prerecorded voice message systems, text messaging systems, automated email systems or other systems, and that this consent may not be revoked except as set forth below. Customer and each Principal agrees that Purchaser may use any telephone numbers (including wireless, landline and voice over IP numbers) or email addresses that Customer or any Principal provides to Purchaser, from which Customer or any Principal calls Purchaser, or at which Purchaser believes it can reach Customer or any Principal. Customer and each Principal understands and agrees that anyone with access to its telephone or email account(s) may listen to or read the messages that Purchaser leaves or sends to Customer or any Principal. Customer and each Principal agrees that Purchaser will not be liable for anyone accessing those messages.  Customer and each Principal agrees that Purchaser will not be liable for any charges that Customer incurs in connection with text messages, emails or other communications that Purchaser sends to Customer or any Principal.

(b)     Customer and each Principal agrees to provide immediate Notice to Purchaser if Customer or any Principal changes telephone numbers or is no longer the subscriber or usual user of a

5

**Initial here on behalf of Customer X**

telephone number that Customer or any Principal provides to Purchaser. Customer and each Principal agrees that Purchaser may monitor and record telephone calls and other communications with Customer or any Principal. To stop marketing text messages, Customer and/or any Principal must reply "STOP" to any marketing text message Purchaser sends to Customer or any Principal. To stop marketing emails, Customer and each Principal must follow the opt-out instructions provided at the bottom of Purchaser's marketing emails.

8.    <u>Bank Account Access</u>.   Customer agrees to provide Purchaser with ongoing and continuous read only streaming access to the Approved Account, via Purchaser's online banking link, including by providing all necessary passwords and online log-in information. If access is interrupted for any reason, Customer agrees to relink Purchaser to the Approved Account within 24 hours of receiving Notice from Purchaser.

9.    <u>Indemnification For Claims Brought By Third Parties</u>. Customer and each Principal represent and warrant that the Amount Sold is freely assignable by Customer and that this Agreement does not violate the terms of any other agreement to which Customer or any Principal is subject (including but not limited to any other sale of future receipts agreement or any loans). It is expressly agreed that Customer and each Principal, jointly and severally, shall assume liability for and do hereby agree to indemnify and hold harmless Purchaser and its agents, affiliates and servants, from and against any and all losses, damages, claims, penalties, liabilities and expenses (including reasonable attorney's fees and in-house attorney's fees) of any nature whatsoever imposed on, incurred by or asserted against Purchaser or its agents, affiliates and representatives, in any way relating to or growing out of any claim by any third party that this Agreement violates the terms of any other agreement to which Customer or any Principal is subject.

10.    <u>Mandatory Arbitration of Disputes / Waivers</u>.
     (a)      All disputes and claims for which a court otherwise would be authorized by law to grant relief, in any manner, that any party may have, now or in the future, of any kind or nature whatsoever with or against any other party or its affiliates arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by either the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules, or Resolute Systems, LLC in accordance with its Financial Dispute Arbitration Rules. In any arbitration matter brought before the AAA, regardless of claim amount, interest, and/or arbitration fees and costs, the Expedited Procedures of the Commercial Arbitration Rules shall apply. In any arbitration matter brought before Resolute Systems, LLC, exclusive of claim amount, interest, and/or arbitration fees and costs, the Document Submission only Procedures of the Financial Dispute Arbitration Rules shall apply.

     Judgment on the award rendered by the arbitrator will be final and binding, and may be entered in any court having jurisdiction thereof. A party may demand arbitration any time after the dispute or

claim in question has arisen even if a lawsuit has been filed. This Paragraph 10 is a material inducement for Purchaser to enter into this Agreement.

     (b)      Except as prohibited by law, the arbitration proceedings shall be conducted in confidence, and all documents, written testimony, and records therein shall be received, heard, and maintained by the arbitrator in confidence, available for inspection only by the parties, their respective attorneys and experts, who shall agree, in advance and in writing, to maintain the confidentiality of such information. The parties shall be allowed adequate discovery as part of the arbitration process, meaning reasonable access to essential documents as determined by agreement or the arbitrator. Parties may choose to present written testimony to support their positions through the submission of written affidavits, in accordance with the documents-based resolution format.

     (c)      All arbitration matters shall be conducted and decided on document submissions by the parties. All necessary hearings associated with arbitration matters shall be conducted telephonically, with video conferencing used only if necessary. The arbitrator shall issue a "standard" form of award, which shall state only the relief to which the parties are or are not entitled. Except as otherwise specified herein, the arbitrator shall have the authority to award equitable relief, damages, costs and fees to the extent permitted by law, including, but not limited to, any remedy or relief that a governing court might order; provided, however, that the arbitrator may not award any declaratory, injunctive or other relief for the benefit of the general public or any third party. If a court decides that applicable law precludes enforcement of the foregoing limitations as to a claim for injunctive relief, then after all appeals from that decision have been exhausted, that claim (and only that claim) must be severed from the arbitration and may be brought in court after the arbitration of the remaining claims has been concluded.

     (d)      The parties agree that this Agreement, any arbitration under this Agreement, and any arbitration award rendered in such arbitration shall be governed by the Federal Arbitration Act and the applicable laws of the Commonwealth of Massachusetts. The parties further agree that the arbitrator shall determine all issues and disputes including those related to arbitrability, including but not limited to the meaning, construction, validity, scope and/or enforceability of this Paragraph 10.

     (e)      <u>Class Action Waiver</u>. EACH PARTY AGREES THAT A CLAIM MAY ONLY BE BROUGHT BY A PARTY IN HIS, HER, OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER OR IN ANY PURPORTED CLASS OR REPRESENTATIVE MATTER, REGARDLESS OF WHETHER SUCH CLAIM IS BROUGHT AS LITIGATION OR ARBITRATION. EACH PARTY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES HIS, HER, OR ITS RIGHT TO PARTICIPATE IN A CLASS ACTION, PRIVATE ATTORNEY GENERAL ACTION, CLASS ARBITRATION, OR OTHER REPRESENTATIVE ACTION IN ANY MATTER BROUGHT AGAINST ANY OTHER PARTY. FURTHER, THE PARTIES AGREE THAT IN ANY ARBITRATION MATTER, THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR

Initial here on behalf of Customer X ▮▮▮▮

CONFIDENTIAL

SBFA 02712

**Exhibit 13-221**

**ER818**

MORE THAN ONE PARTY'S CLAIMS, EXCEPT FOR CLAIMS BY OR AGAINST CUSTOMER AND/OR RELATED PRINCIPAL(S).

(f)      Severability of Arbitration Provision.  If any portion of this Paragraph 10 is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force.  However, if a determination is made with respect to any claim that the class action waiver in Paragraph 10(e) (the "Class Action Waiver") is unenforceable, only this Section (f) of Paragraph 10 will remain in force with respect to that claim and the remaining provisions of this Paragraph 10 shall be null and void, provided that the determination concerning the Class Action Waiver shall be subject to appeal.

11.     Jury Trial Waiver.  UNLESS PROHIBITED BY LAW, THE PARTIES      HEREBY      KNOWINGLY,      VOLUNTARILY, INTENTIONALLY, WITHOUT DURESS AND AFTER DISCUSSING OR HAVING THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH THEIR ATTORNEYS, WAIVE THE RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CONTROVERSY, DISPUTE, OR CLAIM, INCLUDING ALL CLAIMS SOUNDING IN CONTRACT OR TORT, ARISING FROM OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREIN.  THIS WAIVER OF TRIAL BY JURY PROVISION IS A MATERIAL INDUCEMENT FOR PURCHASER TO ENTER INTO THIS AGREEMENT.

12.     Financial Condition and History.

(a)      Customer and each Principal authorize Purchaser and its agents to investigate their financial condition and history and authorize each of Customer's card processors and other recipients of Customer's Receivables ("Receivables Recipients"), as well as any of Customer's customers, to provide Purchaser with Customer payment card, check processing and customer payment activity statements and any other information on Customer upon Purchaser's request. Customer and each Principal authorize Purchaser to obtain a credit report and/or background report on Customer and each individual or Principal that signs this Agreement at any time during the term of this Agreement and one hundred eighty (180) days after the term of this Agreement (so as to allow time for post-judgment enforcement in the event arbitration is commenced).  Customer will provide to Purchaser within five (5) days of a request by Purchaser any documents relating to Customer's financial condition and history including, but not limited to, Customer's bank statements, financial statements, tax returns and credit card and check processing activity statements.  Such documents shall be legible, complete and unredacted.  A photocopy of this authorization will be deemed acceptable for release of financial information.

(b)      Customer agrees that Purchaser may share information regarding the Amount Sold and/or payments made or owed by Customer to Purchaser in accordance with this Agreement with: (i) any broker or other third party that introduced Customer to Purchaser; (ii) any attorney, accountant, financial advisor or employee for the purpose of advising Purchaser; and (iii) any credit reporting entities.

13.     Indemnification of Card Processors, Other Receivables Recipients and Customers.  Customer and each Principal agree to jointly and severally indemnify and hold harmless each of Customer's card processors and other Receivables Recipients, and each of their respective officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees and in-house attorney's fees) incurred by Customer's card processor or other Receivables Recipient resulting from (i) claims asserted by Purchaser for monies owed to Purchaser as a result of Customer's breach of this Agreement and (ii) actions taken by Customer's card processor or other Receivables Recipient in reliance upon information or instructions provided by Purchaser.  Customer agrees to promptly, but in no event more than three (3) Business Days from Customer's receipt of such request from Purchaser and/or credit card processor or other Receivables Recipient, execute any authorizations or other documents that a credit card processor, other Receivables Recipient or customer may require in order to release funds directly to Purchaser.

14.     Reliance on Terms.  Paragraphs 12 and 13 of this Agreement are agreed to for the benefit of Customer, Purchaser and each of Customer's card processors and other Receivables Recipients, and notwithstanding the fact that each of Customer's card processors, other Receivables Recipients and customers is not a party to this Agreement, each of Customer's card processors, other Receivables Recipients and customers may rely upon their terms and raise them as a defense in any action.

15.     Closing of Customer's Business.  Provided that Customer has not violated any of the representations, warranties and covenants in this Agreement, upon written Notice to Purchaser by Customer, and provision of such proof as requested by Purchaser, that the Customer has involuntarily closed its business and is no longer generating Future Receipts, Purchaser agrees that it shall have no further right to collect Daily Amounts or Adjusted Daily Amounts.

16.     Remedies.  In the event Customer breaches or violates any provision of this Agreement, including but not limited to the representations, warranties and covenants made in Paragraph 6 above: (i) Purchaser shall be entitled to all remedies available under the law; and (ii) in any action for damages, Purchaser shall be entitled to the "Uncollected Future Receipts" (defined as Amount Sold less the amount of Future Receipts received by Purchaser) plus any fees due to it under this Agreement.  **Because the transaction evidenced by this Agreement is not a loan, if Customer's business slows down and Customer's Future Receipts decrease or if Customer closes its business and Customer has not violated any of the representations, warranties and covenants in this Agreement, there shall be no default or breach of this Agreement.**  Purchaser is purchasing the Future Receipts and Purchaser assumes the risk that Customer's business may fail or be adversely affected by conditions outside the control of Customer provided Customer has not breached a representation, warranty or covenant set forth in this Agreement.

7

Initial here on behalf of Customer X

17.    Indemnification of Purchaser for Breach; Attorney's Fees and Costs.  Customer and Principal(s) shall jointly and severally indemnify and hold harmless Purchaser and its agents from and against any and all liabilities, claims, obligations, damages, penalties, actions and suits of whatsoever nature incurred by Purchaser or its agents, in any way relating to or arising out of this Agreement, but specifically any claim that Customer or any Principal has breached this Agreement, including, without limitation, and to the extent not prohibited by applicable law, the payment of all costs and expenses of every kind for the enforcement of Purchaser's rights and remedies hereunder and/or the collection of amounts due to Purchaser hereunder, including but not limited to attorneys' fees, in-house attorneys' fees, and collection agency fees and costs (collectively, "Indemnified Amounts").

18.    Notices.  Except as otherwise provided herein, each Party giving any notice or other communication ("Notice") pursuant to this Agreement shall do so by email and by either internationally recognized overnight courier or registered or certified mail (return receipt requested).  Notice to Customer shall be sent to Customer's physical address set forth on the first page of this Agreement, and to Customer's email address as communicated to Purchaser.  Notice to Purchaser shall be sent via email to notices@forwardfinancing.com, and to Purchaser's physical address as follows: Forward Financing, 53 State Street, 20ᵗʰ Floor, Boston, MA 02109.  Any party changing its address, or any other contact information shall provide Notice to all other parties.  If the addressee rejects or otherwise refuses to accept a Notice, or if the Notice cannot be delivered because of a change in address for which no Notice was given, then such Notice shall be deemed to have been received upon the rejection, refusal or inability to deliver.

19.    Confidentiality.  The terms and conditions of this Agreement and any documents that Customer and each Principal executes in connection with this Agreement (collectively, "Confidential Information") are proprietary and confidential information of Purchaser. Unless disclosure is required by law or court order, Customer and each Principal shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Customer or Principal(s) who needs to know such information for the purpose of advising Customer or Principal(s) ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Customer or Principal(s) and first agrees in writing to be bound by the terms of this Paragraph 19.  Customer and each Principal shall provide Purchaser with adequate advance Notice of any request or subpoena requiring disclosure of such Confidential Information, in order to provide Purchaser with the opportunity to properly object to such disclosure.

20.    Assignment.  Customer and Principal(s) shall not assign their rights or obligations under this Agreement or any interest in this Agreement without the prior written consent of Purchaser, which consent may be withheld in Purchaser's sole discretion.  Purchaser reserves the right to assign this Agreement or any interest under this Agreement without prior notice to Customer or Principal(s).

21.    Non-waiver.  Purchaser's failure to exercise, or delay in exercising, any right under this Agreement, will not constitute a waiver of any such right.

22.    Definitions and Interpretation.   "Customer" shall be interpreted to include Customer and each Principal unless such interpretation would be redundant or inapplicable.  All paragraph and section headings in this Agreement are inserted for convenience only and are not intended to affect the interpretation of the Agreement.

23.    Construction.  No provision of this Agreement shall be construed or enforced against any party hereto because such party drafted or caused to be drafted such provision.  Each provision of this Agreement shall be construed as if such provision had been proposed and drafted or caused to be drafted by all parties hereto.

24.    Consent to Publication.   By signing this Agreement, Customer and Principal(s) agree that Purchaser may republish any reviews, testimonials or other statements that Customer or Principal(s) makes publicly regarding Purchaser.

25.    Use of Information.  Customer and each Principal agree that any information it provides to Purchaser, including but not limited to personally identifiable information, may be used or disclosed for business purposes by Purchaser in its discretion, without the need for prior consent, unless otherwise prohibited by law.

26.    Miscellaneous.  This Agreement shall be binding upon Customer and Principal(s) and inure to the benefit of Purchaser, its successors and assigns.  This Agreement constitutes the entire Agreement between the parties, and no representations, agreements, or understandings of any kind, either written or oral, shall be binding upon the parties unless expressly contained herein.  The parties may modify any of the terms of this Agreement or amend this Agreement only by a written document signed by all parties.  If any of the provisions of this Agreement are determined to be invalid, illegal or unenforceable in any respect, the remaining provisions shall not be affected in any manner.  The parties agree to execute such further and additional documents, instruments and writings as may be necessary for the purpose of fully effectuating the terms and provisions of this Agreement.  Electronic signatures hereto shall be deemed acceptable for all purposes.  Paragraphs 2, 7, 9-11, 12, 16-19, 21, and 24-26 shall survive any termination, satisfaction or cancellation of this Agreement.

27.    Severability.  Except as provided otherwise in Paragraph 10, if any provision of this Agreement is deemed to be void or unenforceable by a court of competent jurisdiction or any governmental agency, that provision will continue to be enforceable to the extent permitted by that court or agency, and the remainder of that provision will no longer be considered as part of this Agreement.  All

8

Initial here on behalf of Customer X

other provisions of this Agreement will, however, remain in full force and effect.

28.     Privacy.  Purchaser's privacy policy can be found at: https://www.forwardfinancing.com/privacy-policy/. Purchaser's privacy policy for California residents can be found at: https://www.forwardfinancing.com/privacy-policy/#californiaprivacypolicy/.

9

Initial here on behalf of Customer X



CONFIDENTIAL                    SBFA 02715

**Exhibit 13-224**                    **ER821**

EACH PARTY ACKNOWLEDGES THAT THEY HAVE READ, UNDERSTAND AND AGREE TO THE TERMS OF THIS "FUTURE RECEIPTS SALE AGREEMENT" AND UPON EXECUTION OF THE AGREEMENT SHALL BE OBLIGATED TO ALL OF THE FOREGOING TERMS AND CONDITIONS—INCLUDING THE JURY TRIAL WAIVER AND CLASS ACTION WAIVER—AND THE AUTHORIZATION AGREEMENT FOR DIRECT DEPOSITS (ACH CREDITS) AND DIRECT PAYMENTS (ACH DEBITS) AND ANY OTHER EXHIBITS, ADDENDA OR SCHEDULES THAT MAY BE ADDED OR ATTACHED HERETO. The person executing this Agreement on behalf of Customer warrants and represents that he/she is authorized to bind Customer to all of the terms and conditions set forth in this Agreement and that all of the information provided herein is true and accurate in all respects. Purchaser's payment of the Purchase Price shall be deemed Purchaser's acceptance of this Agreement, notwithstanding any failure by Purchaser to sign this Agreement.

ANY MISREPRESENTATION MADE BY CUSTOMER OR ANY PRINCIPAL IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE FRAUD OR INTENTIONAL MISREPRESENTATION.

**Forward Financing LLC**

Signature: _____

Name: _____

Title: _____

Date: _____

**Customer (Business)**

Signature: X █████████████████████

Name: ████████████

Title: Owner

Date: July 3, 2023

**Principal 1 (individually)**

Signature: X ████████████████████████

Name: ████████████████████████

Date: July 3, 2023

10

CONFIDENTIAL                    SBFA 02716

**Exhibit 13-225**                    **ER822**

FORWARD FINANCING LLC

AUTHORIZATION AGREEMENT FOR
DIRECT DEPOSITS (ACH CREDITS) AND
DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments (ACH Debits) (the "Authorization") is part of (and incorporated by reference into) the Future Receipts Sale Agreement (the "Agreement"). Customer should keep this important legal document for Customer's records. All capitalized terms used in this Authorization shall have the same meaning assigned to such terms in the Agreement unless otherwise noted herein.

DISBURSEMENT OF PURCHASE PRICE AND OTHER AMOUNTS OWED TO CUSTOMER.  By signing below, Customer authorizes Purchaser to disburse: (i) the Purchase Price set forth in the Agreement less the amount of any applicable fees upon Purchaser's approval by initiating an Automated Clearing House ("ACH") credit to the checking account(s) identified below or any other deposit account that Customer specifies as belonging to it, and that is acceptable to Purchaser (hereinafter referred to as the "Approved Account"); and (ii) any Monthly Reconciliation and other amounts that Customer may become entitled to under the Agreement by initiating one or more ACH credits to the Approved Account.

DAILY ACH COLLECTIONS.  By signing below, Customer enrolls in Purchaser's Automatic Collection Program and authorizes Purchaser to collect each Business Day the Daily Amount of Future Receipts (or Adjusted Daily Amount of Future Receipts, if applicable) and any fees or other amounts that Customer owes Purchaser pursuant to the Future Receipts Sale Agreement by initiating ACH debits to the Approved Account in accordance with the terms of the Agreement. Customer irrevocably authorizes Purchaser (which includes for the purposes of this Authorization, Purchaser's agents, service providers, successors and assigns) to initiate electronic debit entries via the ACH network or similar network to the Approved Account or any substitute bank accounts Customer later identifies  for any amounts due to Purchaser, including Daily Amounts and Adjusted Daily Amounts, on or after the dates such amounts come due.  Customer will not allow the Approved  Account (or any later identified substitute account) to be closed or replaced unless Customer provides Purchaser at least 10 days' advance written Notice and sufficient information and documentation for Purchaser to update its records relating to a replacement bank account.  The Notice must be sent to notices@forwardfinancing.com.  If Purchaser is unable to withdraw amounts from Customer's account for any reason, Customer agrees to pay Purchaser a $35 Returned Item Fee for each such occurrence as set forth in the Agreement in addition to all other remedies available to Purchaser.  Customer authorizes Purchaser to initiate a separate debit to the Approved Account (or any later identified substitute account) for the Returned Item Fee or to add this fee to a debit for a subsequent Daily Amount or Adjusted Daily Amount.  In the event that any debit is not successful, Customer authorizes Purchaser to reinitiate the debit up to five additional times.  In the event Purchaser makes an error in initiating a debit or credit, Customer authorizes Purchaser to initiate a credit or debit to correct the error.  To the extent that Purchaser initiates debits over the ACH network, Customer agrees to be bound by the rules governing the ACH network. Customer agrees that it will not cancel this Authorization or instruct any depository holding Future Receipts that Purchaser has purchased to reject Purchaser's debits.

BUSINESS PURPOSE ACCOUNT.  By signing below, Customer attests that the Approved Account was established for business purposes and not for personal, family or household purposes.

ACCOUNT CHANGES.  Customer agrees to provide prompt Notice to Purchaser if there are any changes to the Approved Account and/or routing numbers of the Approved Account.

MISCELLANEOUS.  Purchaser is not responsible for any fees charged by Customer's bank as the result of credits or debits initiated under this Agreement.  The origination of ACH transactions to Customer's bank accounts, including, but not limited to, the Approved Account, must comply with the provisions of U.S. law.

Depository Name: ███████████████
City / State / Zip:
Business Name: ███████████████          Account No: ████████████

Signature: ████████████████████
Name:                                                    Title: Owner
                                                             Date: July 3, 2023

11

**FORWARD FINANCING LLC**

**FUTURE RECEIPTS
SALE AGREEMENT
ADDENDUM**

VIA FAX / EMAIL



July 3, 2023

RE: Forward Financing / Early Performance Discount

We refer to the Future Receipts Sale Agreement dated July 3, 2023 (as amended from time to time, the "Agreement") between _____ ("Customer") and Forward Financing LLC ("Purchaser" or "Forward Financing"). Capitalized terms used and not defined in this addendum have the meanings as used in the Agreement. Pursuant to the Agreement, Forward Financing has agreed to pay Customer the amount of the "Purchase Price" (as set forth in the Agreement) in exchange for the "Amount Sold" (as set forth in the Agreement) of Customer's Future Receipts. The Parties desire to add the following terms to the Agreement:

Customer and Forward Financing hereby agree that notwithstanding anything to the contrary in the Agreement, Customer has the right (but not the obligation) to request an early performance discount as outlined below. Customer is not entitled to an early performance discount when using funds provided by Forward Financing to satisfy an outstanding balance.

 A. Customer may request an early performance discount by offering to pay Purchaser on or before the 90th day after the date of the Agreement (First Optional Discount Date) an amount such that Purchaser will have received on or before the First Optional Discount Date a total of $23,360.00 in connection with the Agreement.
 B. Customer may request an early performance discount by offering to pay Purchaser on or before the 120th day after the date of the Agreement (Second Optional Discount Date) an amount such that Purchaser will have received on or before the Second Optional Discount Date a total of $23,680.00 in connection with the Agreement.
 C. Customer may request an early performance discount by offering to pay Purchaser on or before the 150th day after the date of the Agreement (Third Optional Discount Date) an amount such that Purchaser will have received on or before the Third Optional Discount Date a total of $24,000.00 in connection with the Agreement.

In the event that Customer breaches the Agreement in any manner, including, without limitation, by breaching any of the representations, warranties or covenants set forth in Paragraph 6 of the Agreement, the early performance discount schedule set forth above will no longer be available, but Customer still may request to terminate this contract by paying Forward Financing that portion of the Amount Sold that Forward Financing has not yet collected ("Uncollected Future Receipts"), along with any other fees due under this Agreement.

Customer may request an early performance discount by contacting notices@forwardfinancing.com.  Purchaser will respond to Customer regarding any such requests promptly.

Except as modified by this addendum, the Agreement remains in full force and effect. Customer agrees to execute any documents and/or agreements in order to implement the provisions of this addendum.

1

Initial here on behalf of Customer X *BC*

CONFIDENTIAL          SBFA 02718

**Exhibit 13-227**          **ER824**

This addendum may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument. Executed signature pages transmitted by means of electronic delivery shall be legally valid and binding against the Parties.

By executing this addendum at the appropriate place below, Customer and Forward Financing acknowledge and agree to the terms and conditions of this addendum.

**Forward Financing LLC**

Signature: _____

Name: _____

Title: _____

Date: _____

**Customer (Business)**

Signature: X ███████████████

Name: ███████████████

Title: _____ Owner _____

Date: _____ July 3, 2023 _____

**Principal 1 (individually)**

Signature: X ███████████████

Name: ███████████████

Date: _____ July 3, 2023 _____

2

CONFIDENTIAL                    SBFA 02719

**Exhibit 13-228**                    **ER825**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

## OFFER SUMMARY FOR FORWARD PURCHASE AGREEMENT (FIXED)

| | | |
|---|---|---|
| Funding Provided | $29,250.00 | This is how much funding Kapitus LLC will provide. Due to deductions or payments to others, the total funds that will be provided to you directly is $20,010.00. For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed." The amount you receive directly may change if, per the attached "Itemization of Amount Financed," the amount financed will be used to pay down or pay off other financial obligations (to us or to a third party), and those amounts are not known or may change. |
| Estimated Annual Percentage Rate (APR) | 45.64% | APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through the designated deposit account and/or payment processor, as applicable, will be $61,075.00. Since your actual income may vary from our estimate, your effective APR may also vary. APR is not an interest rate. The cost of this financing is based upon fees charged by Kapitus LLC rather than interest that accrues over time. |
| Finance Charge | $11,250.00 | This is the dollar cost of your financing. Your finance charge will not increase if you take longer to pay off what you owe. |
| Estimated Total Payment Amount | $40,500.00 | This is the total dollar amount of payments we estimate you will make under the contract. |
| Estimated Monthly Cost | $2,252.00 | Although you do not make payments on a monthly basis, this is our calculation of your average monthly costs based upon payment amounts disclosed below. |
| Estimated Payment | $520.00/Weekly | |
| Payment Terms | We based the preset $520.00/Weekly upon our estimate of 3.7% of your total income, based upon the financial information submitted to us during the underwriting process. Upon request, you may be entitled to an adjustment of the preset amount set forth above on a going-forward basis to more closely reflect ███████ actual receipts. For more details on your rights, see paragraph 8 of the Purchase Agreement. | |
| Estimated Term | 1 years, 6 months | This is our estimate of how long it will take to collect amounts due to us under the contract based upon the assumption that you will receive $61,075.00 in monthly income. |
| Prepayment | If you pay off the financing faster than required, you still must pay all or a portion of the finance charge, up to $10,500.00 based upon our estimates. | |
| | If you pay off the financing faster than required, you will not be required to pay additional fees. | |

Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.

████████████████████████

Recipient's Signature

12/19/2022

Date

CONFIDENTIAL
**Exhibit 14-229**

SBFA 00627
**ER826**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426



## FORWARD PURCHASE AGREEMENT (FIXED ACH DELIVERY)

This Forward Purchase Agreement ("the Purchase Agreement") dated December 19 2022 is entered into between Kapitus LLC ("Purchaser") and each of the merchant(s) listed below (the "Seller" or "Merchant")   Seller agrees to sell, assign, and transfer and Purchaser agrees to purchase and receive Seller's accounts, receipts, contract rights, and other rights to payment arising from or relating to the payment to Seller through cash, checks, electronic transfers, ACH transfers, credit cards, charge cards, debit cards, prepaid cards, mobile payments (including Apple Pay™ and other ACH payments) and other similar payment methods that may accrue to Seller in the ordinary course of Seller's Business ("Receipts").

**SELLER:**

| | | | |
|---|---|---|---|
| SELLER'S LEGAL NAME: ██████ | TRADE NAME: ████████████- | | |
| | ████████ | | |
| TYPE OF ENTITY: ████████ | | | |
| PHYSICAL ADDRESS: ████████ | CITY: ██████ | STATE: ████ | ZIP: ██████ |
| MAILING ADDRESS: | CITY: | STATE: | ZIP: |
| TELEPHONE: (████████ | EMAIL ADDRESS: ██████████ | | |

### SALE CONFIRMATION (CID 9019141)

1.  Purchaser:  **Kapitus LLC, 2500 Wilson Boulevard Suite 350, Arlington, VA 22201**

2   Servicer  **Kapitus Servicing, Inc., 2500 Wilson Boulevard, Suite 350, Arlington, VA 22201**

3.  Purchased Amount:  $40,500.00
    Total dollar amount of Receipts to be delivered to Purchaser

4.  Purchase Price:  $30,000.00
    Gross total paid for Receipts purchased.

5.  Closing Fee:  $750.00 ((2.5%) of Purchase Price)
    Up-front fee charged for closing the purchase.

6.  Net Purchase Price:  $20,010.00
    Net total delivered to Seller as consideration for purchase, equal to the Purchase Price less the Closing Fee and any payment made to Purchaser or any third party as agreed by Seller

7.  Specified Percentage:  3.700000 %.

    Percentage of receipts to be delivered until Purchased Amount is delivered to Purchaser.

    Seller irrevocably designates only one deposit account acceptable to Purchaser to facilitate the collection of the Specified Percentage until such time as Purchaser receives the full Purchased Amount.  In the event of a breach of any of the Transaction Documents the Specified Percentage shall equal 100%

Kapitus-FPA-ACH 2021-09-07

**CONFIDENTIAL**
**Exhibit 14-230**

Page   1

SBFA 00628
**ER827**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

8. Fixed ACH Terms: <u>Specified Amount and Frequency: $520.00 Weekly</u>.

Seller authorizes Purchaser to ACH Debit the Specified Amount from the designated deposit account as the base payment credited against the Specified Percentage due. The <u>Specified Amount is an estimate of the Specified Percentage</u>. Seller understands that it is responsible for ensuring that funds adequate to cover the amount to be debited by Purchaser remain in the account.

**Reconciliation:** The Specified Amount shall be reconciled to reflect the Seller's actual Receipts at Seller's request. Seller may initiate a reconciliation by calling 1-800-780-7133 and requesting to speak with a Kapitus Servicing, Inc. ("Servicer") customer service representative. The Seller agrees to provide any information needed to complete such reconciliation, including providing online access to Seller's banking transaction data through a secure, read-only link. It is the Seller's responsibility to provide bank transaction data and/or statements for any and all bank accounts held by the Seller to reconcile the ACH debits to the Specified Percentage permitting Servicer to debit or credit the difference to the Seller. <u>Upon verification of the Receipts generated by Seller, Servicer shall adjust the Specified Amount on a going-forward basis to more closely reflect the Seller's actual Receipts. Once the Seller elects to conduct a reconciliation, either Party may thereafter request a reconciliation once every 30 days.</u> After each adjustment, the new dollar amount shall be deemed the Specified Amount until any subsequent adjustment. **SELLER SHALL NOT BE ENTITLED TO ANY RECONCILIATION IF SELLER HAS DEFAULTED UNDER ANY OF THE TRANSACTION DOCUMENTS.**

9. Security Interest: To secure Seller's payment and performance obligations to Purchaser under the Transaction Documents, Seller hereby grants to Purchaser a security interest in the property, rights, accounts, and other interests as set forth in the Security Agreement.

10 General Terms and Conditions: The Purchaser and Seller shall be bound by this Purchase Agreement, the Sale Terms and Conditions governing the purchase of Receipts from Seller, the Security Agreement, the Guaranty, which are incorporated by reference herein, dated December 19, 2022 and the Agreement to Arbitrate, dated December 19, 2022 (collectively, the "Transaction Documents")

Each signatory represents and warrants that: (1) he or she is authorized to enter into this sale, legally binding the Seller to deliver the Receipts as agreed, and (2) all information provided herein, in the application, in any documents submitted, and in any interviews conducted during the underwriting of the sale, including without limitation any financial information, are true, accurate and complete in all respects. Seller and Guarantor(s) expressly acknowledge and agree that Purchaser and Servicer are relying on such representations and warranties when determining to purchase the Receipts and that the accuracy thereof is a material condition of the Transaction Documents. **If any information provided is false or misleading, Seller shall be held liable for fraud in the inducement and fraud and Guarantor(s) shall be personally liable for the Seller's obligations.**

**CONFIDENTIAL**
**Exhibit 14-231**

SBFA 00629
**ER828**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

**IT IS UNDERSTOOD THAT ANY REPRESENTATIONS OR ALLEGED PROMISES BY INDEPENDENT BROKERS OR AGENTS ARE NULL AND VOID IF NOT INCLUDED IN THE TRANSACTION DOCUMENTS. ANY MODIFICATION OR OTHER ALTERATION TO THE TRANSACTION DOCUMENTS MUST BE IN WRITING AND DULY EXECUTED BY THE PARTIES.**

**CONSENT TO RECEIVE AUTODIALED AND PRERECORDED CALLS AND MESSAGES**

Purchaser, Kapitus Servicing, Inc. and their subsidiaries and affiliates (collectively, "KAPITUS") may from time to time notify applicant(s) of various promotional offers and other marketing information, or contact Seller and Guarantor(s) in connection with the servicing of the Transaction Documents, or in connection with any default under the Transaction Documents. By signing this Purchase Agreement, Seller and Guarantor(s) expressly consent and authorize KAPITUS to call, send text messages, and/or send other electronic messages (including prerecorded or artificial voice messages) using an automatic telephone dialing system to any telephone number provided by Seller or Guarantor(s) in the Transaction Documents, any and all applications or any administrative form or other means, including cellular phone numbers and landlines, regardless of their inclusion on any do not call list, for purposes of servicing, collections, marketing or promoting any product offered by KAPITUS. Seller and Guarantor(s) further expressly consent and authorize KAPITUS to record all calls with KAPITUS. Please note that you are not required to consent to be called for marketing or promotional purposes in order to obtain any products or services from KAPITUS. If you do not agree to be called for marketing or promotional purposes, please call (844) 547-9396 or email DNC@kapitus.com

**SELLER**

By _____           _____
             (Print Name and Title)                              (Signature)

**PURCHASER**

By  Steve Podhorzer _____           _____
         (Company Officer or Designee)                       (Signature)

**GUARANTOR**

By _____           _____
                  (Print Name)                                   (Signature)

**GUARANTOR**

By _____           _____
                  (Print Name)                                   (Signature)

**GUARANTOR**

By _____           _____
                  (Print Name)                                   (Signature)

Kapitus-FPA-ACH 2021-09-07

CONFIDENTIAL

Page   3

SBFA 00630

Exhibit 14-232

ER829

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426



## AUTHORIZED SUB-SERVICING AGENT

Purchaser, as Agent, may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents. Kapitus Servicing, Inc. is the Authorized Sub-Servicing Agent and the General Agent of the Purchaser. Servicer will initiate all debits and credits to Seller's account, provide customer service and administrative support to Purchaser and Seller, initiate any necessary collection actions in the event of any default under the Transaction Documents, initiate and defend legal actions related to the Transaction Documents, and provide legal support services to Purchaser..

### SERVICER FEES

| | | |
|---|---|---|
| 11. | Banking Fees | $50.00 for outgoing wire transfers or payments by check. |
| 12. | Changing Bank Accounts | $75.00 |
| 13. | UCC Terminations | $250.00 |
| 14. | Default Fee | $2500.00 |
| 15. | Returned Payment Fee | $15.00 |

*OTHER THAN THE CLOSING FEE, IF ANY, AND THE SERVICER FEES SET FORTH ABOVE, NEITHER PURCHASER NOR KAPITUS SERVICING IS CHARGING ANY FEES TO SELLER. IF SELLER IS CHARGED ANY ADDITIONAL FEE IN CONNECTION WITH THE SALE, IT IS NOT AUTHORIZED OR CHARGED BY KAPITUS AND SELLER SHOULD INFORM KAPITUS IF ANY UNAUTHORIZED FEE HAS BEEN CHARGED IN CONNECTION WITH THE TRANSACTION DOCUMENTS.*

*YOUR APPLICATION TO SELL RECEIPTS IS AN APPLICATION FOR BUSINESS CREDIT, AND IF IT IS DENIED, YOU HAVE THE RIGHT TO A WRITTEN STATEMENT OF THE SPECIFIC REASONS FOR THE DENIAL. TO OBTAIN THE STATEMENT, PLEASE CONTACT KAPITUS LLC AT THE ABOVE ADDRESS OR PHONE NUMBER WITHIN 60 DAYS FROM THE DATE YOU ARE NOTIFIED OF THE DECISION. YOU HAVE THE RIGHT TO OBTAIN A WRITTEN STATEMENT OF REASONS FOR THE DENIAL WITHIN 30 DAYS OF RECEIVING YOUR REQUEST FOR THE STATEMENT.*

*NOTICE: THE FEDERAL EQUAL CREDIT OPPORTUNITY ACT prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is the Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington, DC 20580, ftc.gov*

CONFIDENTIAL
**Exhibit 14-233**

Page 4

SBFA 00631

**ER830**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

## SALE TERMS AND CONDITIONS

### I.  GENERAL TERMS

**1.1 Sale of Receipts.**  Seller and Purchaser intend that the transfer of the interest in the Receipts from Seller to Purchaser constitutes a forward sale, and not a loan, for all legal, practical and business purposes.  Seller agrees that the Purchase Price equals the fair market value of the Receipts being purchased as of the date sold that are expected to come into existence in the future in the ordinary course of the operation of Seller's business.  Title to, responsibility for and risk of loss of the interest in the Receipts shall pass from the Seller to the Purchaser upon execution of this Agreement with respect to the Purchased Amount. In addition:

(a)  as further set forth in the Security Agreement, Seller hereby grants to Purchaser a security interest in all right, title and interest of Seller in and to the Receipts, which security interest shall secure the payment of the Purchase Price and all other obligations of Seller under this Agreement.  Seller hereby authorizes Purchaser to file any financing statements deemed necessary by Purchaser to perfect or maintain Purchaser's interest in the Receipts;

(b)  the parties acknowledge that the delivery of the Purchase Price is not a payment in whole or in part for the use or forbearance of money, but rather delivery of the bargained for payment of the purchase price to Purchaser under the Purchase Agreement, notwithstanding anything to the contrary contained herein;

(c)  the Parties agree and acknowledge that there is no stated or unstated interest factor in this Agreement, and no interest will be paid;

(d)  in the event that a court ignores the intent of the parties that the Transaction Documents be treated as a forward purchase of Receipts, and further determines that the arrangement creates a loan or other indebtedness rather than a completed forward sale of Receipts, and further determines that under that court-determined arrangement that the PURCHASER has charged or received

"interest," and further determines that the amount of interest is in excess of the highest applicable rate, the imputed rate so determined shall automatically be reduced to the maximum rate permitted by applicable law and Purchaser shall promptly refund to Seller as liquidated damages any amount received by Purchaser in excess of such maximum lawful rate, it being intended that Seller not pay or contract to pay, and that Seller not receive or contract to receive, directly or indirectly in any manner whatsoever, interest on indebtedness in excess of that which may be paid by Seller under applicable law.

**1.2 Term of Agreement.**  The Purchase Agreement shall have an indefinite term.  The Purcha e Agreement shall commence with Purchaser's delivery of the funds constituting the Purchase Price and shall run until such time as Purchaser receives sufficient receipts to equal the value of the Purchased Amount and thus fulfill the delivery of the future receivable purchased and all of Seller's other obligations to Purchaser are fully satisfied. The Purchase Agreement and the provisions of this Section 1.2 are applicable to any renewals and additional agreements executed by the parties that constitute Forward Purchase Agreements and/or purchase of future receivables.

**1.3 Authorization to Debit.**  Seller shall establish an account with a financial institution acceptable to Purchaser that will be designated to collect the Receipts generated by Seller   Seller hereby authorizes Purchaser and/or its agents to obtain any amounts due pursuant to the Transaction Documents by ACH debit of the account designated, or of any other Seller account, as provided pursuant to the Transaction Documents.  This authorization shall be irrevocable without the written consent of Purchaser. Seller shall provide Purchaser and/or its agents with all of the information and authorizations necessary for verifying Sellers's receivables, Receipts and deposits.

**1.3 Financial Condition.**  Seller and Guarantor(s) authorize Purchaser to

investigate their financial responsibility and history, and will provide to Purchaser any bank or financial statements, tax returns, or any other documentation, as Purchaser deems necessary prior to or at any time after execution of the Transaction Documents.  A photocopy of this authorization will be deemed as acceptable for release of any necessary information. Seller and Guarantor(s) authorize and consent to Purchaser updating their credit and financial profile from time to time in the future, as Purchase deems appropriate, including by obtaining investigative, consumer, and personal or business credit reports.  This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.4.  Financial Information and Credit Reporting.** Seller and Guarantor authorize Purchaser to obtain business and personal credit bureau and consumer reports at any time and from time to time for purposes of deciding whether to purchase Receipts from Seller, for any requested loan or for any update, renewal, extension of credit or other lawful purpose. Upon Seller's or Guarantor's request, Purchaser will advise Seller or Guarantor if Purcha er obtained a credit report and Purchaser will give Seller or Guarantor the credit bureau's name and address. Seller and Guarantor agree to submit current financial information, update any credit application, or both, at any time promptly upon Purchaser's request. Purchaser may report Purchaser's experiences with Seller and Guarantor to third parties as permitted by law.  Seller and Guarantor also agree that Purchaser may release information to comply with governmental reporting or legal process that Purchaser believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss, and/or seeking recovery for such loss.  This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.5 Transactional History.**  Seller and Guarantor authorize Purchaser to act as Seller's and Guarantor's agent,

CONFIDENTIAL
**Exhibit 14-234**

SBFA 00632
**ER831**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

respectively, for purposes of accessing and retrieving transaction history information regarding Seller and/or Guarantor from Seller's and Guarantor's financial institutions, banks, banking accounts, and/or credit card processing accounts. Seller and Guarantor authorize their respective financial institutions to provide Purchaser with Seller's and Guarantor's transaction history, and any and all information regarding Seller's and Guarantor's accounts, balances, or transfers, for any purpose, including for purposes of collection. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.6 Indemnification.** Seller and Guarantor jointly and severally will indemnify and hold Purchaser, and its officers, directors, shareholders, members, managers, employees, owners, partners, affiliates, subsidiaries, parent company, successors, transferees, assigns, purchasers, investors, financiers, agents, representatives, attorneys and professionals, (collectively, the "Purchaser Parties") harmless from all losses, costs, damage, liabilities or expenses (including, without limitation, court costs and attorneys' fees) that the Purchaser Parties may sustain or incur by reason of defending claims asserted by Seller and/or Guarantor, and all per on and entities claiming by, through or under them, to the fullest extent permitted by law, in protecting the security interest conveyed pursuant to the Security Agreement or the priority thereof, in enforcing any other term of the Transaction Documents, and/or in the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with the Tran action Documents and/or any other documents now or hereafter executed in connection with the Transaction Documents, the Collateral and/or the Additional Collateral, including without limitation any legal or dispute resolution proceeding, bankruptcy proceeding, receivership, and/or any other insolvency proceeding or other proceeding for relief for debtors or creditors.

In no event will Purchaser, its officers, directors, shareholders, members, managers, employees, affiliates, agents or representatives be liable for any claims asserted by Seller under any legal theory for lost profits, lost revenues, lost business

opportunities, exemplary, punitive, special, incidental, indirect or con equential damage , each of which i waived by Seller and Guarantor(s). This section shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.7 Power of Attorney.** Seller irrevocably appoints Purchaser as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Purchaser, or in the case of the occurrence of any Event of Default, from Seller, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Purchaser; and (v) to file any claims or take any action or institute any proceeding which Purchaser may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.8 Disclosure of Information.** Seller and Guarantor and each person signing this Agreement on behalf of Seller and/or as a Guarantor, in respect of himself or herself per onally, authorize Purcha er to disclose information concerning Seller's and each Guarantor's credit standing (including credit bureau reports that Purchaser obtains) and business conduct. Seller and each Guarantor hereby waives to the maximum extent permitted by law any claim for damages against Purchaser Parties relating to any (i) investigation undertaken by or on behalf of Purchaser as permitted by the Transaction Documents or (ii) disclosure of information as permitted by the Transaction Documents. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.9 Publicity.** Seller and Guarantor(s) authorize Purcha er to u e it , hi or her name in a listing of clients and in advertising and marketing materials. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.10 UCC Agent & D/B/A's.** Seller and Guarantor(s) hereby acknowledge and agree that Purchaser may be using affiliates, representatives, agents, "doing business as" or "d/b/a" and/or fictitious names in connection with various matters relating to the transaction between Purchaser and Seller and Guarantor(s), and may file UCC-1 financing statements and other notices or filings using such names on its own behalf or though Purchaser's UCC agent. Purchaser shall have no obligation to terminate any UCC financing statement filed in connection with the Purchase Agreement absent a written request by Purchaser and after delivery of the Receipts purchased and the fulfillment of all of Seller's obligations to Purchaser under the Transaction Documents, and payment of the UCC Termination fee stated in the Purchase Agreement. Notwithstanding any terms to the contrary contained herein, and except as may be required under applicable law, Purchaser shall have no obligation to terminate any UCC financing statement while there is a pending: (i) petition for bankruptcy protection under Title 11 of the United States Code or any state-law analogue filed by or against Purchaser, Seller, or Guarantor(s); (ii) insolvency proceeding or other proceeding instituted against Purchaser, Seller or Guarantor(s), and/or any other guarantor for relief for debtors or creditors; (iii) receivership proceeding brought by or against Purchaser, Seller, Guarantor, and/or any other guarantor; and/or (iv) any other legal proceeding or alternative dispute resolution proceeding between any of the Seller and/or Guarantor, on the one hand, and the Purchaser Parties, on the other hand. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.11. Alternative Delivery of Receipts.** If Seller or Guarantor knows that for any reason Purchaser will be unable to receive delivery of the Receipts from Seller's account, then Seller must promptly set up

Kapitus-FPA-T&C 2021-09-07

CONFIDENTIAL
**Exhibit 14-235**

Page   2
SBFA 00633
**ER832**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

another arrangement for delivery of receipts that is authorized by Purchaser. Seller and Guarantor under tand and agree that delivery of Receipts made at any other address or method than as specified by Purchaser may result in a delay in processing and/or crediting the delivery of Receipts by Seller.

**1.12 Early Delivery Option.** Seller shall have the option to deliver the Purchased Amount at any time, along with any fees incurred under the Transaction Documents, less Receipts previously delivered. Purchaser may, from time to time, and in the Purchaser's sole discretion, offer discounts for early delivery of Receipts communicated to Seller through one or more customer web interfaces, emails or addenda to the Purchase Agreement. Such discounts will be based on the time elapsed since disbursement of the Purchase Price, the history of the delivery of Receipts, and the remaining amount of Receipts due to be delivered.

**II.        REPRESENTATIONS, WARRANTIES AND COVENANTS** Seller and Guarantor represents, warrants and covenants that as of this date and during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** The information and financial statements which have been furnished to Purchaser by Seller and Guarantor, and such future statements which will be furnished hereafter at the request of Purchaser, fairly represent the ownership and operations of the Seller's business and the financial condition of Seller and Guarantor at such dates, and ince tho e date , there ha been no material adverse change, financial or otherwise, in such condition, operation or ownership of Seller or Guarantor (as applicable). Seller and Guarantor are current on any and all lease, rent or mortgage payments due. Seller and Guarantor are currently in compliance with all loans, financing agreements, promissory notes, and/or other obligations of indebtedness, except as disclosed to Purchaser. No material changes, financial or otherwise, in the condition, operation or ownership of Seller and Guarantor (as applicable) are in any way expected or anticipated and Seller and Guarantor do not anticipate closing or selling Seller's

business. Neither the Seller nor the Guarantor are party to any pending litigation that i expected to have a material impact on the Seller or Guarantor.  Seller has a continuing, affirmative obligation to advise Purchaser of any material change in its financial condition, operation or ownership. Purchaser may request statements at any time during the performance of this Agreement and the Seller shall provide them to Purchaser within five (5) business days.  Seller's failure to do so is a material breach of this Agreement.

**2.2 Compliance with Law.** Seller is in compliance and shall comply with all laws, including possession of all necessary permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.3 Authorization.** Seller, and the person(s) signing the Transaction Documents on behalf of Seller, have full power and authority to incur and perform the obligations under the Transaction Documents, all of which have been duly authorized.

**2.4 Insurance.** Seller will maintain property, liability, and business interruption in urance and name Purchaser as certificate holder, loss payee and additional insured in amounts and against risks as are satisfactory to Purchaser and shall provide Purchaser proof of such insurance upon request.

**2.5 Tax Obligations.** Seller is currently in compliance with all federal state and local tax law , ha filed all return , and ha paid all taxes due, except as disclosed to Purchaser.  No federal, state, or local taxing authority has filed any lien against the assets of the Seller and/or Guarantor. Seller or Guarantor shall pay all taxes owed to federal, state, or local governments when due.

**2.6 Deposit Arrangements and Delivery of Receipts.** Without Purchaser's prior written con ent, Seller will not (i) change the account designated for the delivery of Receipts; (ii) set up multiple accounts into which any of the Seller's receipts are deposited or otherwise transferred; (iii) block or stop payment on Purchaser debit;

(iv) permit any event to occur that could cause diversion of any of Seller's receipts; (v) or take any other action that could have any adverse effect upon Seller's obligations under the Transaction Documents.  Seller will batch out receipts with all payment processors on a daily basis.

**2.7 Change of Name or Location.** Seller will not conduct Seller's business(es) under any name other than as disclosed to the Purchaser or change any of its places of business, or change its jurisdiction or incorporation or organization without ten (10) days prior written notice to Purchaser.

**2.8 Estoppel Certificate.** Seller will at any time, and from time to time, upon at least one (1) day's prior notice from Purchaser to Seller, execute, acknowledge and deliver to Purchaser and/or to any other person, firm or corporation specified by Purchaser, a statement certifying that the Purchase Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy or Insolvency.** Seller is solvent, no transfer of property is being made by Seller, and no obligation i being incurred by Seller in connection with the sale of Receipts with the intent to hinder, delay, or defraud either present or future creditors of Seller.  Seller represents that it is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code or any state-law analogue, and there ha been no involuntary petition under such laws brought or pending against Seller.  Seller further warrants that it does not anticipate filing any such receivership or bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Other Financing.** Seller shall not enter into any arrangement, agreement or commitment for any additional financing, whether in the form of a purchase and sale of receivables, the sale of accounts receivable, or a loan (whether secured or unsecured) with any party other than Purchaser without Purchaser's written consent.

Kapitus-FPA-T&C 2021-09-07

**CONFIDENTIAL**
**Exhibit 14-236**

Page   3
SBFA 00634
**ER833**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

**2.11 Unencumbered Receipts.** Seller has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Purchaser.

**2.12 Authorization to Obtain Lease Information.** Seller and Guarantor authorize Purchaser to receive pertinent information regarding the commercial lease or mortgage for the physical location of Seller's business (the "Premises") from any applicable lender, leasing company or agent. Upon any Event of Default under this Agreement, as security for the Seller's obligations set forth herein, Seller and/or Guarantor shall, at the request of Purchaser deliver to Purchaser an executed Assignment of Lease covering the Premises in favor of Purchaser.

**2.13. Business Purpose.** Seller is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Seller is entering into this Agreement for business purposes and not a a con umer for per onal, family or household purposes.

**2.14 Default Under Other Contracts.** Seller's execution of and/or performance under this Agreement will not cause or create an event of default by Seller under any contract with another person or entity.

**2.15. Sale or Dissolution of Seller.** Seller shall not: (a) sell, dispose, transfer or otherwise convey its business, assets and/or any equity interest in Seller; or (b) effectuate the suspension, dissolution, or termination or Seller's business without the express prior written consent of Purchaser, or the written agreement of any purchaser, assignee, or transferee assuming all of Seller's and Guarantor's obligations under the Transaction Documents pursuant to documentation satisfactory to Purchaser (as applicable).

**2.16 Accuracy of Information.** All information provided by Seller and Guarantor to Purchaser in the Transaction Documents, in any application, in all other Seller forms and in response to any request by Purchaser for information whether oral or in writing, is true, accurate and complete in all respects.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a) Seller changes its deposit or banking relationships with any financial institution in any way that interferes with the delivery of the Receipts, including, by way of example and not limitation, using multiple depository accounts to collect Receipts without the prior written consent of Purchaser;

(b) Seller closes or changes the account(s) designated to collect the Receipts without notice to Purchaser, or otherwise permits any event to occur that could cause diversion of any Receipts to an account other than that designated to collect the Receipts;

(c) Seller interrupts the operation of its business in the ordinary course (other than as a result of adverse weather, natural disasters or acts of God) without notice to Purchaser of any planned shutdown or interruption of operations,

(d) Seller transfers, moves, sells, disposes, transfers or otherwise conveys its business, or all or substantially all of its assets, without: (i) the express prior written consent of Purchaser, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Seller's obligations under the Transaction Documents pursuant to documentation satisfactory to Purchaser;

(e) any debit is rejected or returned due to insufficient funds and Seller fails to respond to Purchase inquiries or to contact Purchaser within five (5) business days;

(f) Seller shall violate any term, covenant, or condition in the Transaction Documents;

(g) any representation or warranty by Seller in the Transaction Documents shall prove to have been incorrect, false or misleading in any material respect when made;

(h) Seller or Guarantor sends a notice of termination of any Purchase Agreement;

(i) Seller suspends, dissolves or terminates its corporate existence without notice to Purchaser;

(j) Seller or Guarantor makes or sends notice of any intended assignment, bulk sale or transfer of Seller's assets;

(k) Seller or Guarantor performs any act that reduces the value of any Collateral or Additional Collateral or reduces the value of the Collateral or Additional Collateral granted under the Security Agreement;

(l) Seller or Guarantor fails to pay taxes to any federal, state, or local government when due; or

(m) Seller shall default under any of the terms, covenants and conditions of any other agreement with Purchaser, including those between Purchaser and any business that is affiliated or associated with Seller.

**3.2 Remedies for Default.** In case any Event of Default occurs and is not waived by Purchaser: Purchaser may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provi ion contained herein, or to enforce the discharge of Seller's obligations under the Transaction Document or any other legal or equitable right or remedy. In addition, and without limitation, upon any Event of Default: (a) the full uncollected Purchased Amount and any unpaid fees due shall become due and payable in full immediately; (b) Purchaser may enforce the provisions of the Transaction Documents against the Seller and Guarantor(s); (c) Purchaser may enforce its security interest in the Collateral, Additional Collateral and the Cross Collateral; (d) Purchaser may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

generated check drawn on Seller's bank account or otherwise; (e) Purchaser may direct any payment or credit card proce or to deposit any amounts due to Seller directly to Purchaser; (f) Purchaser may exercise its rights under the Assignment of Lease set forth in Section 2.12; (g) Purchaser may exercise the Power of Attorney set forth in Section 1.7.

All rights, powers and remedies of Purchaser in connection with this Agreement may be exercised at any time by Purchaser after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity. Seller and Guarantor acknowledge and agree that there may be no adequate remedy at law with respect to a breach of the Transaction Documents. Accordingly, Seller and Guarantor agree that Purchaser shall have the right, in addition to any other rights and remedies existing in Purchaser's favor at law or in equity, to enforce Purchaser's rights and obligations under the Transaction Documents not only by an action or actions for damages, but also for an action or actions for specific performance, injunctive and/or other equitable relief without posting of a bond or other security. To the extent authorized by applicable law, Seller and Guarantor hereby agree to toll or waive any relevant statute of limitations in respect of any claims arising under, and/or relating to the Transaction Documents. This section shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**3.3 Costs.** Seller shall pay to Purchaser all rea onable co t a ociated with (a) a breach by Seller of the Transaction Documents and the enforcement thereof, and (b) the enforcement of Purchaser's remedies set forth herein, including but not limited to (i) expenses, court costs and attorneys' fees of twenty-five percent (25%) of the total amount due to Purchaser or the actual attorney fees incurred, whichever is greater, and (ii) default interest on the total amount due to Purchaser accruing from the date of default at the rate of ten percent (10%) per annum or such other amount as allowed by law.

**3.4 Required Notifications.** Seller is required to give Purchaser fourteen (14)

days' prior written notice of: (a) any change in control of the Seller or the sale, transfer or assignment of all or substantially all of the Seller's assets or equity interests; and (b) the suspension, dissolution or termination of its business.

**3.5. Servicer and Default Fees.** Seller shall pay certain fees for services related to origination and servicing of the Transaction Documents as detailed in the Purchase Agreement. Upon the occurrence of any Event of Default, Seller and Guarantor shall be liable for a default fee in the amount stated in the Purchase Agreement, payable on demand in addition to any other fees or charges due under the Transaction Documents.

## IV. MISCELLANEOUS

**4.1 Modifications; Amendment.** No modification, amendment, waiver or consent of any provision of the Transaction Documents shall be effective unless the same shall be in writing and signed by Purchaser. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.2 Purchaser acting as Agent.** Purchaser has entered into the Transaction Document a agent (in uch capacity, "Agent") for itself and one or more third parties as "co-investors" or "co-purchasers" (each a "Principal"). Agent and each Principal have elected to treat the transaction consummated under the Transaction Documents (the "Transaction") as a single transaction on behalf of separate Principals, and Agent hereby certifie that the portion of the Transaction allocable to the account of each of the Principals (the "Portion") for which it is acting (to the extent that any such Transaction is allocable to the account of more than one Principal) is set forth in one or more addenda to the Transaction Documents, which may be provided to Seller upon request.

All references to "Purchaser" "Seller" or "Guarantor," as the case may be, in the Transaction Documents shall be subject to the provisions of this section and shall be construed to reflect that (i) each Principal shall have, in connection with the Transaction entered into by the Agent on

its behalf, all of the rights, responsibilities, privileges and obligations of a "Purchaser" directly entering into uch Tran action with the other parties under each of the Transaction Documents and (ii) Agent's Principals have designated Agent (acting directly or through the Authorized Subservicing Agent) as their sole agents for performance of Purchaser's obligations to Seller and for receipt of performance by Seller of its obligations to Purchaser in connection with the Transaction (including, among other things, as Agent for each Principal in connection with transfers of cash or other property and as agent for giving and receiving all notices under the Transaction Documents). Both Agent and its Principals shall be deemed "parties" to the Transaction Documents and all references to a "party" or "either party" in any Transaction Document shall be deemed revised accordingly.

The parties hereto acknowledge and agree that any assignment, pledge and/or grant to Purchaser by the Seller or a Performance Guarantor of a security interest in and to any property and assets (including the Collateral and the Additional Collateral) pursuant to any of the applicable Transaction Documents to secure the payment and/or performance of any of their respective and/or joint obligations, shall be deemed to have been made to the Purchaser for and on behalf of itself and any other Principal. Purchaser hereby agrees to hold all Collateral and Additional Collateral hereafter delivered to it pursuant to the Transaction Documents, for itself and for the benefit of the Principals, on and subject to the terms and conditions set forth in the Transaction Documents. In its capacity, the Agent and Sub-Servicing Agent are each a "representative" of each of the Principals within the meaning of the term "secured party" as defined in the UCC. In addition to the representations and warranties set forth in the Transaction Documents, Agent hereby makes the following representations and warranties, which shall continue during the term of any Transaction: Principal has duly authorized Agent to execute and deliver the Transaction Documents on its behalf, has the power to so authorize Agent and to enter into the Transaction contemplated by the Transaction Documents and to perform the obligations of Purchaser, and has taken all necessary action to authorize such execution and

CONFIDENTIAL
**Exhibit 14-238**

SBFA 00636

**ER835**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

delivery by Agent and such performance by it. This provision shall survive, in its entirety, the delivery of the Receipt purchased and the termination of the Purchase Agreement.

**4.3 Sub-Servicing Agent.** Purchaser may contract with one or more general agents to service the Transaction Documents (the "Sub-Servicing Agent") that will provide customer service, treasury, administrative, bookkeeping, reporting, collections, and support services, but not limited to, background checks, credit checks, general underwriting review, filing UCC-1 security interests and any other UCC documentation, for the Purchaser. Seller and Guarantor(s) acknowledge and agree that Purchaser has granted Sub-Servicing Agent all rights and authority as its general agent to take any and all actions to enforce the Purchase Agreement, through legal actions in the name of the Purchaser or otherwise, and to assert and/or defend against any and all claims arising from or relating to the Purchase Agreement. Any and all authorizations and rights granted to Purchaser under the Transaction Documents are hereby granted to Sub-Servicing Agent, as servicer and general agent of Purchaser. In no event will the Sub-Servicing Agent be liable for any claims made against the Purchaser or under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, actual, special, incidental, indirect or consequential damages, each of which is waived by the Seller and Guarantor(s). This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.4 Notices.** All notices, requests, consent, demands and other communications under the Transaction Documents and any addendum shall be delivered by ordinary mail to the respective parties at the addresses set forth in the Purchase Agreement and shall become effective upon delivery. The Parties hereto may also send such notices, requests, consent, demands and other communications via facsimile or electronic mail at such numbers and email addresses communicated by the parties hereto in writing or as reflected in the records of the Sub-Servicing Agent. This provision shall survive, in its entirety, the delivery of the

Receipts purchased and the termination of the Purchase Agreement.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** Seller and Guarantor agree that any suit, action or proceeding to enforce or arising out of or relating to this Agreement shall be brought in any court in the Commonwealth of Virginia or in the United States District Court for the Eastern District of Virginia (the "Acceptable Forums"), and Seller and Guarantor waive personal service of process. Seller and Guarantor agree that the Acceptable Forums are convenient to them, submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. In the event a legal proceeding concerning this Agreement is initiated in any other forum, Seller and Guarantor waive any right to oppose any motion or application made by Purchaser to transfer such proceeding to an Acceptable Forum, or to dismiss the action on the grounds of *forum non conveniens*.

This Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with Virginia law (to the extent not preempted by federal law) without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for under this Agreement will be governed by the laws of the Commonwealth of Virginia. Seller and Guarantor understand and agree that (i) Purchaser and/or Kapitus Servicing are located in Virginia, (ii) all final credit decisions are made from Virginia, (iii) the Agreement is made in Virginia (that is, no binding contract will be formed until Seller's signed Agreement is received and accepted in Virginia) and (iv) Seller's delivery of Receipts are not accepted until received in Virginia. This section shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.6. Counterparts; Facsimile and PDF Acceptance.** Each of the Transaction Documents may be executed in one or

more counterparts, each of which counterparts shall be deemed to be an original of each such Transaction Document, and all such counterparts for the respective Transaction Document shall constitute one and the same such Transaction Document. For purposes of the execution of each of the Transaction Documents, electronically transmitted PDFs, facsimile copies of signatures, or electronically transmitted copies of signatures complying with the US Federal ESIGN Act of 2000 (e.g. www.docusign.com) shall be treated as original signatures for all purposes. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.7 Waiver of Remedies.** No failure on the part of Purchaser to exercise, and no delay in exercising, any right under the Transaction Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right under the Transaction Documents preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.8 Solicitations.** Seller and Guarantor authorize the Purchaser Parties to communicate with, solicit and/or market to Seller and Guarantor via regular mail, telephone, electronic mail and facsimile in connection with the provision of goods or services by the Purchaser Parties, their affiliates or any third party that the Purcha er Partie  hare, tran fer, exchange, disclose or provide information with and will hold the Purchaser Parties harmless against any and all claims pursuant to the federal CAN-SPAM ACT of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003), the Telephone Consumer Protection Act (TCPA), and any and all other state or federal laws relating to transmissions or solicitations by and any of the methods described above. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

CONFIDENTIAL
Exhibit 14-239

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

**4.9 Survival of Representation, etc.** Except as otherwise provided herein, all repre entation , warrantie and covenant herein, including those in the Security Agreement and the Guaranty shall survive the execution and delivery of the Purchase Agreement and shall continue in full force until all obligations under the Purchase Agreement shall have been satisfied in full and the Purchase Agreement shall have terminated. Notwithstanding any terms to the contrary contained herein: (i) the Security Agreement and the Guaranty shall survive, in their entirety, the delivery of the Purchased Amount and the termination of the Purchase Agreement; and (ii) in the event that Purchaser must return any amount paid by Seller, Guarantor, any other guarantor, entity or person with respect to the obligations arising under the Transaction Documents, including without limitation, arising from or relating to, Seller, Guarantor, any other guarantor, entity or person becoming subject to a proceeding under the United States Bankruptcy Code or any similar law (whether arising under Federal or State law), and/or any other legal proceeding or alternative dispute resolution proceeding, all representations, warranties and covenants and other obligations under the Transaction Documents and any addendum thereof (if any) shall remain in full force and effect and Seller and Guarantor shall be obligated for any such amounts repaid, as well attorneys' fees, costs and interest in connection with such proceeding. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.10 Severability, Savings.** In case any of the provi ion in the Tran action Documents are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained therein shall not in any way be affected or impaired and the Transaction Documents shall be construed as if such provision had not been included. If any provisions of these Sale Terms and Conditions are in conflict with any other agreement to which any parties are subject, the provisions of the Purchase Agreement shall control. Should any provision of the Transaction Documents require judicial interpretation, the court interpreting or construing the provision shall not apply the rule of construction that a document is to be

construed more strictly against one Party. This provision shall survive, in its entirety, the delivery of the Receipt purchased and the termination of the Purchase Agreement.

**4.11 Entire Agreement.** The Transaction Documents embody the entire agreement between Seller, Guarantor(s), and Purchaser and supersede all prior agreements and understandings relating to the subject matter hereof. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.12 JURY TRIAL WAIVER.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTION DOCUMENTS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS. THIS PROVISION SHALL SURVIVE, IN ITS ENTIRETY, THE DELIVERY OF THE RECEIPTS PURCHASED AND THE TERMINATION OF THE PURCHASE AGREEMENT.

**4.13 CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION. TO THE EXTENT A PARTY IS PERMITTED TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION, THE PARTIES AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR

REPRESENTATIVE ACTION AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION. THIS PROVISION IS A MATERIAL INDUCEMENT FOR PURCHASER TO ENTER INTO THIS AGREEMENT. THIS PROVISION SHALL SURVIVE, IN ITS ENTIRETY, THE DELIVERY OF THE RECEIPTS PURCHASED AND THE TERMINATION OF THE PURCHASE AGREEMENT.

**4.14 Successors; Assigns; Amendment.** Purchaser and any Principal may assign, transfer or sell its right to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part. Purchaser reserves the rights to sell or assign this Agreement with or without prior written notice to Seller. Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Purchaser which consent may be withheld in Purchaser's sole discretion. The Transaction Documents shall be binding upon and inure to the benefit of the heirs, executors, trustees, administrators, legal representatives, ucce or , tran feree and a ign of the Parties. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.15 ARBITRATION.** *PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY. A SEPARATE AGREEMENT BETWEEN THE PARTIES PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT.*

**Signatures on Next Page**

Kapitus-FPA-T&C 2021-09-07

CONFIDENTIAL
**Exhibit 14-240**

Page 7
SBFA 00638
**ER837**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

SELLER AND GUARANTOR ACKNOWLEDGE AND AGREE TO BE BOUND BY THE SALE TERMS AND CONDITIONS.  THE TERMS, DEFINITIONS, CONDITIONS, AND INFORMATION SET FORTH IN THE "PURCHASE AGREEMENT", "SECURITY AGREEMENT", AND THE "GUARANTY" (AS APPLICABLE) ARE HEREBY SUBJECT TO AND MADE A PART OF THE SALE TERMS AND CONDITIONS.  CAPITALIZED TERMS NOT DEFINED IN THE SALE TERMS AND CONDITIONS, SHALL HAVE THE MEANING SET FORTH IN THE "PURCHASE AGREEMENT," "SECURITY AGREEMENT" OR "GUARANTY," AS APPLICABLE.

**SELLER**

By _____          _____
        (Print Name and Title)                              (Signature)

**GUARANTOR**

By _____          _____
                (Print Name)                                    (Signature)

**GUARANTOR**

By  N/A _____          _____
                (Print Name)                                    (Signature)

**GUARANTOR**

By  N/A _____          _____
                (Print Name)                                    (Signature)

### USE OF PROCEEDS CERTIFICATION

*This Use of Proceeds Certification is part of (and incorporated by reference into) the Purchase Agreement.*

Each signatory below, on behalf of each Seller or Guarantor, hereby certifies the following to the Purchaser:

1.  The entirety of the Purchase Price will be used in the ordinary course of business.
2.  The entirety of the Purchase Price will be used exclusively for a Business Purpose and no other.  A Business Purpose as applied to use of proceed  obtained under thi  Purcha e Agreement refer   olely to the purcha e and acqui ition of  pecific product  or  ervice u ed for the following purposes only: (i) working capital, (ii) business insurance (but not self-insurance programs), (iii) franchise fees, (iv) employee training, (v) the purchase of equipment, (vi) inventory, (vii) business supplies and raw materials, and (viii) the construction, renovation or improvement of facilities (but not the purchase of real estate).  Business Purpose does not include: (a) payment for, or purchase of, any items, goods, materials real property, personal property or services for personal, individual or household use; or (b) use of funds for any proceeding under the United States Bankruptcy Code or any similar law (whether arising under Federal or State law) and/or any other legal proceeding or alternative dispute resolution proceeding.

**SELLER**

By _____          _____
        (Print Name and Title)                              (Signature)

**GUARANTOR**

By _____          _____
                (Print Name)                                    (Signature)

**GUARANTOR**

By  N/A _____          _____
                (Print Name)                                    (Signature)

**GUARANTOR**

By  N/A _____          _____
                (Print Name)                                    (Signature)

Kapitus-FPA-T&C 2021-09-07

Page    8

**CONFIDENTIAL**                    SBFA 00639

**Exhibit 14-241**

**ER838**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

# SECURITY AGREEMENT

**SECURITY INTEREST**.  To secure Seller's delivery of the Receipts purchased and other obligations to Purchaser under the Transaction Documents, Seller hereby grants to Purchaser a security interest in: (i) all accounts, accounts receivable, contracts, real property leases, notes, bills, acceptances, chooses in action, chattel paper, instruments, documents and other forms of obligations at any time owing to the Seller arising out of goods sold or leased or for services rendered by Seller, the proceeds thereof and all of Seller's rights with respect to any goods represented thereby, whether or not delivered, goods returned by customers and all rights as an unpaid vendor or lienor, including rights of stoppage in transit and of recovering possession by proceedings including replevin and reclamation, together with all customer lists, books and records, ledger and account cards, computer tapes, software, disks, printouts and records, whether now in existence or hereafter created, relating thereto (collectively referred to hereinafter as "Receivables"); (ii) all inventory, including without limitation, all goods manufactured or acquired for sale or lease, and any piece goods, raw materials, work in process and finished merchandise, findings or component materials, and all supplies, goods, incidentals, office supplies, packaging materials and any and all items used or consumed in the operation of the business of Seller or which may contribute to the finished product or to the sale, promotion and shipment thereof, in which Seller now or at any time hereafter may have an interest, whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of Seller or is held by Seller or by others for Seller's account (collectively referred to hereinafter as "Inventory"); (iii) goods, including without limitation, all machinery, equipment, parts, supplies, apparatus, appliances, tools, fittings, furniture, furnishings, fixtures and articles of <u>tangible personal property of every description now or hereafter owned by the Seller</u> or in which Seller may have or may hereafter acquire any interest, at any location (collectively referred to hereinafter as "Equipment"); (iv) general intangibles in which the Seller now has or hereafter acquires any rights, including but not limited to, causes of action, corporate or business records, inventions, designs, patents, patent applications, trademarks, trademark registrations and applications therefor, goodwill, trade names, trade secrets, trade processes, copyrights, copyright registrations and applications therefor, licenses, permits, franchises, customer lists, computer programs, all claims under guaranties, tax refund claims, rights and claims against carriers and shippers, leases, claims under insurance policies, all rights to indemnification and all other intangible personal property and intellectual property of every kind and nature (collectively referred to hereinafter as "Intangibles"); (v) all the capital stock, bonds, notes, partnership interests, member interests in limited liability companies, and other securities, if any, held of record or beneficially by the Seller, including without limitation the capital stock of all subsidiaries of the Seller, and the Seller's interests in all securities brokerage accounts (collectively referred to hereinafter as "Investments"); (vi) all cash on hand and on deposit in banks, trust companies and similar institutions, and all property accounted for in the Seller's financial statements as "cash equivalents" (collectively referred to hereinafter as "Cash"); (vii) all other assets, proceeds and items not directly referred to herein as those terms are defined in Article 9 of the Uniform Commercial Code under applicable federal and state law (collectively referred to hereinafter as "UCC Article 9 Items"); (viii) all accessions to, substitutions for, and all replacements, products and proceeds of the Receivables, Inventory, Equipment, Intangibles, Investments, Cash and UCC Article 9 Items (collectively referred to hereinafter as "Collateral"), including without limitation proceeds of insurance policies insuring the Collateral; and (ix) books and records relating to any of the Collateral (including without limitation, customer data, credit files, computer programs, printouts, and other computer materials and records of the Seller pertaining to any of the Collateral), <u>whether now or hereafter owned or acquired by Seller and wherever located; and all proceeds of the foregoing.</u> If the Transaction Documents or any addenda identify more than one Seller, this Security Agreement applies to each Seller, jointly and severally.

Seller and Guarantor acknowledge and agree that any security interest granted to Purchaser under any other agreement between Seller and Purchaser will secure the obligations hereunder, and that the Seller's obligations secured by this Security Agreement, and the Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting Purchaser's interest in the Collateral.

CONFIDENTIAL
**Exhibit 14-242**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

Seller and Guarantor further acknowledge and agree that if, in the future, Seller enters into any agreement with Purchaser, any security interest granted to Purchaser under such future agreements will relate back to this Security Agreement, and that the Seller and/or Guarantor's obligations, and the Collateral granted, under such future agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting Purchaser's interest in the Collateral.

CROSS-COLLATERAL.  To secure Seller's delivery of the Receipts purchased and other obligations to Purchaser under the Purchase Agreement, Seller and each Guarantor hereby grants Purchaser a security interest in all assets and equity interests in the following collateral: **: N/A** (the "Additional Collateral"). Seller and each Guarantor understands that Purchaser will have a security interest in the aforesaid Additional Collateral upon execution of this Security Agreement.

Each of Seller and each Guarantor acknowledges and agrees that any security interest granted to Purchaser under any other agreement between Seller and/or Guarantor and Purchaser will secure the obligations hereunder, and that the Seller and/or Guarantor's payment and performance obligations under the Purchase Agreement, and secured by this Security Agreement, and the Collateral and Additional Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting Purchaser's interest in the Collateral and Additional Collateral.

Each of Seller and each Guarantor further acknowledges and agrees that, if Seller and/or Guarantor enter into future agreements with Purchaser, any security interest granted to Purchaser under such future agreements will relate back to this Security Agreement, and that the Seller and/or Guarantor's obligations, and the Collateral and Additional Collateral granted, under any such future agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting Purchaser's interest in the Collateral and Additional Collateral.

Each of Seller and each Guarantor agree to execute any documents or take any action in connection with this Security Agreement as Purchaser deems necessary to carry out the purpose of such agreements including, without limitation, to perfect or maintain Purchaser's security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements.  Each of Seller and each Guarantor hereby authorizes Purchaser to file any financing statements deemed necessary by Purchaser to perfect or maintain Purchaser's security interest, which financing statement may contain notification that Seller and Guarantor have granted a negative pledge to Purchaser with respect to the Collateral and the Additional Collateral, and that any subsequent Purchaser or lienor may be tortiously interfering with Purchaser's rights.  Each Seller and each Guarantor shall be jointly and severally liable for and shall pay to Purchaser upon demand all costs and expenses, including but not limited to attorney's fees and costs, which may be incurred by Purchaser in protecting, preserving and enforcing Purchaser's security interest and rights.

NEGATIVE PLEDGE.  Seller and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional financings, loans, lien or other encumbrance of any kind with respect to any of the Collateral or the Additional Collateral, as applicable, without the prior written permission of Purchaser.

 CERTIFICATED COLLATERAL.  If any of the Collateral and/or Additional Collateral is now or in the future evidenced or represented by a certificate or certificates, each Seller and each Guarantor shall immediately, and without the need to be notified, deliver such certificate(s) to Purchaser, duly endorsed in a manner satisfactory to Purchaser, to be held as Collateral and/or Additional Collateral pursuant to this Security Agreement.

CONSENT TO ENTER PREMISES AND ASSIGN LEASE.  Purchaser shall have the right to cure Seller's default in the payment of rent for the Premises on the following terms: In the event Seller or Guarantor are served with papers in an action against Seller for nonpayment of rent or for summary eviction, Seller or Guarantor shall promptly provide

Page    2

CONFIDENTIAL
**Exhibit 14-243**

SBFA 00641
**ER840**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

Purchaser with such papers and Purchaser may execute its rights and remedies under the Assignment of Lease pursuant to Section 2.12 of the Sale Terms and Conditions. Seller also agrees that Purchaser may enter into an agreement with Seller's landlord giving Purchaser the right to: (a) enter Seller's Premises and to take possession of the fixtures, equipment and other Collateral therein for the purpose of protecting and preserving same; and (b) to assign Seller's lease to another qualified Seller capable of operating a business comparable to Seller's at such Premises.

REMEDIES. Upon any Event of Default, Purchaser may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "PURCHASE AGREEMENT", "SALE TERMS AND CONDITIONS", AND THE "GUARANTY" (AS APPLICABLE) ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT, SHALL HAVE THE MEANING SET FORTH IN THE "PURCHASE AGREEMENT," "SALE TERMS AND CONDITIONS" OR "GUARANTY," AS APPLICABLE.

**SELLER**

By ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(Print Name and Title)                    (Signature)

**GUARANTOR**

By ▮▮▮▮▮▮▮▮▮▮

(Print Name)                              (Signature)

**GUARANTOR**

By  N/A

(Print Name)                              (Signature)

**GUARANTOR**

By  N/A

(Print Name)                              (Signature)

Kapitus-FPA-Security Agreement 2021-09-07

CONFIDENTIAL

Page   3

SBFA 00642

Exhibit 14-244

ER841

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

Contract# 9019141

# GUARANTY

**PERSONAL GUARANTY OF PERFORMANCE**.  Each undersigned Guarantor hereby unconditionally guarantees to Purchaser the Merchant's performance of all of the representations, warranties, covenants made by Seller in the Purchase Agreement, the Sale Terms and Conditions, the Security Agreement, Guaranty, and Agreement to Arbitrate (collectively, the "Transaction Documents"), as each may be renewed, amended, extended or otherwise modified from time to time (the "Guaranteed Obligations").  Guarantor shall be liable for and Purchaser may charge and collect all costs and expenses, including but not limited to attorneys' fees and court costs, which may be incurred by Purchaser in connection with the collection of any or all of the Guaranteed Obligations from Guarantor or the enforcement of the Transaction Documents.  (It is understood by all parties that Guarantors are only guaranteeing that they will not take any action or permit the Seller to take any action that is a breach of the Transaction Documents and is not making an absolute guaranty of repayment.)

**GUARANTOR WAIVERS**.  In the event that Seller fails to deliver Receipts generated due to Guarantor's actions or malfeasance, or Guarantor otherwise fails to perform any obligation or covenant under the Transaction Documents, Purchaser may enforce its rights under this Guaranty or any of the other Transaction Documents without first seeking to obtain payment from the Seller, any other guarantor, or through the Security Agreement.

Purchaser does not have to notify Guarantor of any of the following events, and Guarantor will not be released from its obligations under this Guaranty, if it is not notified of: (i) Merchant's failure to deliver timely the Receipts due or to pay any amount owed under the Purchase Agreement; (ii) any material or adverse change in Merchant's financial condition or business operations; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations, including all collateral listed in the Security Agreement, or any other guarantee of the Guaranteed Obligations; (iv) Purchaser's acceptance of this Guaranty; (v) any renewal, extension or other modification of any of the Transaction Documents and/or Merchant's other obligations to Purchaser; and (vi) the Purchaser's pursuit and/or enforcement of any rights and remedies, available at law and in equity, relating to, and/or arising from, the Transaction Documents.

In addition, Purchaser may take any of the following actions without releasing Guarantor from any of its obligations under this Guaranty: (i) renew, extend or otherwise modify any of the Transaction Documents  or Merchant's other obligations to Purchaser; (ii) release Seller from its obligations to Purchaser; (iii) sell, release, impair, waive or otherwise fail to realize upon, any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Guaranty; and (v) pursuit and/or enforcement of any rights and remedies, available at law and in equity, relating to, and/or arising from, the Transaction Documents.  Until all of Merchant's obligations to Purchaser under any of the Transaction Documents are satisfied in full, Guarantor shall not seek reimbursement from Seller or any other guarantor for any amounts paid by Guarantor under any of the Transaction Documents.

Guarantor permanently waives and shall not seek to exercise the following rights that Guarantor may have against Merchant, any other guarantor or third party, any collateral, or any other real or personal property for any amounts paid by Guarantor, any other guarantor, or third party, or acts performed by Guarantor, any other guarantor, or third party, under the Transaction Documents including, without limitation: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.  In the event that Purchaser must return any amount paid by Merchant, any guarantor, entity, or person with respect to the Guaranteed Obligations, including, without limitation, any Merchant, guarantor, entity or person becoming subject to a proceeding under the United States Bankruptcy Code

Page   1

CONFIDENTIAL
**Exhibit 14-245**

SBFA 00643
**ER842**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

**Contract# 9019141**

or any similar law, (whether arising under Federal or State law), and/or any other Insolvency Proceeding, legal proceeding or alternative dispute resolution proceeding,  the Guaranteed Obligations under this Guaranty shall remain in full force and effect and Guarantor shall be obligated for any such amounts repaid as well as attorneys' fees, costs, and interest in connection with such proceeding.

**GUARANTOR ACKNOWLEDGEMENT**.  Guarantor acknowledges that: (i) he/she understands the seriousness of the provisions of this Guaranty; (ii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iii) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

**JOINT AND SEVERAL LIABILITY**.  The obligations hereunder of the persons or entities constituting Guarantor under this Guaranty are joint and several.

## CONSENT TO RECEIVE AUTODIALED AND PRERECORDED CALLS AND MESSAGES

PURCHASER, Kapitus Servicing and their subsidiaries and affiliates (collectively, "KAPITUS") may from time to time notify applicant(s) of various promotional offers and other marketing information, or contact Merchant(s) and Guarantor(s) in connection with the servicing of the Transaction Documents, or in connection with any default under the Transaction Documents.  By signing this Guaranty, Guarantor(s) expressly consent and authorize  KAPITUS to call, send text messages, and/or send other electronic messages (including prerecorded or artificial voice messages) using an automatic telephone dialing system to any telephone number provided by Merchant(s) or Guarantor(s)  in the Transaction Documents, any and all applications or any administrative form or other means, including cellular phone numbers and landlines, regardless of their inclusion on any do not call list, for purposes of servicing, collections, marketing or promoting any product offered by KAPITUS.  Guarantor(s) further expressly consent and authorize KAPITUS to record all calls with KAPITUS.  Please note that you are not required to consent to be called for marketing or promotional purposes in order to qualify for financing or obtain any other products or services from KAPITUS.  If you do not agree to be called for marketing or promotional purposes, please call (844) 547-9396 or email DNC@kapitus.com.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "PURCHASE AGREEMENT", "SALE TERMS AND CONDITIONS", AND THE "SECURITY AGREEMENT" (AS APPLICABLE) ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTY SHALL HAVE THE MEANING SET FORTH "PURCHASE AGREEMENT", "SALE TERMS AND CONDITIONS", AND THE "SECURITY AGREEMENT," AS APPLICABLE.

**GUARANTOR**
By _____
       (Print Name)                  (Signature)

**GUARANTOR**
By  N/A
       (Print Name)                  (Signature)

**GUARANTOR**
By  N/A
       (Print Name)                  (Signature)

Kapitus-FPA-Guaranty 2021-09-07

CONFIDENTIAL

Page   2

SBFA 00644

Exhibit 14-246

ER843

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

## AGREEMENT TO ARBITRATE

**PLEASE READ THIS AGREEMENT CAREFULLY. THIS AGREEMENT TO ARBITRATE ("AGREEMENT") PROVIDES THAT DISPUTES BETWEEN STRATEGIC FUNDING SOURCE, INC. D/B/A KAPITUS AND ITS SUBSIDIARIES AND AFFILIATES, INCLUDING BUT NOT LIMITED TO KAPITUS LLC AND KAPITUS SERVICING, INC. (COLLECTIVELY, "KAPITUS"), ON ONE HAND, AND** ███████████████████████████████████████████████████**, (COLLECTIVELY, "YOU" OR "MERCHANT") (EACH A "PARTY" AND TOGETHER WITH KAPITUS, "THE PARTIES") MAY BE RESOLVED BY BINDING ARBITRATION.**

**ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT. THIS AGREEMENT IS GOVERNED BY THE FEDERAL ARBITRATION ACT ("FAA"), AND SHALL BE INTERPRETED IN THE BROADEST WAY THAT LAW WILL ALLOW.**

**I.    Covered Claims.**

**a.**    You or Kapitus may arbitrate any claim, dispute or controversy between the Parties arising out of and/or related to: (i) this Agreement; (ii) any other agreement between the Parties; and/or (iii) the relationship between the Parties, whether or not related to a contract between them ("Claims").

**b.**    **If arbitration is chosen by any Party in accordance with Section III below, no Party will have the right to litigate the Claims in court or to have a jury trial on the Claims.**

**c.**    Except as stated below, all Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, Merchant's or Kapitus's negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims. This also includes Claims made by or against anyone connected with Kapitus or Merchant or claiming through Kapitus or Merchant, or by someone making a claim through Kapitus or Merchant, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company. Threshold issues of whether any claim is arbitrable also are subject to arbitration in accordance with this Agreement.

**II.    Arbitration Limits.**

**a.**    Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis. The arbitrator has no authority to arbitrate any claim on a class or representative basis and may award relief only on an individual basis. If arbitration is chosen by any Party, neither Merchant nor Kapitus may pursue a Claim as part of a class action or other representative action.

**b.**    Claims of two or more persons may not be combined in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates or entities under common ownership or control of a Party are deemed one person for purposes of this Agreement.

CONFIDENTIAL
**Exhibit 14-247**
SBFA 00645
**ER844**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

### III.    How Arbitration Works.

**a.**    Arbitration shall be conducted by the American Arbitration Association ("AAA") according to this arbitration provision and the applicable AAA Commercial Arbitration Rules in effect when the claim is filed ("AAA Rules"), except where those rules conflict with this arbitration provision.  Merchant can obtain copies of the AAA Rules at the AAA's website (www.adr.org).  Merchant or Kapitus may choose to have a hearing, appear at any hearing by phone or other electronic means, and/or be represented by counsel.  Notwithstanding any terms to the contrary, any in-person hearing will be held in Arlington, Virginia.  The arbitration shall be conducted and the award shall be rendered in English.

**b.**    Arbitration may be requested any time, even where there is a pending lawsuit, unless discovery has fully and finally concluded, and/or a final judgment entered. Neither Merchant nor Kapitus waives the right to arbitrate by filing or serving a complaint, answer, counterclaim, or motion in a lawsuit.  To choose arbitration, a Party must file a motion to compel arbitration in a pending matter or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.

**c.**    The arbitration shall be conducted by a single arbitrator agreed to by the Parties within twenty (20) days of receipt by respondent of the request for arbitration (unless an extended time period is agreed to by the Parties). In the event the Parties are unable to agree upon the selection of the arbitrator, the arbitrator shall be selected in accordance with this arbitration provision and the AAA Rules for appointing an arbitrator from the AAA National Roster.  The selected arbitrator may limit discovery.  The arbitrator shall not apply any federal or state rules of civil procedure for discovery, but the arbitrator shall honor claims of privilege recognized at law and shall take reasonable steps to protect account information and other confidential information of any Party if requested to do so.  Except as may be required by law, neither a Party nor the arbitrator may disclose the existence, content or results of any arbitration without the prior written consent of both parties, unless to protect or pursue a legal right. The arbitrator shall apply the substantive laws of the jurisdiction specified in any contract between the parties.  If no jurisdiction is specified or if multiple jurisdictions are specified in various contracts among the Parties, the substantive laws of the Commonwealth of Virginia shall apply, without regard to any applicable principals of conflicts of law.

**d.**    The arbitrator shall make any award in writing and, if requested by Merchant or Kapitus, shall include a reasoned opinion for the award.  An arbitration award shall decide the rights and obligations only of the parties named in the arbitration, and shall not have any bearing on any other person or dispute.

**e.**    The arbitrator shall have no authority to award punitive damages, consequential damages, or other damages not measured by the prevailing Party's actual damages, except as required by statute or allowed under any agreement between the Parties.

### IV.    Paying for Arbitration Fees.

**a.**    Arbitration fees will be allocated according to the applicable AAA Rules.  All parties are responsible for their own attorney's fees, expert fees and any other expenses unless the arbitrator awards such fees or expenses to Kapitus based on a contract between the parties or applicable law.

**b.**    The Parties agree that failure or refusal of a Party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that Party to present evidence or cross-examine witnesses.  In such event, the other Party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award.  Such waiver shall not allow for a default judgment against the non-paying Party in the absence of evidence presented as provided for above.

**CONFIDENTIAL**                                              SBFA 00646

**Exhibit 14-248**                                              **ER845**

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

## V.    The Final Award.

**a.**    Any award rendered by the arbitrator shall be final, and binding on the Parties, and may be entered and enforced in any court having jurisdiction, and any court where a Party or its assets is located (to which jurisdiction the Parties consent for the purposes of enforcing such award) unless a Party appeals such award in writing to the AAA within 30 days of notice of the award pursuant to the AAA's Optional Appellate Arbitration Rules.  The arbitration appeal shall be determined by a panel of 3 arbitrators.  The panel will consider all facts and legal issues anew based on the same evidence presented in the prior arbitration and will make decisions based on a majority vote.  Arbitration fees for the arbitration appeal shall be allocated according to the applicable AAA Rules.  An award by a panel on appeal is final.  A final award is subject to judicial review as provided by applicable law.

## VI.    Miscellaneous.

**a.**    <u>Survival.</u>  This Agreement shall survive: (i) termination of the account or the relationship between Merchant and Kapitus; (ii) <u>repayment of any amounts owed by Merchant to Kapitus</u>; (iii) the termination of any other agreement between Merchant and Kapitus; (iv) the  filing of any petition or institution of any proceeding by or against any Party  under any provisions of the Bankruptcy Reform Act, Title 11 of the United States Code, or any other similar law relating to bankruptcy, insolvency or other relief for debtors, or general affecting creditor's rights or seeking the appointment of a receiver, trustee, custodian, administrator or liquidator of or for any Party's assets; (v) <u>any sale, transfer and/or assignment of</u>  <u>Merchant's account with Kapitus, or amounts owed on Merchant's account, to another person or entity</u>; (vi)  the closure, suspension, dissolution or termination of Merchant's business; and (vi) the sale, transfer, and/or assignment of Merchant's business, any interest therein that constitutes a change of control in such business, and/or substantially all of Merchant's assets.

**b.**    <u>Severability.</u>  If any part of this Agreement is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration and/or litigation of a class or representative Claim.

**c.**    <u>Entire Agreement, Amendment, Successors, and Assigns.</u>  This Agreement contains the entire understanding among the Parties concerning the subject matter hereof.  No representation, promise, statement of intention has been made by any Party concerning the subject matter hereof that is not embodied in this Agreement, and no Party shall be bound by, or liable for, any such alleged representation, promise or statement of intention not set forth herein.  This Agreement may not be amended, modified, severed or waived, except through a written agreement between Merchant and Kapitus.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, executors, trustees, administrators, representatives, receivers, liquidators, successors, transferees, and assigns of the Parties.  This Agreement shall not be assignable or otherwise transferrable by Merchant without Kapitus's prior written consent to be exercised solely in Kapitus's discretion.  Kapitus may assign or otherwise transfer this Agreement.

**d.**    <u>Counterparts; Electronic Signatures</u>.  This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument.  Electronically transmitted PDFs, facsimile copies of signatures, or electronically transmitted copies of signatures complying with the US Federal ESIGN Act of 2000 (e.g. www.docusign.com) shall be treated as original signatures for all purposes.

**e.**    <u>Authorization.</u>  Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

CONFIDENTIAL
**Exhibit 14-249**

SBFA 00647

**ER846**

(38 of 295), Page 38 of 295 , Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 38 of 295
Case 2:22-cv-08775-RGK-SK Document 52-16 Filed 09/27/23 Page 22 of 62 Page ID
#:1052

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426

**f.**     **Waiver.** No failure on the part of Kapitus to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**g.**     **Further Assurances.** Each Party agrees to take all reasonable steps necessary to effectuate the terms of this Agreement. The Parties agree that they will take all actions, execute, and deliver any and all documents reasonably necessary to carry out the intent and purpose of this Agreement, including, without limitation any documents and fees necessary for the commencement and conduct of arbitration as set forth herein.

**h.**     **No Interpretation of Captions or Headings.** The captions and headings within this Agreement are for ease of reference only and are not intended to create any substantive meaning or to modify the terms and clauses either following them or contained in any other provision of this Agreement

**i.**     **Notices.** All notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to Kapitus at 2500 Wilson Boulevard, Suite, 350, Arlington, VA 22201, and to Merchant and/or Guarantor at the address(es) provided by Merchant or Guarantor to Kapitus and as reflected in Kapitus's system of record, and shall become effective only upon receipt. In addition, all notices, requests, consent, demands and other communications must be emailed to generalcounsel@kapitus.com and ▮▮▮▮▮▮▮▮▮▮▮

**MERCHANT**
By  ▮▮▮▮▮▮▮▮
     (Print Name and Title)                     (Signature)

**KAPITUS**
By  Steve Podhorzer
   (Company Officer or Designee)              (Signature)

**GUARANTOR**
By  ▮▮▮▮▮
        (Print Name)                  (Signature)

**GUARANTOR**
By  N/A
        (Print Name)                  (Signature)

**GUARANTOR**
By  N/A
        (Print Name)                  (Signature)

DocuSign Envelope ID: AD99CBD1-E182-4D6E-85CB-A08AC5AA1426



| ITEMIZATION OF AMOUNT FINANCED | | |
|---|---|---|
| 1 | Amount Given Directly to You | $20,010.00 |
| 2 | Amount Paid on Your Account with N/A | N/A |
| 3 | Amount Paid on Your Account with Kapitus (Contract ID #5365611) | $9,240.00 |
| 4 | Wire Fee | N/A |
| 5 | Amount Provided to You or on Your Behalf (1+2+3+4) | $29,250.00 |
| 6 | Prepaid Finance Charge: Origination/Closing Fee | $750.00 |
| 7 | Principal Balance (5+6) | $30,000.00 |

DocuSign Envelope ID: 389400DC-A621-44D7-B9E7-F4F7B0682EEB

# Kapitus LLC

**Serviced through Kapitus Servicing, Inc.**
**2500 Wilson Boulevard Suite 350, Arlington, Virginia 22201**
**Ph. (844) 547-9396**
**Contract ID# 2954931**

## FUTURE RECEIVABLES FACTORING AGREEMENT (ACH)

Agreement dated <u>November 20 2019</u> between **Kapitus LLC ("PURCHASER")** and each of the merchant(s) listed below and on any attached addendum as applicable (the "**Merchant**") (the " Merchant Agreement" or the "Agreement").

### MERCHANT INFORMATION

| | | | |
|---|---|---|---|
| Merchant's Legal Name: ███████ | | | |
| D/B/A: ███████ | | | |
| Type of entity: ███████ | | | |
| Physical Address: ███████ | City: ███ | State: ███ | Zip: ███ |
| Mailing Address: ███████ | City: ███ | State: ███ | Zip: ███ |
| Date business started (mm/yyyy) ███ | Federal ID# ███████ | | |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to PURCHASER in consideration of the funds provided ("<u>Purchase Price</u>") as specified below, all of Merchant's future receipts, accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers and/or other third party payors (collectively the "<u>Receipts</u>" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business), until such time as the "<u>Receipts Purchased Amount</u>" or "<u>Purchased Amount</u>" has been delivered by Merchant to PURCHASER. The Receipts Purchased Amount shall be paid to PURCHASER by the Merchant irrevocably authorizing <u>only one</u> depositing account acceptable to PURCHASER (the "<u>Account</u>") to remit the percentage specified below (the "<u>Specified Percentage</u>") of the Merchant's Receipts, until such time as PURCHASER receives payment in full of the Receipts Purchased Amount. In consideration of servicing the account, the Merchant hereby authorizes PURCHASER to ACH Debit the "Specified Amount" from the merchant's bank account as the base payment credited against the Specified Percentage due. The Specified Amount is intended to represent the Specified Percentage of Receipts. For as long as no Event of Default has occurred, once each calendar month, Merchant may request that PURCHASER adjust the Specified Amount to more closely reflect the Merchant's actual Receipts. Merchant agrees to provide PURCHASER any information requested to assist in this reconciliation. Upon verification of such information, PURCHASER shall adjust the Specified Amount on a going-forward basis to more closely reflect the Merchant's actual Receipts. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Specified Amount until any subsequent adjustment. **It is the Merchant's responsibility to provide bank statements for any and all bank accounts held by the Merchant to reconcile the payments made against the Specified Percentage permitting PURCHASER to debit or credit the difference to the merchant so that payment equals the Specified Percentage.** Merchant understands that it is responsible for ensuring that funds adequate to cover the amount to be debited by PURCHASER remain in the account. Merchant will be held responsible for any fees incurred by PURCHASER resulting from a rejected ACH attempt or an event of default PURCHASER is not responsible for any overdrafts or rejected transactions in the Merchants account which may result from the scheduled ACH debits under the terms of this agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between PURCHASER and Merchant, upon the violation of any provision contained in Section 1.9 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all applicable fees is set forth in Appendix A.

Purchase Price: $10,000.00    Specified Percentage: 1%    Specific Weekly Amount: $193.00    Receipts Purchased Amount: $12,500.00

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE SECURITY AGREEMENT AND GUARANTEE ARE HEREBY INCORPORATED IN FULL AND MADE A PART OF THIS AGREEMENT.

**MERCHANT**

By ███████ _____
    **(Print Name and Title)**                                              **(Signature)**

**Kapitus LLC**

By    Steve Podhorzer _____
    **(Company Officer)**                                              **(Signature)**

To the extent set forth herein, each of the parties is obligated upon his, her or its' execution of the Agreement to comply with all terms of this Agreement. Each of above-signed Merchant and Owner(s) represents and warrants that: (1) he or she is authorized to sign this Agreement for Merchant, legally binding the Merchant to deliver the receivables as agreed, and (2) the information provided herein, and in the applications provided, documents submitted, financial information provided, and in any interviews during underwriting is true, accurate and complete in all respects. If any information provided to PURCHASER is determined to be false or misleading, Merchant shall be deemed in material breach of all agreements between Merchant and PURCHASER and Owner(s) shall

Kapitus-FRF-ACH 2018-12-12

DocuSign Envelope ID: 389400DC-A621-44D7-B9E7-F4F7B0682EEB

be personally liable for the Merchant's obligations under the Personal Guaranty of Performance. Merchant and each of the above-signed Owners authorizes PURCHASER, its agents and representatives and any credit reporting agency engaged by PURCHASER, to (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Owners for the purpose of this Agreement, and (ii) obtain a credit report at any time now or for so long as Merchant and/or Owners(s) continue to have any obligation owed to PURCHASER.

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH ANY APPLICATION FOR FUNDING, IN ANY DOCUMENT SUBMITTED AND/OR THIS AGREEMENT WILL RESULT IN A SEPARATE CAUSE OF ACTION, INCLUDING BUT NOT LIMITED TO A CLAIM AGAINST THE OWNER/GUARANTOR FOR FRAUD OR FRAUDULENT INDUCEMENT**



**AUTHORIZED SUB-SERVICING AGENT – Kapitus Servicing, Inc.**

**PURCHASER, as Agent, may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents. Kapitus Servicing, Inc. ("Kapitus Servicing") is the Authorized Sub-Servicing Agent of the PURCHASER for this contract providing administrative, bookkeeping, reporting and support services for the PURCHASER and the Merchant. Kapitus Servicing is acting as agent for services including but not limited to background checks, credit checks, general underwriting review, filing UCC-1 security interests, cash management, account reporting, servicing, collections and remit capture. Merchant and Owner/Guarantor acknowledge and agree that PURCHASER has granted Kapitus Servicing all rights and authority as its general agent to take any and all actions to enforce the terms of this Agreement, through legal actions in the name of PURCHASER, or otherwise. Any and all authorizations and/or rights granted to PURCHASER under this Agreement are hereby granted to Kapitus Servicing, as servicer and general agent for PURCHASER. Kapitus Servicing is not a credit card processor, or in the business of processing credit cards. Merchant hereby acknowledges that in no event will Kapitus Servicing be liable for any claims made against the PURCHASER or the Processor under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, actual, special, incidental, indirect or consequential damages, each of which is waived by the Merchant and Owner/Guarantor.**

MERCHANT INITIALS: _ ████ ___

Kapitus-FRF-ACH 2018-12-12

Page 2 of 6

CONFIDENTIAL

SBFA 00716

Exhibit 14-253

ER850

DocuSign Envelope ID: 389400DC-A621-44D7-B9E7-F4F7B0682EEB

## MERCHANT AGREEMENT TERMS AND CONDITIONS

### I. GENERAL TERMS

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to PURCHASER, with a Bank acceptable to PURCHASER, to set up the Account and obtain electronic fund transfer services. Merchant shall provide PURCHASER and/or its authorized agent with all of the information, authorizations necessary for verifying Merchant's receivables, receipts and deposits into the Account. Merchant shall authorize PURCHASER to deduct the amounts owed to PURCHASER for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant by permitting PURCHASER to withdraw the specific amount credited against the specified percentages by ACH debit of the Account. The authorization shall be irrevocable without the written consent of PURCHASER.

**1.2 Term of Agreement.** This Agreement shall have an indefinite term that shall last either until all the Merchant's obligations to PURCHASER are fully satisfied. This shall include but not be limited to any renewals, outstanding fees or costs.

**1.3 Financial Condition.** Merchant and Guarantor(s) authorize PURCHASER to investigate their financial responsibility and history, and will provide to PURCHASER any bank or financial statements, tax returns, or any other documentation, as PURCHASER deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of any necessary information. PURCHASER is authorized to update such information and financial profiles from time to time as it deems appropriate.

**1.4 Transactional History.** Merchant authorizes their banks or financial institions to provide PURCHASER with Merchant's banking and/or processing history to determine qualification or continuation in this program.

**1.5 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless PURCHASER, its officers, directors, shareholders, members, managers, employees, affiliates, agents and representatives against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred as a result of claims asserted against PURCHASER by Merchant to the fullest extent permitted by law.

**1.6 No Liability.** In no event will PURCHASER its officers, directors, shareholders, members, managers, employees, affiliates, agents or representatives be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

**1.7 Sale of Receipts.** Merchant and PURCHASER agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from PURCHASER to Merchant. Merchant agrees that the Purchase Price is in exchange for the sale of future Receipts pursuant to this Agreement equals the fair market value of such

Receipts. PURCHASER has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to PURCHASER in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts be deemed as interest hereunder and charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that PURCHASER has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and PURCHASER shall promptly refund to Merchant any interest received by PURCHASER in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that PURCHASER not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.

**1.8 Power of Attorney** Merchant irrevocably appoints PURCHASER as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to PURCHASER from Processor/Bank, or in the case of the occurrence of any of (a) - (d) in Section 1.9 or the occurrence of an Event of Default under Section 3 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to PURCHASER; and (v) to file any claims or take any action or institute any proceeding which PURCHASER may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount.

**1.9 Protections Against Default.** The following Protections 1 through 6 may be invoked by PURCHASER, immediately and without notice to Merchant in the event (a) Merchant changes its deposit relationships with any financial institution in any way that interferes with PURCHASER's collection of the Receipts due; (b) Merchant closes or changes the bank account(s) through which the Receipts are settled, or permits any event to occur that could cause diversion of any of Merchant's transactions to another bank account; (c) Merchant interrupts the operation of its business (other than adverse weather, natural disasters or acts of God) transfers, moves, sells, disposes, transfers or otherwise conveys its business or assets without (i) the express prior written consent of PURCHASER, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to PURCHASER; or (d) any debit of the Specified Amount is rejected or returned due to insufficient funds and Merchant fails to contact PURCHASER within three (3) business days. These protections are in addition to any other

remedies available to PURCHASER at law, in equity or otherwise pursuant to this Agreement.

Protection 1. The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately

Protection 2. PURCHASER may enforce the provisions of the Personal Guaranty of Performance against the Guarantor.

Protection 3. PURCHASER may enforce its security interest in the Collateral identified in Article III hereof.

Protection 4. The entire Purchase Amount shall become immediately refundable to PURCHASER from Merchant.

Protection 5. PURCHASER may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, in which PURCHASER shall recover judgment against Merchant, Merchant shall be liable for all of PURCHASER's costs of lawsuit, including but not limited to attorneys' fees of twenty-five percent (25%) of any balance due, court costs and expenses.

Protection 6. PURCHASER may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise.

**1.10 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner, in respect of himself or herself personally, authorizes PURCHASER to disclose information concerning Merchant's and each Owner's credit standing (including credit bureau reports that PURCHASER obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner hereby waives to the maximum extent permitted by law any claim for damages against PURCHASER or any of its affiliates and the PURCHASER relating to any (i) investigation undertaken by or on behalf of PURCHASER as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.11 Publicity.** Merchant and each Owner only authorizes PURCHASER to use its, his or her name in a listing of clients and in advertising and marketing materials with their express written consent.

**1.12 UCC Agent & D/B/A's.** Merchant hereby acknowledges and agrees that PURCHASER may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between PURCHASER and Merchant, any may file UCC-1 financing statements and other notices or filings using such names on its own behalf or though PURCHASER's UCC agent. PURCHASER shall have no obligation to terminate any UCC financing statement filed in connection with this Agreement absent a written request by PURCHASER and after delivery of the Receipts Purchased Amount.

### II. REPRESENTATIONS, WARRANTIES AND COVENANTS
Merchant represents, warrants and covenants that as of this date and during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** Merchant is solvent, and no transfer of property is

CONFIDENTIAL
**Exhibit 14-254**

SBFA 00717
**ER851**

DocuSign Envelope ID: 389400DC-A621-44D7-B9E7-F4F7B0682EEB

being made by Merchant and no obligation is being incurred by Merchant in connection with this Agreement with the intent to hinder, delay, or defraud either present or future creditors of Merchant. Merchant's bank statements and financial information, provided to PURCHASER fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant is current on any and all lease, rent or mortgage payments due. No material changes, financial or otherwise, in the condition, operation or ownership of Merchant are in any way expected or anticipated. Merchant has a continuing, affirmative obligation to advise PURCHASER of any material change in its financial condition, operation or ownership. PURCHASER may request statements at any time during the performance of this Agreement and the Merchant shall provide them to PURCHASER within 5 business days. Merchant's failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming PURCHASER as loss payee and additional insured in amounts and against risks as are satisfactory to PURCHASER and shall provide PURCHASER proof of such insurance upon request.

**2.5 Tax Obligations.** Merchant is currently in compliance with all federal state and local tax laws, has filed all returns, and has paid all taxes due, except as disclosed to PURCHASER.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the PURCHASER or change any of its places of business without ten (10) days prior written notice to PURCHASER.

**2.7 Daily Batch Out.** Merchant will batch out receipts with all payment processors on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from PURCHASER to Merchant, execute, acknowledge and deliver to PURCHASER and/or to any other person, person firm or corporation specified by PURCHASER, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy or Insolvency.** As of the date of this Agreement, Merchant represents that it is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code or any state-law analogue, and there has been no involuntary petition under such laws brought or pending against Merchant. Merchant

further warrants that it does not anticipate filing any such receivership or bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Additional Financing. Merchant shall not enter into any arrangement, agreement or commitment for any additional financing, whether in the form of a purchase of receivables or a loan to the business with any party other than PURCHASER without PURCHASER's written permission.**

**2.11 Unencumbered Receipts.** Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of PURCHASER.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Default Under Other Contracts.** Merchant's execution of and/or performance under this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

### III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) Merchant shall admit in writing within 120 days of funding its inability to pay its debts, or shall make a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) the sending of notice of termination by Guarantor; (e) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (f) Merchant shall transfer or sell all or substantially all of its assets; (h) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (i) Merchant shall use multiple depository accounts without the prior written consent of PURCHASER; (j) Merchant shall change its bank account without the prior written consent of PURCHASER; (k) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; or (l) Merchant shall default under any of the terms, covenants and conditions of any other agreement with PURCHASER.

**3.2 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4 hereof, PURCHASER on its own and on behalf of the PURCHASER may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Personal Guaranty) or any other legal or equitable right or

remedy. All rights, powers and remedies of PURCHASER in connection with this Agreement may be exercised at any time by PURCHASER after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.3 Costs.** Merchant shall pay to PURCHASER all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (b) the enforcement of PURCHASER's remedies set forth herein, including but not limited to expenses, court costs and attorneys' fees of twenty-five percent (25%) of any balance due.

**3.4 Required Notifications. Merchant is required to give PURCHASER written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give PURCHASER seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or equity interests.**

### IV. MISCELLANEOUS

**4.1 Modifications; Amendment.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by PURCHASER.

**4.2 Assignment.** PURCHASER and any Principal may assign, transfer or sell its right to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part. Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of PURCHASER which consent may be withheld in PURCHASER's sole discretion. PURCHASER reserves the rights to sell or assign this Agreement with or without prior written notice to Merchant.

**4.3 Notices.** All notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to PURCHASER the address set forth in this Agreement and shall become effective only upon receipt.

**4.4 Waiver.** No failure on the part of PURCHASER to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** Merchant and Guarantor agree that any suit, action or proceeding to enforce or arising out of this Agreement shall be brought in any court in the Commonwealth of Virginia or in the United States District Court for the Eastern District of Virginia (the "Acceptable Forums"), and Merchant and Guarantor waive personal service of process. Merchant and Guarantor agree that the Acceptable Forums are convenient to them, submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. In the event a legal proceeding concerning this Agreement is initiated in any other forum, Merchant and Guarantor waive any right to oppose any motion or application made by PURCHASER to transfer such proceeding to an Acceptable Forum, or to dismiss the action on the grounds of forum non conveniens.

CONFIDENTIAL
**Exhibit 14-255**

SBFA 00718
**ER852**

DocuSign Envelope ID: 389400DC-A621-44D7-B9E7-F4F7B0682EEB

This Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with Virginia law (to the extent not preempted by federal law) without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for under this Agreement will be governed by the laws of the Commonwealth of Virginia. Merchant and Guarantor understand and agree that (i) PURCHASER and/or Kapitus Servicing are located in Virginia, (ii) all final credit decisions are made from Virginia, (iii) the Agreement is made in Virginia (that is, no binding contract will be formed until Merchant's signed Agreement is received and accepted in Virginia) and (iv) Merchant's payments are not accepted until received in Virginia.

**4.6  Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.8  Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and Security Agreement and Guaranty hereto embody the entire agreement between Merchant and PURCHASER and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.9  JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.10  CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION. TO THE EXTENT ANY PARTY IS PERMITTED TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION, THE PARTIES HERETO AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION. THIS PROVISION IS A MATERIAL INDUCEMENT FOR PURCHASER TO ENTER INTO THIS AGREEMENT.

**4.11  ARBITRATION.** *PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* THIS SECTION PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT. THIS ARBITRATION PROVISION IS GOVERNED BY THE FEDERAL ARBITRATION ACT ("FAA"), AND SHALL BE INTERPRETED IN THE BROADEST WAY THE LAW WILL ALLOW.

**Covered claims**

a. *Merchant and/or Performance Guarantors, (collectively hereinafter referred to as "Merchant") or PURCHASER may arbitrate* any claim, dispute or controversy between Merchant and PURCHASER arising out of or related to this Agreement, any other agreement, or the Merchant/PURCHASER relationship ( "Claims").

b. **If arbitration is chosen by any party in accordance with paragraph 4.11(h) neither Merchant nor PURCHASER will have the right to litigate that Claim in court or have a jury trial on that Claim.**

c. Except as stated below, all Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, Merchant or PURCHASER's negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims.  This also includes Claims made by or against anyone connected with PURCHASER or Merchant or claiming through PURCHASER or Merchant, or by someone making a claim through PURCHASER or Merchant, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company.

**Arbitration limits**

d. Individual Claims filed in a small claims court are not subject to arbitration, as long as the matter stays in small claims court.

e. PURCHASER will not initiate arbitration to enforce its rights under this Agreement. If Merchant asserts a Claim against PURCHASER, PURCHASER may elect to arbitrate any Claims against PURCHASER.

f. Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis. The arbitrator has no authority to arbitrate any claim on a class or representative basis and may award relief only on an individual basis. If arbitration is chosen by any party, neither Merchant nor PURCHASER may pursue a Claim as part of a class action or other representative action. Claims of 2 or more persons may not be combined in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

**How arbitration works**

g. Arbitration shall be conducted by the American Arbitration Association ("AAA") according to this arbitration provision and the applicable AAA Commercial Arbitration Rules in effect when the claim is filed ("AAA Rules"), except where those rules conflict with this arbitration provision. Merchant can obtain copies of the AAA Rules at the AAA's website (www.adr.org) or by calling 800-778-7879.  Merchant or PURCHASER may choose to have a hearing, appear at any hearing by phone or other electronic means, and/or be represented by counsel.  Notwithstanding any terms to the contrary, any in-person hearing will be held in Arlington, Virginia

h. Arbitration may be requested any time, even where there is a pending lawsuit, unless a trial has begun or a final judgment entered.  Neither Merchant nor PURCHASER waive the right to arbitrate by filing or serving a complaint, answer, counterclaim, or motion in a lawsuit.  To choose arbitration, a party must file a motion to compel arbitration in a pending matter or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.

i. The arbitration shall be conducted by a single arbitrator in accord with this arbitration provision and the AAA Rules, which may limit discovery.  The arbitrator shall not apply any federal or state rules of civil procedure for discovery, but the arbitrator shall honor claims of privilege recognized at law and shall take reasonable steps to protect account information and other confidential information of either party if requested to do so.  The arbitrator shall apply the substantive laws of the Commonwealth of Virginia without regard to any applicable principals of conflicts of law.

j. The arbitrator shall make any award in writing and, if requested by Merchant or PURCHASER, shall include a reasoned opinion for the award.  An arbitration award shall decide the rights and obligations only of the parties named in the arbitration, and shall not have any bearing on any other person or dispute.

k. The arbitrator shall have no authority to award punitive damages, consequential damages, or other damages not measured by the prevailing party's actual damages, except as required by statute.

**Paying for arbitration fees**

l. Arbitration fees will be allocated according to the applicable AAA Rules. All parties are responsible for their own attorney's fees, expert fees and any other expenses unless the arbitrator awards such fees or expenses to PURCHASER based on applicable law.

m. The parties agree that failure or refusal of a party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that party to present evidence or cross-examine witnesses.  In such event, the other party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award.  Such

Kapitus-FRF-ACH 2018-12-12

CONFIDENTIAL
**Exhibit 14-256**

SBFA 00719
**ER853**

DocuSign Envelope ID: 389400DC-A621-44D7-B9E7-F4F7B0682EEB

waiver shall not allow for a default judgment against the non-paying party in the absence of evidence presented as provided for above.

n. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of both parties.

**The final award**

o. Any award by an arbitrator is final unless a party appeals it in writing to the AAA within 30 days of notice of the award pursuant to the AAA's Optional Appellate Arbitration Rules. The arbitration appeal shall be determined by a panel of 3 arbitrators. The panel will consider all facts and legal issues anew based on the same evidence presented in the prior arbitration, and will make decisions based on a majority vote. Arbitration fees for the arbitration appeal shall be allocated according to the applicable AAA Rules. An award by a panel on appeal is final. A final award is subject to judicial review as provided by applicable law.

**Survival and Severability of Terms**

p. This arbitration provision shall survive changes in this Agreement and termination of the account or the relationship between Merchant and PURCHASER, including the bankruptcy of any party and any sale of Merchant account, or amounts owed on Merchant account, to another person or entity. If any part of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration of a class or representative Claim. This arbitration provision may not be amended, severed or waived, except as provided in this Agreement or in a written agreement between Merchant and PURCHASERs.

**RIGHT TO OPT OUT OF ARBITRATION.**

q. MERCHANT AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, MERCHANT AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE MERCHANT AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, MERCHANT AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: Kapitus Servicing, Inc. – ARBITRATION OPT OUT, 2500 Wilson Boulevard, Suite 350, Arlington, VA 22201 ATTENTION: General Counsel.

**4.12 PURCHASER acting as Agent.**
PURCHASER has entered into this Agreement, the Merchant Security Agreement and the Guaranty (collectively, the Transaction Documents") as agent (in such capacity, "Agent") for itself and one or more third parties as "co-investors" or "co-PURCHASERs" (each a "Principal"). Agent and each Principal have elected to treat the transaction consummated under the Transaction Documents (the "Transaction") as a single transaction on behalf of separate Principals, and Agent hereby certifies that the portion of the Transaction allocable to the account of each of the Principals (the "Portion") for which it is acting (to the extent that any such Transaction is allocable to the account of more than one Principal) as set forth in one or more addenda to

the Transactional Documents, which may be provided to Merchant upon request.

All references to "PURCHASER" or "Merchant" or "Performance Guarantors," as the case may be, in the Transaction Documents shall be subject to the provisions of this Section 4.12 and shall be construed to reflect that (i) each Principal shall have, in connection with with the Transaction entered into by the Agent on its behalf, all of the rights, responsibilities, privileges and obligations of a "PURCHASER" directly entering into such Transaction with the other parties under each of the Transaction Agreements and (ii) Agent's Principals have designated Agent (acting directly or through the Authorized Subservicing Agent) as their sole agents for performance of PURCHASER's obligations to Merchant and for receipt of performance by Merchant of its obligations to PURCHASER in connection with the Transaction (including, among other things, as Agent for each Principal in connection with transfers of cash or other property and as agent for giving and receiving all notices under the Transaction Documents), either directly. Both Agent and its Principals shall be deemed "parties" to the Transaction Documents and all references to a "party" or "either party" in any Transaction Document shall be deemed revised accordingly.

The parties hereto acknowledge and agree that any assignment, pledge and/or grant to PURCHASER by the Merchant or a Performance Guarantor of a security interest in and to any property and assets (including the Collateral and the Additional Collateral) pursuant to any of the applicable Transaction Agreements to secure the payment and/or performance of any of their respective and/or joint obligations, shall be deemed to have been made to the PURCHASER for and on behalf of itself and any other Principal. PURCHASER hereby agrees to hold all Collateral and Additional Collateral hereafter delivered to it pursuant to the Transaction Documents, for itself and for the benefit of the Principals, on and subject to the terms and conditions set forth in the Transaction Documents. In its capacity, the Agent and Sub-Servicing Agent are each a "representative" of each of the Principals within the meaning of the term "secured party" as defined in the UCC. In addition to the representations and warranties set forth in the Transaction Documents, Agent hereby makes the following representations and warranties, which shall continue during the term of any Transaction: Principal has duly authorized Agent to execute and deliver the Transaction Documents on its behalf, has the power to so authorize Agent and to enter into the Transaction contemplated by the Transaction Documents and to perform the obligations of Fumder, and has taken all necessary action to authorize such execution and delivery by Agent and such performance by it.

**4.13 Counterparts; Facsimile and PDF Acceptance.**
This Agreement and the Merchant Security Agreement and Guaranty may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument. Signatures on this Agreement and the Merchant Security Agreement and Guaranty sent by facsimile or PDF will be treated as original signatures for all purposes.

INITIALS: __  __

CONFIDENTIAL
Exhibit 14-257

DocuSign Envelope ID: 389400DC-A621-44D7-B9E7-F4F7B0682EEB

## SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name ███████████

D/B/A: ███████

Physical Address: ████████████ City: ████████ State: ███ Zip:███████

Federal ID# ████████

### SECURITY AGREEMENT

**Security Interest.** To secure Merchant's payment and performance obligations to PURCHASER under the Future Receivable Factoring Agreement between Merchant and PURCHASER (the "Merchant Agreement"), Merchant hereby grants to PURCHASER a security interest in all accounts, accounts receivable, contracts, real property leases, notes, bills, acceptances, choses in action, chattel paper, instruments, documents and other forms of obligations at any time owing to the Merchant arising out of goods sold or leased or for services rendered by Merchant, the proceeds thereof and all of Merchant's rights with respect to any goods represented thereby, whether or not delivered, goods returned by customers and all rights as an unpaid vendor or lienor, including rights of stoppage in transit and of recovering possession by proceedings including replevin and reclamation, together with all customer lists, books and records, ledger and account cards, computer tapes, software, disks, printouts and records, whether now in existence or hereafter created, relating thereto (collectively referred to hereinafter as "Receivables"); (ii) all inventory, including without limitation, all goods manufactured or acquired for sale or lease, and any piece goods, raw materials, work in process and finished merchandise, findings or component materials, and all supplies, goods, incidentals, office supplies, packaging materials and any and all items used or consumed in the operation of the business of Merchant or which may contribute to the finished product or to the sale, promotion and shipment thereof, in which Merchant now or at any time hereafter may have an interest, whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of Merchant or is held by Merchant or by others for Merchant's account (collectively referred to hereinafter as "Inventory"); (iii) goods, including without limitation, all machinery, equipment, parts, supplies, apparatus, appliances, tools, fittings, furniture, furnishings, fixtures and articles of tangible personal property of every description now or hereafter owned by the Grantor or in which Grantor may have or may hereafter acquire any interest, at any location (collectively referred to hereinafter as "Equipment"); (iv) general intangibles in which the Merchant now has or hereafter acquires any rights, including but not limited to, causes of action, corporate or business records, inventions, designs, patents, patent applications, trademarks, trademark registrations and applications therefor, goodwill, trade names, trade secrets, trade processes, copyrights, copyright registrations and applications therefor, licenses, permits, franchises, customer lists, computer programs, all claims under guaranties, tax refund claims, rights and claims against carriers and shippers, leases, claims under insurance policies, all rights to indemnification and all other intangible personal property and intellectual property of every kind and nature (collectively referred to hereinafter as "Intangibles"); (v) All the capital stock, bonds, notes, partnership interests, member interests in limited liability companies, and other securities, if any, held of record or beneficially by the Merchant, including without limitation the capital stock of all subsidiaries of the Merchant, and the Merchant's interests in all securities brokerage accounts (collectively referred to hereinafter as "Investments"); (vi) all cash on hand and on deposit in banks, trust companies and similar institutions, and all property accounted for in the Merchant's financial statements as "cash equivalents" (collectively referred to hereinafter as "Cash"); (vii) all other assets, proceeds and items not directly referred to herein as those terms are defined in Article 9 of the Uniform Commercial Code under applicable federal and state law (collectively referred to hereinafter as "UCC Article 9 Items"); (viii) all accessions to, substitutions for, and all replacements, products and proceeds of the Receivables, Inventory, Equipment, Intangibles, Investments, Cash and UCC Article 9 Items (collectively referred to hereinafter as "Collateral"), including without limitation proceeds of insurance policies insuring the Collateral; and (ix) Books and records relating to any of the Collateral (including without limitation, customer data, credit files, computer programs, printouts, and other computer materials and records of the Merchant pertaining to any of the Collateral), whether now or hereafter owned or acquired by Merchant and wherever located; and all proceeds of the foregoing. If the Merchant Agreement identifies more than one Merchant, this Security Agreement applies to each Merchant, jointly and severally.

Merchant acknowledges and agrees that any security interest granted to PURCHASER under any other agreement between Merchant and PURCHASER will secure the obligations hereunder, and that the Merchant's payment and performance obligations secured by this Security Agreement, and the Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting PURCHASER's interest in the Collateral.

Merchant further acknowledges and agrees that, if Merchant enters into future Agreements with PURCHASER, any security interest granted to PURCHASER under such future Agreements will relate back to this Security Agreement, and that the Merchant's payment and performance obligations, and the Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting PURCHASER's interest in the Collateral.

**Cross-Collateral.** To secure the payment and performance obligations to PURCHASER (and the PURCHASERs) under this Merchant Security Agreement and Guaranty (this "Agreement"), Merchant and each Guarantor hereby grants PURCHASER, for itself and its participants, a security interest in the collateral set forth in the Addendum to the Security Agreement and Guarantee (the "Additional Collateral"). Each Guarantor agrees and acknowledges that PURCHASER will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Guarantor acknowledges and agrees that any security interest granted to PURCHASER under any other agreement between Guarantor and PURCHASER will secure the obligations hereunder, and that the Guarantor's payment and performance obligations under this Agreement, and the Additional Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting PURCHASER's interest in the Additional Collateral.

Guarantor further acknowledges and agrees that, if Guarantor enters into future Agreements with PURCHASER, any security interest granted to PURCHASER under such future Agreements will relate back to this Agreement, and that the Guarantor's payment and performance obligations, and the Additional Collateral granted, under such future Agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting PURCHASER's interesting the Additional Collateral.

Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as PURCHASER deems necessary to perfect or maintain PURCHASER's first priority security interest in the Collateral and Additional Collateral, including the execution of any control agreements. Each of Merchant and each Guarantor hereby authorizes PURCHASER to file any financing statements deemed necessary to perfect or maintain PURCHASER's security interest, which financing statements may contain notification that Merchant and each Guarantor have granted a negative pledge to PURCHASER with respect to the Collateral and Additional Collateral, and that any subsequent lender or lienor may be tortiously interfering with PURCHASER's rights. Merchant and each Guarantor shall be jointly and severally liable for and shall pay to PURCHASER upon demand all costs and expenses, including but not limited to attorneys' fees, which may be incurred by PURCHASER in protecting, preserving and enforcing PURCHASER's security interest and rights.

Kapitus-FRF-ACH 2018-12-12

Page 1 of 5

DocuSign Envelope ID: 389400DC-A621-44D7-B9E7-F4F7B0682EEB

**Negative Pledge.** Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional financings, loans, lien or other encumbrance of any kind on or with respect to any of the Collateral or Additional Collateral, as applicable without written permission of PURCHASER.

**Consent to Enter Premises and Assign Lease.** PURCHASER shall have the right to cure Merchant's default in the payment of rent for the Premises on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, PURCHASER may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that PURCHASER may enter into an agreement with Merchant's landlord giving PURCHASER the right: (a) to enter the Premises and to take possession of the fixtures, equipment and other Collateral therein for the purpose of protecting and preserving same; and (b) to assign Merchant's lease to another qualified merchant capable of operating a business comparable to Merchant's at the Premises.

**Remedies.** Upon any Event of Default, PURCHASER may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any obligations then owing to PURCHASER, whether by acceleration or otherwise.

### GUARANTY

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to PURCHASER Merchant's performance of all of the representations, warranties, covenants made by Merchant in this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due (i) at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in this Agreement and the Merchant Agreement, and (ii) if within 120 days Merchant admits its inability to pay its debts, or makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts. (It is understood by all parties that Guarantors are only guaranteeing that they will not take any action or permit the merchant to take any action that is a breach of this agreement.)

**Guarantor Waivers.** In the event that Merchant fails to make a payment or perform any obligation due to Guarantor's actions or malfeasance under the Merchant Agreement, PURCHASER may enforce its rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral, Additional Collateral or Cross-Collateral PURCHASER may hold pursuant to this Agreement or any other guaranty.

PURCHASER does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) PURCHASER's acceptance of this Agreement ; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to PURCHASER. In addition, PURCHASER may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to PURCHASER; (ii) release Merchant from its obligations to PURCHASER; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount plus any accrued but unpaid interest and Merchant's other obligations to PURCHASER under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement including without limitation under the following rights and remedies: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that PURCHASER must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

## Guarantor Acknowledgement. Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

INITIALS: [blacked out]

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**Consent to Receive Autodialed and Prerecorded Calls and Messages.** PURCHASER, Kapitus Servicing, Inc., as servicer, and their subsidiaries and affiliates (collectively, Kapitus) may from time to time notify Merchant(s) and Owner(s) of various promotional offers and other marketing information, or contact Merchant(s) and Owners(s) in connection with the servicing of this Agreement, or in connection with any default under this Agreement. By signing this Agreement, Merchant(s), and Owner(s) expressly consent and authorize Kapitus to call, send text messages, and/or send other electronic messages (including prerecorded or artificial voice messages) using an automatic telephone dialing system to any telephone number provided by Merchant(s) and Owner(s) in this Agreement or corresponding administrative form or any other applications for funding, including cellular phone numbers and landlines, regardless of their inclusion on any do not call list for purposes of servicing, collections, marketing, or promoting any product offered by Kapitus.

Please note that Merchant(s) and Owner(s) are not required to consent to this section of this Agreement in order to qualify or obtain any products or services from Kapitus. If you do not agree to be called for marketing or promotional purposes please call (844) 547-9396 or email DNC@kapitus.com

Kapitus-FRF-ACH 2018-12-12

CONFIDENTIAL
**Exhibit 14-259**

SBFA 00722

**ER856**

DocuSign Envelope ID: 389400DC-A621-44D7-B9E7-F4F7B0682EEB

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", ARE HEREBY INCORPORATED IN FULL AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANINGS SET FORTH IN THE MERCHANT AGREEMENT.

MERCHANTS AND OWNERS/GUARANTORS ACKNOWLEDGE THAT THIS WRITING REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO. IT IS UNDERSTOOD THAT ANY REPRESENTATIONS OR ALLEGED PROMISES BY INDEPENDENT BROKERS OR AGENTS OF ANY PARTY IF NOT INCLUDED IN THIS WRITTEN AGREEMENT ARE CONSIDERED NULL AND VOID. ANY MODIFICATION OR OTHER ALTERATION TO THE AGREEMENT MUST BE IN WRITING AND EXECUTED BY THE PARTIES TO THIS CONTRACT.

**MERCHANT**

By _____         ███████████████████
         (Print Name and Title)                              (Signature)

**OWNER/GUARANTOR #1**

By _____         ███████████████████
         (Print Name)                                        (Signature)

**OWNER/GUARANTOR #2**

By     N/A _____         _____
         (Print Name)                                        (Signature)

DocuSign Envelope ID: 389400DC-A621-44D7-B9E7-F4F7B0682EEB



### APPENDIX A: SCHEDULE OF FEES

**A. Origination Fee**                           To cover underwriting and related expenses

| Amount Funded | Origination Fee |
|---|---|
| Up to $15,000.00 | $395.00 |
| Over $15,000.00 | 2.5% of Amount Funded |
| Due diligence Fee | $0.00 |

**B. Rejected ACH or NSF Fee**
**If Daily ACH Payments**

| Amount Funded | Reject Fee |
|---|---|
| Up to $7,500.00 | $25.00 |
| $7,501.00-$50,000.00 | $35.00 |
| $50,000.00-$100,000.00 | $50.00 |
| $100,001.00-$250,000.00 | $75.00 |
| Over $250,000.00 | $100.00 |

**If Weekly ACH Payments**

| Amount Funded | Reject Fee |
|---|---|
| Up to $7,500.00 | $75.00 |
| $7,501.00-$50,000.00 | $99.00 |
| $50,001.00-$100,000.00 | $175.00 |
| $100,001.00-$250,000.00 | $275.00 |
| Over $250,000.00 | $395.00 |

| | | |
|---|---|---|
| **C. Bank Change Fee** | $75.00 | When Merchant requires a change of account to be Debited requiring us to adjust our system |
| **D. Default Fee** | $2,500.00 | When Merchant defaults under the terms of this Agreement |
| **E. UCC Termination Fee** | $250.00 | When Merchant requests a UCC termination |
| **F. Administrative Fee** | $0.00 | |

**Miscellaneous Service Fees.** If Merchant elects to have the funding electronically deposited to their designated bank account by Fed Wire, Merchant shall pay a $50 wire fee. If Merchant elects to have the funding electronically deposited to their designated bank account by ACH transfer, Merchant shall pay a $20.00 fee.

Other than the Origination Fee, if any, set forth above, PURCHASER is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Merchant. If Merchant is charged another such fee, IT IS NOT BEING CHARGED BY KAPITUS SERVICING OR PURCHASER NOR DOES KAPITUS SERVICING OR PURCHASER RECEIVE ANY PORTION OF SUCH FEES.

MERCHANT INITIALS: _ ███ ____

CONFIDENTIAL          SBFA 00724

Exhibit 14-261                              ER858

DocuSign Envelope ID: 389400DC-A621-44D7-B9E7-F4F7B0682EEB

# ADDENDUM TO SECURITY AGREEMENT AND GUARANTY

### MERCHANT INFORMATION

Merchant's Legal Name: ███████████████

D/B/A: ████████                                    State of Incorporation / Organization: ███

Type of entity: █████████████

Physical Address: ██████████████    City: ███████    State: ███    Zip: ████████

Mailing Address: █████████████    City ██████████    State ███    Zip ████████

Date business started (mm/yyyy): ██████    Federal ID# ██████████

**Additional Collateral: N/A**

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT" AND THE "SECURITY AGREEMENT AND GUARANTY" ARE HEREBY INCORPORATED IN FULL.**

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Merchant and each Guarantor under this Agreement are joint and several.

OWNER/GUARANTOR #3

By ___N/A_____            _____
                    (Print Name)                                   (Signature)

OWNER/GUARANTOR #4

By ___N/A_____            _____
                    (Print Name)                                   (Signature)

OWNER/GUARANTOR #5

By ___N/A_____            _____
                    (Print Name)                                   (Signature)

OWNER/GUARANTOR #6

By ___N/A_____            _____
                    (Print Name)                                   (Signature)

OWNER/GUARANTOR #7

By ___N/A_____            _____
                    (Print Name)                                   (Signature)

OWNER/GUARANTOR #8

By ___N/A_____            _____
                    (Print Name)                                   (Signature)

OWNER/GUARANTOR #9

By ___N/A_____            _____
                    (Print Name)                                   (Signature)

OWNER/GUARANTOR #10

By ___N/A_____            _____
                    (Print Name)                                   (Signature)

Kapitus-FRF-ACH 2018-12-12

CONFIDENTIAL
**Exhibit 14-262**

SBFA 00725

**ER859**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

## OFFER SUMMARY FOR FORWARD PURCHASE AGREEMENT (FIXED)

| | | |
|---|---|---|
| Funding Provided | $20,865.00 | This is how much funding Kapitus LLC will provide. Due to deductions or payments to others, the total funds that will be provided to you directly is $20,865.00. For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed." The amount you receive directly may change if, per the attached "Itemization of Amount Financed," the amount financed will be used to pay down or pay off other financial obligations (to us or to a third party), and those amounts are not known or may change. |
| Estimated Annual Percentage Rate (APR) | 79.86% | APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through the designated deposit account and/or payment processor, as applicable, is $19,360.00. Since your actual income may vary from our estimate, your effective APR may also vary.<br><br>APR is not an interest rate. The cost of this financing is based upon fees charged by Kapitus LLC rather than interest that accrues over time. |
| Finance Charge | $9,309.00 | This is the dollar cost of your financing. Your finance charge will not increase if you take longer to pay off what you owe. |
| Estimated Total Payment Amount | $30,174.00 | This is the total dollar amount of payments we estimate you will make under the contract. |
| Estimated Monthly Cost | $2,522.00 | Although you do not make payments on a monthly basis, this is our calculation of your average monthly costs based upon payment amounts disclosed below. |
| Estimated Payment | $123.00/Daily | |
| Payment Terms | This contract requires daily payments. Daily payments will be deducted on all week days excluding federal holidays. We based the preset $123.00/Daily upon our estimate of 13% of your total income, based upon the financial information submitted to us during the underwriting process. Upon request, you may be entitled to an adjustment of the preset amount set forth above on a going-forward basis to more closely reflect ████████████, ████████████ actual receipts. For more details on your rights, see paragraph 8 of the Purchase Agreement. | |
| Estimated Term | 365 days | This is our estimate of how long it will take to collect amounts due to us under the contract based upon the assumption that you will receive $19,360.00 in monthly income. |
| Prepayment | If you pay off the financing faster than required, you still must pay all or a portion of the finance charge, up to $8,774.00 based upon our estimates. | |
| | If you pay off the financing faster than required, you will not be required to pay additional fees. | |

Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.

████████████        12/27/2022

CONFIDENTIAL      SBFA 12088

Exhibit 14-263     ER860

(52 of 295), Page 52 of 295 , Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 52 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-16   Filed 09/27/23   Page 36 of 62   Page ID
#:1066

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

Recipient's Signature                                    Date

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D



## FORWARD PURCHASE AGREEMENT (FIXED ACH DELIVERY)

This Forward Purchase Agreement ("the Purchase Agreement") dated December 27 2022 is entered into between Kapitus LLC ("Purchaser") and each of the merchant(s) listed below (the "Seller" or "Merchant")  Seller agrees to sell, assign, and transfer and Purchaser agrees to purchase and receive Seller's accounts, receipts, contract rights, and other rights to payment arising from or relating to the payment to Seller through cash, checks, electronic transfers, ACH transfers, credit cards, charge cards, debit cards, prepaid cards, mobile payments (including Apple Pay™ and other ACH payments) and other similar payment methods that may accrue to Seller in the ordinary course of Seller's Business ("Receipts").

### SELLER:

| | | |
|---|---|---|
| SELLER'S LEGAL NAME: ███████████ - | | TRADE NAME: ██████████████████ - |
| ████████ | | ███████████ |

TYPE OF ENTITY <u>CORPORATION</u>

| | | | | | |
|---|---|---|---|---|---|
| PHYSICAL ADDRESS: ████████ | CITY: ███████ | STATE: █████ | | ZIP ████████ |
| MAILING ADDRESS: | CITY: | STATE: | | ZIP: |
| TELEPHONE: ████████ | | EMAIL ADDRESS: ████████████████ | | |

### SALE CONFIRMATION (CID 9151081)

1. Purchaser: **Kapitus LLC, 2500 Wilson Boulevard Suite 350, Arlington, VA 22201**

2 Servicer **Kapitus Servicing, Inc., 2500 Wilson Boulevard, Suite 350, Arlington, VA 22201**

3. Purchased Amount: $30,174.00
   Total dollar amount of Receipts to be delivered to Purchaser

4. Purchase Price: $21,400.00
   Gross total paid for Receipts purchased.

5. Closing Fee: $535.00 ((2.5%) of Purchase Price)
   Up-front fee charged for closing the purchase.

6. Net Purchase Price: $20,865.00
   Net total delivered to Seller as consideration for purchase, equal to the Purchase Price less the Closing Fee and any payment made to Purchaser or any third party as agreed by Seller

7. Specified Percentage: 13.0 %.

   Percentage of receipts to be delivered until Purchased Amount is delivered to Purchaser.

   Seller irrevocably designates only one deposit account acceptable to Purchaser to facilitate the collection of the Specified Percentage until such time as Purchaser receives the full Purchased Amount.  In the event of a breach of any of the Transaction Documents the Specified Percentage shall equal 100%

Kapitus-FPA-ACH 2021-09-07

CONFIDENTIAL
**Exhibit 14-265**

Page   1

SBFA 12090
**ER862**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

| | | |
|---|---|---|
| 8. | Fixed ACH Terms: | Specified Amount and Frequency: $123.00 Daily. |

Seller authorizes Purchaser to ACH Debit the Specified Amount from the designated deposit account as the base payment credited against the Specified Percentage due. The Specified Amount is an estimate of the Specified Percentage.  Seller understands that it is responsible for ensuring that funds adequate to cover the amount to be debited by Purchaser remain in the account.

**Reconciliation:**  The Specified Amount shall be reconciled to reflect the Seller's actual Receipts at Seller's request.  Seller may initiate a reconciliation by calling 1-800-780-7133 and requesting to speak with a Kapitus Servicing, Inc. ("Servicer") customer service representative.  The Seller agrees to provide any information needed to complete such reconciliation, including providing online access to Seller's banking transaction data through a secure, read-only link.  It is the Seller's responsibility to provide bank transaction data and/or statements for any and all bank accounts held by the Seller to reconcile the ACH debits to the Specified Percentage permitting Servicer to debit or credit the difference to the Seller.  Upon verification of the Receipts generated by Seller, Servicer shall adjust the Specified Amount on a going-forward basis to more closely reflect the Seller's actual Receipts. Once the Seller elects to conduct a reconciliation, either Party may thereafter request a reconciliation once every 30 days.  After each adjustment, the new dollar amount shall be deemed the Specified Amount until any subsequent adjustment.  **SELLER SHALL NOT BE ENTITLED TO ANY RECONCILIATION IF SELLER HAS DEFAULTED UNDER ANY OF THE TRANSACTION DOCUMENTS.**

| | | |
|---|---|---|
| 9. | Security Interest: | To secure Seller's payment and performance obligations to Purchaser under the Transaction Documents, Seller hereby grants to Purchaser a security interest in the property, rights, accounts, and other interests as set forth in the Security Agreement. |
| 10 | General Terms and Conditions: | The Purchaser and Seller shall be bound by this Purchase Agreement, the Sale Terms and Conditions governing the purchase of Receipts from Seller, the Security Agreement, the Guaranty, which are incorporated by reference herein, dated December 27, 2022 and the Agreement to Arbitrate, dated December 27, 2022 (collectively, the "Transaction Documents") |

Each signatory represents and warrants that: (1) he or she is authorized to enter into this sale, legally binding the Seller to deliver the Receipts as agreed, and (2) all information provided herein, in the application, in any documents submitted, and in any interviews conducted during the underwriting of the sale, including without limitation any financial information, are true, accurate and complete in all respects.  Seller and Guarantor(s) expressly acknowledge and agree that Purchaser and Servicer are relying on such representations and warranties when determining to purchase the Receipts and that the accuracy thereof is a material condition of the Transaction Documents.   **If any information provided is false or misleading, Seller shall be held liable for fraud in the inducement and fraud and Guarantor(s) shall be personally liable for the Seller's obligations.**

Kapitus-FPA-ACH 2021-09-07

Page   2

**CONFIDENTIAL**
**Exhibit 14-266**

SBFA 12091

**ER863**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

**IT IS UNDERSTOOD THAT ANY REPRESENTATIONS OR ALLEGED PROMISES BY INDEPENDENT BROKERS OR AGENTS ARE NULL AND VOID IF NOT INCLUDED IN THE TRANSACTION DOCUMENTS. ANY MODIFICATION OR OTHER ALTERATION TO THE TRANSACTION DOCUMENTS MUST BE IN WRITING AND DULY EXECUTED BY THE PARTIES.**

**CONSENT TO RECEIVE AUTODIALED AND PRERECORDED CALLS AND MESSAGES**

Purchaser, Kapitus Servicing, Inc. and their subsidiaries and affiliates (collectively, "KAPITUS") may from time to time notify applicant(s) of various promotional offers and other marketing information, or contact Seller and Guarantor(s) in connection with the servicing of the Transaction Documents, or in connection with any default under the Transaction Documents. By signing this Purchase Agreement, Seller and Guarantor(s) expressly consent and authorize KAPITUS to call, send text messages, and/or send other electronic messages (including prerecorded or artificial voice messages) using an automatic telephone dialing system to any telephone number provided by Seller or Guarantor(s) in the Transaction Documents, any and all applications or any administrative form or other means, including cellular phone numbers and landlines, regardless of their inclusion on any do not call list, for purposes of servicing, collections, marketing or promoting any product offered by KAPITUS. Seller and Guarantor(s) further expressly consent and authorize KAPITUS to record all calls with KAPITUS. Please note that you are not required to consent to be called for marketing or promotional purposes in order to obtain any products or services from KAPITUS. If you do not agree to be called for marketing or promotional purposes, please call (844) 547-9396 or email DNC@kapitus.com

**SELLER**

By _____
        (Print Name and Title)                (Signature)

**PURCHASER**

By  Steve Podhorzer
       (Company Officer or Designee)         (Signature)

**GUARANTOR**

By _____
           (Print Name)              (Signature)

**GUARANTOR**

By _____
           (Print Name)              (Signature)

**GUARANTOR**

By _____
           (Print Name)              (Signature)

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D



## AUTHORIZED SUB-SERVICING AGENT

Purchaser, as Agent, may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents. Kapitus Servicing, Inc. is the Authorized Sub-Servicing Agent and the General Agent of the Purchaser. Servicer will initiate all debits and credits to Seller's account, provide customer service and administrative support to Purchaser and Seller, initiate any necessary collection actions in the event of any default under the Transaction Documents, initiate and defend legal actions related to the Transaction Documents, and provide legal support services to Purchaser..

### SERVICER FEES

| | | |
|---|---|---|
| 11. | Banking Fees | $50.00 for outgoing wire transfers or payments by check. |
| 12. | Changing Bank Accounts | $75.00 |
| 13. | UCC Terminations | $250.00 |
| 14. | Default Fee | $2500.00 |
| 15. | Returned Payment Fee | $15.00 |

*OTHER THAN THE CLOSING FEE, IF ANY, AND THE SERVICER FEES SET FORTH ABOVE, NEITHER PURCHASER NOR KAPITUS SERVICING IS CHARGING ANY FEES TO SELLER. IF SELLER IS CHARGED ANY ADDITIONAL FEE IN CONNECTION WITH THE SALE, IT IS NOT AUTHORIZED OR CHARGED BY KAPITUS AND SELLER SHOULD INFORM KAPITUS IF ANY UNAUTHORIZED FEE HAS BEEN CHARGED IN CONNECTION WITH THE TRANSACTION DOCUMENTS.*

*YOUR APPLICATION TO SELL RECEIPTS IS AN APPLICATION FOR BUSINESS CREDIT, AND IF IT IS DENIED, YOU HAVE THE RIGHT TO A WRITTEN STATEMENT OF THE SPECIFIC REASONS FOR THE DENIAL. TO OBTAIN THE STATEMENT, PLEASE CONTACT KAPITUS LLC AT THE ABOVE ADDRESS OR PHONE NUMBER WITHIN 60 DAYS FROM THE DATE YOU ARE NOTIFIED OF THE DECISION. YOU HAVE THE RIGHT TO OBTAIN A WRITTEN STATEMENT OF REASONS FOR THE DENIAL WITHIN 30 DAYS OF RECEIVING YOUR REQUEST FOR THE STATEMENT.*

*NOTICE: THE FEDERAL EQUAL CREDIT OPPORTUNITY ACT PROHIBITS CREDITORS FROM DISCRIMINATING AGAINST CREDIT APPLICANTS ON THE BASIS OF RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, MARITAL STATUS, AGE (PROVIDED THE APPLICANT HAS THE CAPACITY TO ENTER INTO A BINDING CONTRACT); BECAUSE ALL OR PART OF THE APPLICANT'S INCOME DERIVES FROM ANY PUBLIC ASSISTANCE PROGRAM; OR BECAUSE THE APPLICANT HAS IN GOOD FAITH EXERCISED ANY RIGHT UNDER THE CONSUMER CREDIT PROTECTION ACT. THE FEDERAL AGENCY THAT ADMINISTERS COMPLIANCE WITH THIS LAW CONCERNING THIS CREDITOR IS THE FEDERAL TRADE COMMISSION, 600 PENNSYLVANIA AVENUE, NW, WASHINGTON, DC 20580, FTC.GOV*

CONFIDENTIAL
**Exhibit 14-268**

SBFA 12093
**ER865**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

## SALE TERMS AND CONDITIONS

### I. GENERAL TERMS

**1.1 Sale of Receipts.** Seller and Purchaser intend that the transfer of the interest in the Receipts from Seller to Purchaser constitutes a forward sale, and not a loan, for all legal, practical and business purposes. Seller agrees that the Purchase Price equals the fair market value of the Receipts being purchased as of the date sold that are expected to come into existence in the future in the ordinary course of the operation of Seller's business. Title to, responsibility for and risk of loss of the interest in the Receipts shall pass from the Seller to the Purchaser upon execution of this Agreement with respect to the Purchased Amount. In addition:

(a) as further set forth in the Security Agreement, Seller hereby grants to Purchaser a security interest in and to all right, title and interest of Seller in and to the Receipts, which security interest shall secure the payment of the Purchase Price and all other obligations of Seller under this Agreement. Seller hereby authorizes Purchaser to file any financing statements deemed necessary by Purchaser to perfect or maintain Purchaser's interest in the Receipts;

(b) the parties acknowledge that the delivery of the Purchase Price is not a payment in whole or in part for the use or forbearance of money, but rather delivery of the bargained for payment of the purchase price to Purchaser under the Purchase Agreement, notwithstanding anything to the contrary contained herein;

(c) the Parties agree and acknowledge that there is no stated or unstated interest factor in this Agreement, and no interest will be paid;

(d) in the event that a court ignores the intent of the parties that the Transaction Documents be treated as a forward purchase of Receipts, and further determines that the arrangement creates a loan or other indebtedness rather than a completed forward sale of Receipts, and further determines that under that court-determined arrangement that the PURCHASER has charged or received

"interest," and further determines that the amount of interest is in excess of the highest applicable rate, the imputed rate so determined shall automatically be reduced to the maximum rate permitted by applicable law and Purchaser shall promptly refund to Seller as liquidated damages any amount received by Purchaser in excess of such maximum lawful rate, it being intended that Seller not pay or contract to pay, and that Seller not receive or contract to receive, directly or indirectly in any manner whatsoever, interest on indebtedness in excess of that which may be paid by Seller under applicable law.

**1.2 Term of Agreement.** The Purchase Agreement shall have an indefinite term. The Purcha e Agreement shall commence with Purchaser's delivery of the funds constituting the Purchase Price and shall run until such time as Purchaser receives sufficient receipts to equal the value of the Purchased Amount and thus fulfill the delivery of the future receivable purchased and all of Seller's other obligations to Purchaser are fully satisfied. The Purchase Agreement and the provisions of this Section 1.2 are applicable to any renewals and additional agreements executed by the parties that constitute Forward Purchase Agreements and/or purchase of future receivables.

**1.3 Authorization to Debit.** Seller shall establish an account with a financial institution acceptable to Purchaser that will be designated to collect the Receipts generated by Seller Seller hereby authorizes Purchaser and/or its agents to obtain any amounts due pursuant to the Transaction Documents by ACH debit of the account designated, or of any other Seller account, as provided pursuant to the Transaction Documents. This authorization shall be irrevocable without the written consent of Purchaser. Seller shall provide Purchaser and/or its agents with all of the information and authorizations necessary for verifying Sellers's receivables, Receipts and deposits.

**1.3 Financial Condition.** Seller and Guarantor(s) authorize Purchaser to

investigate their financial responsibility and history, and will provide to Purchaser any bank or financial statements, tax returns, or any other documentation, as Purchaser deems necessary prior to or at any time after execution of the Transaction Documents. A photocopy of this authorization will be deemed as acceptable for release of any necessary information. Seller and Guarantor(s) authorize and consent to Purchaser updating their credit and financial profile from time to time in the future, as Purchase deems appropriate, including by obtaining investigative, consumer, and personal or business credit reports. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.4. Financial Information and Credit Reporting.** Seller and Guarantor authorize Purchaser to obtain business and personal credit bureau and consumer reports at any time and from time to time for purposes of deciding whether to purchase Receipts from Seller, for any requested loan or for any update, renewal, extension of credit or other lawful purpose. Upon Seller's or Guarantor's request, Purchaser will advise Seller or Guarantor if Purcha er obtained a credit report and Purchaser will give Seller or Guarantor the credit bureau's name and address. Seller and Guarantor agree to submit current financial information, update any credit application, or both, at any time promptly upon Purchaser's request. Purchaser may report Purchaser's experiences with Seller and Guarantor to third parties as permitted by law. Seller and Guarantor also agree that Purchaser may release information to comply with governmental reporting or legal process that Purchaser believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss, and/or seeking recovery for such loss. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.5 Transactional History.** Seller and Guarantor authorize Purchaser to act as Seller's and Guarantor's agent,

CONFIDENTIAL
**Exhibit 14-269**

SBFA 12094
**ER866**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

respectively, for purposes of accessing and retrieving transaction history information regarding Seller and/or Guarantor from Seller's and Guarantor's financial institutions, banks, banking accounts, and/or credit card processing accounts. Seller and Guarantor authorize their respective financial institutions to provide Purchaser with Seller's and Guarantor's transaction history, and any and all information regarding Seller's and Guarantor's accounts, balances, or transfers, for any purpose, including for purposes of collection. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.6 Indemnification.** Seller and Guarantor jointly and severally will indemnify and hold Purchaser, and its officers, directors, shareholders, members, managers, employees, owners, partners, affiliates, subsidiaries, parent company, successors, transferees, assigns, purchasers, investors, financiers, agents, representatives, attorneys and professionals, (collectively, the "Purchaser Parties") harmless from all losses, costs, damage, liabilities or expenses (including, without limitation, court costs and attorneys' fees) that the Purchaser Parties may sustain or incur by reason of defending claims asserted by Seller and/or Guarantor, and all per on and entities claiming by, through or under them, to the fullest extent permitted by law, in protecting the security interest conveyed pursuant to the Security Agreement or the priority thereof, in enforcing any other term of the Transaction Documents, and/or in the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with the Tran action Documents and/or any other documents now or hereafter executed in connection with the Transaction Documents, the Collateral and/or the Additional Collateral, including without limitation any legal or dispute resolution proceeding, bankruptcy proceeding, receivership, and/or any other insolvency proceeding or other proceeding for relief for debtors or creditors.

In no event will Purchaser, its officers, directors, shareholders, members, managers, employees, affiliates, agents or representatives be liable for any claims asserted by Seller under any legal theory for lost profits, lost revenues, lost business

opportunities, exemplary, punitive, special, incidental, indirect or con equential damage , each of which i waived by Seller and Guarantor(s). This section shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.7 Power of Attorney.** Seller irrevocably appoints Purchaser as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Purchaser, or in the case of the occurrence of any Event of Default, from Seller, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Purchaser; and (v) to file any claims or take any action or institute any proceeding which Purchaser may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.8 Disclosure of Information.** Seller and Guarantor and each person signing this Agreement on behalf of Seller and/or as a Guarantor, in respect of himself or herself per onally, authorize Purcha er to disclose information concerning Seller's and each Guarantor's credit standing (including credit bureau reports that Purchaser obtains) and business conduct. Seller and each Guarantor hereby waives to the maximum extent permitted by law any claim for damages against Purchaser Parties relating to any (i) investigation undertaken by or on behalf of Purchaser as permitted by the Transaction Documents or (ii) disclosure of information as permitted by the Transaction Documents. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.9 Publicity.** Seller and Guarantor(s) authorize Purcha er to u e it , hi or her name in a listing of clients and in advertising and marketing materials. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.10 UCC Agent & D/B/A's.** Seller and Guarantor(s) hereby acknowledge and agree that Purchaser may be using affiliates, representatives, agents, "doing business as" or "d/b/a" and/or fictitious names in connection with various matters relating to the transaction between Purchaser and Seller and Guarantor(s), and may file UCC-1 financing statements and other notices or filings using such names on its own behalf or though Purchaser's UCC agent. Purchaser shall have no obligation to terminate any UCC financing statement filed in connection with the Purchase Agreement absent a written request by Purchaser and after delivery of the Receipts purchased and the fulfillment of all of Seller's obligations to Purchaser under the Transaction Documents, and payment of the UCC Termination fee stated in the Purchase Agreement. Notwithstanding any terms to the contrary contained herein, and except as may be required under applicable law, Purchaser shall have no obligation to terminate any UCC financing statement while there is a pending: (i) petition for bankruptcy protection under Title 11 of the United States Code or any state-law analogue filed by or against Purchaser, Seller, or Guarantor(s); (ii) insolvency proceeding or other proceeding instituted against Purchaser, Seller or Guarantor(s), and/or any other guarantor for relief for debtors or creditors; (iii) receivership proceeding brought by or against Purchaser, Seller, Guarantor, and/or any other guarantor; and/or (iv) any other legal proceeding or alternative dispute resolution proceeding between any of the Seller and/or Guarantor, on the one hand, and the Purchaser Parties, on the other hand. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**1.11. Alternative Delivery of Receipts.** If Seller or Guarantor knows that for any reason Purchaser will be unable to receive delivery of the Receipts from Seller's account, then Seller must promptly set up

Kapitus-FPA-T&C 2021-09-07

CONFIDENTIAL
**Exhibit 14-270**

Page   2
SBFA 12095
**ER867**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

another arrangement for delivery of receipts that is authorized by Purchaser. Seller and Guarantor under tand and agree that delivery of Receipts made at any other address or method than as specified by Purchaser may result in a delay in processing and/or crediting the delivery of Receipts by Seller.

**1.12 Early Delivery Option.** Seller shall have the option to deliver the Purchased Amount at any time, along with any fees incurred under the Transaction Documents, less Receipts previously delivered. Purchaser may, from time to time, and in the Purchaser's sole discretion, offer discounts for early delivery of Receipts communicated to Seller through one or more customer web interfaces, emails or addenda to the Purchase Agreement. Such discounts will be based on the time elapsed since disbursement of the Purchase Price, the history of the delivery of Receipts, and the remaining amount of Receipts due to be delivered.

**II.        REPRESENTATIONS, WARRANTIES AND COVENANTS** Seller and Guarantor represents, warrants and covenants that as of this date and during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** The information and financial statements which have been furnished to Purchaser by Seller and Guarantor, and such future statements which will be furnished hereafter at the request of Purchaser, fairly represent the ownership and operations of the Seller's business and the financial condition of Seller and Guarantor at such dates, and ince tho e date , there ha been no material adverse change, financial or otherwise, in such condition, operation or ownership of Seller or Guarantor (as applicable). Seller and Guarantor are current on any and all lease, rent or mortgage payments due. Seller and Guarantor are currently in compliance with all loans, financing agreements, promissory notes, and/or other obligations of indebtedness, except as disclosed to Purchaser. No material changes, financial or otherwise, in the condition, operation or ownership of Seller and Guarantor (as applicable) are in any way expected or anticipated and Seller and Guarantor do not anticipate closing or selling Seller's

business. Neither the Seller nor the Guarantor are party to any pending litigation that i expected to have a material impact on the Seller or Guarantor. Seller has a continuing, affirmative obligation to advise Purchaser of any material change in its financial condition, operation or ownership. Purchaser may request statements at any time during the performance of this Agreement and the Seller shall provide them to Purchaser within five (5) business days. Seller's failure to do so is a material breach of this Agreement.

**2.2 Compliance with Law.** Seller is in compliance and shall comply with all laws, including possession of all necessary permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.3 Authorization.** Seller, and the person(s) signing the Transaction Documents on behalf of Seller, have full power and authority to incur and perform the obligations under the Transaction Documents, all of which have been duly authorized.

**2.4 Insurance.** Seller will maintain property, liability, and business interruption in urance and name Purchaser as certificate holder, loss payee and additional insured in amounts and against risks as are satisfactory to Purchaser and shall provide Purchaser proof of such insurance upon request.

**2.5 Tax Obligations.** Seller is currently in compliance with all federal state and local tax law , ha filed all return , and ha paid all taxes due, except as disclosed to Purchaser. No federal, state, or local taxing authority has filed any lien against the assets of the Seller and/or Guarantor. Seller or Guarantor shall pay all taxes owed to federal, state, or local governments when due.

**2.6 Deposit Arrangements and Delivery of Receipts.** Without Purchaser's prior written con ent, Seller will not (i) change the account designated for the delivery of Receipts; (ii) set up multiple accounts into which any of the Seller's receipts are deposited or otherwise transferred; (iii) block or stop payment on Purchaser debit;

(iv) permit any event to occur that could cause diversion of any of Seller's receipts; (v) or take any other action that could have any adverse effect upon Seller's obligations under the Transaction Documents. Seller will batch out receipts with all payment processors on a daily basis.

**2.7 Change of Name or Location.** Seller will not conduct Seller's business(es) under any name other than as disclosed to the Purchaser or change any of its places of business, or change its jurisdiction or incorporation or organization without ten (10) days prior written notice to Purchaser.

**2.8 Estoppel Certificate.** Seller will at any time, and from time to time, upon at least one (1) day's prior notice from Purchaser to Seller, execute, acknowledge and deliver to Purchaser and/or to any other person, firm or corporation specified by Purchaser, a statement certifying that the Purchase Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy or Insolvency.** Seller is solvent, no transfer of property is being made by Seller, and no obligation i being incurred by Seller in connection with the sale of Receipts with the intent to hinder, delay, or defraud either present or future creditors of Seller. Seller represents that it is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code or any state-law analogue, and there ha been no involuntary petition under such laws brought or pending against Seller. Seller further warrants that it does not anticipate filing any such receivership or bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Other Financing.** Seller shall not enter into any arrangement, agreement or commitment for any additional financing, whether in the form of a purchase and sale of receivables, the sale of accounts receivable, or a loan (whether secured or unsecured) with any party other than Purchaser without Purchaser's written consent.

**CONFIDENTIAL**
**Exhibit 14-271**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

**2.11 Unencumbered Receipts.** Seller has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Purchaser.

**2.12 Authorization to Obtain Lease Information.** Seller and Guarantor authorize Purchaser to receive pertinent information regarding the commercial lease or mortgage for the physical location of Seller's business (the "Premises") from any applicable lender, leasing company or agent. Upon any Event of Default under this Agreement, as security for the Seller's obligations set forth herein, Seller and/or Guarantor shall, at the request of Purchaser deliver to Purchaser an executed Assignment of Lease covering the Premises in favor of Purchaser.

**2.13. Business Purpose.** Seller is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Seller is entering into this Agreement for business purposes and not a a con umer for per onal, family or household purposes.

**2.14 Default Under Other Contracts.** Seller's execution of and/or performance under this Agreement will not cause or create an event of default by Seller under any contract with another person or entity.

**2.15. Sale or Dissolution of Seller.** Seller shall not: (a) sell, dispose, transfer or otherwise convey its business, assets and/or any equity interest in Seller; or (b) effectuate the suspension, dissolution, or termination or Seller's business without the express prior written consent of Purchaser, or the written agreement of any purchaser, assignee, or transferee assuming all of Seller's and Guarantor's obligations under the Transaction Documents pursuant to documentation satisfactory to Purchaser (as applicable).

**2.16 Accuracy of Information.** All information provided by Seller and Guarantor to Purchaser in the Transaction Documents, in any application, in all other Seller forms and in response to any request by Purchaser for information whether oral or in writing, is true, accurate and complete in all respects.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a) Seller changes its deposit or banking relationships with any financial institution in any way that interferes with the delivery of the Receipts, including, by way of example and not limitation, using multiple depository accounts to collect Receipts without the prior written consent of Purchaser;

(b) Seller closes or changes the account(s) designated to collect the Receipts without notice to Purchaser, or otherwise permits any event to occur that could cause diversion of any Receipts to an account other than that designated to collect the Receipts;

(c) Seller interrupts the operation of its business in the ordinary course (other than as a result of adverse weather, natural disasters or acts of God) without notice to Purchaser of any planned shutdown or interruption of operations,

(d) Seller transfers, moves, sells, disposes, transfers or otherwise conveys its business, or all or substantially all of its assets, without: (i) the express prior written consent of Purchaser, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Seller's obligations under the Transaction Documents pursuant to documentation satisfactory to Purchaser;

(e) any debit is rejected or returned due to insufficient funds and Seller fails to respond to Purchase inquiries or to contact Purchaser within five (5) business days;

(f) Seller shall violate any term, covenant, or condition in the Transaction Documents;

(g) any representation or warranty by Seller in the Transaction Documents shall prove to have been incorrect, false or misleading in any material respect when made;

(h) Seller or Guarantor sends a notice of termination of any Purchase Agreement;

(i) Seller suspends, dissolves or terminates its corporate existence without notice to Purchaser;

(j) Seller or Guarantor makes or sends notice of any intended assignment, bulk sale or transfer of Seller's assets;

(k) Seller or Guarantor performs any act that reduces the value of any Collateral or Additional Collateral or reduces the value of the Collateral or Additional Collateral granted under the Security Agreement;

(l) Seller or Guarantor fails to pay taxes to any federal, state, or local government when due; or

(m) Seller shall default under any of the terms, covenants and conditions of any other agreement with Purchaser, including those between Purchaser and any business that is affiliated or associated with Seller.

**3.2 Remedies for Default.** In case any Event of Default occurs and is not waived by Purchaser: Purchaser may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provi ion contained herein, or to enforce the discharge of Seller's obligations under the Transaction Document or any other legal or equitable right or remedy. In addition, and without limitation, upon any Event of Default: (a) the full uncollected Purchased Amount and any unpaid fees due shall become due and payable in full immediately; (b) Purchaser may enforce the provisions of the Transaction Documents against the Seller and Guarantor(s); (c) Purchaser may enforce its security interest in the Collateral, Additional Collateral and the Cross Collateral; (d) Purchaser may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-

Kapitus-FPA-T&C 2021-09-07

Page 4

CONFIDENTIAL
**Exhibit 14-272**

SBFA 12097

**ER869**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

generated check drawn on Seller's bank account or otherwise; (e) Purchaser may direct any payment or credit card proce or to deposit any amounts due to Seller directly to Purchaser; (f) Purchaser may exercise its rights under the Assignment of Lease set forth in Section 2.12; (g) Purchaser may exercise the Power of Attorney set forth in Section 1.7.

All rights, powers and remedies of Purchaser in connection with this Agreement may be exercised at any time by Purchaser after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity. Seller and Guarantor acknowledge and agree that there may be no adequate remedy at law with respect to a breach of the Transaction Documents. Accordingly, Seller and Guarantor agree that Purchaser shall have the right, in addition to any other rights and remedies existing in Purchaser's favor at law or in equity, to enforce Purchaser's rights and obligations under the Transaction Documents not only by an action or actions for damages, but also for an action or actions for specific performance, injunctive and/or other equitable relief without posting of a bond or other security. To the extent authorized by applicable law, Seller and Guarantor hereby agree to toll or waive any relevant statute of limitations in respect of any claims arising under, and/or relating to the Transaction Documents. This section shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**3.3 Costs.** Seller shall pay to Purchaser all rea onable co t a ociated with (a) a breach by Seller of the Transaction Documents and the enforcement thereof, and (b) the enforcement of Purchaser's remedies set forth herein, including but not limited to (i) expenses, court costs and attorneys' fees of twenty-five percent (25%) of the total amount due to Purchaser or the actual attorney fees incurred, whichever is greater, and (ii) default interest on the total amount due to Purchaser accruing from the date of default at the rate of ten percent (10%) per annum or such other amount as allowed by law.

**3.4 Required Notifications.** Seller is required to give Purchaser fourteen (14)

days' prior written notice of: (a) any change in control of the Seller or the sale, transfer or assignment of all or substantially all of the Seller's assets or equity interests; and (b) the suspension, dissolution or termination of its business.

**3.5. Servicer and Default Fees.** Seller shall pay certain fees for services related to origination and servicing of the Transaction Documents as detailed in the Purchase Agreement. Upon the occurrence of any Event of Default, Seller and Guarantor shall be liable for a default fee in the amount stated in the Purchase Agreement, payable on demand in addition to any other fees or charges due under the Transaction Documents.

## IV. MISCELLANEOUS

**4.1 Modifications; Amendment.** No modification, amendment, waiver or consent of any provision of the Transaction Documents shall be effective unless the same shall be in writing and signed by Purchaser. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.2 Purchaser acting as Agent.** Purchaser has entered into the Transaction Document a agent (in uch capacity, "Agent") for itself and one or more third parties as "co-investors" or "co-purchasers" (each a "Principal"). Agent and each Principal have elected to treat the transaction consummated under the Transaction Documents (the "Transaction") as a single transaction on behalf of separate Principals, and Agent hereby certifie that the portion of the Transaction allocable to the account of each of the Principals (the "Portion") for which it is acting (to the extent that any such Transaction is allocable to the account of more than one Principal) is set forth in one or more addenda to the Transaction Documents, which may be provided to Seller upon request.

All references to "Purchaser" "Seller" or "Guarantor," as the case may be, in the Transaction Documents shall be subject to the provisions of this section and shall be construed to reflect that (i) each Principal shall have, in connection with the Transaction entered into by the Agent on

its behalf, all of the rights, responsibilities, privileges and obligations of a "Purchaser" directly entering into uch Tran action with the other parties under each of the Transaction Documents and (ii) Agent's Principals have designated Agent (acting directly or through the Authorized Subservicing Agent) as their sole agents for performance of Purchaser's obligations to Seller and for receipt of performance by Seller of its obligations to Purchaser in connection with the Transaction (including, among other things, as Agent for each Principal in connection with transfers of cash or other property and as agent for giving and receiving all notices under the Transaction Documents). Both Agent and its Principals shall be deemed "parties" to the Transaction Documents and all references to a "party" or "either party" in any Transaction Document shall be deemed revised accordingly.

The parties hereto acknowledge and agree that any assignment, pledge and/or grant to Purchaser by the Seller or a Performance Guarantor of a security interest in and to any property and assets (including the Collateral and the Additional Collateral) pursuant to any of the applicable Transaction Documents to secure the payment and/or performance of any of their respective and/or joint obligations, shall be deemed to have been made to the Purchaser for and on behalf of itself and any other Principal. Purchaser hereby agrees to hold all Collateral and Additional Collateral hereafter delivered to it pursuant to the Transaction Documents, for itself and for the benefit of the Principals, on and subject to the terms and conditions set forth in the Transaction Documents. In its capacity, the Agent and Sub-Servicing Agent are each a "representative" of each of the Principals within the meaning of the term "secured party" as defined in the UCC. In addition to the representations and warranties set forth in the Transaction Documents, Agent hereby makes the following representations and warranties, which shall continue during the term of any Transaction: Principal has duly authorized Agent to execute and deliver the Transaction Documents on its behalf, has the power to so authorize Agent and to enter into the Transaction contemplated by the Transaction Documents and to perform the obligations of Purchaser, and has taken all necessary action to authorize such execution and

CONFIDENTIAL
**Exhibit 14-273**

Page   5
SBFA 12098
**ER870**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

delivery by Agent and such performance by it. This provision shall survive, in its entirety, the delivery of the Receipt purchased and the termination of the Purchase Agreement.

**4.3 Sub-Servicing Agent.** Purchaser may contract with one or more general agents to service the Transaction Documents (the "Sub-Servicing Agent") that will provide customer service, treasury, administrative, bookkeeping, reporting, collections, and support services, but not limited to, background checks, credit checks, general underwriting review, filing UCC-1 security interests and any other UCC documentation, for the Purchaser. Seller and Guarantor(s) acknowledge and agree that Purchaser has granted Sub-Servicing Agent all rights and authority as its general agent to take any and all actions to enforce the Purchase Agreement, through legal actions in the name of the Purchaser or otherwise, and to assert and/or defend against any and all claims arising from or relating to the Purchase Agreement. Any and all authorizations and rights granted to Purchaser under the Transaction Documents are hereby granted to Sub-Servicing Agent, as servicer and general agent of Purchaser. In no event will the Sub-Servicing Agent be liable for any claims made against the Purchaser or under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, actual, special, incidental, indirect or consequential damages, each of which is waived by the Seller and Guarantor(s). This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.4 Notices.** All notices, requests, consent, demands and other communications under the Transaction Documents and any addendum shall be delivered by ordinary mail to the respective parties at the addresses set forth in the Purchase Agreement and shall become effective upon delivery. The Parties hereto may also send such notices, requests, consent, demands and other communications via facsimile or electronic mail at such numbers and email addresses communicated by the parties hereto in writing or as reflected in the records of the Sub-Servicing Agent. This provision shall survive, in its entirety, the delivery of the

Receipts purchased and the termination of the Purchase Agreement.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** Seller and Guarantor agree that any suit, action or proceeding to enforce or arising out of or relating to this Agreement shall be brought in any court in the Commonwealth of Virginia or in the United States District Court for the Eastern District of Virginia (the "Acceptable Forums"), and Seller and Guarantor waive personal service of process. Seller and Guarantor agree that the Acceptable Forums are convenient to them, submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. In the event a legal proceeding concerning this Agreement is initiated in any other forum, Seller and Guarantor waive any right to oppose any motion or application made by Purchaser to transfer such proceeding to an Acceptable Forum, or to dismiss the action on the grounds of *forum non conveniens*.

This Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with Virginia law (to the extent not preempted by federal law) without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for under this Agreement will be governed by the laws of the Commonwealth of Virginia. Seller and Guarantor understand and agree that (i) Purchaser and/or Kapitus Servicing are located in Virginia, (ii) all final credit decisions are made from Virginia, (iii) the Agreement is made in Virginia (that is, no binding contract will be formed until Seller's signed Agreement is received and accepted in Virginia) and (iv) Seller's delivery of Receipts are not accepted until received in Virginia. This section shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.6. Counterparts: Facsimile and PDF Acceptance.** Each of the Transaction Documents may be executed in one or

more counterparts, each of which counterparts shall be deemed to be an original of each such Transaction Document, and all such counterparts for the respective Transaction Document shall constitute one and the same such Transaction Document. For purposes of the execution of each of the Transaction Documents, electronically transmitted PDFs, facsimile copies of signatures, or electronically transmitted copies of signatures complying with the US Federal ESIGN Act of 2000 (e.g. www.docusign.com) shall be treated as original signatures for all purposes. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.7 Waiver of Remedies.** No failure on the part of Purchaser to exercise, and no delay in exercising, any right under the Transaction Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right under the Transaction Documents preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.8 Solicitations.** Seller and Guarantor authorize the Purchaser Parties to communicate with, solicit and/or market to Seller and Guarantor via regular mail, telephone, electronic mail and facsimile in connection with the provision of goods or services by the Purchaser Parties, their affiliates or any third party that the Purcha er Partie  hare, tran fer, exchange, disclose or provide information with and will hold the Purchaser Parties harmless against any and all claims pursuant to the federal CAN-SPAM ACT of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003), the Telephone Consumer Protection Act (TCPA), and any and all other state or federal laws relating to transmissions or solicitations by and any of the methods described above. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

CONFIDENTIAL
**Exhibit 14-274**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

**4.9 Survival of Representation, etc.** Except as otherwise provided herein, all repre entation , warrantie and covenant herein, including those in the Security Agreement and the Guaranty shall survive the execution and delivery of the Purchase Agreement and shall continue in full force until all obligations under the Purchase Agreement shall have been satisfied in full and the Purchase Agreement shall have terminated. Notwithstanding any terms to the contrary contained herein: (i) the Security Agreement and the Guaranty shall survive, in their entirety, the delivery of the Purchased Amount and the termination of the Purchase Agreement; and (ii) in the event that Purchaser must return any amount paid by Seller, Guarantor, any other guarantor, entity or person with respect to the obligations arising under the Transaction Documents, including without limitation, arising from or relating to, Seller, Guarantor, any other guarantor, entity or person becoming subject to a proceeding under the United States Bankruptcy Code or any similar law (whether arising under Federal or State law), and/or any other legal proceeding or alternative dispute resolution proceeding, all representations, warranties and covenants and other obligations under the Transaction Documents and any addendum thereof (if any) shall remain in full force and effect and Seller and Guarantor shall be obligated for any such amounts repaid, as well attorneys' fees, costs and interest in connection with such proceeding. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.10 Severability, Savings.** In case any of the provi ion in the Tran action Documents are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained therein shall not in any way be affected or impaired and the Transaction Documents shall be construed as if such provision had not been included. If any provisions of these Sale Terms and Conditions are in conflict with any other agreement to which any parties are subject, the provisions of the Purchase Agreement shall control. Should any provision of the Transaction Documents require judicial interpretation, the court interpreting or construing the provision shall not apply the rule of construction that a document is to be

construed more strictly against one Party. This provision shall survive, in its entirety, the delivery of the Receipt purchased and the termination of the Purchase Agreement.

**4.11 Entire Agreement.** The Transaction Documents embody the entire agreement between Seller, Guarantor(s), and Purchaser and supersede all prior agreements and understandings relating to the subject matter hereof. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.12 JURY TRIAL WAIVER.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTION DOCUMENTS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS. THIS PROVISION SHALL SURVIVE, IN ITS ENTIRETY, THE DELIVERY OF THE RECEIPTS PURCHASED AND THE TERMINATION OF THE PURCHASE AGREEMENT.

**4.13 CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION. TO THE EXTENT A PARTY IS PERMITTED TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION, THE PARTIES AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR

REPRESENTATIVE ACTION AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION. THIS PROVISION IS A MATERIAL INDUCEMENT FOR PURCHASER TO ENTER INTO THIS AGREEMENT. THIS PROVISION SHALL SURVIVE, IN ITS ENTIRETY, THE DELIVERY OF THE RECEIPTS PURCHASED AND THE TERMINATION OF THE PURCHASE AGREEMENT.

**4.14 Successors; Assigns; Amendment.** Purchaser and any Principal may assign, transfer or sell its right to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part. Purchaser reserves the rights to sell or assign this Agreement with or without prior written notice to Seller. Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Purchaser which consent may be withheld in Purchaser's sole discretion. The Transaction Documents shall be binding upon and inure to the benefit of the heirs, executors, trustees, administrators, legal representatives, ucce or , tran feree and as ign of the Parties. This provision shall survive, in its entirety, the delivery of the Receipts purchased and the termination of the Purchase Agreement.

**4.15 ARBITRATION.** *PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY. A SEPARATE AGREEMENT BETWEEN THE PARTIES PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT.*

Signatures on Next Page

CONFIDENTIAL
Exhibit 14-275

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

SELLER AND GUARANTOR ACKNOWLEDGE AND AGREE TO BE BOUND BY THE SALE TERMS AND CONDITIONS.  THE TERMS, DEFINITIONS, CONDITIONS, AND INFORMATION SET FORTH IN THE "PURCHASE AGREEMENT", "SECURITY AGREEMENT", AND THE "GUARANTY" (AS APPLICABLE) ARE HEREBY SUBJECT TO AND MADE A PART OF THE SALE TERMS AND CONDITIONS.  CAPITALIZED TERMS NOT DEFINED IN THE SALE TERMS AND CONDITIONS, SHALL HAVE THE MEANING SET FORTH IN THE "PURCHASE AGREEMENT," "SECURITY AGREEMENT" OR "GUARANTY," AS APPLICABLE.

**SELLER**
By _____          _____
          (Print Name and Title)                    (Signature)

**GUARANTOR**
By _____          _____
                (Print Name)                          (Signature)

**GUARANTOR**
By  N/A _____          _____
                (Print Name)                          (Signature)

**GUARANTOR**
By  N/A _____          _____
                (Print Name)                          (Signature)

### USE OF PROCEEDS CERTIFICATION

*This Use of Proceeds Certification is part of (and incorporated by reference into) the Purchase Agreement.*

Each signatory below, on behalf of each Seller or Guarantor, hereby certifies the following to the Purchaser:

1. The entirety of the Purchase Price will be used in the ordinary course of business.
2. The entirety of the Purchase Price will be used exclusively for a Business Purpose and no other.  A Business Purpose as applied to use of proceed  obtained under thi  Purcha e Agreement refer   olely to the purcha e and acqui ition of  pecific product  or  ervice u ed for the following purposes only: (i) working capital, (ii) business insurance (but not self-insurance programs), (iii) franchise fees, (iv) employee training, (v) the purchase of equipment, (vi) inventory, (vii) business supplies and raw materials, and (viii) the construction, renovation or improvement of facilities (but not the purchase of real estate).  Business Purpose does not include: (a) payment for, or purchase of, any items, goods, materials real property, personal property or services for personal, individual or household use; or (b) use of funds for any proceeding under the United States Bankruptcy Code or any similar law (whether arising under Federal or State law) and/or any other legal proceeding or alternative dispute resolution proceeding.

**SELLER**
By _____          _____
          (Print Name and Title)                    (Signature)

**GUARANTOR**
By _____          _____
                (Print Name)                          (Signature)

**GUARANTOR**
By  N/A _____          _____
                (Print Name)                          (Signature)

**GUARANTOR**
By  N/A _____          _____
                (Print Name)                          (Signature)

**CONFIDENTIAL**

Page    8
SBFA 12101

**Exhibit 14-276**

**ER873**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

# SECURITY AGREEMENT

**SECURITY INTEREST**.  To secure Seller's delivery of the Receipts purchased and other obligations to Purchaser under the Transaction Documents, Seller hereby grants to Purchaser a security interest in: (i) all accounts, accounts receivable, contracts, real property leases, notes, bills, acceptances, chooses in action, chattel paper, instruments, documents and other forms of obligations at any time owing to the Seller arising out of goods sold or leased or for services rendered by Seller, the proceeds thereof and all of Seller's rights with respect to any goods represented thereby, whether or not delivered, goods returned by customers and all rights as an unpaid vendor or lienor, including rights of stoppage in transit and of recovering possession by proceedings including replevin and reclamation, together with all customer lists, books and records, ledger and account cards, computer tapes, software, disks, printouts and records, whether now in existence or hereafter created, relating thereto (collectively referred to hereinafter as "Receivables"); (ii) all inventory, including without limitation, all goods manufactured or acquired for sale or lease, and any piece goods, raw materials, work in process and finished merchandise, findings or component materials, and all supplies, goods, incidentals, office supplies, packaging materials and any and all items used or consumed in the operation of the business of Seller or which may contribute to the finished product or to the sale, promotion and shipment thereof, in which Seller now or at any time hereafter may have an interest, whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of Seller or is held by Seller or by others for Seller's account (collectively referred to hereinafter as "Inventory"); (iii) goods, including without limitation, all machinery, equipment, parts, supplies, apparatus, appliances, tools, fittings, furniture, furnishings, fixtures and articles of tangible personal property of every description now or hereafter owned by the Seller or in which Seller may have or may hereafter acquire any interest, at any location (collectively referred to hereinafter as "Equipment"); (iv) general intangibles in which the Seller now has or hereafter acquires any rights, including but not limited to, causes of action, corporate or business records, inventions, designs, patents, patent applications, trademarks, trademark registrations and applications therefor, goodwill, trade names, trade secrets, trade processes, copyrights, copyright registrations and applications therefor, licenses, permits, franchises, customer lists, computer programs, all claims under guaranties, tax refund claims, rights and claims against carriers and shippers, leases, claims under insurance policies, all rights to indemnification and all other intangible personal property and intellectual property of every kind and nature (collectively referred to hereinafter as "Intangibles"); (v) all the capital stock, bonds, notes, partnership interests, member interests in limited liability companies, and other securities, if any, held of record or beneficially by the Seller, including without limitation the capital stock of all subsidiaries of the Seller, and the Seller's interests in all securities brokerage accounts (collectively referred to hereinafter as "Investments"); (vi) all cash on hand and on deposit in banks, trust companies and similar institutions, and all property accounted for in the Seller's financial statements as "cash equivalents" (collectively referred to hereinafter as "Cash"); (vii) all other assets, proceeds and items not directly referred to herein as those terms are defined in Article 9 of the Uniform Commercial Code under applicable federal and state law (collectively referred to hereinafter as "UCC Article 9 Items"); (viii) all accessions to, substitutions for, and all replacements, products and proceeds of the Receivables, Inventory, Equipment, Intangibles, Investments, Cash and UCC Article 9 Items (collectively referred to hereinafter as "Collateral"), including without limitation proceeds of insurance policies insuring the Collateral; and (ix) books and records relating to any of the Collateral (including without limitation, customer data, credit files, computer programs, printouts, and other computer materials and records of the Seller pertaining to any of the Collateral), whether now or hereafter owned or acquired by Seller and wherever located; and all proceeds of the foregoing. If the Transaction Documents or any addenda identify more than one Seller, this Security Agreement applies to each Seller, jointly and severally.

Seller and Guarantor acknowledge and agree that any security interest granted to Purchaser under any other agreement between Seller and Purchaser will secure the obligations hereunder, and that the Seller's obligations secured by this Security Agreement, and the Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting Purchaser's interest in the Collateral.

Kapitus-FPA-Security Agreement 2021-09-07

Page   1

CONFIDENTIAL
**Exhibit 14-277**

SBFA 12102

**ER874**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

Seller and Guarantor further acknowledge and agree that if, in the future, Seller enters into any agreement with Purchaser, any security interest granted to Purchaser under such future agreements will relate back to this Security Agreement, and that the Seller and/or Guarantor's obligations, and the Collateral granted, under such future agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting Purchaser's interest in the Collateral.

CROSS-COLLATERAL.  To secure Seller's delivery of the Receipts purchased and other obligations to Purchaser under the Purchase Agreement, Seller and each Guarantor hereby grants Purchaser a security interest in all assets and equity interests in the following collateral: **: N/A** (the "Additional Collateral"). Seller and each Guarantor understands that Purchaser will have a security interest in the aforesaid Additional Collateral upon execution of this Security Agreement.

Each of Seller and each Guarantor acknowledges and agrees that any security interest granted to Purchaser under any other agreement between Seller and/or Guarantor and Purchaser will secure the obligations hereunder, and that the Seller and/or Guarantor's payment and performance obligations under the Purchase Agreement, and secured by this Security Agreement, and the Collateral and Additional Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting Purchaser's interest in the Collateral and Additional Collateral.

Each of Seller and each Guarantor further acknowledges and agrees that, if Seller and/or Guarantor enter into future agreements with Purchaser, any security interest granted to Purchaser under such future agreements will relate back to this Security Agreement, and that the Seller and/or Guarantor's obligations, and the Collateral and Additional Collateral granted, under any such future agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting Purchaser's interest in the Collateral and Additional Collateral.

Each of Seller and each Guarantor agree to execute any documents or take any action in connection with this Security Agreement as Purchaser deems necessary to carry out the purpose of such agreements including, without limitation, to perfect or maintain Purchaser's security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements.  Each of Seller and each Guarantor hereby authorizes Purchaser to file any financing statements deemed necessary by Purchaser to perfect or maintain Purchaser's security interest, which financing statement may contain notification that Seller and Guarantor have granted a negative pledge to Purchaser with respect to the Collateral and the Additional Collateral, and that any subsequent Purchaser or lienor may be tortiously interfering with Purchaser's rights.  Each Seller and each Guarantor shall be jointly and severally liable for and shall pay to Purchaser upon demand all costs and expenses, including but not limited to attorney's fees and costs, which may be incurred by Purchaser in protecting, preserving and enforcing Purchaser's security interest and rights.

NEGATIVE PLEDGE.  Seller and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional financings, loans, lien or other encumbrance of any kind with respect to any of the Collateral or the Additional Collateral, as applicable, without the prior written permission of Purchaser.

 CERTIFICATED COLLATERAL.  If any of the Collateral and/or Additional Collateral is now or in the future evidenced or represented by a certificate or certificates, each Seller and each Guarantor shall immediately, and without the need to be notified, deliver such certificate(s) to Purchaser, duly endorsed in a manner satisfactory to Purchaser, to be held as Collateral and/or Additional Collateral pursuant to this Security Agreement.

CONSENT TO ENTER PREMISES AND ASSIGN LEASE.  Purchaser shall have the right to cure Seller's default in the payment of rent for the Premises on the following terms: In the event Seller or Guarantor are served with papers in an action against Seller for nonpayment of rent or for summary eviction, Seller or Guarantor shall promptly provide

(67 of 295), Page 67 of 295, Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 67 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-16   Filed 09/27/23   Page 51 of 62   Page ID
#:1081

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

Purchaser with such papers and Purchaser may execute its rights and remedies under the Assignment of Lease pursuant to Section 2.12 of the Sale Terms and Conditions.  Seller also agrees that Purchaser may enter into an agreement with Seller's landlord giving Purchaser the right to: (a) enter Seller's Premises and to take possession of the fixtures, equipment and other Collateral therein for the purpose of protecting and preserving same; and (b) to assign Seller's lease to another qualified Seller capable of operating a business comparable to Seller's at such Premises.

REMEDIES.  Upon any Event of Default, Purchaser may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "PURCHASE AGREEMENT", "SALE TERMS AND CONDITIONS", AND THE "GUARANTY" (AS APPLICABLE) ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT.  CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT, SHALL HAVE THE MEANING SET FORTH IN THE "PURCHASE AGREEMENT," "SALE TERMS AND CONDITIONS" OR "GUARANTY," AS APPLICABLE.

**SELLER**
By _____     ███████████     _____
           (Print Name and Title)                                              (Signature)
**GUARANTOR**
By _____     ███████████     _____
                 (Print Name)                                                   (Signature)
**GUARANTOR**
By  N/A _____     _____
                 (Print Name)                                                   (Signature)
**GUARANTOR**
By  N/A _____     _____
                 (Print Name)                                                   (Signature)

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

Contract# 9151081

# GUARANTY

**PERSONAL GUARANTY OF PERFORMANCE**.  Each undersigned Guarantor hereby unconditionally guarantees to Purchaser the Merchant's performance of all of the representations, warranties, covenants made by Seller in the Purchase Agreement, the Sale Terms and Conditions, the Security Agreement, Guaranty, and Agreement to Arbitrate (collectively, the "Transaction Documents"), as each may be renewed, amended, extended or otherwise modified from time to time (the "Guaranteed Obligations").  Guarantor shall be liable for and Purchaser may charge and collect all costs and expenses, including but not limited to attorneys' fees and court costs, which may be incurred by Purchaser in connection with the collection of any or all of the Guaranteed Obligations from Guarantor or the enforcement of the Transaction Documents.  (It is understood by all parties that Guarantors are only guaranteeing that they will not take any action or permit the Seller to take any action that is a breach of the Transaction Documents and is not making an absolute guaranty of repayment.)

**GUARANTOR WAIVERS**.  In the event that Seller fails to deliver Receipts generated due to Guarantor's actions or malfeasance, or Guarantor otherwise fails to perform any obligation or covenant under the Transaction Documents, Purchaser may enforce its rights under this Guaranty or any of the other Transaction Documents without first seeking to obtain payment from the Seller, any other guarantor, or through the Security Agreement.

Purchaser does not have to notify Guarantor of any of the following events, and Guarantor will not be released from its obligations under this Guaranty, if it is not notified of: (i) Merchant's failure to deliver timely the Receipts due or to pay any amount owed under the Purchase Agreement; (ii) any material or adverse change in Merchant's financial condition or business operations; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations, including all collateral listed in the Security Agreement, or any other guarantee of the Guaranteed Obligations; (iv) Purchaser's acceptance of this Guaranty; (v) any renewal, extension or other modification of any of the Transaction Documents and/or Merchant's other obligations to Purchaser; and (vi) the Purchaser's pursuit and/or enforcement of any rights and remedies, available at law and in equity, relating to, and/or arising from, the Transaction Documents.

In addition, Purchaser may take any of the following actions without releasing Guarantor from any of its obligations under this Guaranty: (i) renew, extend or otherwise modify any of the Transaction Documents  or Merchant's other obligations to Purchaser; (ii) release Seller from its obligations to Purchaser; (iii) sell, release, impair, waive or otherwise fail to realize upon, any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Guaranty; and (v) pursuit and/or enforcement of any rights and remedies, available at law and in equity, relating to, and/or arising from, the Transaction Documents.  Until all of Merchant's obligations to Purchaser under any of the Transaction Documents are satisfied in full, Guarantor shall not seek reimbursement from Seller or any other guarantor for any amounts paid by Guarantor under any of the Transaction Documents.

Guarantor permanently waives and shall not seek to exercise the following rights that Guarantor may have against Merchant, any other guarantor or third party, any collateral, or any other real or personal property for any amounts paid by Guarantor, any other guarantor, or third party, or acts performed by Guarantor, any other guarantor, or third party, under the Transaction Documents including, without limitation: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.  In the event that Purchaser must return any amount paid by Merchant, any guarantor, entity, or person with respect to the Guaranteed Obligations, including, without limitation, any Merchant, guarantor, entity or person becoming subject to a proceeding under the United States Bankruptcy Code

Kapitus-FPA-Guaranty 2021-09-07

Page    1

**CONFIDENTIAL**
**Exhibit 14-280**

SBFA 12105

**ER877**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

Contract# 9151081

or any similar law, (whether arising under Federal or State law), and/or any other Insolvency Proceeding, legal proceeding or alternative dispute resolution proceeding,  the Guaranteed Obligations under this Guaranty shall remain in full force and effect and Guarantor shall be obligated for any such amounts repaid as well as attorneys' fees, costs, and interest in connection with such proceeding.

**GUARANTOR ACKNOWLEDGEMENT**.  Guarantor acknowledges that: (i) he/she understands the seriousness of the provisions of this Guaranty; (ii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iii) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

**JOINT AND SEVERAL LIABILITY**.  The obligations hereunder of the persons or entities constituting Guarantor under this Guaranty are joint and several.

## CONSENT TO RECEIVE AUTODIALED AND PRERECORDED CALLS AND MESSAGES

PURCHASER, Kapitus Servicing and their subsidiaries and affiliates (collectively, "KAPITUS") may from time to time notify applicant(s) of various promotional offers and other marketing information, or contact Merchant(s) and Guarantor(s) in connection with the servicing of the Transaction Documents, or in connection with any default under the Transaction Documents.  By signing this Guaranty, Guarantor(s) expressly consent and authorize  KAPITUS to call, send text messages, and/or send other electronic messages (including prerecorded or artificial voice messages) using an automatic telephone dialing system to any telephone number provided by Merchant(s) or Guarantor(s)  in the Transaction Documents, any and all applications or any administrative form or other means, including cellular phone numbers and landlines, regardless of their inclusion on any do not call list, for purposes of servicing, collections, marketing or promoting any product offered by KAPITUS.  Guarantor(s) further expressly consent and authorize KAPITUS to record all calls with KAPITUS.  Please note that you are not required to consent to be called for marketing or promotional purposes in order to qualify for financing or obtain any other products or services from KAPITUS.  If you do not agree to be called for marketing or promotional purposes, please call (844) 547-9396 or email DNC@kapitus.com.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "PURCHASE AGREEMENT", "SALE TERMS AND CONDITIONS", AND THE "SECURITY AGREEMENT" (AS APPLICABLE) ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTY SHALL HAVE THE MEANING SET FORTH "PURCHASE AGREEMENT", "SALE TERMS AND CONDITIONS", AND THE "SECURITY AGREEMENT," AS APPLICABLE.

**GUARANTOR**
By _____
         (Print Name)                                    (Signature)
**GUARANTOR**
By  N/A _____
         (Print Name)                                    (Signature)
**GUARANTOR**
By  N/A _____
         (Print Name)                                    (Signature)

Kapitus-FPA-Guaranty 2021-09-07

Page   2
SBFA 12106
**ER878**

CONFIDENTIAL
**Exhibit 14-281**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

## AGREEMENT TO ARBITRATE

***PLEASE READ THIS AGREEMENT CAREFULLY.*** **THIS AGREEMENT TO ARBITRATE ("AGREEMENT") PROVIDES THAT DISPUTES BETWEEN STRATEGIC FUNDING SOURCE, INC. D/B/A KAPITUS AND ITS SUBSIDIARIES AND AFFILIATES, INCLUDING BUT NOT LIMITED TO KAPITUS LLC AND KAPITUS SERVICING, INC. (COLLECTIVELY, "KAPITUS"), ON ONE HAND, AND ███████████████████████████████████████████████, (COLLECTIVELY, "YOU" OR "MERCHANT") (EACH A "PARTY" AND TOGETHER WITH KAPITUS, "THE PARTIES") MAY BE RESOLVED BY BINDING ARBITRATION.**

**ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT. THIS AGREEMENT IS GOVERNED BY THE FEDERAL ARBITRATION ACT ("FAA"), AND SHALL BE INTERPRETED IN THE BROADEST WAY THAT LAW WILL ALLOW.**

**I.**  **Covered Claims.**

**a.**  You or Kapitus may arbitrate any claim, dispute or controversy between the Parties arising out of and/or related to: (i) this Agreement; (ii) any other agreement between the Parties; and/or (iii) the relationship between the Parties, whether or not related to a contract between them ("Claims").

**b.**  **If arbitration is chosen by any Party in accordance with Section III below, no Party will have the right to litigate the Claims in court or to have a jury trial on the Claims.**

**c.**  Except as stated below, all Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, Merchant's or Kapitus's negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims. This also includes Claims made by or against anyone connected with Kapitus or Merchant or claiming through Kapitus or Merchant, or by someone making a claim through Kapitus or Merchant, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company. Threshold issues of whether any claim is arbitrable also are subject to arbitration in accordance with this Agreement.

**II.**  **Arbitration Limits.**

**a.**  Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis. The arbitrator has no authority to arbitrate any claim on a class or representative basis and may award relief only on an individual basis. If arbitration is chosen by any Party, neither Merchant nor Kapitus may pursue a Claim as part of a class action or other representative action.

**b.**  Claims of two or more persons may not be combined in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates or entities under common ownership or control of a Party are deemed one person for purposes of this Agreement.

CONFIDENTIAL
**Exhibit 14-282**

SBFA 12107
**ER879**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

### III. How Arbitration Works.

**a.**     Arbitration shall be conducted by the American Arbitration Association ("AAA") according to this arbitration provision and the applicable AAA Commercial Arbitration Rules in effect when the claim is filed ("AAA Rules"), except where those rules conflict with this arbitration provision. Merchant can obtain copies of the AAA Rules at the AAA's website (www.adr.org). Merchant or Kapitus may choose to have a hearing, appear at any hearing by phone or other electronic means, and/or be represented by counsel. Notwithstanding any terms to the contrary, any in-person hearing will be held in Arlington, Virginia. The arbitration shall be conducted and the award shall be rendered in English.

**b.**     Arbitration may be requested any time, even where there is a pending lawsuit, unless discovery has fully and finally concluded, and/or a final judgment entered. Neither Merchant nor Kapitus waives the right to arbitrate by filing or serving a complaint, answer, counterclaim, or motion in a lawsuit. To choose arbitration, a Party must file a motion to compel arbitration in a pending matter or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.

**c.**     The arbitration shall be conducted by a single arbitrator agreed to by the Parties within twenty (20) days of receipt by respondent of the request for arbitration (unless an extended time period is agreed to by the Parties). In the event the Parties are unable to agree upon the selection of the arbitrator, the arbitrator shall be selected in accordance with this arbitration provision and the AAA Rules for appointing an arbitrator from the AAA National Roster. The selected arbitrator may limit discovery. The arbitrator shall not apply any federal or state rules of civil procedure for discovery, but the arbitrator shall honor claims of privilege recognized at law and shall take reasonable steps to protect account information and other confidential information of any Party if requested to do so. Except as may be required by law, neither a Party nor the arbitrator may disclose the existence, content or results of any arbitration without the prior written consent of both parties, unless to protect or pursue a legal right. The arbitrator shall apply the substantive laws of the jurisdiction specified in any contract between the parties. If no jurisdiction is specified or if multiple jurisdictions are specified in various contracts among the Parties, the substantive laws of the Commonwealth of Virginia shall apply, without regard to any applicable principals of conflicts of law.

**d.**     The arbitrator shall make any award in writing and, if requested by Merchant or Kapitus, shall include a reasoned opinion for the award. An arbitration award shall decide the rights and obligations only of the parties named in the arbitration, and shall not have any bearing on any other person or dispute.

**e.**     The arbitrator shall have no authority to award punitive damages, consequential damages, or other damages not measured by the prevailing Party's actual damages, except as required by statute or allowed under any agreement between the Parties.

### IV. Paying for Arbitration Fees.

**a.**     Arbitration fees will be allocated according to the applicable AAA Rules. All parties are responsible for their own attorney's fees, expert fees and any other expenses unless the arbitrator awards such fees or expenses to Kapitus based on a contract between the parties or applicable law.

**b.**     The Parties agree that failure or refusal of a Party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that Party to present evidence or cross-examine witnesses. In such event, the other Party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award. Such waiver shall not allow for a default judgment against the non-paying Party in the absence of evidence presented as provided for above.

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

**V.    The Final Award.**

**a.**    Any award rendered by the arbitrator shall be final, and binding on the Parties, and may be entered and enforced in any court having jurisdiction, and any court where a Party or its assets is located (to which jurisdiction the Parties consent for the purposes of enforcing such award)  unless a Party appeals such award in writing to the AAA within 30 days of notice of the award pursuant to the AAA's Optional Appellate Arbitration Rules.  The arbitration appeal shall be determined by a panel of 3 arbitrators.  The panel will consider all facts and legal issues anew based on the same evidence presented in the prior arbitration and will make decisions based on a majority vote.  Arbitration fees for the arbitration appeal shall be allocated according to the applicable AAA Rules.  An award by a panel on appeal is final.  A final award is subject to judicial review as provided by applicable law.

**VI.    Miscellaneous.**

**a.**    <u>Survival.</u>  This Agreement shall survive: (i) termination of the account or the relationship between Merchant and Kapitus; (ii) repayment of any amounts owed by Merchant to Kapitus; (iii) the termination of any other agreement between Merchant and Kapitus; (iv), the  filing of any petition or institution of any proceeding by or against any Party  under any provisions of the Bankruptcy Reform Act, Title 11 of the United States Code, or any other similar law relating to bankruptcy, insolvency or other relief for debtors, or general affecting creditor's rights or seeking the appointment of a receiver, trustee, custodian, administrator or liquidator of or for any Party's assets; (v) any sale, transfer and/or assignment of  Merchant's account with Kapitus, or amounts owed on Merchant's account, to another person or entity; (vi)  the closure, suspension, dissolution or termination of Merchant's business; and (vi) the sale, transfer, and/or assignment of Merchant's business, any interest therein that constitutes a change of control in such business, and/or substantially all of Merchant's assets.

**b.**    <u>Severability.</u>  If any part of this Agreement is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration and/or litigation of a class or representative Claim.

**c.**    <u>Entire Agreement, Amendment, Successors, and Assigns.</u>  This Agreement contains the entire understanding among the Parties concerning the subject matter hereof.  No representation, promise, statement of intention has been made by any Party concerning the subject matter hereof that is not embodied in this Agreement, and no Party shall be bound by, or liable for, any such alleged representation, promise or statement of intention not set forth herein.  This Agreement may not be amended, modified, severed or waived, except through a written agreement between Merchant and Kapitus.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, executors, trustees, administrators, representatives, receivers, liquidators, successors, transferees, and assigns of the Parties.  This Agreement shall not be assignable or otherwise transferrable by Merchant without Kapitus's prior written consent to be exercised solely in Kapitus's discretion.  Kapitus may assign or otherwise transfer this Agreement.

**d.**    <u>Counterparts; Electronic Signatures</u>.  This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument.  Electronically transmitted PDFs, facsimile copies of signatures, or electronically transmitted copies of signatures complying with the US Federal ESIGN Act of 2000 (e.g. www.docusign.com) shall be treated as original signatures for all purposes.

**e.**    <u>Authorization.</u>  Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

CONFIDENTIAL

SBFA 12109

**Exhibit 14-284**

**ER881**

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

**f.**   **Waiver.** No failure on the part of Kapitus to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**g.**   **Further Assurances.** Each Party agrees to take all reasonable steps necessary to effectuate the terms of this Agreement. The Parties agree that they will take all actions, execute, and deliver any and all documents reasonably necessary to carry out the intent and purpose of this Agreement, including, without limitation any documents and fees necessary for the commencement and conduct of arbitration as set forth herein.

**h.**   **No Interpretation of Captions or Headings**. The captions and headings within this Agreement are for ease of reference only and are not intended to create any substantive meaning or to modify the terms and clauses either following them or contained in any other provision of this Agreement

**i.**   **Notices.** All notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to Kapitus at 2500 Wilson Boulevard, Suite, 350, Arlington, VA 22201, and to Merchant and/or Guarantor at the address(es) provided by Merchant or Guarantor to Kapitus and as reflected in Kapitus's system of record, and shall become effective only upon receipt. In addition, all notices, requests, consent, demands and other communications must be emailed to generalcounsel@kapitus.com and sk.eurorepair@gmail.com.

**MERCHANT**
By _____         _____
   (Print Name and Title)                    (Signature)

**KAPITUS**
By Steve Podhorzer                       _____
   (Company Officer or Designee)             (Signature)

**GUARANTOR**
By _____         _____
   (Print Name)                              (Signature)

**GUARANTOR**
By N/A                                   _____
   (Print Name)                              (Signature)

**GUARANTOR**
By N/A                                   _____
   (Print Name)                              (Signature)

CONFIDENTIAL                                SBFA 12110

Exhibit 14-285                                          ER882

(74 of 295), Page 74 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 74 of 295
Case 2:22-cv-08775-RGK-SK Document 52-16 Filed 09/27/23 Page 58 of 62 Page ID
#:1088

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D



| ITEMIZATION OF AMOUNT FINANCED | | |
|---|---|---|
| 1 | Amount Given Directly to You | $20,865.00 |
| 2 | Amount Paid on Your Account with N/A | N/A |
| 3 | Amount Paid on Your Account with Kapitus (Contract ID #N/A) | N/A |
| 4 | Wire Fee | N/A |
| 5 | Amount Provided to You or on Your Behalf (1+2+3+4) | $20,865.00 |
| 6 | Prepaid Finance Charge: Origination/Closing Fee | $535.00 |
| 7 | Principal Balance (5+6) | $21,400.00 |

(75 of 295), Page 75 of 295, Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 75 of 295
Case 2:22-cv-08775-RGK-SK  Document 52-16  Filed 09/27/23  Page 59 of 62  Page ID
#:1089

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

## **Representations and Acknowledgements – Funding is Contingent Upon Your Completion and Review by Kapitus**

1. **I am an authorized representative of my business,** with the authority to bind my business to all obligations in pending financing agreement with Kapitus and to execute any other documents that may be needed. ▮

2. **I am an authorized signatory on the business bank account** to which the funding will be disbursed and from which ACH debits will be made in payment of the business financing.

3. **I understand that a blanket UCC-1 financing statement** will be filed to secure my repayment obligations and that the UCC-1 may be filed by an agent or under an alias. ▮

4. **My business does NOT have a current** financing product that obligates my business to make payments on a less than monthly basis that has not been disclosed to Kapitus in writing in connection with my application for funding, nor have I taken on such an obligation since I submitted my application for funding to Kapitus nor do I intend to do so, without Kapitus written consent if my business obtains financing from Kapitus.

5. **I do NOT anticipate closing my business** for any reason over the next 12 months, including for, or due to: planned vacations, renovations, seasonality, medical procedures, slow business periods, eviction by landlord, failure to pay taxes, failure to maintain any business licenses, or failure to comply with any legal requirements, or any other reason.

6. **I do NOT anticipate selling my business in the next 12 months.**

7. **Neither my business nor I plan to file for bankruptcy** or commence any similar proceeding, nor do I have any reason to believe that creditors of my business may attempt to file an involuntary bankruptcy proceeding against my business or commence any similar proceeding, within the next 12 months. ▮

8. **I am current and NOT in arrears with the payments due under my business's mortgage, or under my business's lease, as applicable.**

9. **Neither my business nor I are in arrears on any business or personal loans or** other financial obligations, except as previously disclosed to Kapitus in writing.

10. **NO taxing or other authorities have filed any liens nor do I have any unpaid tax obligations,** except as previously disclosed to Kapitus in writing. ▮

11. **All information that I provided to Kapitus to obtain financing for my business accurately reflects the current ownership of the business, business status and/or financial condition of my business.**

12. **Neither my business nor I are party to any pending litigation** that I would expect to have a material impact on my business.

13. **I acknowledge that I submitted the statements herein with the intent to obtain financing,**

(76 of 295), Page 76 of 295   Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 76 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-16   Filed 09/27/23   Page 60 of 62   Page ID
#:1090

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

**Kapitus is relying on such statements to determine whether to approve the financing and that any false statements or misrepresentations made to obtain funding constitute fraud** and will subject me and my business to legal action. *If you cannot truthfully make these representations and acknowledgments, p▮▮▮▮ontact your current sales representative to address any previously undisclosed issues.* ▮▮▮▮

14. **I acknowledge any approval for financing is contingent upon, and subject to, Kapitus's review of my responses to these questions, and that Kapitus will not disburse any funds to me unless I can truthfully provide these representations and acknowledgements.** ▮▮▮▮

By: ▮▮▮▮▮
    (Print Name and Title)

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

Contract# 9151081



### EARLY RECEIVABLE DELIVERY ADDENDUM

Pursuant to the terms of that certain Forward Purchase Agreement dated December 27th, 2022, Seller sold receivables to Purchaser.

Provided that Seller is not in default of any obligation to the Purchaser, and subject to the conditions set forth below, in exchange for the early delivery to Purchaser of the receivables purchased, Purchaser shall revise the Receipts Purchased Amount set forth in the Agreement as follows:

| EARLY DELIVERY WINDOW (calendar days immediately following disbursement of the Purchase Price) | DISCOUNTED RECEIPTS PURCHASED AMOUNT | DISCOUNT AMOUNT |
|---|---|---|
| 1-30 calendar days | $27,909.49 | $2,264.51 |
| 31-60 calendar days | $28,255.04 | $1,918.96 |
| 61-90 calendar days | $28,577.17 | $1,596.83 |
| 91-120 calendar days | $28,874.54 | $1,299.46 |
| 121-150 calendar days | $29,145.75 | $1,028.25 |
| 151-180 calendar days | $29,389.28 | $784.72 |
| 181-210 calendar days | $29,603.56 | $570.44 |
| 211-240 calendar days | $29,786.91 | $387.09 |
| 241-270 calendar days | $29,937.56 | $236.44 |
| 271-300 calendar days | $30,053.63 | $120.37 |
| 301-330 calendar days | $30,133.14 | $40.86 |
| 331-360 calendar days | $30,174.00 | $0.00 |

1. Payment of the Discounted Receipts Purchased Amount set forth in this Addendum shall be made in accordance with the terms of the Merchant Agreement, or by wire transfer to:



Wells Fargo Bank

For account of: Kapitus Servicing
Acct#
Note: For credit to account

2. If the payment is received from a third party, the full Receipts Purchased Amount set forth in the Agreement will remain due and owing.

DocuSign Envelope ID: 07107493-A74A-46E3-9D5C-F9DE0971F96D

3. Any payment made pursuant to this Addendum must clear by 11:59 pm of the last date of the Early Delivery Window set forth above.

4. Except as otherwise specifically provided herein, this Addendum shall not be deemed or construed to modify, amend or affect any of the terms and provisions of the Transaction Documents, which shall continue to apply to the Seller and Guarantor(s).

5. Capitalized terms used in this Addendum that are not defined shall have the meaning set forth in the Transaction Document.

EXPERT WITNESS REPORT
Prepared for the California Department of Justice
Friday, September 22, 2023
By Catherine O'Neil

Case Name:     Small Business Finance Association v. Clothilde Hewlet, solely in her
               official capacity as Commissioner of the California Department of
               Financial Protection and Innovation
Case Number:   No 22-cv-08775-RGK-SK (C.D. Cal.)

## Executive Summary

My name is Catherine O'Neil and I am a mathematician and data scientist. I have been hired by the California Department of Justice ("CA DOJ") to look into "Appendix J to Part 1026 - Annual Percentage Rate Computations for Closed-End Credit Transactions"[1] ("Appendix J") with the goal of understanding and providing an opinion on how a company could compute an estimated annual percentage rate on its schedule of cash transactions. I have found that, in the case where there is a single cash disbursement to the customer and a periodic schedule of uniform payments by the customer, the annual percentage rate can be computed using the Excel function "RATE" and then annualizing with a straightforward multiplication factor. This is an extremely easy calculation to set up and is mathematically equivalent to the Appendix J formula.

## More about my Background

I was an undergrad math major in college, and then I got a Ph.D. in mathematics in 1999 from Harvard University. I then taught mathematics at MIT and Columbia College, after which I worked in finance for 4 years as a quantitative analyst and risk researcher. I then became a data scientist and started an algorithmic auditing company called ORCAA. In the past ten years, my publications include *The Shame Machine: who profits in the new age of humiliation*, *Weapons of Math Destruction: how big data increases inequality and threatens democracy*, and *Doing Data Science: straight talk from the front line*. I was also a Bloomberg Opinion columnist until 2022. I was approached by Rachel Yoo from the CA DOJ on September 7th to look into Appendix J and understand its formula. I have not testified as an expert in any other case during the past four years. This report was written by myself and Jake Appel, my ORCAA colleague who was also hired by the California Department of Justice. We are being compensated for our work on an hourly basis at the rate of $300 per hour.

---

[1] Found here: https://www.consumerfinance.gov/rules-policy/regulations/1026/j/

**Exhibit 15-291**

**ER888**

EXPERT WITNESS REPORT

**What does Appendix J say?**

Appendix J formulates a very general formula that implicitly describes an annualized rate of percentage based on a series of cash transactions between two parties, which we can call the business ("B") and the customer ("C"). In particular, it stipulates that B gives money to C, perhaps many times in many different amounts, and also that C gives money back to B, possibly at many different times for different amounts. Assuming that the amount owed by both parties ends up being zero, it deduces the implied percentage rate of the overall transaction.

**Simplifying the situation to a single disbursement and uniform periodic payments**

For the purpose of this assignment, I was asked to assume that customers receive one cash disbursement at the beginning of the contract, and then set up a regular schedule of uniform payments from the customer back to the business. This means the formula in Appendix J simplifies dramatically.

**The simplified the Appendix J formula**

There are two steps to computing the annual percentage rate. First, you compute the raw percentage rate, then you annualize it.

This is the general formula from Appendix J to infer the raw percentage rate:

$$\frac{A_1}{(1+e_1 i)(1+i)^{q_1}} + \frac{A_2}{(1+e_2 i)(1+i)^{q_2}} + \ldots + \frac{A_n}{(1+e_n i)(1+i)^{q_n}} =$$

$$\frac{P_1}{(1+f_1 i)(1+i)^{t_1}} + \frac{P_2}{(1+f_2 i)(1+i)^{t_2}} + \ldots + \frac{P_n}{(1+f_n i)(1+i)^{t_n}}$$

2

Exhibit 15-292

**ER889**

EXPERT WITNESS REPORT

Where the notation is defined as follows:

$A_k$ = The amount of the kth advance.

$q_k$ = The number of full unit-periods from the beginning of the term of the transaction to the kth advance.

$e_k$ = The fraction of a unit-period in the time interval from the beginning of the term of the transaction to the kth advance.

m = The number of advances.

$P_j$ = The amount of the jth payment.

$t_j$ = The number of full unit-periods from the beginning of the term of the transaction to the jth payment.

$f_j$ = The fraction of a unit-period in the time interval from the beginning of the term of the transaction to the jth payment

n = The number of payments.

i = The percentage rate of finance charge per unit-period, expressed as a decimal equivalent.

In our simplified version, there is only one "advance," so the entire left hand side of the above equation has only one term. In other words, m is 1, so instead of there being a bunch of A's with different subscripts, there's only one A. Also, since the first and only disbursement happens at the very beginning of the contract, the e here is simply zero. And since there's no full period where disbursements take place, the q here is zero as well. In other words, the denominator on the single term on the left hand side simplifies to 1.

Moreover, the payments are uniform, so all of the terms on the right hand side have the same numerator. Finally, the payments all happen at the beginning of each time period, starting with the first payment at the beginning of the second time period, so all of the fj's are zero. In other words, only the t's vary, with the payments, so we can simplify the above equation to the following[2]:

---

[2] The latex formulas herein were rendered using https://arachnoid.com/latex/.

3

**Exhibit 15-293**

**ER890**

EXPERT WITNESS REPORT

---

**Simplified Appendix J Formula:**

$$A = \frac{P}{(1+i)} \frac{P}{(1+i)^2} + \cdots + \frac{P}{(1+i)^n}$$

---

We know "A," the initial disbursement, and we know "P," the payments from the customer to the business, and we know "n," which is the number of payments. The remaining variable is "i," the percentage rate, which again is the raw percentage rate, and is not yet annualized.

We will show that the above formula is mathematically equivalent to a formula in Excel called "RATE". This means that if we compute the above value with any choice of A and P, then the "I" above will be the same answer as what RATE gives for i.

### Annualizing the raw percentage rate

Once we solve for "i," we can annualize it by multiplying it by the number of time periods in a year, which is referred to as "w" in Appendix J. So if the time periods are months, we'd multiply it by 12. If the time periods were weeks, we'd multiply by 52, and if the time periods are days, we would multiply by 365, if weekends and holidays are included as days that the customer pays, but more likely by 250, if it's only on business days that payments are made. This product, i*w in Appendix J, is an annualized percentage rate.

Finally, if we want to view the annualized percentage rate as a percentage, we multiply the result above by 100. This is called "I" in Appendix J. We will come back to how to do this in Excel below.

### Excel functions

Excel has a series of related "formulas from finance" that all deal with the notion of percentage rates and cash transactions. They have different notation then Appendix J, so we will have to translate them into our language above. The formula that we care about is the following[3]:

$$pv * (1 + rate)^{nper} + pmt(1 + rate * type) *$$

$$\left( \frac{(1 + rate)^{nper} - 1}{rate} \right) + fv = 0$$

---

[3] Located on the following Microsoft Excel help page: https://support.microsoft.com/en-au/office/pv-function-23879d31-0e02-4321-be01-da16e8168cbd

4

**Exhibit 15-294**

**ER891**

EXPERT WITNESS REPORT

Mapping the terms of this Excel equation onto the previous equation simplified equation:

- pv = "present value of the annuity" becomes -A, since from the perspective of the business, they are giving A to the customer,
- rate = "percentage rate per period" (assumed to be nonzero) becomes i,
- pmt = "payment made each period" (note this formula assumes equal-size payments) becomes P,
- nper = "total number of payment periods" becomes n,
- type = 0, since all payments are made at the end of the period, and
- fv = 0, since there is no balance after the last payment is made.

In other words, the Excel equation translates to:

$$-A \cdot (1+i)^n + P \cdot (1 + i \cdot 0) \cdot \frac{(1+i)^n - 1}{i} = 0$$

Or in other words, after simplifying:

---

**Simplified Excel Formula:**

$$A \cdot (1+i)^n = P \cdot \frac{(1+i)^n - 1}{i}$$

---

**<u>Theorem</u>** The Simplified Excel Formula is mathematically equivalent to the Simplified Appendix J Formula.

Proof. We will use the following fact from high school algebra:

$$X^n - 1 = (X - 1)(X^{n-1} + X^{n-2} + \ldots + X + 1)$$

When we substitute the term (1+i) for X above we get:

$$((1+i)^n - 1) = ((1+i) - 1)((1+i)^{n-1} + (1+i)^{n-2} + \ldots + (1+i) + 1)$$

$$= i \cdot ((1+i)^{n-1} + (1+i)^{n-2} + \ldots + (1+i) + 1)$$

When we plug this in to the right hand side of the Simplified Excel Formula, we get:

$$A \cdot (1+i)^n = P \cdot \frac{i \cdot ((1+i)^{n-1} + (1+i)^{n-2} + \cdots + (1+i) + 1)}{i}$$

5

Exhibit 15-295

**ER892**

EXPERT WITNESS REPORT

Note that the i's cancel in the numerator and denominator on the right hand side[4]:

$$A \cdot (1+i)^n = P \cdot \left((1+i)^{n-1} + (1+i)^{n-2} + \cdots + (1+i) + 1\right)$$

Furthermore, if we divide both sides by $(1+i)^n$, we get:[5]

$$A = P \cdot \frac{((1+i)^{n-1} + (1+i)^{n-2} + \cdots + (1+i) + 1)}{(1+i)^n}$$

Upon expansion, this is exactly the Simplified Appendix J Formula.

**Corollary** Any computation using the Simplified Appendix J Formula will yield the same "i" as the computation using the Simplified Excel Formula, as long as both are defined, in other words as long as i is neither 0 nor -1.

**Examples: How to compute estimated APR using "RATE" function**

Here are examples of how to compute estimated APR using Excel's "RATE" function. Note from the Corollary above, the answers here will be exactly the same as using the Appendix J formula. We are presenting examples here of the RATE function merely to demonstrate how simple it is to use.

Example 1: Consider an arrangement where business B disburses to customer C $22,000 today, and customer C will make a weekly payment of $1,000 to B for the next 25 weeks. The Excel screenshot below shows how this scenario produces an estimated APR of 52.4427%

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Disbursement from B to C | Periodic payment from C to B | Number of payment periods | Period | Payment periods per year | Excel formula text | Excel formula result: interest rate per period | Estimated APR = (G)*(E) |
| -$22,000 | $ 1,000 | 25 | week | 52 | =RATE(25,-1000,22000) | 1.0085% | 52.4427% |

Example 2 - with initial fees: Consider an arrangement just like the above, except that $2,000 of origination fees are deducted from the initial disbursement to C, for a net disbursement of $20,000. The Excel screenshot below shows how this scenario produces an estimated APR of 93.3746%.

---

[4] To do this canceling we must assume i ≠ 0, which is safe in this context: the financing arrangements being considered all involve a disbursement now in exchange for a *larger* sum of payments in the future, i.e., i>0.

[5] To do this division we must assume (1+i) ≠ 0, i.e. i ≠ -1. This is safe for the same reason noted in footnote 4.

6

**Exhibit 15-296**

**ER893**

EXPERT WITNESS REPORT

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Disbursement from B to C | Fees deducted from disbursement | Periodic payment from C to B | Number of payment periods | Period | Payment periods per year | Excel formula text | Excel formula result: interest rate per period | Estimated APR = (H)*(F) |
| -$22,000 | -$2,000 | $  1,000 | 25 | week | 52 | =RATE(25,-1000,(22000-2000)) | 1.7957% | 93.3746% |

This example also addresses the scenario where some of the disbursement is applied to a previous balance customer C has with business B. If some of the funds are used to pay off their previous balance, C receives a smaller net disbursement. We only care about the initial disbursement amount and the subsequent regular and uniform payments.

Example 3 - with daily payments: Consider an arrangement where B disburses to C $22,000 today, and C will make a $200 payment each business day for 125 business days. The Excel screenshot below shows how this scenario produces an estimated APR of 51.8914%. Note that to annualize the percentage rate we assume 250 business days in a calendar year.

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| Disbursement from B to C | Periodic payment from C to B | Number of payment periods | Period | Payment periods per year | Excel formula text | Excel formula result: interest rate per period | Estimated APR = (G)*(E) |
| -$22,000 | $  200 | 125 | business day | 250 | =RATE(125,-200,22000) | 0.2076% | 51.8914% |

## Conclusion

In a transaction where there is one cash disbursement at the beginning of the contract and a regular schedule of uniform payments, I can conclude with mathematical certainty that using Excel RATE function produces the same APR as using the formula in Appendix J. Excel RATE function makes following the formula in Appendix J simple and easy so that anyone with basic understanding of Excel functions would be able to calculate APR using Excel RATE function.

Date: September 22, 2023

_____
Catherine O'Neil

7

**Exhibit 15-297**

**ER894**

EXPERT WITNESS REPORT

**Documents Relied Upon In Formulating the Report**

- Appendix J to Part 1026 – Annual Percentage Rate Computations for Closed-End Credit Transactions
- Help page from Excel "PV" function: https://support.microsoft.com/en-au/office/pv-function-23879d31-0e02-4321-be01-da16e8168cbd

8

Exhibit 15-298

**ER895**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## EXPERT REPORT OF PROFESSOR ADAM J. LEVITIN

*Small Business Finance Association v. Clothilde Hewlet*, No 22-cv-08775-RGK-SK (C.D. Cal.)

Exhibit 16-299

ER896

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

I. INTRODUCTION ...................................................................................... 3

II. PROFESSIONAL BACKGROUND AND QUALIFICATIONS ................................. 3

III. BACKGROUND AND ASSIGNMENT .......................................................... 5

IV. SMALL DOLLAR COMMERCIAL FINANCING ............................................. 5

V. MERCHANT CASH ADVANCES ................................................................ 6

    A. The Use of MCAs .......................................................................... 6

    B. The Structure of MCAs ................................................................... 7

    C. Regulatory Concerns About MCAs .................................................... 9

    D. MCAs Are Frequently Just Disguised Loans ...................................... 10

        a. *Recourse Against Collateral Exceeding the Receivables* ...................... 11

        b. *Recourse Against the Small Business Generally Through Warranties* ..... 11

        c. *Recourse Against the Owner-Guarantor Through Warranties* ............... 13

        d. *Repayment Obligations on MCAs Are Not Really Contingent Upon Generation of Future Receivables* ................................................. 14

VI. THE DIFFICULTY IN DETERMINING IF A TRANSACTION IS ACTUALLY A NON-LOAN TRANSACTION ...................................................................... 14

VII. THE CONFUSING NATURE OF VOLUNTARY DISCLOSURE OF MCA TERMS PRIOR TO THE DFPI REGULATIONS UNDER THE CFDL ................................ 15

VIII. THE IMPORTANCE OF THE ANNUAL PERCENTAGE RATE (APR) AS A STANDARDIZED MEASURE OF CREDIT COST DISCLOSURE ........................................... 19

    A. The Function of the Annual Percentage Rate ..................................... 19

    B. Federal Regulatory Concerns About the APR Are Not Applicable to MCAs . 21

    C. The "Estimated APR" and "Estimated Term" Are Exactly What They Say They Are ................................................................................... 22

    D. The Estimated Term Methodologies Are Necessary Because MCA Providers Are Incentivized to Manipulate the Estimated Term to Make Their Product Look Less Expensive ........................................................................... 23

    E. Without the Estimated APR It Is Impossible to Undertake a Meaningful Cost Comparison of MCAs with Different Payment Percentages ..................... 24

CONCLUSION .......................................................................................... 25

APPENDIX A. LIST OF EXPERT TESTIMONY GIVEN AT DEPOSITION OR TRIAL DURING THE PREVIOUS FOUR YEARS ........................................................ 26

APPENDIX B. CURRICULUM VITAE OF ADAM J. LEVITIN ................................. 27

APPENDIX C. DOCUMENTS RELIED UPON IN FORMULATING THE REPORT ............. 55

**Exhibit 16-300**

**ER897**

(89 of 295), Page 89 of 295   Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 89 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-18   Filed 09/27/23   Page 3 of 58   Page ID
#:1103

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

## I.     INTRODUCTION

1. My name is Adam Jeremiah Levitin. I was retained by the Attorney General of the State of California (the "**State**") on behalf of the California Department of Financial Protection and Innovation to provide expert testimony in the case captioned *Small Business Finance Association v. Clothilde Hewlet*, No 22-cv-08775-RGK-SK (C.D. Cal.) (the "**Litigation**") regarding the application of its regulations[1] under the California Commercial Financing Disclosure Law ("**CFDL**")[2] to various forms of small business financing, including merchant cash advances.

2. I have read the Complaint and defendant's Answers in the aforementioned cases, as well as the Court's opinion on the State's motion to dismiss, and am so acquainted with the subject of the Litigation relating to the California Commercial Financing Disclosure Law.

3. The State has requested that I opine on certain topics relating to the nature of the small dollar commercial financing market and merchant cash advances. Although my opinions are informed by my legal knowledge, they are a predicate or input to the determinations that are reserved for the trier of fact, and I express no opinion here on any ultimate question of whether the disclosures required by California CFDL violate the First Amendment of the United States Constitution. Instead, the opinions I state here would merely be evidence that the trier of fact could use in reaching a conclusion on the ultimate issue.

## II.    PROFESSIONAL BACKGROUND AND QUALIFICATIONS

4. I am the Carmack Waterhouse Professor of Law and Finance at the Georgetown University Law Center in Washington, D.C., where I have taught as a full-time faculty member since 2007. I have held tenure at Georgetown University Law Center since 2011. From 2018-2020 I held the Agnes N. Williams Research Professorship, and from 2020-2023, I held the Anne Fleming Research Professorship.

5. At Georgetown University Law Center, I teach courses in bankruptcy, consumer finance, secured lending, and structured finance, among other topics, and in these courses I regularly teach about the economics and regulation of consumer and small business financing transactions.

6. I have previously served as the Bruce W. Nichols Visiting Professor of Law at Harvard Law School; as the Robert Zinman Scholar in Residence at the American Bankruptcy Institute; as a faculty member for the Practicing Law Institute's Consumer Financial Services program; and as the faculty instructor for the training program for the Federal Trade Commission ("**FTC**") Division of Financial Practices attorneys.

7. From 2008-2010, I served as Special Counsel to the Congressional Oversight Panel that supervised the Troubled Asset Relief Program ("**TARP**").

8. From 2012-2015, I served as a member of the statutory Consumer Advisory Board for the Consumer Financial Protection Bureau ("**CFPB**").

9. Since 2008, I have testified thirty-two times before Congress on financial regulatory issues, including testifying before the House Committee on Small Business on three occasions, one of which was a hearing on price transparency in small business lending.

10. I regularly consult informally with members of Congress, the Consumer Financial Protection Bureau, the Federal Reserve, the Federal Deposit Insurance Corporation, the Departments of Commerce, Housing and Urban Development, and Treasury, the International Monetary Fund, the World Bank,

---

[1] Cal. Code Reg. title 10, § 900 *et seq.*
[2] Cal. Fin. Code §§ 22801 *et seq.*

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

state attorneys general offices, and non-profit policy groups on various financial regulation topics, including financing for small-to-medium enterprises.

11. I have previously served as an expert witness for the State of New Jersey in litigation against a merchant cash advance company. I have also served as an expert witness in several securitization litigations that involved the questions of violations of representations and warranties, issues about what triggers an "Event of Default," and guarantor liability. A list of my testimony at trial or deposition in the past four years may be found in Appendix A to this report.

12. Financial regulation is a major focus of my academic research. I have authored over eighty academic articles and book chapters and encyclopedia entries all of which deal with various topics in financial regulation and financing. Among my publications is a law school textbook on consumer finance and its regulation, CONSUMER FINANCE: MARKETS AND REGULATION (2d ed. Aspen, 2023). The book contains a chapter on consumer credit cost disclosure, including calculation of the finance charge and the annual percentage rate ("**APR**"). I am also a co-author of the National Consumer Law Center's treatise on CONSUMER BANKING AND PAYMENTS LAW. Among my articles is one that specifically addresses high-cost small business lending. Adam J. Levitin, *Rent-A-Bank: Bank Partnerships and The Evasion of Usury Laws*, 71 DUKE L.J. 329, 331-35 (2021). Additionally, I am the author of a law school textbook on financial restructuring, BUSINESS BANKRUPTCY: FINANCIAL RESTRUCTURING AND MODERN COMMERCIAL MARKETS (3d ed. Aspen, 2023) that covers the operation of guaranties in some detail. A complete list of my academic publications from the last ten years may be found in my curriculum vitae in Appendix B to this report.

13. My work has been published in leading law, economics, and finance journals and has been awarded prizes from the American College of Commercial Financial Lawyers, the American College of Consumer Financial Services Lawyers (twice), the *American Bankruptcy Law Journal*, the George Washington University Center for Law, Economics and Finance, and the *Yale Journal on Regulation*. My scholarship has also been cited in numerous judicial opinions, including by several state supreme courts and several federal circuit courts of appeals.

14. I am elected Fellow of the American College of Consumer Financial Services Lawyers, an elected Fellow of the American College of Bankruptcy, and an elected member of the American Law Institute. In 2013, I received the American Law Institute's Young Scholar's Medal, which is awarded every two years to "one or two outstanding early-career law professors whose work is relevant to the real world and has the potential to influence improvements in the law."

15. I hold a J.D. *cum laude* from Harvard Law School. I also hold a Bachelor of Arts (A.B.) degree *magna cum laude* with highest honors in field from Harvard College, a Master of Arts (A.M.) degree and a Master of Philosophy (M.Phil.) degree from Columbia University.

16. I have served as law clerk to the Honorable Jane R. Roth on the United States Court of Appeals for the Third Circuit and am admitted to practice before the bars of the State of New York, the Supreme Court of the United States, the United States Court of Appeals for the Third Circuit, the United States District Court for the Southern District of New York, and the United States District Court for the Eastern District of New York.

17. Based on the foregoing experiences, as well as my research following my engagement in this case, I am familiar with the structure, regulation, and custom and practices of small business finance in general and merchant cash advances in particular. I am also familiar with the calculation of the annual percentage rate and the finance charge and the role of these terms in consumer credit cost disclosure. I believe this specialized knowledge would be helpful to the trier of fact in understanding the evidence and determining ultimate issues regarding whether the disclosures required by the California CFDL violate the First Amendment of the United States Constitution.

(91 of 295), Page 91 of 295   Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 91 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-18   Filed 09/27/23   Page 5 of 58   Page ID
#:1105

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

18. My compensation for preparing this report, for preparing for giving testimony, and for any testimony given in this litigation is at the rate of $700/hour plus reimbursement of approved expenses.

19. My compensation does not depend on either the opinions I express or the outcome of this litigation.

20. This report is the product solely of my own work. I received no assistance from any person in the writing of the report.

21. The sources I considered upon in preparing this report are listed in Appendix C to this report.

## III.   BACKGROUND AND ASSIGNMENT

22. In September 2018, California enacted the CFDL,[3] which directed the California Department of Financial Protection and Innovation ("**DFPI**") to promulgate disclosure regulations for offers of commercial financings of $500,000 or less in California.[4]

23. On June 9, 2022, the California Office of Administrative Law approved the DFPI's final regulations implementing the CFDL. The regulations went into effect on December 9, 2022.

24. The Small Business Finance Association ("**SBFA**") has brought suit claiming that the regulations violate the First Amendment of the United States Constitution because they constitute compelled speech. In particular, the SBFA alleges that "the Regulations compel providers of commercial financing to speak messages that are false, misleading, and controversial. By compelling commercial speech that is neither factual nor uncontroversial, the Regulations violate the First Amendment."[5] SBFA claims that "By treating non-loan transactions (such as leases and sales transactions) and open-end credit like closed-end loans, the speech compelled by the Regulations is inaccurate and does not translate into meaningful disclosures regarding the costs and characteristics of the transactions governed by SB 1235."[6]

25. In order to help inform the trier of fact about the underlying subject of the challenged regulation and the product about whose required disclosures the plaintiffs are complaining, the Office of the California Attorney General has requested that I opine on:

   a.   The nature of the small dollar commercial financing market (that is the market for commercial financings of $500,000 or less) and small dollar commercial financing borrowers;

   b.   The nature and structure of merchant cash advances ("**MCAs**");

   c.   The relationship between performance guaranties and personal guaranties in MCAs;

   d.   The difficulty in determining whether a transaction is in fact a non-loan transaction;

   e.   Whether the pre-regulation, voluntary disclosure of MCA terms was inherently likely to be confusing to many of the businesses that use them; and

   f.   The importance of the Annual Percentage Rate ("**APR**") as a standardized measure of credit cost disclosure.

## IV.   SMALL DOLLAR COMMERCIAL FINANCING

26. The CFDL covers offers of commercial financing for $500,000 or less. Although such financings are large relative to many consumer obligations, they are of a size that would be considered "small dollar" commercial financing in comparison to financings for millions or even billions of dollars.

---

[3] SB 1235 (Sept. 30, 2018).
[4] Cal. Fin. Code § 22804.
[5] Complaint, ¶ 2.
[6] Complaint, ¶ 13.

**ER900**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

27. The federal Truth in Lending Act, the law that governs consumer credit cost disclosures, does not apply to business financing.[7]

28. The primary users of small dollar commercial financing are small businesses. Although small businesses are frequently incorporated, they are closely held, usually by an owner-operator who is the decision-maker for the business.

29. Because of their closely held nature, small businesses are often more akin to consumers in terms of their financial sophistication. A small business selling goods or non-financial services is unlikely to be any more expert in financial matters than a consumer; the small business's expertise is that of its owner-operator, that is of a consumer.

30. Small business financing is frequently underwritten based on the personal credit of the business owner and guaranteed by the business owner.[8] Accordingly, many of the same concerns about adequacy of cost of credit disclosure obtain for small businesses as for consumers.

31. The small dollar commercial financing market involves several different products, which compete with each other to some degree, although many financing providers offer more than one category of product.

32. Among the product classes are closed-end credit (term loans), open-end credit (lines of credit), and what is called sales-based financing (merchant cash advances and, less commonly, products expressly structured as loans with repayment keyed to the borrower's sales). Some small business financings are partially guaranteed by the U.S. Small Business Administration ("**SBA**").[9] (The SBA will also make direct loans in declared disaster areas.)

33. Different small business financing products are provided by different types of entities. Although non-bank finance companies provide all types of small business financing products, banks rarely offer sales-based financing and are generally considered to have more demanding underwriting standards than non-bank finance companies. SBA loans are made primarily, but not exclusively by banks.

## V.  MERCHANT CASH ADVANCES

34. The most common type of sales-based financing for small businesses is a product generally called a "merchant cash advance" or MCA. Unlike other types of financing, including invoice factoring, a MCA does not require the merchant to have any collateral in hand. Instead, it is structured as a purchase of the merchant's future sales, which are credited to the buyer periodically as a fixed percentage of the merchant's sales (or typically just a percentage of payment card receipts). If this formal structure is credited as being the true nature of the product—a major issue with MCAs—it removes MCAs from being treated as extensions of credit in many states. Accordingly, MCAs are not generally regulated as credit, meaning that they are not subject to usury laws and MCA providers are not subject to lender licensing requirements, at least by virtue of offering MCAs.

### A.  The Use of MCAs

35. MCAs are a product used exclusively or almost exclusively by small businesses. Only a small percentage of small businesses with non-owner employees apply for MCAs—just 7% according to a recent Federal Reserve System survey.[10] MCA financing tends to be for smaller amounts than bank loans, although

---

[7] 15 U.S.C. § 1603(1).

[8] *See, e.g.*, Dock Treece, *Personal Guaranties and Business Loans*, BUS. DAILY NEWS, Feb. 21, 2023, *at* https://www.businessnewsdaily.com/16467-personal-guarantee.html.

[9] The guaranty is up to 75% for loans over $150,000 and 85% for smaller loans. 15 U.S.C. § 636(a)(2).

[10] Fed. Reserve Sys., *Small Business Credit Survey, 2023 Report on Employer Firms*, 14, *at* https://www.fedsmallbusiness.org/-/media/project/smallbizcredittenant/fedsmallbusinesssite/fedsmallbusiness/files/2023/2023_sbcs-employer-firms.pdf.

**Exhibit 16-304**

**ER901**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

this might merely reflect the smaller size and weaker financial condition of businesses that apply for MCAs.[11]

36. MCAs are considered a high-cost financing product,[12] but they have certain attractions to small businesses. First, they are quicker to obtain than other forms of financing. Small businesses can apply on-line and get approved and funded within days, as opposed to months for a bank loan.

37. Second, MCAs are easier for small businesses with poor or limited credit histories to obtain than traditional forms of small business financing. A 2023 Federal Reserve Board survey of small business credit found that the approval rate for MCAs (90%) was higher than for any other common form of small business financing.[13]

38. Third, there are generally no restrictions on how the funding from an MCA can be used, unlike many other small business financing products.[14]

39. Fourth, some MCAs have a different payment structure than traditional loans. Although the periodic payment for some MCAs is a fixed dollar amount,[15] for others it is based on a percentage of the merchant's sales (typically just payment card transactions). For MCAs with a variable payment amount the small business's payment obligations rise and fall with its sales revenue stream, which can be attractive to merchants with seasonal sales (Christmas, summer, e.g.).[16] The flip side, however, with variable payment amounts is that there is uncertainty about precisely when the small business will manage to pay off the MCA; lower sales mean a longer payback period.

40. As one small business finance company that does not provide MCAs explains, "MCAs are typically used as a last resort for small, quick financing arrangements that can be repaid in a short amount of time."[17] In this regard, MCAs bear some similarities to high-cost, small-dollar consumer finance products like payday loans.

### B. The Structure of MCAs

41. MCAs are structured to give the small business a lump sum payment. This payment, sometimes known as the "advance amount," is what the DFPI regulations require to be disclosed as "Funding Provided."[18] The "payback amount" that the small business is then expected to repay is the advance amount multiplied by a "factor" plus certain fees.[19] The factor typically ranges from 1.1 to 1.5.[20] It is applied as a multiplier to the advance amount. For example, an advance amount of $100,000 with a multiplier of

---

[11] What Is Revenue-Based Financing? *Why It's Different*, at https://whatisrevenuebasedfinancing.com/why-its-different/ (last viewed Sept. 20, 2022, at 9:20am).

[12] Forward Financing, *Merchant Cash Advances vs. Business Loans — What's the Difference?*, Sept. 13, 2023, *at* https://www.forwardfinancing.com/2023/09/13/merchant-cash-advances-vs-business-loans-whats-the-difference/ (last viewed Sept. 20, 2022, at 9:09am) ("Typically, a traditional business loan – usually from a bank or a credit union – will be less costly than an MCA…"); Kapitus, *Financing Your Small Business With a Merchant Cash Advance*, at https://kapitus.com/wp-content/uploads/2019/11/MCA_eGuide.pdf (merchant cash advances can end up being a much more expensive borrowing option than other kinds of financing.").

[13] Fed. Reserve Sys., *Small Business Credit Survey, 2023 Report on Employer Firms*, 17, *at* https://www.fedsmallbusiness.org/-/media/project/smallbizcredittenant/fedsmallbusinesssite/fedsmallbusiness/files/2023/2023_sbcs-employer-firms.pdf.

[14] Rapid Finance, *Everything You Need to Know About A Merchant Cash Advance*, at https://www.rapidfinance.com/blog/everything-you-need-to-know-about-a-merchant-cash-advance/ (last viewed Sept. 20, 2022, at 9:11am).

[15] *See, e.g.*, SBFA 00629.

[16] *Id.*

[17] eCapital, *Invoice Factoring vs. Merchant Cash Advances: Choosing the Right Funding Solution*, at https://ecapital.com/blog/invoice-factoring-vs-merchant-cash-advances-choosing-the-right-funding-solution/ (last viewed Sept. 20, 2022, at 9:12am).

[18] Cal. Code Reg. title 10, § 914(a)(2)(A).

[19] *See, e.g.*, eCapital, *What Is MCA Factor Rate?*, at https://ecapital.com/financial-term/mca-factor-rate/ (last viewed Sept. 20, 2022, at 9:12am).

[20] eCapital, *Invoice Factoring, supra* note 17. *See also* Jordan Stevens, *Comment, The Merchant Cash Advance Industry May Have a Few Bad Apples, But That Does Not Mean It's Time to Empty the Barrel*, 49 TEX. TECH L. REV. 501, 515 (2017).

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

1.4 would mean that the payback amount would be $140,000. The payback amount will be the amount of the receivables that are supposedly purchased by the MCA provider. Thus, the MCA will appear to be a discounted purchase of receivables, rather than a markup of the funding amount, although the factor calculation is really a markup off the funding amount. Recognizing that MCAs are really markups of the funding amount underscores that the markup is just a charge for providing the financing.

42. In addition to the markup/discount, merchant cash advances often come with other fees: origination fees, underwriting fees, risk assessment fees, facility fees, wire fees, ACH fees, funding fees, administrative fees, etc.

43. The repayment of the payback amount is based on a holdback percentage (which goes by different names) of the merchant's credit card (or credit and debit card) sales. In some cases, this means that the periodic payment is simply the holdback percentage multiplied by the specified receivables. For example, a merchant might be required to remit 28% of its receipts every day.[21] In such instances, if the merchant's sales are up in a given period, the merchant will pay back more of the advance, and if they are lower, then the merchant will pay back less.

44. In other cases, however, the merchant is required to remit a fixed periodic amount. That fixed amount is derived from an application of a holdback percentage to estimated periodic income, but the mandatory payment does not vary with the merchant's sales.[22]

45. MCAs frequently take a security interest in various assets of the small business (not just the assets that are allegedly being purchased). They are also almost invariably guaranteed by the small business's owner, and the MCAs are underwritten based in part on the personal credit of the small business owner.[23] Indeed, some MCA providers refer to the small business *owner* as the client.[24]

46. Some MCAs have a reconciliation or "true-up" provision that enables an adjustment of the holdback percentage at the small business's request if it is finding the payments too onerous.[25] A true-up is merely a formalized mechanism for amending a contract.

47. Not all MCAs have true-ups,[26] and for those that do the true-up is not automatic and self-executing. Instead, it is an option that must be exercised by the small business, and there is considerable variation in what the small business must do to invoke a true-up. Even then, however, there is variation in whether the small business has a right to a true-up or whether the true-up is discretionary to the MCA provider. In some cases, the discretionary is express, but in other cases it is more subtle.

48. For example, a Forward Financing MCA, one of the exemplars produced by the SBFA, says that if there is a true-up request, "Provided that the information provided by the Customer supports the requested Adjusted Weekly Amount, Purchaser shall make the adjustment for a period of 14 days." Although the use of the word "shall" would make the true-up provision seem of right, not discretionary, it is all dependent on the Purchaser, Forward Financing, determining that the information provided supports the requested adjustment. In other words, granting the true-up is entirely discretionary to Forward Financing.

49. Similarly, a Kapitus LLC MCA, another of the exemplars produced by the SBFA states that if a true-up is requested, then "Upon verification of the Receipts generated by Seller, Servicer shall adjust the Specified Amount on a going-forward basis to more closely reflect the Seller's actual Receipts."[27] Again,

---

[21] SBFA 00097.

[22] *See, e.g.*, SBFA 00627.

[23] SBFA 00907 (use of personal credit reports by Kapitus); SBFA 01082; SBFA 01086-87 (Rapid Finance reviewing personal consumer report and credit score), 01091-92 (similar). *See also supra* note 8.

[24] SBFA 01082 (referring to "the business or the client").

[25] *See, e.g.*, SBFA 00629 (Kapitus MCA); SBFA 00030 (Forward Financing MCA).

[26] *See, e.g.*, SBFA 00097-00106 (Rapid Finance MCA) (holdback of 28% of daily receivables with no true-up provision).

[27] SBFA 00629.

**Exhibit 16-306**

**ER903**

(95 of 295), Page 95 of 295   Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 95 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-18   Filed 09/27/23   Page 9 of 58   Page ID
#:1109

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

the word "shall" would seem to make the true-up provision one of right, not discretion, but the extent of the adjustment is left up to the discretion of Kapitus.

50. Critically, prior to the mandatory CFDL, the price disclosures in MCA contracts were not standardized in either substance or formatting among providers, and frequently used unique terminology, such as "factors" and "holdback percentages." This meant that it is extremely difficult for a small business owner to compare the costs of one MCA against another or to compare the costs of an MCA with the costs of other forms of credit. In order to do so, the merchant would have to determine (1) what charges for an MCA would be equivalent to finance charges, estimated the likely term of the advance, and use that information to calculate a standard financing cost comparison measure, namely the APR.

### C. *Regulatory Concerns About MCAs*

51. MCAs are a product with a troubled reputation, having been the target of enforcement actions by the FTC and New Jersey Attorney General in recent years, as well as substantial private litigation.[28] This is because of the high cost of MCA financing relative to other types of financing,[29] the difficulty in comparing MCA financing costs to those of other types of financings, and the concern that MCAs are merely disguised loans, structured so as to avoid licensing and usury statutes. In fact, as discussed in the following section, a number of federal and state courts have found certain MCAs to be nothing more that disguised loans,[30] and New York, Virginia, and Utah have all enacted MCA disclosure regulation in recent years.[31]

52. The SBFA conspicuously avoids using the term MCA in its pleadings, but it describes an MCA to a tee as a form of financing in which a provider "purchases a portion of a business's future receivables at a discount and collects those receivables as they are generated by the business."[32] That "sales-based financing" is generally synonymous with MCAs is clear from the website of Upscale Capital LLC, a MCA provider, which notes that "Commonly referred to as a merchant cash advance or an MCA, revenue-based financing is a merchant cash advance that technically doesn't count as a business loan."[33]

53. The term "Merchant Cash Advance" is also absent from any of the allegedly representative contracts of MCA members produced in this litigation. Yet a perusal of the websites of those SBFA members makes clear that the products that they label for CFDL purposes[34] as "Forward Purchase Agreement"[35] or as "Future Receivables Sales"[36] or "Future Receipts Sales Agreement,"[37] are merely MCAs. Kapitus publishes a guide on "Financing Your Business With a Merchant Cash Advance."[38] Forward Financing has an entire web page devoted to "Merchant Cash Advances Vs. Business Loans — What's the

---

[28] Michael A. Mora, *"I'm Ruined": Litigation Trend Takes Aim at Merchant Cash Advance Industry*, N.Y.L.J., Sept. 7, 2022; Jacob H. Nemon & Jeffrey S. Boxer, *Merchant Cash Advance Litigation Is Getting Wilder*, N.Y.L.J., July 2, 2021.

[29] SBFA 00029 ("This financing may be more expensive than a traditional bank loan.").

[30] *See, e.g.*, Lateral Recovery LLC v. Capital Merchant Services, LLC, 2022 U.S. Dist. LEXIS 181044 (S.D.N.Y. Sep. 30, 2022); Fleetwood Services v. Ram Capital Funding LLC, *2022 U.S.* Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022), *aff'd*, Fleetwood Servs., LLC v. Richmond Capital Grp. LLC, 2023 U.S. App. LEXIS 14241 (2d Cir. 2023); CapCall, LLC v. Foster (*In re* Shoot The Moon, LLC), 635 B.R. 797, 816 (Bankr. D. Mont. 2021); Davis v. Richmond Capital Group LLC, 194 A.D.3d 516 (N.Y. App. Div. 1st Dept. 2021).

[31] N.Y. Fin. Serv. L. §§ 801-812; N.Y. Comp. Codes R. & Regs., tit. 23, part 600; Utah Code §§ 7-27-101 to 7-27-301; Va. Code tit. 6.2, ch. 22.1; 10 Va. Admin. Code §§ 5-240-10 to 5-240-40.

[32] Complaint at ¶ 9(i).

[33] UpScale Capital, *Revenue Based Financing, at* https://upscalecapital.com/business-loan-type/revenue-based-financing/ (last viewed Sept. 20, 2022, at 9:11am).

[34] The CFDL requires a one-to-five-word description of the product offered. The CFDL regulations actually illustrate this with "Merchant Cash Advance," Cal. Code Reg. title 10, § 901(a)(1), a term the SBFA's members eschew on their contracts…but not on their websites.

[35] SBFA 00627 (Kapitus), SBFA 00838 (Kapitus), SBFA 00860 (Kapitus).

[36] SBFA 00097 (Rapid Finance).

[37] SBFA 0028 (Forward Financing).

[38] Kapitus, *Financing Your Business with a Merchant Cash Advance, at* https://kapitus.com/guide/financing-your-business-with-a-merchant-cash-advance/ (last viewed Sept. 20, 2022, at 9:09am).

**Exhibit 16-307**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

Difference?"[39] And Rapid Finance lists "Merchant Cash Advances" among its "Financing Solutions," and refers to "our merchant cash advance."[40]

54. Although the SBFA eschews the use of the term MCA for this Litigation, it is important to recognize that MCAs are a product that the DFPI was concerned about when promulgating its regulations under the CFDL,[41] and that the

### D.  *MCAs Are Frequently Just Disguised Loans*

55. Although the legal characterization of any particular MCA is not directly at issue in this Litigation, it is important to recognize that the legal characterization of MCAs—whether as sales or loans—has significant consequences for MCA providers. If MCAs are in fact loans, then they fit into the well-established credit cost paradigm pioneered by the federal Truth in Lending Act, to which the CFDL largely adheres.[42] Put another way, the concern that MCAs are often in fact disguised loans is a factor urging the application of loan-type disclosures to MCAs, such that irrespective of whether any particular MCA is in fact a loan, small businesses will receive the same type of disclosures.

56. The idea that a sale could be a loan is not intuitive at first glance, but jurisprudence has historically treated a discounted sale of a payment obligation made with recourse against the seller as a loan.[43] Historically, a common transaction was the discounted sale of a note with recourse against the seller. Frequently, this was done through sale by indorsement—the practice of the seller of the note signing his name on the back (Latin: *in dorso*) of the note prior to delivering it to the buyer. Indorsement would make the seller co-liable on the note in its face amount, as it does under Article 3 the current Uniform Commercial Code,[44] meaning that if the transaction was not really a sale at a discount, but a loan in which the discounted amount was the finance charge that for which the indorser was liable.

57. Thus, if the seller indorsed a note from obligor due in one year with a face amount of $120 and a 0% interest rate for $100 (with the discount reflecting repayment risk), it is equivalent to the buyer making a $100 loan to the seller at 20% annual simple interest. In either case, the buyer would have parted with $100 and would have a right to collect $120 in a year, from either the obligor or the seller. Thus,

---

[39] Forward Financing, *Merchant Cash Advances vs. Business Loans*, *supra*, note 12.

[40] Rapid Finance, https://www.rapidfinance.com/financing-solutions/merchant-cash-advance/ (last viewed Sept. 20, 2022, at 9:09am).

[41] *See*, Cal. Code Reg. title 10, § 901(a)(1) (using "Merchant Cash Advance" as an illustration).

[42] The SBFA has alleged that the CFDL parts ways with TILA because it treats the discount on a putative "sale" of future receivables as a finance charge and also includes broker fees in the finance charge. Complaint, ¶ 53. This is incorrect. TILA defines "finance charge" as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction." 15 U.S.C. § 1605(a). The TILA definition goes on to give some examples of things that are or are not finance charges. It never specifically addresses discounts, but it has been well-established in Anglo-American law for centuries that a discount can be equivalent to a loan, with an implicit interest rate. For example, the National Bank Act and the Federal Deposit Insurance Act both treat discounts as equivalent to loans, 12 U.S.C. §§ 85, 1831d, as have various judicial rulings, including from the Supreme Court of the United States. *See infra* note 45. Likewise, TILA does not address brokers' fees *in general*, which would be covered by the general rule about whether it is a charge that is incident to the extension of credit. TILA's illustrative inclusion of borrower-paid mortgage-broker fees being a finance charge does not create a negative implication that other broker fees would not be finance charges. The likely reason for the mortgage-broker-specific illustration is that broker fees are uncommon in other types of consumer finance transactions.

[43] Adam J. Levitin, *Spurious Pedigree of the "Valid-When-Made" Doctrine*, 71 DUKE L.J. ONLINE 87, 97 (2022) (explaining how a discounted sale of a receivable, with recourse to the seller has historically been considered a loan). California courts have declined to treat as loans traditional factoring contracts—sales of existing (as opposed to future) receivables—that are made *without* recourse beyond the receivables purchased. West Pico Furniture Co. v. Pac. Fin. Loans (West Pico), 2 Cal.3d 594, 601-606 (1970).

[44] UCC §§ 3-204, 3-415.

**Exhibit 16-308**

**ER905**

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

when a note is sold at a discount from its face amount, the discount can be treated as imputed prepaid interest.[45]

58. The idea that a discounted sale can be equivalent to a loan is reflected in the current federal usury statutes for national banks and FDIC-insured state-chartered banks, both of which expressly cover loans and discounted sales of receivables.[46] So too do many state usury laws, and the idea is preserved in the terminology of bank borrowing from the Federal Reserve System's "discount window," where the Federal Reserve System makes loans in the form of a discounted purchase with recourse of obligations owed to a bank.

59. The argument that an MCA is in fact just a disguised loan is because, *inter alia*,[47] MCAs are commonly made with a guaranty from the owner of the small business, and that guaranty functions as recourse on the discounted sale. Thus, although the American Factoring Association and the International Factoring Association criticized the DFPI's proposed rule for not distinguishing between sales with recourse and sales without recourse,[48] it is precisely this issue of recourse—not to the small business, but to its owner-guarantor—that is central to whether an MCA is in fact a disguised loan. If the MCA is made with recourse, it is no longer merely a discounted sale of an asset, but an advance of funds with a requirement to repay with a finance charge.

60. The question, then, is whether MCAs give the provider recourse beyond the actual receivables purchased. They often do, in three ways.

    a. *Recourse Against Collateral Exceeding the Receivables*

61. First, MCAs frequently contain a security interest in certain assets of the small business and the guarantor that exceeds the scope of the receivables allegedly "purchased."[49] Indeed, the security interest is frequently a blanket lien on virtually all assets of the small business.

    b. *Recourse Against the Small Business Generally Through Warranties*

62. The second way MCAs often provide recourse beyond the actual receivables purchased is through general recourse against the small business by virtue of the operation of the warranties made within the contract.[50]

63. For example, one of the paradigm MCA contracts produced by the SBFA, that of Kapitus LLC, for a "forward purchase agreement (fixed)."[51] In the Kapitus MCA, the small business warrants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized

---

[45] *See, e.g.*, Nat'l Bank v. Johnson, 104 U.S. 271, 276–77 (1881); Evans v. Nat'l Bank of Savannah, 251 U.S. 108, 114 (1919). *See also* Daniel v. First Nat'l Bank of Birmingham, 227 F.2d 353, 355–56 (5th Cir. 1955) (addressing whether a discount was usurious), *reh'g denied with opinion*, 228 F.2d 803 (5th Cir. 1956).

[46] 12 U.S.C. §§ 85, 1831d(a).

[47] Evidence in other litigation has shown that MCA providers themselves will internally refer to MCAs as loans and will take collateral that far exceeds the scope of the purchased receivables. *See, e.g.*, CapCall, LLC v. Foster (*In re* Shoot The Moon, LLC), 635 B.R. at 806, 815-16 (Bankr. D. Mont. 2021). *See also* eCapital, *What Is Merchant Cash Advance (MCA) or MCA Loan? At* https://ecapital.com/financial-term/merchant-cash-advance-mca-or-mca-loan/, (last viewed Sept. 20, 2022, at 9:18am), (referring to a "merchant cash advance loan").

[48] American Factoring Association and International Factoring Association, Comment on Proposed Rulemaking/Commercial Financing Disclosure Regulations (PRO 01- 18), Nov. 22, 2021, *at* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/12/American-Factoring-Association-11.22.21.pdf.

[49] *See, e.g.*, SBFA 00101 (security interest springing automatically upon breach of representation or warranty and covering all inventory and deposit accounts, *inter alia*) SBFA 00640-00642 (security interest covering all inventory and goods, *inter alia*).

[50] There are no judicial decisions interpreting these contract terms because any disputes would be resolved in arbitration. There is no evidence in the discovery record of which I am aware regarding how MCA providers have interpreted this contractual provision. Nevertheless, MCA providers would be incentivized to claim (other than for purposes of the instant Litigation) that the warranties are triggered because it is advantageous to them.

[51] SBFA 00627-00648. Identical terms relating to the guaranty appear in other Kapitus MCAs. *See* SBFA 00838-00859; SBFA 00860-00881.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

and/operates,"[52] that it has "all necessary permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged,"[53] and that the business "is currently in compliance with all federal state and local tax law, ha[s] filed all return[s] and ha[s] paid all taxes due…"[54] These provisions preclude the business from simply ceasing to operate, for if an incorporated business simply ceased to operate, it would not have revenue to pay its franchise taxes, which would result in administrative dissolution by the Secretary of State and the Franchise Tax Board. If the business were to cease operating, the warranties of good standing and tax compliance would be violated.

64. Likewise, the small business "warrants that it does not anticipate filing any such [state law] receivership or bankruptcy petition."[55] This is a warranty, meaning a promise of a future state of the world, rather than a representation of the present state of the world. If the small business were in the future to file for bankruptcy, it would have, at some point before actually doing so have anticipated doing so. Accordingly, it would have violated its warranty about not anticipating filing for bankruptcy.

65. Similarly, the small business warrants that it will not divert funds.[56] If before filing for bankruptcy, the small business used its receipts to pay utilities or employees, it would also be a breach of the warranty of no diversion of funds.

66. The small business also warrants the maintenance of insurance or of bank accounts.[57] If the small business has no revenue, it will not be able to maintain insurance policies or a bank account and will be in breach of these warranties.

67. The Kapitus MCA additionally provides that the small business "shall not…effectuate the suspension…of Seller's business without the express prior written consent of" Kapitus.[58]

68. A violation of any of these warranties would be an Event of Default under the Kapitus MCA,[59] which would mean that the "full uncollected Purchased Amount and any unpaid fees due shall become due and payable in full immediately"[60] and that Kapitus would be able to exercise its self-help right to foreclose on the small business's assets by virtue of its security interest.[61]

69. The warranties in the MCAs of Rapid Finance and Forward Financing operate similarly to those in the Kapitus MCA.[62]

---

[52] SBFA 00635 (§ 2.13).

[53] SBFA 00634 (§2.2).

[54] SBFA 00634 (§ 2.5).

[55] SBFA 00634 (§ 2.9).

[56] SBFA 00634 (§ 2.6(iv)-(v)).

[57] SBFA 00634 (§§ 2.4, 2.6).

[58] *See, e.g.*, SBFA 00635 (§ 2.15). *See also* SBFA 00101 (§ 7(xvii)) ("Merchant will conduct its business consistent with past practice…").

[59] SBFA 00635 (§ 3.1(a), (b), (c), (g), (l)).

[60] SBFA 00635 (§ 3.2).

[61] *Id.* The presence of a security interest in various assets of the small business and the owner ensures that the MCA provider can exercise self-help remedies, depriving the business and the owner of their financial ability to contest the interpretation of the MCA. In many states (although not California) these self-help remedies are bolstered by a confession of judgment.

[62] SBFA 00101 (representations and warranties, including of maintenance of insurance, licenses, and taxes, and continuation of past business practices), 00104 (liquidated damages of amount sold less amount received by MCA provider; SBFA 00031-32 (representations and warranties including all necessary business licenses and taxes paid, and presumption that if there is a bankruptcy filing or goes out of business that representations were materially untrue), 00034 (liquidated damages as amount outstanding on MCA).

**Exhibit 16-310**

**ER907**

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

      *c.   Recourse Against the Owner-Guarantor Through Warranties*

70. The third way MCAs often provide recourse beyond the actual receivables purchased is through general recourse against the small business's owner-guarantor by virtue of the operation of the warranties made within the contract.

71. A personal guaranty by the small business's owner is standard in MCA contracts. The stated scope of the guaranty varies considerably, however. Some MCA providers—such as the ones the SBFA has featured in this Litigation—only have guaranties of performance of specified representations and warranties,[63] while others (whom the SBFA has understandably not wanted to highlight) have guaranties of repayment of the amount advanced.[64] The supposed guaranties of performance of representations and warranties, however, actually operate to create recourse against the small business owner.[65]

72. Consider, for example, the same Kapitus MCA discussed above.[66] The Kapitus MCA includes an unconditional guaranty of "all of the representations, warranties, covenants made by" the small business.[67] It also states that the guarantor "is not making an absolute guaranty of repayment," and "only guaranteeing that they will not take any action or permit the Seller to take any action that is a breach of the Transaction Documents."[68]

73. As the previous section has explained, however, the failure of the small business to make payments on the MCA would invariably result in a violation of warranties. Thus, the guaranty will not be triggered by virtue of non-payment *per se*, but by virtue of violation of the warranties that will be violated if the small business cannot or chooses not to pay. And because of the acceleration of the entire obligation upon an Event of Default, upon the breach of a warranty, the guarantor would be liable for the entire outstanding balance on the MCA.

74. Thus, there is for all practical purposes recourse against the guarantor on the obligation of payment under the MCAs; the guaranty is effectively a guaranty of payment. That such a functional guaranty of payment exists is hardly surprising given that Kapitus underwrites its MCAs based in part on the personal credit reports of the small business owner.[69]

75. Thus, if the small business filed for bankruptcy because it could not pay the fixed amounts due on the MCA, Kapitus would have recourse against both the small business and its owner-guarantor for the full amount outstanding on the MCA. In short, there functionally is an obligation to repay the MCA, irrespective of business performance. Given that the Kapitus MCA has fixed payments and a discretionary true-up provision, the MCA operates like a traditional closed-end installment loan.

76. The guaranties in the MCAs of Rapid Finance and Forward Financing operate similarly to that in the Kapitus MCA.[70]

---

[63] *See, e.g.*, SBFA 00629, SBFA 00643, SBFA 00105.

[64] *See* CapCall, LLC v. Foster (*In re* Shoot The Moon, LLC), 635 B.R. at 816 (Bankr. D. Mont. 2021) (noting "an absolute, primary, and continuing guaranty of **payment <u>and</u> performance**") (emphasis original). *See also id.* at 816 n.54 (noting that the difference between a guaranty of payment and of performance "is a distinction without a difference insofar as the personal guaranty of "performance" of an "obligation" to pay money…is functionally a payment guaranty…")

[65] The precise wording of warranties varies among MCA, but the basic operational scheme to create effective recourse against the small business and the guarantor is the same.

[66] SBFA 00627-00648. Identical terms relating to the guaranty appear in other Kapitus MCAs. *See* SBFA 00838-00859; SBFA 00860-00881.

[67] SBFA 00643.

[68] *Id.*

[69] SBFA 00907.

[70] SBFA 00105 (guaranty); SBFA 00030-31 (guaranty).

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

    *d. Repayment Obligations on MCAs Are Not Really Contingent Upon Generation of Future Receivables*

77. Although MCA contracts are written to appear to make the MCA provider assume the risk that the small business will not generate future receivables. Often this is not, in fact, how they actually operate.

78. First, many MCAs, such as the Kapitus MCA discussed above, have periodic payments of fixed dollar amounts, rather than ones that vary in dollar amount, but represent a percentage of periodic receipts. The obligation to make fixed dollar payments, rather than ones that vary with sales means that the MCA provider is not assuming the risk of the business's future performance, especially when it has a security interest in the business's current assets.

79. Second, MCA contracts generally prohibit the small business from ceasing to operate without the MCA provider's consent. The Kapitus MCA, for example, provides that the small business "shall not…effectuate the suspension…of Seller's business without the express prior written consent of" Kapitus.[71] If the small business stops operating for reasons other than *force majeure*, it is an Event of Default, which would accelerate the outstanding balance on the MCA and trigger the owner-guaranty.[72]

80. Even if there is a *force majeure* event, the MCA provider does not assume the risk of non-payment. MCA contracts also frequently require the small business to obtain business interruption insurance, with the MCA provider as the loss payee.[73] Business interruption insurance typically covers interruptions caused by specified perils, like fire, wind, water, falling objects, and lightning.[74] This means that the MCA provider does not incur the risk of non-payment because of business interruption from the covered perils.

81. MCA providers claim that there is only a payment obligation to the extent that there is revenue,[75] so long as no representations, warranties, or covenants have been breached. The unavoidable fact, however, is that a business without revenue cannot pay for insurance and taxes, and failure to do so violates warranties, accelerating the MCA balance and triggering the guaranty from the owner. The small business will be liable itself in such instances, and there will also be recourse against the owner. Failure to generate revenue ineluctably means a violation of warranties that can only be performed if there is adequate revenue. In short, the MCA provider frequently does not actually assume the risk of the business failing to generate future receivables because there is recourse against the small business and its owner-guarantor both generally and in the specific assets pledged as collateral that exceed the receivables "sold."

## VI. THE DIFFICULTY IN DETERMINING IF A TRANSACTION IS ACTUALLY A NON-LOAN TRANSACTION

82. SBFA claims that "By treating non-loan transactions (such as leases and sales transactions) and open-end credit like closed-end loans, the speech compelled by the Regulations is inaccurate and does not

---

[71] *See, e.g.*, SBFA 00635 (§ 2.15). *See also* SBFA 00101 (§ 7(xvii)) ("Merchant will conduct its business consistent with past practice…").

[72] SBFA 00635 (§ 3.1(c)).

[73] *See, e.g.*, SBFA 00634 (§ 2.4) ("Seller will maintain property, liability, and business interruption insurance and name Purchaser as certificate holder, loss payee, and additional insured in amounts and against risks as are satisfactory the Purchaser").

[74] Cal. Dept. of Ins., *FAQ on business interruption insurance and other issues affecting California small businesses*, at https://www.insurance.ca.gov/01-consumers/140-catastrophes/FAQ-on-Business-Interruption-Insurance.cfm.

[75] *See, e.g.*, SBFA 00031 ("The parties agree that provided that the Customer has not violated any of the representations, warranties or covenants in this Agreement, it shall not be a breach of this Agreement if the Customer generates no further Future Receipts and therefore has no funds to remit the Amount Sold."); SBFA 00034 ("if Customer's business slows down and Customer's Future Receipts decrease or Customer closes its business and Customer has not violated any of the representations, warranties or covenants in this Agreement, there shall be no default or breach of this Agreement.").

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

translate into meaningful disclosures regarding the costs and characteristics of the transactions governed by SB 1235."[76]

83. The SBFA's position, however, is dependent on being able to distinguish between loan and non-loan transactions. In fact, it can often be quite difficult to do so, and financiers have every incentive to claim that their transactions are not in fact loans, even if they are.

84. Leases are notoriously difficult to distinguish from loans. The mere fact that a transaction is called a lease is not dispositive. Instead, the Uniform Commercial Code provides that "Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case."[77] The UCC goes on to state that "a transaction in the form of a lease creates a security interest" in certain circumstances and that it does not in others, but the circumstances it describes do not cover all possible lease arrangements, leaving little guidance in those instances.

85. As for sales, as discussed above, a sale at a discount with recourse is economically equivalent to a loan and has, historically, been treated as a loan for purposes of usury law. As discussed above, transactions can be cleverly constructed to appear not to have recourse, but in fact to have its functional equivalent. For example, the Kapitus MCA that the SBFA uses as an exemplar can be easily recharacterized as a closed-end loan.[78] It is for a definite amount, has periodic payments of a fixed dollar amount (and, therefore, a knowable maturity date), has a finance charge (the discount), and has a true-up provision for amending the contract that is discretionary to Kapitus. The warranties operate to create full recourse against the borrower as well as the owner-guarantor in the event the business stops operating or files for bankruptcy including because it cannot handle the fixed payments. Economically, the Kapitus MCA cannot be distinguished from a loan.[79] Nevertheless, it still purports to be a sale of future receivables, and a determination of the proper characterization would require litigation.

86. Given the lack of clarity over whether any particular transaction is a loan or not (be it lease or sale), and the ability of the lender to control the features of the transaction, it is easy for a lender to disguise a loan as a lease or sale. Lenders are generally motivated to disguise their loans as leases or sale because doing so enables them to avoid usury, licensing, and credit cost disclosure requirements.

87. In California, masking commercial loans as leases or sales would enable a lender to avoid the licensing requirements of the California Finance Law. If the DFPI regulations under the CFDL were to treat financings undertaken in the form of leases and sales differently than closed-end loans, it would be an invitation for lenders to evade credit cost disclosure—and thereby defeat price competition from comparison shopping—by pretending that loans were actually leases or sales.

88. Subjecting financing transactions that are nominally leases and sales to similar (although not identical) disclosures as closed-end loans is a reasonable approach for disincentivizing disclosure evasion through transaction structuring. This approach avoids the DFPI having to potentially litigate the application of commercial credit disclosures for any particular MCA.

## VII. THE CONFUSING NATURE OF VOLUNTARY DISCLOSURE OF MCA TERMS PRIOR TO THE DFPI REGULATIONS UNDER THE CFDL

89. Prior to the DFPI regulations, voluntary disclosure of MCA terms was inherently likely to be confusing to many small businesses. My opinions here are confined to whether the disclosure of MCA terms was objectively confusing. I do not express any opinion about whether any particular MCA user finds the

---

[76] Complaint, ¶ 13.
[77] UCC § 1-203(a).
[78] SBFA 00627-00648.
[79] Cal. Civ. Code § 1912 defines a "loan of money" as "a contract by which one delivers a sum of money to another, and the latter agrees to return at a future time a sum equivalent to that which he borrowed."

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

terms of any particular MCA confusing, but instead base my opinions on my knowledge of what the field of consumer finance understands about consumer comprehension of financing contracts.

90. It bears emphasis that although MCAs are business financing products, they are marketed to small businesses that tend to be owner-operated and that are unlikely to have any special expertise in financing. Instead, the small business owner's experience with financing is likely limited to his or her own experience as a consumer, and the level of financial sophistication among small business owners is simply that of consumers.

91. Additionally, MCAs are expressly marketed to small businesses that have poor or limited credit histories and that need funds fast. These are borrowers that are likely to either have been rejected for credit elsewhere or to anticipate rejection and therefore are less likely to shop around for the best offer possible once they receive a financing offer. This means that they are unlikely to carefully scrutinize MCA terms—they are simply pleased to have an offer of financing.

92. Disclosures have two separate, but related functions. One is to make clear the terms of a contract. In particular, summary financing disclosure information is to provide a quick and easy way for a borrower to understand the key economic terms of the financing so that the borrower can decide if, on a stand-alone basis, he or she wishes to enter into the financing agreement. Use of unique terminology, use of terminology or layouts that mimic other types of disclosures, or lack of provision of information can all render a disclosure confusing from a stand-alone evaluation standpoint.

93. The second function of disclosure is to enable comparison shopping among products. Comparison shopping greatly depends on having standardized disclosures of information: the content, the terminology, and the layout. Any significant deviation in standardization imposes additional search costs on consumers and can render a disclosure confusing from a comparison-shopping standpoint.

94. Pre-CFDL disclosures of MCA terms in California were confusing from both a stand-alone and comparison-shopping standpoint.

95. Prior to the DFPI regulations, there was no standardization of the disclosure of MCA terms in California. Different MCA providers used different terminology, used different disclosure formats, and disclosed different information. This alone rendered MCA disclosures confusing and frustrated apples-to-apples price comparisons.

96. MCAs that are not subject to the CFDL do not disclose an APR. Instead, they tend to disclose the amount of receivables purchased and a purchase price, some sort of periodic payment amount (either estimated or fixed), and the percentage of receivables purchased.

97. Below, as an example, is an MCA from LG Funding, LLC, dated April 12, 2022, available on the United States Securities and Exchange Commission's website.[80] The five rows below are the summary pricing information shown prior to the "Terms and Conditions" of the MCA.

| | |
|---|---|
| **Purchase Price**<br>*This is the amount being paid to Merchant(s) for the Receivables Purchased Amount defined below .* | $ 205,000.00 |
| **Receivables Purchased Amount**<br>*This is the amount of Receivables defined in Section 1 below being sold.* | $ 287,000.00 |
| **Specified Percentage**<br>*This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is aid in full.* | 25% |
| **Net Funds Provided**<br>*This is the net amount being paid to or on behalf of Merchant(s) after deduction of*<br>*applicable fees listed in Section 2 below.* | $ 200,850.00 |
| **Initial Estimated Payment**<br>*This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from*<br>*Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4*<br>*below.* | $ 1,430.00 Per Day |

98. Nowhere in the LG Funding MCA is there an APR disclosed. Instead, there is a percentage disclosed, but it is the "Specified Percentage," meaning the percentage of receivables that are to be paid to LG

---

[80]   LG Funding LLC, Standard Merchant Cash Advance Agreement, dated April 12, 2022, *at* https://www.sec.gov/Archives/edgar/data/895665/000149315222010141/ex10-52.htm.

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

Funding until the MCA is repaid. A similar use of "Specified Percentage" can be seen in some of the paradigm MCAs submitted by the SBFA.[81]

99.    The disclosure of the "Specified Percentage," but not the APR, is confusing for two reasons.

100.    First, the presence of a single percentage rate that is not the APR on a financing disclosure is inherently confusing because small business owners—who are consumers first and foremost— are used to seeing the APR as the emphasized percentage rate disclosed in a financing agreement. They would reasonably assume that if a single percentage rate is disclosed that it is the APR, and even if they were to read carefully about what the "Specified Percentage" is, they would still be anchored to the idea of the rate being the APR.

101.    Second, the lack of an APR disclosure means that a small business cannot compare the costs of the MCA on an apples-to-apples basis to other MCAs (which might use their own disclosure terminology and layout), much less to non-MCA financing products.

102.    The inability for small businesses to engage in effective comparison shopping frustrates price competition and enables MCA providers to charge higher rates than they could in an environment where comparison shopping is easy.

103.    Below is a MCA agreement from Knight Capital Funding, dated August 8, 2019.[82] Although it contains similar information to that of the LG Funding MCA, there are some important differences:

   a.    Layout. The Knight Capital Funding MCA uses a TILA-disclosure type four box tabular layout instead of the row-based disclosures form LG Funding MCA.

   b.    Different terminology. The Knight Capital Funding MCA uses the term "Purchased Percentage" instead of the "Specified Percentage" used in the LG Funding MCA. Contrast this with the term "Split Percentage" that the SBFA uses in its complaint and the "Monthly Percentage" used by Forward Financing.[83]

   c.    Content. The Knight Capital Funding MCA lacks a of disclosure of the total funds actually provided (meaning the purchase price net of fees).



**FUTURE RECEIVABLES SALE AGREEMENT**

This **FUTURE RECEIVABLES SALE AGREEMENT** ("Agreement") dated 08/08/2019 ("Effective Date"), is made by and between the undersigned Knight Capital entity ("Purchaser"), and
ABCO SOLAR, INC.                                                                                                                                    ("Merchant").

| Purchase Price: | Amount Sold: | Purchased Percentage: | Dollar Amount of Purchased Percentage: |
|---|---|---|---|
| (The dollar amount Purchaser is paying for the Amount Sold.) | (The amount of Future Receivables being sold by Merchant.) | (The percentage of daily Future Receivables that Merchant agrees to remit to Purchaser.) | (This amount represents the daily dollar amount of the Purchased Percentage based upon the financial information Merchant provided to Purchaser.) |
| $105,000.00 | $144,900.00 | 12.09% | $823.30 |

104.    The use of non-standardized terminology, content, and layout, as illustrated by these two MCAs, was the situation that obtained in California prior to the DFPI regulations. Such non-standardized

---

[81] SBFA 00838 (pre-CFDL documentation), SBFA 00861 (pre-CFDL documentation).
[82] Knight Capital Funding, Future Receivables Sale Agreement, dated August, 8, 2019, *at* https://www.sec.gov/Archives/edgar/data/1300938/000118518519001167/ex_155737.htm.
[83] SBFA 00028.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

disclosures are inherently confusing because a consumer cannot readily tell if they are all disclosing the same information.

105.     The confusing nature of pre-DFPI regulation disclosures can still be seen in the additional information provided to small businesses about MCAs. DFPI regulations require a cover sheet that discloses particular information, but the regulations do not govern what else is disclosed. Thus, the information currently disclosed voluntarily by MCA providers in California gives a sense what disclosures would be like without the DFPI-mandated cover sheet.

106.     Rapid Finance, for example, has, on the first page of its Future Receivables Sale Agreement, underneath the DFPI-required cover sheet, a four-box tabular structure.[84] Three of the boxes contain dollar figures, and the fourth a percentage rate. One of the boxes says "Amount Sold" and another the "Discount Charge". The top of the sheet is depicted below.



107.     The Rapid Finance Future Receivables Sale Agreement closely mimics the appearance of the Consumer Financial Protection Bureau's Loan Model Form H-2, a model TILA disclosure form. Form H-2 also has a four-box tabular structure, with three boxes containing dollar figures and one containing a percentage rate. One of its boxes says "Amount Financed" and "another the "Finance Charge". Form H-2 is depicted below.



108.     Form H-2 and variations thereon are familiar to most consumers because lenders generally use it because use of the form creates a safe harbor for TILA compliance.[85]

---

[84] SBFA 00100.

[85] 15 U.S.C. § 1604(b).

Exhibit 16-316

(105 of 295) Page 105 of 295Case: 24-50 05/24/2024, DktEntry: 14.6, Page 105 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-18   Filed 09/27/23   Page 19 of 58   Page ID
#:1119

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

109.   The boxes on Rapid Finance MCA disclose substantively different information than Form H-2, however, and a small business owner could readily be confused by this sort of voluntary disclosure. The layout of the disclosures is confusingly similar because of the following elements:

    a.   The four-box tabular structure;

    b.   The presence of one box showing a percentage rate;

    c.   The presence of a box with a label that starts with "Amount"; and

    d.   The presence of a box with a label that ends with "Charge".

110.   A reasonable small business owner could reasonably—if mistakenly—believe that the Rapid Finance disclosure was disclosing the same information as a usual Form H-2 disclosure. In particular, a reasonable small business owner could reasonably mistake the "Daily Percentage" in the Rapid Finance disclosure for the APR because that is the only percentage rate that would be shown in the four-box structure on Form H-2.

111.   The DFPI regulations were responding to a situation in which small businesses were confronted with inherently confusing, non-standardized cost disclosures.

## VIII. THE IMPORTANCE OF THE ANNUAL PERCENTAGE RATE (APR) AS A STANDARDIZED MEASURE OF CREDIT COST DISCLOSURE

### A. The Function of the Annual Percentage Rate

112.   Among the SBFA's objections to the DFPI's regulations under the CFDL is an objection to the mandatory disclosure of the Estimated Annual Percentage Rate (the "**Estimated APR**").

113.   The concept of the Estimated APR is based on the Annual Percentage Rate or APR prescribed by the federal Truth in Lending Act ("**TILA**"), which governs consumer credit cost disclosures. The policy basis behind TILA's disclosure regime is explained by a Congressional finding that:

> economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit….[86]

114.   The APR—an annualized measure of the cost of credit[87]— is the centerpiece of the TILA disclosure regime. The APR facilitates the credit cost comparison that Congress believed was so vital by providing a common denominator for expressing the all-in costs of credit—the total finance charges—*relative to the amount of funds loaned and for how long* through an annual rate. As the Consumer Financial Protection Bureau has explained "The APR, or annual percentage rate, is the standard way to compare how much loans cost. It lets you compare the cost of loan products on an "apples-to-apples" basis."[88]

115.   The APR is calculated based on the finance charge. Finance charges are:

---

[86] 15 U.S.C. § 1601(a)

[87] *See* 12 C.F.R. § 1026.14(a)(1) ("The annual percentage rate is a measure of the cost of credit, expressed as a yearly rate.").

[88] CFPB, *My payday lender said my loan would cost 15 percent but my loan documents say the annual percentage rate (APR) is almost 400 percent. What is an APR on a payday loan and how should I use it?*, Jan. 17, 2022, at https://www.consumerfinance.gov/ask-cfpb/my-payday-lender-said-my-loan-would-cost-15-percent-but-my-loan-documents-say-the-annual-percentage-rate-apr-is-almost-400-percent-what-is-an-apr-on-a-payday-loan-and-how-should-i-use-it-en-1625/.

**Exhibit 16-317**

**ER914**

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.[89]

116. Interest is always a finance charge,[90] but the finance charge for an extension of credit can include other items, such as certain fees. For example, the finance charges that included in the calculation of the APR include loan origination fees and fees for obtaining credit reports.[91] This means that even if there is no interest rate, but there are fees, the APR will not be zero, and if there is both interest and non-interest finance charges, the APR will not correspond to the annualized interest rate.

117. The calculation of the APR under TILA varies depending on the type of extension of credit. The APR is calculated differently for closed-end credit (credit with a finite due date, such as a home mortgage) and open-end credit (credit without a finite due date, such as lines of credit).[92]

118. For closed-end credit the APR is "a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made."[93] Calculation of the closed-end APR is mathematically complex if a loan has installment payments, and even more so if it has compounded interest,[94] and is often performed using a free on-line tool provided by the federal government.[95] Calculation of the APR for closed-end credit accounts for all finance charges, including both periodic rates and fees.

119. For open-end credit, the APR is "a measure of the cost of credit, expressed as a yearly rate."[96] The calculation of the APR for open-end credit under TILA ignores finance charges other than the periodic rate, which is annualized into an APR by multiplying it by the number of periods in a year.[97]

120. Critically, the APR is not the "price" of credit; borrowers do not pay the APR. Instead, APR is a metric of how expensive it would be to carry the financing for a full year. Because the APR is an annualized percentage rate, its calculation necessarily includes an annualization factor. The annualization is what makes the APR a useful tool for comparing the costs of financings. Without the annualization, costs would be presented on an apples-to-oranges basis because of different lengths of credit extensions, frustrating the comparison shopping that is necessary for efficient markets and borrower protection.

121. Consider, for example, an illustration from the Senate Committee on Banking and Financial Institution's (April 9, 2018) analysis of SB 1235:

For example, compare the following three loans, all of which carry the same simple interest rate of 15% and are repaid via monthly payments of equal amounts. The total dollar cost of all three loans is the same ($15), but the APRs vary significantly. Because APR treats all loans as if they were one year in length (i.e., it annualizes them), a three-month loan appears more expensive than a one-year loan looking only at APR.

---

[89] 12 C.F.R. 1026.4(a).
[90] 15 U.S.C. 1605(a)(1).
[91] 15 U.S.C. § 1605; 12 C.F.R. § 1026.4(a).
[92] 15 U.S.C. § 1606(a)(1)-(2).
[93] 12 C.F.R. § 1026.22(a)(1).
[94] 12 C.F.R. § 1026, App. J (mathematical calculation of the APR for closed-end credit).
[95] https://www.ffiec.gov/examtools/FFIEC-Calculators/APR/#/accountdata
[96] 12 C.F.R. § 1026.14(a)(1).
[97] 12 C.F.R. § 1026.14(b). The use of "spurious" open-end credit—that is transactions that purport to be open-end credit and thereby avoid disclosure of non-interest finance charges in the APR—even though the products actually function as closed-end credit has been a consistent policy concern in APR disclosures. *See* NAT'L CONS. L. CENTER, *TRUTH IN LENDING*, § 6.2.3 (11th ed. 2023).

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

Loan 1: $100 loan carrying a 15% simple interest rate, due in three months, repayable via three monthly payments of equal amounts. No fees. Total dollar cost of the loan = $15. APR = 87%

Loan 2: $100 loan carrying a 15% simple interest rate, due in six months, repayable via six monthly payments of equal amounts. No fees. Total dollar cost of the loan = $15. APR = 49%.

Loan 3: $100 loan carrying a 15% simple interest, due in one year, repayable via twelve monthly payments of equal amounts. No fees. Total dollar cost of the loan = $15. APR = 26%.[98]

122. The Senate analysis misses the point of the APR: it is not supposed to represent the price of the loan. Instead, the APR is measuring that price *relative to the amount of money loaned and for how long*. Relative to how much money is loaned and for how long, the price of the three-month loan in the example is substantially greater than that of the six month or one year loan. Put another way paying $15 to have use of money for three months is more expensive than to pay $15 to have use of the money for six months or for a year. That is what APR is showing, and that is a very useful metric.

123. Consider what would happen if a borrower were confronted with these three loans but was not shown the APR. The borrower might recognize that it is the same dollar price, but different terms, so that the longer-term loans are cheaper, but the borrower would not have a metric indicating the relative differences.

124. Now imagine a more complicated—and realistic comparison, where *(1)* the interest rate differs among the loans, *(2)* the interest is not simple, but is compounded, but with Loan 1 compounding daily, Loan 2 compounding monthly, and Loan 3 compounding annually, and *(3)* there are different fees on each of the loans. At that point, it is virtually impossible for a consumer to find an easy way to compare the costs of the different loans. Many consumers do not understand what compounding is, and even if they do, its calculation is beyond most consumers' mathematical abilities. Indeed, even my law students at Georgetown and Harvard—a highly educated and intelligent population—have been severely challenged by the calculation of compounding.

125. The APR solves the cost comparison conundrum by forcing lenders to disclose a metric that enables an apples-to-apples comparison. This means that consumers are not asked to undertake complex mathematical calculations. Instead, they are given a single percentage rate that they can compare. As two scholars have observed:

> The drafters of TILA understood that without uniform disclosure, interest calculations are forbiddingly complex. The APR is meant to be a simplifying heuristic that allows borrowers to decide between options that are otherwise overwhelmingly complex.[99]

### B. Federal Regulatory Concerns About the APR Are Not Applicable to MCAs

126. Consumer are generally aware of the APR and believe that it is a "very important" credit term.[100] Federal regulators have, however, in recent years, deemphasized the APR in credit cost disclosures for mortgages, but the concerns that animated their actions are not applicable to MCA disclosures.

---

[98] SBFA 00479.

[99] Elizabeth Renuart & Diane E. Thompson, *The Truth, The Whole Truth, and Nothing but the Truth: Fulfilling the Promise of Truth in Lending*, 25 YALE J. ON REG. 181, 221 (2008).

[100] Thomas A. Durkin, *Consumers and Credit Disclosures: Credit Cards and Credit Insurance*, FED. RES. BULL. 203, 206 (April 2002) (awareness of the APR in the credit card context went from 27% before enactment of TILA to 91% by 2000; 76% of credit card holders surveyed in 2001 responded that the APR was a very important credit term and another 19% indicated that the APR was somewhat important).

**Exhibit 16-319**

**ER916**

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

127. Specifically, the CFPB exercised its exemptive authority to dispense in mortgage loan disclosures with the TILA requirement that the APR be disclosed more conspicuously than other information.[101] The Bureau did so because in the particular context of mortgage loan disclosures, its studies had shown that consumers were often confused about the relationship between the APR and the interest rate,[102] and were not using the APR for its intended purpose of comparing loans.[103]

128. Additionally, the CFPB was concerned about emphasis on APR disclosure because they "focus on the cost of credit based on the loan's contractual term, which for mortgages is typically 15 or 30 years. Because many consumers do not hold their mortgages to term, the TILA disclosures do not accurately reflect the cost of credit in these circumstances."[104] Instead, historically, consumers tend to pay off their mortgage (usually through a sale or refinancing) within 5-7 years, that is massively shorter than the formal length of the mortgage. The prepayment of mortgages meant that consumers were paying much less in finance charges because less interest accrued on the mortgage. Accordingly, the effective APR on the mortgages would have been lower than the stated APR.

129. As a result of these concerns, the CFPB deemphasized APR disclosure in the context of home mortgage cost disclosure. APR disclosure is no longer on the front page of the TILA-RESPA integrated disclosure. But the CFPB does still require disclosure of the APR for mortgages; it merely took care to move the APR away from disclosure of the contract interest rate,[105] lest consumers be confused between the interest rate and the APR. [106]

130. Neither of the concerns that animated the CFPB's deemphasizing of the APR in mortgage disclosures has any applicability to MCA disclosures. MCAs do not have interest rates, so there is no interest rate that could be confused with the APR. In the context of an MCA, an APR disclosure is more likely to be used as intended, that is a comparison-shopping tool.

131. Likewise, because MCAs do not have interest that compounds or an amortization schedule that allocates payments between principal and interest (again because there is no interest), the differences in payoff time do not affect the level of finance charges. The fees and discount that make up the finance charges in an MCA are set from the beginning and do not change based on when the small business pays off the MCA.

### C. The "Estimated APR" and "Estimated Term" Are Exactly What They Say They Are

132. The SBFA's main beef with the mandated APR disclosure for MCAS is that the time to pay off an MCA cannot be perfectly predicted *ex ante*. This is not entirely true. For MCAs with fixed payments, it is entirely possible to calculate when the MCA will be paid off if there is not a true-up. True-ups do not exist in all MCAs, and even those that have true-ups are often discretionary. A true-up provision is merely a mechanism for amending the terms of an MCA contract. All financing contracts can be amended, but that fact does not mean that their term cannot be calculated; it is simply calculated without regard to a possible, but not required, amendment. Indeed, ignoring true-ups for credit cost disclosure purposes is consistent with how TILA treats the exercise of options (such as late payment for a fee) in consumer credit agreements.

133. The situation is different for MCAs that do not have fixed payments. For those MCAs, if a merchant's sales are higher than anticipated, the payoff will be faster and vice-versa.

---

[101] 78 Fed. Reg. 79980 (Dec. 31, 2013).

[102] *Id.* at 79975.

[103] *Id. at* 79979.

[104] *Id.*

[105] *Id.* at 79980.

[106] *Id.* at 79976 (concluding that "moving the disclosure of the APR away from the disclosure of the loan's contract interest rate and placing the APR with other long-term metrics may reduce consumer confusion and highlight the APR as a special tool for comparing costs over time.").

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

134. The DFPI regulations recognize this issue and require only disclosure of what is labeled as "Estimated Annual Percentage Rate (APR)",[107] and "Estimated Term."[108]

135. The use of the word "Estimate" in these disclosures is materially different than TILA disclosures, which have no provision for disclosing estimated APR or terms.

136. Lest there be confusion, the DFPI regulations mandate that the cover sheet disclosure contain explanations of these terms. For the Estimated APR, the MCA provider must disclose that:

> APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through [description of particular payment channel or mechanism] will be [average monthly income estimate determined in accordance with sections 930 or 931]. *Since your actual income may vary from our estimate, your effective APR may also vary.[109]*

137. Additionally, the regulations provide that "If no part of the finance charge is based upon an interest rate, in addition to the language required by subdivision (a)(3)(C) of this section: 'APR is not an interest rate. The cost of this financing is based upon fees charged by [financer] rather than interest that accrues over time.'"[110]

138. Although this language is technical, it is no more technical than the language of the MCA contract itself. More importantly, it is an accurate description of what is being disclosed with the Estimated APR.

139. The same is true for "Estimated Term," which is used in the calculation of the Estimated APR. The DFPI regulations require:

> a short explanation stating that the estimated term is based upon assumptions about the recipient's income. For example: "This is our estimate of how long it will take to collect amounts due to us under the contract based upon the assumption that you will receive $6,000 in monthly income through your BrownPay account."[111]

140. Again, the DFPI regulations require an explanation of the disclosure term and that explanation is accurate in all regards, namely that it is a disclosure that the Estimated Term is just that—an estimate based on certain stated assumptions.

141. Simply put, there is nothing false or misleading in the Estimated APR or Estimated Term disclosures, particularly given the DFPI's requirement that explanations be provided next to them on the cover sheet for an MCA.

### D. The Estimated Term Methodologies Are Necessary Because MCA Providers Are Incentivized to Manipulate the Estimated Term to Make Their Product Look Less Expensive

142. Instead, the SBFA's real complaint is about the calculation of the Estimated Term and thus of the Estimated APR. The DFPI regulations allow MCA providers a choice of two methodologies for estimating the term. One is based on the historical sales figures of the small business,[112] and the other is based on the MCA's internal underwriting and past performance of its MCAs.[113]

---

[107] Cal. Code Reg. title 10, § 914(a)(3)
[108] *Id.*, § 914(a)(8).
[109] *Id.*, § 914(a)(3) (emphasis added).
[110] *Id.*
[111] *Id.*, § 914(a)(8)
[112] *Id.*, § 931.
[113] *Id.*, § 932.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

143. It is necessary for the DFPI to mandate a methodology for estimating the Estimated Term because left to their own devices, MCA providers would be incentivized to pick an estimate of the term that would either minimize the Estimated APR (such as estimating the term to be one year exactly so as to avoid any annualization factor) or to suggest to the merchant that the MCA would be paid off faster. By mandating a pair of standard methods of estimating payoff time, the regulations ensure that MCA providers cannot give self-serving and deceptive estimates. (The deception here is that the estimates would not be good faith estimates of actual repayment time calculated on some basis, but numbers produced to achieve a different end that do not attempt to estimate the actual repayment time.)

### E. Without the Estimated APR It Is Impossible to Undertake a Meaningful Cost Comparison of MCAs with Different Payment Percentages

144. Without the Estimated APR, it would be impossible to compare MCAs of slightly different lengths on an apples-to-apples basis. Consider the paradigm MCA contracts SBFA has submitted.

145. For example, a Kapitus LLC MCA has an estimated term of "1 year, 6 months,"[114] while a Rapid Finance MCA has an estimated term of "1 Year 0.28 Months",[115] and a Forward Financing MCA has an estimated term of "273 days".[116]

146. Without the Estimated APR, how would a small business owner that wanted to compare the cost of these three MCAs in order to find the cheapest funding do so? Simply looking at the discount of the funding amount relative to the purchased amount of receivables would not provide an answer, as the MCAs also vary on their holdback percentage (3.7%, weekly, 28% daily, and 14% weekly, respectively), and therefore will vary on the length of time to payoff even with the same revenue stream for the borrower. Thus, the small business is faced with MCAs with different prices for different payoff rates and therefore periods. At this point, the small business is comparing apples-to-oranges-to-bananas. Without a standard comparison metric like the Estimated APR, there is no way for a small business to make an informed cost comparison.

147. The APR is the best metric available for facilitating apples-to-apples price comparisons of different financing products with different terms. It enables comparison shopping among MCAs and also comparison of MCAs with other types of financing products. The DFPI's requirement of an Estimated APR relies on the Estimated Term, which is different for MCAs than for closed-end credit where there is a known term, but if an Estimated Term calculation methodology were not mandated, MCA providers would be strongly incentivized to manipulate their estimates to lower the APR to make their products look less expensive. And if there were no Estimated APR required, there would be no way of comparing costs among MCAs or between MCAs and other products. Far from being misleading as the SBFA suggests, the DFPI regulations actually help consumers make informed choices.

Continued on Next Page

---

[114] SBFA 00628 (Mattson Ex. 13)
[115] SBFA 00097 (Mattson Ex. 14)
[116] SBFA 00041.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## CONCLUSION

148. The real gravamen of the SBFA's complaint is that Estimated APR disclosure makes clear that MCAs are high-cost products—the payday loans of small business lending—and that may make small business owners think twice about whether they want to finance using an MCA. In short, the SBFA is invoking the First Amendment as a shield from competition.

149. I reserve the right to amend and supplement this report.

150. I declare the foregoing to all be correct and true to the best of my knowledge.


EXECUTED on September 22, 2023, in the Town of Somerset, Montgomery County, Maryland.


_____

**Exhibit 16-323**

**ER920**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## APPENDIX A. LIST OF EXPERT TESTIMONY GIVEN AT DEPOSITION OR TRIAL DURING THE PREVIOUS FOUR YEARS

- *De La Torre v. CashCall, Inc.*, No. 19-civ-01235 (San Mateo California Sup. Ct.) (trial testimony, April-May, 2021)

- *In re Navient Corp. Securities Litigation,* No. 17-cv-8373 (RBK/AMD) (D.N.J.) (deposition, June 9, 2021)

- *Deutsche Bank Nat'l Trust Co., as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC1 v. Morgan Stanley ABS Capital I Inc.*, No. 650291/2013 (N.Y. Sup. Ct.)

- *Deutsche Bank Nat'l Trust Co., as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC3 v. Morgan Stanley ABS Capital I Inc.*, No. 651959/2013 (N.Y. Sup. Ct.) (deposition, March 8, 2022)

- *Andrade v. Am. First Fin., Inc.*, No. 3:18-cv-06743 (N.D. Cal.) (depositions, January 25, 2022, and March 15, 2022)

- *Fernandez v. CoreLogic Credco LLC.*, No. 3:20-cv-1262 (S.D. Cal.) (deposition, July 10, 2023)

- *Cox v. Century Financial Group, Inc.,* No. 7-cv-100-4294 (Mo. Cir. Ct. of Clay County) (deposition, August 22, 2023)

**Exhibit 16-324**

**ER921**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## APPENDIX B. CURRICULUM VITAE OF ADAM J. LEVITIN

(114 of 295) Page 114 of 295 Case: 24-50 05/24/2024, DktEntry: 14.6, Page 114 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-18   Filed 09/27/23   Page 28 of 58   Page ID #:1128

28

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

# ADAM J. LEVITIN

Carmack Waterhouse Professor of Law and Finance
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
adam.levitin@law.georgetown.edu
(202) 662-9234 (o)

## ACADEMIC APPOINTMENTS

**GEORGETOWN UNIVERSITY LAW CENTER**          2007-present
*Carmack Waterhouse Professor of Law and Finance (2023-present)*
*Anne Fleming Research Professor (2020-2023)*
*Agnes N. Williams Research Professor (2018-2020)*
*Professor of Law (2011-present) (tenured)*
*Associate Professor of Law (2007-2011)*

**HARVARD LAW SCHOOL**          2012-2013
*Bruce W. Nichols Visiting Professor of Law*

**AMERICAN BANKRUPTCY INSTITUTE**          Fall 2009
*Robert Zinman Scholar in Residence*

**FEDERAL TRADE COMMISSION**          Summer 2008
*Faculty, Division of Financial Practices Academy*

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *cum laude*          2005

**COLUMBIA UNIVERSITY**, M.PHIL. IN HISTORY          2001

**COLUMBIA UNIVERSITY**, A.M. IN HISTORY          2000

**HARVARD COLLEGE**, A.B. IN NEAR EASTERN LANGUAGES & CIVILIZATIONS AND HISTORY,
    *magna cum laude with highest honors in field*          1998

## OTHER PROFESSIONAL LEGAL EXPERIENCE

**GORDIAN CRYPTO ADVISORS LLC**          2022-present
*Principal*

**DELAWARE ATTORNEY GENERAL'S OFFICE**          2011-2012
*Volunteer Consulting Attorney*

**CONGRESSIONAL OVERSIGHT PANEL FOR TROUBLED ASSET RELIEF PROGRAM**    2008-2010
*Special Counsel*

**WEIL, GOTSHAL & MANGES LLP**, New York, New York          2006-2007
*Associate, Business Finance & Restructuring Department*

**HON. JANE R. ROTH, THIRD CIRCUIT COURT OF APPEALS,** Wilmington, Delaware    2005-2006
*Judicial Clerk*

**Exhibit 16-326**

**ER923**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## HONORARY PROFESSIONAL AFFILIATIONS

- American College of Bankruptcy, Elected Fellow (2021)
- American College of Consumer Financial Services Lawyers, Elected Fellow (2021)
- American Law Institute, Elected Member (2014)

## SCHOLARSHIP AWARDS AND GRANTS

- Grant Gilmore Award, American College of Commercial Finance Lawyers (2022)
- Axiom Business Book Awards, Gold Medal for Real Estate (2021)
- LawDragon 500 Leading Global Insolvency and Restructuring Lawyers (2020)
- LawDragon 500 Leading U.S. Bankruptcy and Insolvency Lawyers (2020)
- Student Loan Law Initiative Research Grant for Understanding and Encouraging Enrollment in Income Driven Repayment Programs (with John Brooks and Brian Galle) (2020)
- Best Professional Article, American College of Consumer Financial Services Lawyers Annual Writing Competition (2014)
- American Law Institute, Young Scholar's Medal (2013)
- Pew Charitable Trusts, Grant for Strategies for Reviving the Housing Market (2012)
- George Washington University, Center for Law, Economics & Finance, Junior Faculty Scholarship Prize (2011)
- Walton H. Hamilton Prize for Outstanding Scholarship, *Yale Journal on Regulation* (2009)
- Best Professional Article, American College of Consumer Financial Services Lawyers Annual Writing Competition (2009)
- Editors' Prize, *American Bankruptcy Law Journal* (2007)

## LEGAL PUBLICATIONS

**Books**

- CONSUMER FINANCE: SELECT FEDERAL LAW MATERIALS (CreateSpace, 4th ed. 2022)
- CONSUMER FINANCE: SELECT STATE LAW AND PRIVATE LAW MATERIALS (CreateSpace, 4th ed. 2022)
- THE GREAT AMERICAN HOUSING BUBBLE: WHAT WENT WRONG AND HOW WE CAN PROTECT OURSELVES IN THE FUTURE (Harvard University Press 2020) (with Susan Wachter)
  - "an impressive new book," Robert J. Schiller, *N.Y. Times* (July 31, 2020)
  - "an indispensable analysis of the crisis and the far-reaching measures needed to prevent a recurrence." *Kirkus Starred Review*
  - Axiom Business Book Awards, Gold Medal for Real Estate (2021)
- CONSUMER FINANCE: MARKETS AND REGULATION (Wolters Kluwer, 2018; 2nd edition, Aspen, 2023)
- BUSINESS BANKRUPTCY: FINANCIAL RESTRUCTURING AND MODERN COMMERCIAL MARKETS (Wolters Kluwer, 2015; 2nd edition, Wolters Kluwer, 2018; 3rd edition, Aspen, 2023)
- CONSUMER BANKING AND PAYMENTS LAW (Nat'l Consumer Law Center, 5th ed., 2013; 2014 supplement) (with Lauren Saunders *et al.*)

**Exhibit 16-327**

**ER924**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## Articles (published or accepted for publication)

- *Samson's Toupée: The Source-of-Strength Doctrine in Bankruptcy*, 42 YALE J. REG (forthcoming 2024) (invited contribution)

- *The New Usury: The Ability-to-Repay Revolution in Consumer Finance*, 92 GEO. WASH. L. REV. (forthcoming 2023)

- *The Financial Inclusion Trilemma*, 41 YALE J. ON REG. (forthcoming 2023)

- *Not Your Keys, Not Your Coins: Custodial Credit Risk in Cryptocurrency*, 101 TEX. L. REV. 877 (2023)
    – Reviewed in JOTWELL, Oct. 2022
    – Winner, Grant Gilmore Award, American College of Commercial Finance Lawyers

- *Judge Shopping in Chapter 11 Bankruptcy*, 2023 ILL. L. REV. 351 (2023)

- *The Constitutional Problems with Nondebtor Releases in Chapter 11 Bankruptcy*, 90 FORDHAM L. REV. 429 (2022)

- *Purdue's Poison Pill: The Breakdown of Chapter 11's Checks and Balances*, 100 TEX. L. REV. 1079 (2022)
    – Response piece by Jonathan C. Lipson, *First in Time; First is Right: Comments on Levitin's* Poison Pill, 101 TEX. L. REV. ONLINE (2022)

- *The Spurious Pedigree of the "Valid-When-Made" Doctrine*, 71 DUKE L.J. ONLINE 87 (2022)

- *Rent-a-Bank: Bank Partnerships and the Evasion of Usury Laws*, 71 DUKE L.J. 329 (2021)

- *The Proceduralist Inversion—A Response to Skeel*, 130 YALE L.J. FORUM 335 (2020) (with Edward Janger)

- *Redesigning Education Finance: How Student Loans Outgrew the "Debt" Paradigm*, 109 GEO. L.J. 5 (2020) (with John R. Brooks)

- *A Tale of Two Markets: Post-Crisis Regulation and Innovation in the Mortgage and Structured Finance Markets*, 2020 ILL. L. REV. 47 (2020) (with William Bratton)

- *The Fast and the Usurious: Putting the Brakes on Auto Lending Abuses*, 108 GEO. L.J. 1257 (2020)

- *Considering Law and Macroeconomics*, 83 LAW & CONTEMP. PROB. i (2020) (with Anna Gelpern)

- *Mortgage Risk Premiums During the Housing Bubble*, 58 J. R.E. FIN. & ECON. (2019) (with Desen Lin and Susan Wachter) (peer-reviewed journal)

- *Law of the Middle Class: Consumer Finance in the Law School Curriculum*, 31 LOYOLA CONSUMER L. REV. 393 (2019)

- *One Dollar, One Vote: Mark-to-Market Governance in Bankruptcy*, 104 IOWA L. REV. 1857 (2019) (with Edward Janger)

- *Junk Cities: Insolvency Crises in Overlapping Municipalities*, 106 CAL. L. REV. 459 (2019) (with David Schleicher & Aurelia Chaudhury)

- *Badges of Opportunism: Policing Restructuring Support Agreements*, 13 BROOK. J. OF CORP., FIN. & COMM. LAW 169 (2019) (symposium issue) (with Edward Janger)

- *The Faulty Foundation Draft Restatement of Consumer Contracts*, 36 YALE J. ON REG. 447 (2019) (with Nancy Kim *et al.*) (lead author)
    – Reviewed in JOTWELL, May 15, 2019

- *Bankruptcy's Lorelei: The Dangerous Allure of Financial Institutions Bankruptcy,* 97 N.C. L. REV. 101 (2019)
    – Reprinted in BANKRUPTCY'S UNIVERSAL PRAGMATIST (Christoph G. Paulus & John A.E. Pottow, ed.)

- *The New Bond Workouts*, 167 U. PA. L. REV. 1597 (2018) (with William Bratton)

Exhibit 16-328

ER925

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- *Pandora's Digital Box: The Promise and Perils of Digital Wallets,* 166 U. PA. L. REV. 305 (2018)

- *Safe Banking: Finance and Democracy,* 83 U. CHIC. L. REV. 357 (2016)

- *Prioritization and Mutualization: Clearinghouses and the Redundancy of Financial Contract Safe Harbors in Bankruptcy,* 10 BROOK. J. OF CORP., FIN. & COMM. LAW 129 (2015)

- *Second Liens and the Leverage Option,* 68 VAND. L. REV. 1243 (2015) (with Susan Wachter)

- *Bankruptcy Law and the Cost of Credit: The Impact of Cramdown on Mortgage Interest Rates,* 57:1 J.L. & ECON. 139 (2014) (with Joshua Goodman) (peer-reviewed journal)

- *The Politics of Financial Regulation and the Regulation of Financial Politics,* 127 HARV. L. REV. 1991 (2014)

- *The Paper Chase: Securitization, Foreclosure, and the Uncertainty of Mortgage Title,* 63 DUKE L.J. 637 (2013)
  −Winner, American College of Consumer Financial Services Lawyers Annual Writing Competition

- *A Transactional Genealogy of Scandal from Michael Milken to Enron to Goldman Sachs,* 86 S. CAL. L. REV. 783 (2013) (with William Bratton)
  −Discussed in TIME ("The Accounting Trick Behind Thirty Years of Scandal," Aug. 15, 2012)
  −Reprinted in 56 CORP. PRACTICE COMMENTATOR (2014)

- *The Consumer Financial Protection Bureau: An Introduction,* 32 REV. BANKING & FIN. L. 321 (2013)

- *The Commercial Real Estate Bubble,* 2 HARV. BUS. L. REV. 801 (2013) (with Susan Wachter)

- *The Public Option in Housing Finance,* 46 U.C. DAVIS L. REV. 1111 (2013) (with Susan Wachter)

- *Skin-in-the-Game: Risk Retention Lessons from Credit Card Securitization,* 81 GEO. WASH. L. REV. 813 (2013)

- *The Tenuous Case for Derivatives Clearinghouses,* 101 GEO. L.J. 445 (2013)

- *Why Housing?* 23 HOUSING POL'Y DEBATE 5 (2013) (with Susan Wachter) (peer reviewed)

- *Bankrupt Politics and the Politics of Bankruptcy,* 97 CORNELL L. REV. 100 (2012)

- *Explaining the Housing Bubble,* 100 GEO. L.J. 1177 (2012) (with Susan Wachter)
  −Discussed in THE ECONOMIST ("Bricks and Slaughter," Mar. 3, 2011)

- *The Dodd-Frank Act and Housing Finance: Can It Restore Private Risk-Capital to the Securitization Market?* 29 YALE J. ON REG. 101 (2012) (symposium volume) (with Andrey D. Pavlov & Susan M. Wachter)

- *Rate Jacking: Risk-Based and Opportunistic Pricing in Credit Cards,* 2011 UTAH L. REV. 339 (2011) (invited theme issue on the Credit C.A.R.D. Act)

- *Private Disordering? Payment Card Fraud Liability Rules,* 5 BROOK. J. OF CORP., FIN. & COMM. LAW 1 (2011) (symposium issue)

- *Mortgage Servicing,* 28 YALE J. ON REG. 1 (2011) (with Tara Twomey)

- *In Defense of Bailouts,* 99 GEO. L.J. 435 (2011)
  −Winner, 2011 C-LEAF Junior Faculty Scholarship Prize
  −Reviewed in JOTWELL, May 14, 2010

- *Rewriting Frankenstein Contracts: The Workout Prohibition in Residential Mortgage Backed Securities,* 82 S. CAL. L. REV. 1075 (2010) (with Anna Gelpern)
  −Accepted for the 2009 Stanford-Yale Junior Faculty Forum

- *Back to the Future with Chapter 13: A Reply to Professor Scarberry,* 37 PEPPERDINE L. REV. 1261 (2010)

- *Bankruptcy Markets: Making Sense of Claims Trading,* 4 BROOK. J. OF CORP., FIN. & COMM. LAW 64 (2010) (symposium issue)

**Exhibit 16-329**

**ER926**

(118 of 295) Page 118 of 295 Case: 24-50  05/24/2024  DktEntry: 14.6  Page 118 of 295
Case 2:22-cv-08775-RGK-SK  Document 52-18  Filed 09/27/23  Page 32 of 58  Page ID
#:1132
32

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- *The Crisis Without a Face:  Emerging Narratives of the Financial Crisis*, 63 U. MIAMI L. REV. 999 (2009) (invited foreword to themed volume)

- *Resolving the Foreclosure Crisis:  Modification of Mortgages in Bankruptcy*, 2009 WISC. L. REV. 565 (2009)
    – Accepted for the American Law and Economics Association Annual Convention
    – Accepted for Third Annual Conference on Empirical Legal Studies
    – Accepted for Harvard-Texas Conference on Commercial Realities

- *Hydraulic Regulation:  Regulating Credit Markets Upstream*, 26 YALE J. ON REG. 143 (2009)
    – Winner, Walton H. Hamilton Prize for Outstanding Scholarship, Yale Journal on Regulation
    – Accepted for Univ. of Connecticut Workshop on Banking & Consumer Financial Services Law

- *Priceless?  The Costs of Credit Cards*, 55 UCLA L. REV. 1321 (2008)
    – Winner, American College of Consumer Financial Services Lawyers Annual Writing Competition

- *Priceless?  The Social Costs of Credit Card Merchant Restraints*, 45 HARV. J. ON LEGIS. 1 (2008)

- *Payment Wars:  The Merchant-Bank Struggle for Control of Consumer Payment Systems*, 12 STAN. J. L., BUS. & FIN. 425 (2007)

- *Finding Nemo:  Rediscovering the Virtues of Negotiability in the Wake of Enron*, 2007 COLUM. BUS. L. REV. 83 (2007)

- *Toward a Federal Common Law of Bankruptcy: Judicial Lawmaking in a Statutory Regime*, 80 AM. BANKR. L.J. 1 (2006) (double-blind peer-reviewed journal, published by National Conference of Bankruptcy Judges)
    – Winner of American Bankruptcy Law Journal's 2007 Editors' Prize

- *The Limits of Enron:  Counterparty Risk in Bankruptcy Claims Trading*, 15 J. BANKR. L. & PRAC. 389 (2006) (peer-reviewed journal)

- *The Merchant-Bank Struggle for Control of Payment Systems*, 17 J. FIN. TRANSFORMATION 73 (2006) (peer-reviewed applied finance journal)

- *The Antitrust Super Bowl:  America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 BERKELEY BUS. L.J. 265 (2005)

## Book Chapters

- *Rethinking Duties to Serve in Housing Finance*, in HOMEOWNERSHIP BUILT TO LAST, Eric Belsky *et al.*, eds. (Brookings Institution Press 2014) (with Janneke Ratcliffe)

- *Deregulation and the Financial Crisis of 2008*, in REGULATORY BREAKDOWN? THE CRISIS OF CONFIDENCE IN U.S. REGULATION, Cary Coglianese, ed. (University of Pennsylvania Press 2012) (with Susan M. Wachter)

- *Fiscal Federalism and the Limits of Bankruptcy*, in WHEN STATES GO BROKE: ORIGINS, CONTEXT, AND SOLUTIONS FOR THE AMERICAN STATES IN FISCAL CRISIS, Peter Conti-Brown, ed. (Cambridge University Press 2011)

- *Information Asymmetries in the U.S. Mortgage Crisis*, in THE AMERICAN MORTGAGE SYSTEM:  RETHINK, RECOVER, REBUILD, Susan M. Wachter & Martin M. Smith, eds. (University of Pennsylvania Press 2011) (with Susan M. Wachter)

- *Modification of Mortgages in Bankruptcy*, LESSONS FROM THE FINANCIAL CRISIS: INSIGHTS AND ANALYSIS FROM TODAY'S LEADING MINDS, Richard W. Kolb, ed. (Wiley 2009)

## Edited Volumes

- 82 LAW & CONTEMP. PROB., *Law and Macroeconomics* (2019) (with Anna Gelpern)

**Exhibit 16-330**

**ER927**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## Shorter Articles, Research Papers, and Commissioned Studies

- *Report on Legal and Institutional Differences in the European and American Securitization Markets*, commissioned by the German Council of Economic Experts (Sachverständigenrat zur Begutachtung der gesamtwirtschaftlichen Entwicklung), Sept. 2023

- "*No More Bailouts: A Blueprint for a Standing Emergency Economic Resilience and Stabilization Program*," Great Democracy Initiative whitepaper (July 2020) (with Lindsay Owens and Ganesh Sitaraman)

- "*Abusive Acts and Practices*"—*Towards a Definition?* Invited Written Presentation for Consumer Financial Protection Bureau Symposium on "Abusive" (June 25, 2019)

- *Independent Review of the Empirical Studies Supporting the Draft Restatement of Consumer Contracts* (Dec. 21, 2017) (lead author)

- *The Economics of Retail Payments Security: Commentary,* in THE PUZZLE OF PAYMENTS SECURITY: FITTING THE PIECES TOGETHER TO PROTECT THE RETAIL PAYMENTS SYSTEM 69 (Fed. Res. Bank of K.C. 2016)

- *Pandora's Digital Box: Competitive and Business Risks of Mobile Wallets*, Merchants Advisory Group White Paper (2016) (commissioned study)

- *A Lawyer and Partner, and Also Bankrupt,* 4 J. OF LAW (4 THE POST) 93 (2014) (reprinted from blog post at www.creditslips.org)

- *An Analysis of the Proposed Interchange Fee Litigation Settlement,* Geo. L. & Econ. Research Paper, No. 12-033, *at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2133361

- *Clearing the Mortgage Market Through Principal Reduction: A Bad Bank for Housing (RTC 2.0),* Pew Charitable Trusts Strategies to Improve the Housing Market Research Paper (2012), *available at* http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Clearing_the_Mortgage_Market.pdf (commissioned study).

- *What Next for Housing Finance?* 15 WHARTON REAL ESTATE REV. (2012) (with Susan Wachter)

- *Cross-Routing: PIN and Signature Debit Interchangeability Under the Durbin Amendment,* 2 LYDIAN J.16 (Dec. 2010)

- *Interchange Regulation: Implications for Credit Unions*, Research Brief #224, The Filene Research Institute, November 2010

- *Overdraft Regulation: A Silver Lining to the Regulatory Clouds?*, Research Brief #211, The Filene Research Institute, April 2010 (commissioned study)

- *The Credit C.A.R.D. Act: Opportunities and Challenges for Credit Unions*, Research Brief #202, The Filene Research Institute, Dec. 2009 (commissioned study)

- *Critique of Evans and Wright's Study of the Consumer Financial Protection Agency Act*, white paper, Oct. 22, 2009, *available at* http://ssrn.com/abstract=1492471

- *Bad and Good Securitization*, 13 WHARTON REAL ESTATE REV. 23 (2010) (with Andrey Pavlov and Susan Wachter), *available at* http://papers.ssrn.com/abstract=1462895

- *The Consumer Financial Protection Agency*, Policy Analysis, Pew Charitable Trusts Financial Reform Project, Research Brief #2, July 2009
    - –The "best one-stop paper for understanding why CFPA needs to pass." Baseline Scenario, *at* http://baselinescenario.com/2009/08/17/a-cfpa-research-brief/

- *Evaluation of Alternatives for Secondary Mortgage Markets*, Study for the National Association of Realtors' Presidential Advisory Group (2009) (commissioned study)

- *Remote Deposit Capture: A Legal and Transactional Overview*, 126 BANKING L.J. 115 (2009) (peer-edited journal)

**Exhibit 16-331**

**ER928**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- *Helping Homeowners: Modification of Mortgages in Bankruptcy,* 3 HARV. L. & POL'Y REV. (online) (Jan. 19, 2009) (invited contribution), *at* http://www.hlpronline.com/Levitin_HLPR_011909.pdf

- *Reforming Mortgage* Servicing, Research Brief, American Association of Retired Persons, Dec. 2008 (commissioned study)

- *All But Accurate: A Critique of the American Bankers Association Study on Credit Card Regulation*, white paper, December 6, 2007, *at* http://papers.ssrn.com/abstract=900444

- *Gifting Plans and Absolute Priority*, 124 BANKING L.J. 722 (2007) (peer-edited journal)

- *The Problematic Case for Incentive Compensation in Bankruptcy*, 155 UNIV. PA. L. REV. PENNUMBRA 88 (2007)

- *Antitrust Issues in Credit Card Merchant Restraints Rules*, Tobin Project Working Paper, Risk Policy Working Paper, May 6, 2007 (with Elizabeth Warren)

- *Health Care Privacy Issues in Corporate Reorganizations*, Materials Presented Before the American Bankruptcy Institute 2007 New York City Bankruptcy Conference, May 7, 2007 (with Arthur R. Cormier & Andrew M. Troop)

## Encyclopedia Entries

- *Mortgage Market Character and Trends: USA*, in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed., (Cambridge University Press 2012) (with Susan Wachter)

- *American Mortgages,* in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed., (Cambridge University Press 2012) (with Susan Wachter)

## LEGISLATIVE TESTIMONY AND BRIEFINGS

- "FTX Bankruptcy," Bipartisan House Financial Services Committee Staff Briefing, Dec. 8, 2022

- Testimony Before the House Judiciary Committee Subcommittee on Regulatory Reform, Commercial and Antitrust Law, July 28, 2021 (hearing on "Oversight of the Bankruptcy Code, Part 1: Confronting Abuses of the Chapter 11 System").

- Testimony Before the House Committee on Small Business, Sept. 9, 2020 (hearing on "Transparency in Small Business Lending").

- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, March 26, 2019 (hearing on Chairman's Housing Reform Outline: Part I).

- Testimony Submitted to the Senate Judiciary Committee, Nov. 13, 2018 (hearing on the Taxpayer Protection and Responsible Resolution Act of 2018).

- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, Jan. 25, 2018 (hearing on "Examining Opportunities and Challenges in the Financial Technology ("Fintech") Marketplace").

- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, June 8, 2017 ("Fostering Economic Growth: The Role of Financial Institutions in Local Communities").

- Testimony Submitted to the House Financial Services Committee's Subcommittee on Financial Institutions and Consumer Credit, Mar. 21, 2017 (hearing on "Ending the *De Novo* Drought: Examining the Application Process for *De Novo* Financial Institutions").

- Testimony Before the House Financial Services Committee, July 9, 2016 ("Making a Financial Choice: More Capital or More Government Control?") (hearing on the CHOICE Act).

**Exhibit 16-332**

**ER929**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Testimony Before the Senate Judiciary Committee, Subcommittee on The Constitution, July 23, 2015 ("The Administrative State v. The Constitution: Dodd-Frank at Five").

- Testimony Before the House Financial Services Committee, Mar. 15, 2015 ("Preserving Consumer Choice and Financial Independence").

- Testimony Before the House Judiciary Committee, Subcommittee on Regulatory Reform, Commercial and Antitrust Law, July 17, 2014 ("Guilty Until Proven Innocent?  A Study of the Propriety & Legal Authority for the Justice Department's *Operation Choke Point*").

- Testimony Before the House Financial Services Committee, Subcommittee on Capital Markets and Government Sponsored Enterprises, Feb. 26, 2014 ("The Dodd-Frank Act's Impact on Asset-Backed Securities").

- Testimony Before the House Committee on Small Business, Subcommittee on Oversight, Investigations, and Regulation, Dec. 3, 2013 ("Regulatory Landscape:  Burdens on Small Financial Institutions").

- Testimony Before the Senate Banking Committee, Oct. 1, 2013 ("Housing Finance Reform: Fundamentals of a Functioning Private Label Mortgage Backed Securities Market").

- Testimony Before the House Financial Services Committee, July 18, 2013 ("A Legislative Proposal to Protect American Taxpayers and Homeowners by Creating a Sustainable Housing Finance System") (hearing on the PATH Act).

- Testimony Before the House Judiciary Committee, Subcommittee on Intellectual Property, Competition, and the Internet, July 10, 2012 ("The Dodd-Frank Act's Effects on Financial Services Competition").

- Testimony Before the House Financial Services Committee, Subcommittee on Capital Markets and Government Sponsored Institutions, June 7, 2012 ("Investor Protection:  The Need to Protect Investors from Government").

- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, May 9, 2012 ("Rising Regulatory Compliance Costs and Their Impact on the Health of Small Financial Institutions").

- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit & Subcommittee on Capital Markets and Government Sponsored Enterprises, Nov. 16, 2011 (Joint Hearing on "H.R. 1697: The Communities First Act").

- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Sept. 13, 2011 ("Housing Finance Reform: Should There Be a Government Guarantee?").

- Testimony Submitted to the House Committee on the Judiciary, Sept. 8, 2011 (H.R. 2533, the "Chapter 11 Bankruptcy Venue Reform Act of 2011").

- Testimony Before the House Committee on Small Business, Subcommittee on Oversight, Investigations & Regulation, July 28, 2011 ("Open for Business:  The Impact of the CFPB on Small Business").

- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, July 19, 2011 ("Enhanced Consumer Financial Protection After the Financial Crisis").

- Testimony Before the House Government Oversight and Reform Committee, Subcommittee on TARP, Financial Institutions, and Bailouts of Public and Private Institutions, May 24, 2011 ("Who's Watching the Watchmen? Oversight of the Consumer Financial Protection Bureau").

- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, Apr. 6, 2011 ("Legislative Proposals to Improve the Structure of the Consumer Financial Protection Bureau").

- Testimony Before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010 ("Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing").

**Exhibit 16-333**

**ER930**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Nov. 16, 2010 ("Problems in Mortgage Servicing from Modifications to Foreclosures").
- Testimony Before the Financial Crisis Inquiry Commission, Oct. 28, 2010, *at* http://fcic.law.stanford.edu/interviews/view/421.
- "Future of Housing Finance," Center for American Progress Mortgage Finance Working Group Presentation to the U.S. Department of Treasury, August 2, 2010.
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, December 11, 2009 ("Home Foreclosures:  Will Voluntary Mortgage Modification Help Families Save Their Homes?  Part II?").
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, July 23, 2009 ("The Worsening Foreclosure Crisis:  Is It Time to Reconsider Bankruptcy Reform?).
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, April 2, 2009 (re: Consumer Debt — Are Credit Cards Bankrupting Americans?).
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, Mar. 24, 2009 ("Abusive Credit Card Practices and Bankruptcy," re: Consumer Credit Fairness Act, S.257).
- Testimony Before the Senate Committee on Banking, Housing and Urban Affairs, Feb. 12, 2009 (re: Modernizing Consumer Protection in the Financial Regulatory System: Strengthening Credit Card Protections).
- Testimony Before the House Judiciary Committee, Jan. 22, 2009 (re:  Helping Families Save Their Homes in Bankruptcy Act, H.R. 220, and the Emergency Homeownership and Equity Protection Act, H.R. 225).
- Testimony Before the Senate Judiciary Committee, Nov. 19, 2008 (re: Helping Families Save Their Homes in Bankruptcy Act, now S.61).
- "Bankruptcy Modification of Mortgages," Democratic Staff Briefing, United States House of Representatives, November 14, 2008.
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit on March 13, 2008 (re: Credit Cardholders' Bill of Rights).
- Testimony Submitted to the Economic Matters Committee, Maryland State House of Delegates, March 6, 2008.
- "Credit Card Regulation," Democratic Staff Briefing, United States House of Representatives, March 5, 2008.

## REGULATORY AND LEGISLATIVE COMMENTS FILED

- Letter to the Reporters on the fourth draft of the American Law Institute Restatement of the Law of Consumer Contracts, Nov. 10, 2021
- Letter to the Permanent Editorial Board of the Uniform Commercial Code regrading proposed Commentary on Perfection of a Security Interest in Intangible Money and Related Choice-of-Law Rules, Aug. 9, 2021
- Comments to the Office of the Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "Fair Access to Financial Services," Docket No. OCC- 2020-004, Dec. 18, 2020
- Legal Scholars Letter to Senator Elizabeth Warren Regarding the Consumer Bankruptcy Reform Act of 2020, December 14, 2020 (co-lead drafter)

**Exhibit 16-334**

**ER931**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Comments to the Office of the Comptroller of the Currency regarding the Charter Application of Figure Bank, N.A., 2020-WE-Charter-317953, Dec. 7, 2020

- Letter to Chief Judge Cecilia Morris, U.S. Bankruptcy Court for the Southern District of New York, regarding Local Rule 1073-1, Nov. 24 (2020)

- Comments to the Consumer Financial Protection Bureau regarding "Qualified Mortgage Definition Under the Truth in Lending Act (Regulation Z): General QM Loan Definition", Docket No. CFPB-2020-0020, Sept. 23, 2020

- Comments to the Office of Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "National Banks and Federal Savings Associations as Lenders," Docket No. OCC-2020-0026, September 3, 2020

- Comments to the Consumer Financial Protection Bureau regarding Request for Information from Taskforce on Federal Consumer Financial Law, Docket No. CFPB-2020-0013, June 1, 2020

- Comments to the Federal Deposit Insurance Corporation regarding Notice of Proposed Rulemaking regarding "Federal Interest Rate Authority," RIN 3064-AF21, Jan. 5, 2020

- Comments to the Office of Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "Permissible interest on loans that are sold, assigned, or otherwise transferred," Docket No. OCC-2019-0027, Jan. 5, 2020

- Comments to the Securities and Exchange Commission on Request for Comments on Asset-Level Disclosure Requirements for Residential Mortgage-Backed Securities, Nov. 23, 2019

- Letter to William K. Harrington, Esq. United States Trustee, Region 2, Regarding Appointment of Examiner in the Chapter 11 Case of Purdue Pharma, Inc., No. 19-23649 (Bankr. S.D.N.Y.), Nov. 5, 2019  (co-author with Jonathan Lipson and Stephen Lubben)

- Comments to the Consumer Financial Protection Bureau on proposed rescission of Final Rule regarding Payday, Vehicle Title, and Certain High-Cost Loans, Docket No. CFPB-2019-0006, May 15, 2019

- Letter on behalf of bankruptcy and financial regulation scholars to Senators Warren and Sanders in support of the U.S. Territorial Relief Act of 2019, May 2, 2019 (drafter)

- Joint Letter of Concerned Members of the Members Consultative Group to the American Law Institute Council on Council Draft No. 5 of the Restatement of the Law of Consumer Contracts, Oct. 3, 2018 (lead drafter)

- Letter on behalf of bankruptcy and financial regulation scholars to Senators Warren and Sanders in support of the U.S. Territorial Relief Act of 2018, July 25, 2018 (drafter)

- Comments of Financial Regulation and Consumer Protection Scholars Regarding the Consumer Financial Protection Bureau's Request for Information on Regulatory Guidance, Docket No. CFPB-2018-0013, July 2, 2018 (lead drafter)

- Letter Regarding Independent Review of the Empirical Studies Supporting Council Draft No. 3 of the Restatement of the Law, Consumer Contracts, to the American Law Institute Council, Jan. 12, 2018

- Joint Letter of Empirical Legal Scholars to the American Law Institute Council, concerning the third draft of the Restatement of the Law of Consumer Contracts, Oct. 9, 2017

- Letter to the American Law Institute Council, concerning the third draft of the Restatement of the Law of Consumer Contracts, Oct. 2, 2017

- Legal Scholars Letter to Congressional Banking and Financial Services Committee Leadership Regarding H.R. 10 and the Consumer Financial Protection Bureau, May 12, 2017 (co-lead drafter)

- Joint Letter of Concerned Members of the Members Consultative Group to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts, Oct. 19, 2016 (lead drafter)

**Exhibit 16-335**

**ER932**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Consumer Finance Scholars Comment Letter to the Consumer Financial Protection Bureau regarding Proposed Rulemaking on Payday, Vehicle Title, and Certain High-Cost Loans, Sept. 13, 2016 (lead drafter)

- Joint Letter of Concerned Members of the Members Consultative Group to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts, Dec. 31, 2015 (lead drafter)

- Corporate Finance Scholars' Letter to Congressional Leadership on Proposed Omnibus Appropriations Bill Rider to Amend the Trust Indenture Act, Dec. 8, 2015 (lead drafter)

- Letter to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts. Nov. 15, 2015

- Letter to the Reporters on the first draft of the American Law Institute Restatement of the Law of Consumer Contracts. Mar. 27, 2015

- Comments to the Consumer Financial Protection Bureau on Amendments Relating to Small Creditors and Rural or Underserved Areas Under the Truth in Lending Act (Regulation Z), Feb. 27, 2015

- Letter to the Reporters on the first draft of the American Law Institute Restatement of the Law of Consumer Contracts, Nov. 12, 2014

- Comments to the Consumer Financial Protection Bureau on Advanced Notice of Proposed Rulemaking regarding Debt Collection, Feb. 28, 2014

- Comments to the Federal Housing Finance Agency on Proposed State-Level Guarantee Fee Increases, Nov. 29, 2012

- Comments to the Permanent Editorial Board of the Uniform Commercial Code on the Draft Report on Mortgage Notes, May 27, 2011

- Comments to the Permanent Editorial Board of the UCC on Draft Report on Enforceability of Mortgage Notes, April 2011

- Comments to the Federal Reserve Board on the Durbin Amendment Rulemaking (Reg E), Feb. 21, 2011
  −Cited in NACS v. Bd. of Governors of Fed. Reserve Sys., 2013 WL 3943489 (D.D.C. July 31, 2013)

- Comments to the Bankruptcy Rules Committee on Proposed Amendments to Federal Rule of Bankruptcy Procedure 2019, Feb. 15, 2010.

- Comments to the Permanent Editorial Board of the UCC on Proposed (Pre-Release) Draft Report on Enforceability of Mortgage Notes, Jan. 5, 2011


## AMICUS BRIEFS AUTHORED (LEAD AUTHOR OR CO-AUTHOR)

- Amicus Brief (in support of appellants), *Harrington v. Purdue Pharma L.P.*, No. 23-a-87, Supreme Court of the United States, 2023 (sole author, represented by Daniel Walfish)

- Amicus Brief (in support of respondent), *Community Financial Services Ass'n v. Consumer Financial Protection Bureau*, Supreme Court of the United States, No. 22-448 (lead co-author; represented by Greg Lipper)

- Amicus Brief (in support of appellees and affirmance), *In re Purdue Pharma, LP*, No. 22-110-bk(L) (2d Cir. 2022) (sole author, represented by Daniel Walfish)

- Amicus Brief (in support of plaintiffs), *California ex rel. Becerra v. FDIC*, No. 20-cv-5860 (N. D. Cal. 2020) (sole author, represented by Eliza Duggan and Ted Mermin)

- Amicus Brief (in support of plaintiffs), *California ex rel. Becerra v. v. Brooks*, No. 20-cv-5200 (N. D. Cal. 2020) (sole author, represented by Eliza Duggan and Ted Mermin)

**Exhibit 16-336**

**ER933**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Amicus Brief (in opposition to proposed settlements between the United States Department of Justice and the Debtors and between the United States Department of Justice and the Sackler Family), *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y.) (lead co-author; co-counsel with Jonathan Lipson and Daniel Walfish)

- Amicus Brief (in support of respondent), *City of Chicago v. Fulton*, Supreme Court of the United States, No. 19-357 (co-author; represented by David Kuney)

- Amicus Brief (in support of the judgment below), *Seila Law LLC v. Consumer Financial Protection Bureau*, Supreme Court of the United States, No. 19-7 (lead co-author; co-counsel with Deepak Gupta and Patricia McCoy)

- Amicus Brief (in support of neither party), *McShannock v. JP Morgan Chase Bank N.A.*, No. 1:19-15899 (9th Cir. 2019) (sole author)

- Amicus Brief (in support of appellant), *Rent-Rite Super Kegs West, Ltd. v. World Business Lenders, LLC*, No. 1:19-cv-01552 (D. Colo. 2019) (sole author) (discussed favorably in decision reversing and remanding)

- Amicus Brief (in support of plaintiff), *Meade v. Marlette Funding, LLC*, No. 17-cv-30376 (Denver District Court, Colo. 2018) (sole author)

- Amicus Brief (in support of plaintiff), *Meade v. Avant of Colorado, LLC*, No. 17-cv-30377 (Denver District Court, Colo. 2018) (sole author)

- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *English v. Trump*, United States Court of Appeals for the District of Columbia, (2018) (co-lead author; represented by Law Offices of Courtney Weiner)

- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *Lower East Side People's Federal Credit Union v. Trump*, United States District Court for Southern District of New York, No. 1:17-cv-09536 (S.D.N.Y. 2017) (co-lead author; represented by Law Offices of Courtney Weiner)

- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *English v. Trump*, United States District Court for District of Columbia, No. 1:17-cv-02534 (D.D.C. 2017) (co-lead author; represented by Law Offices of Courtney Weiner)

- Amicus Brief of Scholars of Behavioral Science and Economics in support of Respondents, *Masterpiece Cakeshop, Ltd., et al., v. Colorado Civil Rights Commission et al*, Supreme Court of the United States, No. 16-111 (co-author; represented by Allison Ehlert and Adam Hoffman)

- Amicus Brief (in support of appellant), *Expressions Hair Designs v. Schneiderman*, Supreme Court of the United States, No. 15-1391, Nov. 21, 2016 (lead author; co-counsel with Carl Cecere)

- Amicus Brief of Financial Regulation Scholars in support of petitioners at en banc rehearing, *CFPB v. PHH Corp.*, D. C. Circuit en banc, No. 15-1177, Mar. 31, 2016 (co-lead author; co-counsel with Michael Barr and Deepak Gupta)

- Amicus Brief of Scholars of Behavioral Economics (in support of certiorari petition), *Expressions Hair Designs v. Schneiderman*, Supreme Court of the United States, No. 15-1391, June 15, 2016 (lead author; represented by Allison Ehlert and Adam Hoffman)

- Amicus Brief (in support of respondents), *Bank of America v. Caulkett*, United States Supreme Court, 2015 (lead author; co-counsel with Michael Fitzgerald)

- Amicus Brief (supplemental), *Eaton v. Federal National Mortgage Association & Another*, Supreme Judicial Court of Massachusetts, No. 11041, Jan. 27, 2012 (sole author)

- Amicus Brief, *Eaton v. Federal National Mortgage Association & Another*, Supreme Judicial Court of

**Exhibit 16-337**

**ER934**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

      Massachusetts, No. 11041, Sept. 22, 2011 (sole author)

- Amicus Brief, *Residential Funding Co. v. Saurman*, No. 143178, Supreme Court of Michigan, Oct. 21, 2011 (co-author with John Pottow & Rebecca Tushnet)

- Amicus Brief, *Bevilacqua v. Rodriguez,* Supreme Judicial Court of Massachusetts, No. 10880, April 21, 2011 (lead author)

- Amicus Brief on Behalf of the Texas Hotel and Lodging Ass'n, *La Villita Motor Inns, J.V., v. Orix Capital Markets, LLC, et al.*, Supreme Court of Texas, No. 10-1001, Mar. 20, 2011 (lead author)

## Editorials and Blogging

- "Supreme threat," FTAlphaville, August 30, 2023
- "The Justice Department was right to object to Purdue's rotten deal," Letter to the Editor, WASH. POST, Aug. 28, 2023
- "The Solution to Biden's Student Loan Problems Is Right Before His Eyes," WASH. POST, July 18, 2023 (with John Brooks and Brian Galle)
- "The Debt Ceiling Is Unconstitutional—but Not for the Reason You Think," THE AMERICAN PROSPECT, May 22, 2023 (with Anna Gelpern and Stephen Lubben)
- "Dissecting the U.S. Public Debt Clause," FTAlphaville, May 10, 2023 (with Anna Gelpern and Stephen Lubben)
- "The Implications of LTL's Per-Debtor Analysis," Harvard Bankruptcy Roundtable Blog, Feb. 14, 2023
- "Johnson & Johnson Was Abusing the Bankruptcy System," Letter to the Editor, WALL ST. J., Feb. 9, 2023
- "The Texas Two-Step: A Different Look at Bankruptcy Code Section 548," Harvard Bankruptcy Roundtable Blog, Nov. 1, 2022 (with Judith Fitzgerald)
- "CFPB Opponents Are Playing with Fire," AMERICAN BANKER, Oct. 28, 2022
- "Looming Legal Issues in Cryptocurrency Bankruptcies," THE DEAL, July 19, 2022
- "Crypto Winter Arrives," THE DEAL, July 18, 2022
- "How Apple Locks Out the Competition with Its Digital Key," PROMARKETS, Jan. 12, 2022
- "A Better Way to Fix the Student Loan Problem," POLITICO, Jan. 12, 2022 (with John Brooks)
- "It's Time for Biden to Fire the FDIC Chief," POLITICO, Dec. 16, 2021
- "The Boy Scouts Are Abusing Bankruptcy," BLOOMBERGLAW, Nov. 16, 2021
- "Now is the time for bankruptcy venue reform," THE HILL, August 6, 2021 (with Joan Feeney, Steven Rhodes, and Jay Westbrook)
- "Consumers—not banks—should control access to personal financial data," THE HILL, July 6, 2021
- "Reform Our Bankruptcy Laws Before a Tsunami of Covid Debt Comes Due," CNBC, Jan. 11, 2021
- "Supersize the Supreme Court to Save It," The AMERICAN PROSPECT, October 12, 2020
- "In Case of Economic Emergency:  Break Glass," BOSTON GLOBE, July 5, 2020 (with Lindsay Owens and Ganesh Sitaraman)
- "Mortgage Market Déjà vu," THE AMERICAN PROSPECT, July 1, 2020 (with Susan Wachter)
- "How to Start Closing the Racial Wealth Gap," THE AMERICAN PROSPECT, June 17, 2020
- "How to Get Money to Small Businesses, Fast," N.Y. TIMES, Mar. 24, 2020 (with Satyam Khanna)
- "The Americans Joe Biden Left Behind on the Bankruptcy Bill," THE AMERICAN PROSPECT, Jan. 9, 2019

**Exhibit 16-338**

**ER935**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Who Needs More Supreme Court Justices? Democrats and Republicans Do," BLOOMBERGLAW, Apr. 2, 2019
- "Depoliticize the Supreme Court by Adding Two Dozen New Justices," THE HILL, Dec. 7, 2018
- "Treasury's Bankruptcy Plan Would Mean More, Not Fewer, Bailouts," AMERICAN BANKER, Feb. 23, 2018
- "Toys 'R' Us and the Rigged Economy," HUFFINGTON POST, Sept. 26, 2017
- "Fixing the Equifax Problem: Public Utility Regulation of Credit Reporting," HUFFINGTON POST, Sept. 24, 2017
- "'Madden fix' bills are a recipe for predatory lending," AMERICAN BANKER, Aug. 25, 2017
- "Draining the Financial Swamp," WALL ST. JOURNAL, Mar. 21, 2017
- "What the CFPB 'Commission' Debate Is Really About," AMERICAN BANKER, Dec. 29, 2016
- "Glass-Steagall's Political Firewall," HUFFINGTON POST, Oct. 27, 2015
- "Where's the Proof that Durbin Failed Consumers?" AMERICAN BANKER, Oct. 22, 2015
- "Who's Afraid of a Republican CFPB?" AMERICAN BANKER, Oct. 16, 2015
- "Recalibrate the TIA for Today's Debt Markets," WALL ST. J. BANKRUPTCY BEAT, Sept. 30, 2015
- "The CFPB's Data Collection Should Be Applauded," AMERICAN BANKER, Aug. 17, 2015
- "Discharge Private Student Loans, But Federal Loans Have Safety Net," WALL ST. J. BANKRUPTCY BEAT, May 11, 2015
- "Eliminate Vendor Priority Claims," WALL ST. J. BANKRUPTCY BEAT, Dec. 3, 2014
- "Argentina and Distressed Investors," WALL ST. J. BANKRUPTCY BEAT, July 29, 2014
- "Mandatory Arbitration Offers Bargain-Basement Justice," AMERICAN BANKER, May 13, 2014
- "Outlook for Corporate Restructuring," WALL ST. J. BANKRUPTCY BEAT, Mar. 26, 2014
- "Postal Banking: Maybe Not So Crazy After All," AMERICAN BANKER, Jan. 31, 2014
- Letter to the Editor, N.Y. TIMES, Nov. 1, 2013
- "Hands Off Detroit's Final Treasures!" SALON, Aug. 20, 2013.
- "Don't Take My Pension: The Looming Public Worker Nightmare," SALON, Aug. 12, 2013.
- "Make the Banks Pay," SALON, Oct. 27, 2011.
- "Fed's Feeble Swipe Fee Rule Is an Unauthorized Sop to Big Banks," AMERICAN BANKER, July 8, 2011.
- "More Openness on Mortgages," N.Y. TIMES, Mar. 8, 2010.
- Letter to the Editor, WASHINGTON POST, July 6, 2010.
- Letter to the Editor, WASHINGTON TIMES, June 22, 2010.
- "Swipe Fee Reform Benefits Consumers and Businesses Large and Small," HUFFINGTON POST, June 18, 2010.
- "Rein in the Credit Card Games," DETROIT FREE-PRESS, Nov. 28, 2008 (reprinted as "Consumer Pay High Price for Credit Cards," SAN DIEGO UNION-TRIBUNE, Nov. 30, 2008) (reprinted as "Credit cards on Santa's naughty list," ATLANTA JOURNAL CONSTITUTION, Dec. 7, 2008).
- "Bailout Bill Must Include Help for Homeowners," WASHINGTON INDEPENDENT, Sept. 26, 2008.
- "The Card Industry Still Has a Chance to Reform," AMERICAN BANKER, Aug. 8, 2008.
- "The Flaws in the FHA Housing Bill", op-ed, WALL ST. JOURNAL, July 11, 2008.
- Letter to the Editor, WALL ST. JOURNAL, April 3, 2008.
- "Complex Pricing of Credit Cards Should be Simplified," op-ed, CHICAGO TRIBUNE, Dec. 27, 2007
- "Conglomerate Master" guest blogger on The Conglomerate, 2010-2011
- Guest blogger, PrawfsBlawg, May 2008

**Exhibit 16-339**

**ER936**

(128 of 295) Page 128 of 295 Case: 24-50 05/24/2024, DktEntry: 14.6, Page 128 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-18   Filed 09/27/23   Page 42 of 58   Page ID #:1142

42

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

- Guest blogger, Warren Reports at TPM Café, Jan. 2007
- Blogger, Credit Slips, www.creditslips.org, Dec. 31, 2007-present

## PRESENTATIONS AND PANELS

### 2023

- Comments on David Schleicher's *In a Bad State: Responding to State and Local Budget Crises*, Wharton School, University of Pennsylvania, May 24, 2023 (commentator)
- The Panic of 2023, University of Illinois Law School, Apr. 24, 2023 (guest lecturer)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Apr. 24, 2023 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, Apr. 21, 2023 (presenter)
- "Bankruptcy 101:  Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Apr. 19, 2023 (presenter)

- "Russia Sanctions and Payment Card Networks," Georgetown University Law Center, Mar. 21, 2023 (guest lecturer)
- "Cryptocurrency Regulation: Market Structure" Berkeley Law Center for Law and Business Conference, Feb. 8, 2023
- "Cryptocurrency and Bankruptcy," Corporate Restructuring and Insolvency Seminar, January 20, 2023 (presenter)

### 2022

- "Cryptocurrency and Bankruptcy," Fordham Law School, Nov. 14, 2022
- "The Good, the Bad, and the Ugly of Blockchain, Crypto, and Web3," Berkeley Center for Law and Business webinar, Sept. 23, 2022
- Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, July 21, 2022 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, July 19, 2022 (presenter)
- "US Consumer Finance Regulation," JPMorgan Chase Institute, July 18, 2022
- "Bankruptcy 101:  Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, July 14, 2022 (presenter)
- "The Stop Wall Street Looting Act," Harvard Law School, Apr. 18, 2022 (guest lecturer)
- Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Mar. 23, 2022 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, Mar. 16, 2022 (presenter)
- "Bankruptcy 101:  Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Mar. 14, 2022 (presenter)
- "Credit Derivatives 101," Gerson Lehrman Group webcast, Mar. 9, 2022 (presenter)

**Exhibit 16-340**

**ER937**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Russia Sanctions and Payment Card Networks," Georgetown University Law Center, Mar. 6, 2022 (guest lecturer)
- "The Fintech Trilemma," Federal Reserve Board conference on The Future of Financial Services | Data and Connectivity Symposium, Mar. 1, 2022 (presenter)
- "How Academia Influences Lawmaking," American Association of Law Schools Annual Meeting, Section on Creditors' and Debtors' Rights, Jan. 6, 2022 (presenter)

**2021**

- "If It Walks Like a Loan and Talks Like a Loan, Is It a Loan?" Consumer Federation of America Virtual Financial Services Conference, Dec. 8, 2021 (panelist)
- "The Legislative Landscape for Consumer Bankruptcy: Chapter 10, Student Loans and Beyond," American Bankruptcy Institute Consumer Practice Extravaganza, Nov. 3, 2021 (presenter)
- "State of the Settlements, Bellwethers, and Settlement Design Innovations," Georgetown University O'Neill Institute for National and Global Health Law and the Pew Charitable Trusts Opioid Summit, Sept. 25, 2021 (panelist)
- "Cryptocurrency Regulation," Capstone investor webinar, Sept. 29, 2021 (presenter)
- "Cryptocurrency Regulation," Raymond James investor webinar, Sept. 13, 2021 (presenter)
- "The Financial Inclusion Trilemma," Georgetown Law Faculty Workshop, July 13, 2021 (presenter)
- "Purdue's Poison Pill: The Breakdown of Chapter 11's Checks and Balances," Corporate Restructuring and Insolvency Seminar, June 15, 2021 (presenter)
- "Rethinking Bankruptcy Exceptionalism," Emerging Scholars Conference, University of Chicago, May 25, 2021 (commentator on paper by Jonathan Seymour)
- "Conglomerates, Conflicts of Interest, and Consumer Protection," Arthur Wilmarth Celebration Conference, May 24, 2021 (panelist)
- "Addressing Poverty and Financial Distress in the Jewish Community," Jewish Federation of Greater Washington Board Meeting, Apr. 28, 2021 (panelist)
- "Contractual Inequality," Consumer Law Scholars Conference, UC Berkeley, Mar. 5, 2021 (commentator on paper by Manisha Padi)
- "Cryptocurrency, Blockchain, and Decentralized Finance," National Community Reinvestment Coalition Just Economy 2021 Conference, May 12, 2021 (panelist)
- Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Mar. 16, 2021 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, Mar. 10, 2021 (presenter)
- "Contractual Inequality," Consumer Law Scholars Conference, UC Berkeley, Mar. 5, 2021 (commentator on paper by Manisha Padi)
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Mar. 3, 2021 (presenter)
- "The Consumer Bankruptcy Reform Act of 2020," Brooklyn Law School, Feb. 4, 2021 (co-presenter)
- "The Great American Housing Bubble," Wharton Club of Boston, Jan. 28, 2021 (presenter)
- "The Coming Consumer Financial Cliff," Hebrew Free Loan Association Board Meeting, Jan. 11, 2021

**2020**

- "Attacking State Usury Law Evasions," National Consumer Law Center Consumer Rights Litigation Conference, Nov. 14, 2020 (panelist)

**Exhibit 16-341**

**ER938**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Oct. 30, 2020 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, Oct. 28, 2020 (presenter)
- "Bankruptcy 101:  Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Oct. 26, 2020 (presenter)
- "Loan Sharks or Angel Fish?  The Pros and Cons of Bank Partnerships and Interest Rate Exportation Rights," Columbia Law and Political Economy Society, Oct. 26, 2020 (panelist)
- "The Great American Housing Bubble," Harvard Club of New York, August 12, 2020 (presenter)
- "The New Usury:  The Ability-to-Repay Revolution in Consumer Finance," Georgetown Law Faculty Workshop, June 17, 2020 (presenter)
- Bipartisan briefing on nonbank mortgage lending and servicing, House Financial Services Committee Staff, Apr. 16, 2020 (presenter)
- "The New Usury:  The Ability-to-Repay Revolution in Consumer Finance," Consumer Law Scholars Conference, UC Berkeley, Mar. 6, 2020 (presenter)
- "Bankruptcy: Voidable Actions and Equitable Remedies," Gerson Lehrman Group webcast, Feb. 26, 2020 (presenter)
- Bankruptcy: Chapter 11 Operations and Governance," Gerson Lehrman Group webcast, Feb. 25, 2020 (presenter)
- Bankruptcy: Chapter 11 Plans," Gerson Lehrman Group webcast, Feb. 19, 2020 (presenter)
- Bankruptcy: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Feb. 18, 2020 (presenter)
- "Fintech Innovations?" American Association of Law Schools Annual Meeting, Jan. 5, 2020 (roundtable participant)
- "Reflections On and Lessons From 'Foreclosed,' a New Book by Professor Chris Odinet," American Association of Law Schools Annual Meeting, Jan. 4, 2020 (commentator)

**2019**

- "Debt Restructurings:  Exchange Offers and Consent Solicitations," Gerson Lehrman Group webcast, Oct. 31, 2019 (presenter)
- Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Oct. 24, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, Oct. 17, 2019 (presenter)
- "Bankruptcy 101:  Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Oct. 3, 2019 (presenter)
- "Law and Macroeconomics," Georgetown Law and Macroeconomics Conference, Sept. 27, 2019 (presenter)
- "Opioid Bankruptcies: Further Developments," Capstone LLC, September 17, 2019 (presenter)
- "Credit Derivatives 101," Gerson Lehrman Group webcast, Sept. 11, 2019 (presenter)
- "Securitization 101," Gerson Lehrman Group webcast, Sept. 4, 2019 (presenter)
- "Opioid Bankruptcies," Capstone LLC, August 13, 2019 (presenter)
- "Abusive Acts and Practices," Consumer Financial Protection Bureau Symposium, June 25, 2019 (presenter)
- "Credit Derivatives 101," Gerson Lehrman Group webcast, April 2, 2019 (presenter)

**Exhibit 16-342**

**ER939**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Securitization 101," Gerson Lehrman Group webcast, March 26, 2019 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, March 12, 2019 (presenter)
- "The Fast and the Usurious:  Putting the Brakes on Auto Lending Abuses," University of Minnesota School of Law Faculty Workshop, Mar. 7, 2019 (presenter)
- "Public-Private Risk-Sharing in Financial Regulation," Boston College, Regulation and Markets Workshop, Feb. 19, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, March 5, 2019 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, February 26, 2019 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, February 13, 2019 (presenter)

**2018**

- "Get Rid of Multi-Member Commissions," American Constitution Society Convening on Reimagining the Regulatory State, Dec. 13, 2018 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, November 14, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, November 9, 2018 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, October 31, 2018 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 24, 2018 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, July 18, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, July 16, 2018 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, July 12, 2018 (presenter)
- "Law, Macroeconomics, and Norms," Georgetown University Law Center Summer Workshop, July 10, 2018 (presenter with Anna Gelpern)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, July 9, 2018 (presenter)
- "A Public Option for Bank Accounts (or Central Banking for All)", Vanderbilt Law Roundtable on Financial Transformation, June 1, 2018 (commentator)
- "Mortgage Risk Premia During the Housing Bubble," American Finance Association 2018 Annual Meeting, Washington D.C., June 1, 2018
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, March 26, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, March 19, 2018 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, March 12, 2018 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, March 5, 2018 (presenter)
- "The Fast and the Usurious:  Putting the Brakes on Auto Lending Abuses," Agnes N. Williams Research Chair Inaugural Lecture, Georgetown University Law Center, Feb. 21, 2018
- "Bankruptcy's Lorelei:  The Dangerous Allure of Financial Institutions Bankruptcy," Jay Westbrook Celebration Symposium, University of Texas School of Law, Feb. 3, 2017 (presenter)

**Exhibit 16-343**

**ER940**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

**2017**

- "The New Restructuring?  Coercion and Opportunism in Debt Workouts," University of Pennsylvania Law Review Symposium, Oct. 20, 2017 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, November 1, 2017 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, October 25, 2017 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, October 18, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 11, 2017 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, June 15, 2017 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, June 8, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, June 1, 2017 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, February 7, 2017 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, January 31, 2017 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, January 24, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, January 17, 2017 (presenter)

**2016**

- "The New Restructuring?  Coercion and Opportunism in Debt Workouts," University of Pennsylvania Institute of Law and Economics Fall Corporate Roundtable, December 9, 2016 (co-presenter)
- "FinTech Charters," U.S. PIRG/National Council of LaRaza FinTech/Big Data Conference, December 6, 2016
- Roundtable on Housing Finance Reform, Bipartisan Policy Center, December 5, 2016 (participant)
- "The New Restructuring?  Coercion and Opportunism in Debt Workouts," Georgetown University Law Center Faculty Workshop, Nov. 8, 2016 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, October 20, 2016 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, October 13, 2016 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 6, 2016 (presenter)
- "Pandora's Digital Box," Merchant Advisory Group Webinar, July 27, 2016  (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, June 16, 2016 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, Jun 9, 2016 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, June 2, 2016 (presenter)
- "One Dollar, One Vote," Wharton School, University of Pennsylvania, April 21, 2016
- "Minority Creditors' Rights under the Trust Indenture Act and Syndicated Loan Agreements", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Gifting Revisited", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Multi-Debtor Issues in Chapter 11", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016

**Exhibit 16-344**

**ER941**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Empty and Indirect Creditor Issues in Restructuring", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Developments in Fraudulent Transfer Law", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "State and Federal Law of Corporate Governance", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, Feb. 18, 2016 (presenter)
- "Bankruptcy 101:  Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Feb. 11, 2016 (presenter)

**2015**

- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Aug. 17, 2015 (presenter)
- "The Puzzle of Payments Security:  Fitting the Pieces Together to Protect the Retail Payments System," Federal Reserve Bank of Kansas City, June 25-26, 2015 (presenter)
- "Foreclosure Activity:  Legal Framework and the Impact on Borrowers and Lenders," Urban Institute, June 9, 2015 (respondent)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, June 2, 2015 (presenter)
- "Mortgage Servicing:  Contracts, Technology and Incentives," Consumer Financial Protection Bureau, Enforcement Division, Washington DC, April 21, 2015 (presenter)
- "Politics of the Bailouts," Financial Crisis Seminar, University of California, Irvine, Mar. 11, 2015 (presenter)
- "Clearinghouses and the Bankruptcy Treatment of Financial Contracts," Brooklyn Law School, Symposium on the Treatment of Financial Contracts in Bankruptcy and Bank Resolution, Feb. 27, 2015 (presenter)
- "Second-Liens and the Leverage Option," Georgetown University Law Center Faculty Workshop, Jan. 29, 2015 (presenter)

**2014**

- "Safe Banking," Duke University School of Law Faculty Workshop, Dec. 11, 2014 (presenter)
- ABI-Brooklyn Law School Junior Scholars Bankruptcy Workshop, Nov. 21-22, 2014 (commentator)
- "Safe Banking," University of Virginia Law School Law & Economics Workshop, Nov. 13, 2014 (presenter)
- "Safe Banking," University of Maryland School of Law Faculty Workshop, Oct. 23, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Oct. 16, 2014 (presenter)
- "Safe Banking," Georgetown University Law Center Faculty Workshop, Sept. 23, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Anchorage Capital, New York, Sept. 18, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, July 29, 2014 (presenter)
- "Financial Services and the Post Office," Pew Charitable Trusts, Washington, D.C., July 16, 2014 (panelist)

**Exhibit 16-345**

**ER942**

(134 of 295) Page 134 of 295 Case: 24-50 05/24/2024, DktEntry: 14.6, Page 134 of 295
Case 2:22-cv-08775-RGK-SK Document 52-18 Filed 09/27/23 Page 48 of 58 Page ID
#:1148

48

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

- "The $10 Trillion Dollar Question: Reforming Housing Finance Markets," American Law Institute Young Scholar's Medalist Conference, Washington, DC, June 10, 2014 (convener)
- "Why Teach Consumer Finance", American Association of Law Schools Mid-Year Meeting, Washington DC, June 9, 2014, panel on "Modern Financial Regulatory Approaches"
- "Perspectives on the CFPB," Financial Services Roundtable's 4th Annual Consumer Program, May 14, 2014, Washington, DC (panelist)
- "Short-Term Debt Markets," Institute for Law and Economics Corporate Roundtable, University of Pennsylvania Law School, May 2, 2014 (panelist)
- "What Should/Shouldn't Be in the Fine Print?", Making The Fine Print Fair, April 4, 2014, Washington, DC (moderator)
- "Behavioral Economics: The End of the First Wave," Georgetown University Faculty Retreat, Feb. 19, 2014 (presenter)

**2013**

- "Mortgage Servicing", Consumer Financial Protection Bureau Legal Division Speaker Series, Dec. 11, 2013
- "The Politics of Financial Regulation and the Regulation of Financial Politics," Georgetown University Law Center Faculty Workshop, Nov. 12, 2013
- "The Politics of Financial Regulation and the Regulation of Financial Politics," Fordham University Law School Faculty Workshop, Nov. 7, 2013
- "The Disclosure Paradox," Americans for Financial Reform Conference on Transparency in Financial Regulation, Washington DC, Oct. 11, 2013.
- "Financing Housing: GSE Reform and Sensible Mortgage Lending, CQ Roll Call Forum in partnership with the National Association of Home Builders, Washington, DC, Sept. 17, 2013 (panelist)
- CFPB Conference on Mobile Payments and Financial Inclusion, Sept. 12, 2013 (panelist)
- "Legal Leverage," Law and Society Association Annual Meeting, June 1, 2013
- "Legal Leverage," American Law Institute Annual Meeting, May 21, 2013
- "Bankruptcy Law and the Cost of Credit: The Impact of Cramdown on Mortgage Interest Rates," Harvard Law School Law and Economics Workshop, April 9, 2013
- "Duties to Serve after the Fall," Harvard Joint Center for Housing Studies, April 2, 2013

**2012**

- "The Paper Chase: Securitization, Foreclosures, and the Uncertainty of Mortgage Title," Harvard Law Faculty Workshop, Nov. 12, 2012
- "Community Responses to the Foreclosure Crisis," Harvard Law School, Nov. 9, 2012 (panelist)
- Cornell Junior Scholars Financial Regulation Workshop, Sept. 29, 2012 (commentator)
- "American Financial Regulation," Cornell Law School Faculty Workshop, Sept. 28, 2012
- "A Transactional Genealogy of Scandal," Georgetown University Law Center Faculty Workshop, July 19, 2012
- "RTC 2.0," Pew Housing Conference, Washington, DC, June 20, 2012
- "Opportunities and Challenges for Businesses and Consumers." FTC Mobile Payments Workshop, Washington, DC, April 26, 2012
- "A Theory of American Financial Regulation," University of Minnesota School of Law, Minneapolis, MN, April 23, 2012

Exhibit 16-346

**ER943**

49

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "A Theory of American Financial Regulation," Georgetown University Law Center Faculty Workshop, April 19, 2012
- Consumer and Investor Protection, George Washington University Law School C-LEAF Conference, Mar. 2, 2012 (panelist)
- "Mortgage Notes and the Uniform Commercial Code," American Ass'n of Law Schools Annual Convention, Washington, DC, Jan. 5, 2012 (panelist)

**2011**

- "The Consumer Financial Protection Bureau," World Bank, Washington, DC, Nov. 17, 2011 (panelist)
- "Mortgage Servicing Litigation," AmeriCatalyst Conference, Austin Texas, Nov. 2011
- "Modification of Mortgages in Bankruptcy," John Marshall School of Law, Chicago, IL, Oct. 20, 2011
- "Financial institutions in the new regulatory environment: Opportunities, constraints and global challenges," Georgetown McDonough School of Business, Washington, DC, Sept. 22, 2011 (panelist)
- "The Public Option in Housing Finance," Univ. Pennsylvania Law School Conference on Regulatory Breakdown, Sept. 2011
- "Mortgage Servicing," National Association of Business Economists webinar, July 7, 2011
- "Servicing Litigation," AmeriCatalyst webinar, June 23, 2011
- "State Bankruptcy," Stanford Law School, Palo Alto, CA, May 13, 2011
- "In Defense of Bailouts," C-LEAF Junior Scholars Workshop, April 1, 2011
- Durbin Amendment, PYMNTS Conference, Washington, DC, Mar. 29, 2011 (panel)
- "State Bankruptcy," American College of Bankruptcy, Washington, DC, March 19, 2011
- "Behavioral Economics and the Consumer Financial Protection Bureau," GMU National Attorneys General Education Program, Arlington, VA, March 11, 2011
- "The Dodd-Frank Act and the Financial Crisis Inquiry Commission Report," GMU National Attorneys General Education Program, Arlington, VA, March 10, 2011
- The Big-Bankruptcy Empirical Research Agenda, Conference, UCLA Law School, Los Angeles, California, February, 11 2011 (presenter)
- Treatment of Derivatives and Other Financial Contracts in Insolvency, World Bank Insolvency and Debtor/Creditor Regime Task Force Meeting, January 11, 2011 (presenter)
- Asset Sales in Bankruptcy, American Association of Law Schools Annual Convention, San Francisco, California, January 7, 2011 (moderator)
- Credit Cards and College Students, American Association of Law Schools Annual Convention, San Francisco, California, January 7, 2011 (panelist)
- "Explaining the Housing Bubble," American Association of Law Schools Annual Convention, San Francisco, California, January 6, 2011

**2010**

- "Explaining the Housing Bubble," Tel Aviv University Law School, Law and Economics Workshop, Tel Aviv, Israel, Nov. 29, 2010
- "Modification of Mortgages in Bankruptcy," American University Washington College of Law, Washington, D.C., Nov. 11, 2010
- "The Uncertain Value Proposition in Mobile Commerce," Mobile Commerce Conference, University of Washington Law School, Seattle, October 29, 2010

**Exhibit 16-347**

**ER944**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Robosigning, Putbacks, and Failed Loan Modification Programs," Federal Reserve System & Federal Deposit Insurance Corporation Conference on Mortgages and the Future of Housing Finance, Arlington, VA, Oct. 25, 2010
- "Why We Need Bankruptcy More Than Ever," American College of Bankruptcy, Washington, D.C., Oct. 22, 2010 (moderator)
- "Explaining the Housing Bubble," Georgetown University Law School Legal Scholarship Workshop, Washington, D.C., Oct. 20, 2010
- "In Defense of Bailouts," University of Pennsylvania School of Law, Philadelphia, Pennsylvania, Oct. 18, 2010
- "What Have They Done?" American Enterprise Institute, Washington, D.C. Oct. 14, 2010 (panelist)
- AmeriCatalyst, Inside Out: Rebuilding the U.S. Housing Finance System, Austin, Texas, Sept. 14, 2010 (moderator)
- AmeriCatalyst, Inside Out: Rebuilding the U.S. Housing Finance System, Austin, Texas, Sept. 13, 2010 (panelist)
- "Financial Data Privacy in the United States," U.S. State Department Foreign Press Center, Washington, D.C., June 21, 2010
- "Information Failures in the U.S. Mortgage Crisis," Tobin Project Workshop, Washington, D.C., June 8, 2010
- "Information Failures in the U.S. Mortgage Crisis," Federal Reserve Bank of Philadelphia, May 14, 2010
- "Too Big to Fail," American Bankruptcy Institute Great Debates, ABI Annual Convention, Washington, D.C., April 30, 2010
- "In Defense of Bailouts," Georgetown University Law Center Faculty Workshop, Washington, D.C., April 14, 2010
- Practicing Law Institute, Consumer Financial Services Institute, Chicago, Apr. 8, 2010 (panelist)
- "Private Disordering? Payment Card Fraud Liability Rules," Symposium on Data Security and Data Privacy in the Payment System, Brooklyn Law School, Mar. 19, 2010
- The New Regulatory Landscape, Filene Research Institute, National Credit Union Executive Conference, Feb. 23, 2010 (keynote)
- "Private Label Securitization," University of Pennsylvania Wharton School, Philadelphia, Pennsylvania, Feb. 22, 2010
- Practicing Law Institute, Consumer Financial Services Institute, New York, Feb. 18, 2010 (panelist)

**2009**
- The Consumer Financial Protection Agency, Consumer Federation of America Financial Services Conference, Washington, D.C., Dec. 3, 2009 (panelist)
- "Conceptual Challenges in Access to Credit versus Regulation" Conference on Consumer Finance Post-Apartheid: The South African Experience, University of Connecticut School of Law, Nov. 21 (moderator)
- "The Disclosure Paradox," University of Connecticut School of Law, Nov. 21, 2009
- The Consumer Financial Protection Agency, American Enterprise Institute, Washington, D.C., Nov. 18, 2009 (panelist)
- "Mortgage Workouts," University of Pennsylvania Law School, Philadelphia, Pennsylvania, Nov. 17, 2009

**Exhibit 16-348**                    **ER945**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Too Big to Fail," American Bankruptcy Institution Legislative Symposium, Washington, D.C., Nov. 17, 2009 (panelist)
- "Role of Central Banks in Payment System Regulation," Federal Reserve Bank of Kansas City, November, 2009
- Workshop on Behavioral and Institutional Research and Financial Services Regulatory Reform, Penn Law School, Philadelphia, Pennsylvania, Nov. 6, 2009 (moderator)
- "The Consumer Financial Protection Agency," Women in Housing Finance, Washington, D.C., Oct. 29, 2009 (panelist)
- The Consumer Financial Protection Agency, Symposium: Regulatory Reform at the Crossroads: What Is the Right Response to the Financial Crisis?, George Washington University Law School, Washington, D.C., October 23, 2009 (panelist)
- "Consumer Credit Reform Legislation," American Bankruptcy Institute Midwest Consumer Bankruptcy Conference, Chicago, Illinois (October 2009) (keynote address)
- "DIP Financing," American Bankruptcy Institute-University of Missouri Kansas City Bankruptcy Conference, Kansas City, Missouri (October 2009) (panelist)
- "Making Home Affordable?," American Bankruptcy Institute-University of Missouri Kansas City Bankruptcy Conference, Kansas City, Missouri (October 2009) (keynote address)
- "Current Issues in Chapter 11," American Bankruptcy Institute Northeast Bankruptcy Conference, Bretton Woods, New Hampshire (July 2009) (panelist)
- "Consumer Protection in Financial Transactions," ABA Section on Antitrust, Consumer Protection Conference, Georgetown University Law Center (June 2009) (panelist)
- "Frankenstein Contracts," Stanford-Yale Junior Faculty Forum, Palo Alto, California (May 30, 2009)
- "Who Pays for Payments," Federal Reserve Bank of Chicago, May 15, 2009
- "The Financial Crisis and Administrative Law," Georgetown University Law Center White Tablecloth Faculty Luncheon, May 2009
- "The Financial Crisis," Georgetown University Law Center Board of Visitors Annual Meeting, Santa Fe, NM, April 4, 2009
- "Bankruptcy Claims Trading," Symposium, Brooklyn Law School & Brooklyn Journal of Corporate, Financial and Commercial Law (February 27, 2009)
- "Modification of Mortgages in Bankruptcy," International Monetary Fund, (January 23, 2009)
- "Real Estate Transactions in Troubled Times," Joint Extended Program of the AALS Section on Real Estate Transactions and the AALS Section on Creditors' and Debtors' Rights, American Association of Law Schools Annual Convention (January 10, 2009)
- "Hydraulic Regulation," AALS Section on Financial Institutions and Consumer Financial Services. American Association of Law Schools Annual Convention (January 9, 2009)

**2008**

- "Mortgage Loss Mitigation," Pennsylvania Bar Institution Real Estate Institute, Philadelphia, PA, (Dec. 5, 2008) (panelist)
- "The Impact of the Subprime Meltdown," Commercial Law League of America and National Conference of Bankruptcy Judges (Nov. 11, 2008) (panelist)
- "Foreclosure Externalities," Conference on "The Public Aspects of Private Property," Georgetown University Law Center (Nov. 7-8, 2008)
- "United States Banking Regulation," Presentation to Great Wall Asset Management Corporation (Chinese government agency responsible for non-performing bank assets), Georgetown University, Oct. 30, 2008)

**Exhibit 16-349**

**ER946**

52

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Equal Rights Under Law," Response to Professor Li Xia Feng, Georgetown University-Chinese Central Party School Conference, Washington, D.C., (Oct. 21, 2008)
- "Wall Street to Main Street:  Bail Out and Restructuring," ABA 2008 Administrative Law Conference, Washington, D.C. (Oct. 17, 2008) (panelist)
- "The Subprime Mortgage Crisis:  A Systemic View," National Conference of Bankruptcy Judges Annual Convention (September 25, 2008) (panelist)
- "Lehman Brothers' Bankruptcy," Student Bar Association, Georgetown University Law Center (Sept. 17, 2008)
- "Hydraulic Regulation:  Regulating Credit Markets Upstream," Georgetown University Law Center Faculty Workshop (Sept. 16, 2008)
- Panel on "Mounting Household Debt, Lending Practices, and Legislative and Regulatory Responses," Federal Reserve Bank of Cleveland 2008 Community Development Policy Summit (June 11, 2008)
- "Hydraulic Regulation:  Regulating Markets Upstream" University of Connecticut School of Law Junior Workshop on Banking and Consumer Financial Services Law (May 28, 2008)
- Panel on "Credit Card Regulation" Conference on Consumer Credit Protection Sponsored by the Federalist Society, the Financial Services Roundtable, and the Consumer Bankers Association, National Press Club, Washington, D.C., (May 20, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," American Law and Economics Association Annual Convention, (May 16, 2008)
- Panel on "Emerging Privacy Issues between the US and the EU - Bridging the Transatlantic Gap," Conference at Georgetown University Law Center (April 28, 2008)
- Panel on "Bankruptcy Law in Indonesia" at *Indonesia: Current Legal Reform*, Conference sponsored by the United States-Indonesia Society, International Law Institute, and the Millennium Challenge Corporation (a United States government corporation) (April 22, 2008)
- Panel on "Subprime Mortgage Lending," Paul Robeson Conference, Columbia Law School (April 18, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," University of Virginia School of Law Faculty Workshop (April 11, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," Board of Governors of the Federal Reserve, Research and Statistics Workshop (March 25, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," Georgetown University Faculty Workshop (March 18, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," Harvard-University of Texas Conference on Commercial Realities (Feb. 29, 2008)

**2007 and prior**

- Commentator, Conglomerate Third Annual Junior Scholars' Workshop (June 24, 2007)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Cornell Law School (Dec. 18, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Georgetown University Law Center (Dec. 4, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," The Ohio State University Moritz College of Law (Nov. 28, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Cardozo Law School (Nov. 21, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Washington University in St. Louis Law School (Nov. 20, 2006)

**Exhibit 16-350**

**ER947**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Priceless?  The Costs of Credit Card Merchant Restraints," Northwestern University Law School (Nov. 14, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," American University Washington College of Law (Nov. 9, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Brooklyn Law School (Nov. 1, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Emory Law School (Oct. 18, 2006)
- "Finding <u>Nemo</u>:  Rediscovering the Virtues of Negotiability in the Wake of <u>Enron</u>," New York Law School (Sept. 8, 2006)
- "Finding <u>Nemo</u>:  Rediscovering the Virtues of Negotiability in the Wake of <u>Enron</u>," Conglomerate Second Annual Junior Scholars' Workshop (July 10, 2006), *at* <u>http://www.theconglomerate.org/junior_scholars_workshop/index.html</u>

## COURSES TAUGHT

**Bankruptcy:**  2008(s); 2008(sum); 2008(f); 2009 (sum); 2010(s)
**Contracts:**  2009(f); 2011(f); 2012(f-Harvard Law School)
**Commercial Finance/Secured Credit:**  2009(s); 2013(f)
**Consumer Finance:**  2011(s); 2012(s); 2013(s-Harvard Law School); 2014(s), 2017(s); 2018(s); 2019(s), 2021(s), 2023(f)
**Financial Restructuring:**  2011(s); 2012(s); 2013(s-Harvard Law School); 2014(s); 2016(s), 2016(f); 2017(f); 2019(s), 2020(s), 2020(f), 2021(f); 2023(s), 2024(s)
**Law of Money Seminar:** 2016(s), 2021(s)
**Payment Systems and Financial Transactions:**  2008(sum—FTC); 2008(f); 2023(s)
**Payment Systems: Law, Technology, and Policy:** 2023(f)
**Regulation of Financial Institutions:**  2018(f)
**Sales and Leases:** 2017(s); 2018(s)
**Structured Finance (Securitization & Derivatives):**  2010(s)

## SCHOOL SERVICE

- Academic Standards Committee (2021(f))
- Admissions Committee (2022-23)
- Appointments Committee (2018-19; 2013-14; 2011-12, chair; 2009-10)
- Faculty Workshop Committee (2016(s), chair; 2017(f), chair)
- Fellows and Teaching Careers Committee (2019-20)
- Finance Committee (2010-11)
- Financial Aid Committee (2013-2014)
- Rank and Tenure Committee (2020-21)
- Tax Appointments Committee (2013-14; chair, 2010-11)
- Technology Committee (2016-17)
- Legal Profession Committee (2008-2009; 2007-2008)

**Exhibit 16-351**

**ER948**

(140 of 295) Page 140 of 295Case: 24-50 05/24/2024, DktEntry: 14.6, Page 140 of 295
Case 2:22-cv-08775-RGK-SK Document 52-18 Filed 09/27/23 Page 54 of 58 Page ID
#:1154

54

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## PROFESSIONAL SERVICE AND ACTIVITIES

- DC Bar Pro Bono Center, Bankruptcy Clinic trainer (2021)
- Jewish Federation of Greater Washington Anti-Poverty Initiative (2021)
- Biden for President, Policy Volunteer Coordinator—Consumer Protection and Consumer Credit (2020)
- Warren for President, Policy Volunteer Coordinator—Financial Regulation, Consumer Protection, and Bankruptcy (2019-2020)
- Federal Reserve Bank of Philadelphia, Supervisory Research Forum (2019-2020)
- Supreme Court Fellows Program, Academic Advisory Board (2018-19)
- Member, Mortgage Servicing Collaborative (convened by the Urban Institute) (2018)
- Federal Reserve Secure Payments Task Force (2015)
- Federal Reserve Faster Payments Task Force (2015)
- Consumer Financial Protection Bureau, statutory Consumer Advisory Board (2012-2015)
- Member, American Law Institute Advisory Group on UCC and Holder-in-Due-Course Policy.
- Member, American Law Institute Member's Consultative Group, Restatement on Law of Consumer Contracts
- Urban Institute, Housing Finance Policy Center, Academic Research Council
- Center for American Progress, Mortgage Finance Working Group
- Reporter, Advisory Committee on Multiple Debtor Cases, American Bankruptcy Institute Commission to Study the Reform of Chapter 11
- World Bank Insolvency and Debtor/Creditor Regime Task Force
- Fellow, Center for Law, Economics and Finance (C-LEAF) at George Washington University Law School
- Editorial Board, AMERICAN BANKRUPTCY INSTITUTE LAW REVIEW
- Manuscript reviewer for AMERICAN BANKRUPTCY LAW JOURNAL; Cambridge University Press; CITYSCAPE; Conference on Empirical Legal Studies; COLUMBIA LAW REVIEW; Cornell University Press; GEORGETOWN LAW JOURNAL; HOUSING POLICY DEBATE; JOURNAL OF EMPIRICAL LEGAL STUDIES; LAW & SOCIETY REVIEW; Netherlands Organization for Scientific Research; Oxford University Press; STANFORD LAW REVIEW, University of Chicago Press; YALE LAW JOURNAL; Yale University Press
- Area Organizer for Bankruptcy, American Law and Economics Association (2009)
- Executive Committee Member, AALS Section on Fin. Institutions & Consumer Fin. Services (2009)

## COURT ADMISSIONS

- Supreme Court of the United States (2015) (Bar # 294231)
- United States Court of Appeals for the Third Circuit (2006)
- United States District Court for the Southern District of New York (2006)
- United States District Court for the Eastern District of New York (2006)
- New York State Courts (2006)

**Exhibit 16-352**

**ER949**

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

### APPENDIX C. DOCUMENTS RELIED UPON IN FORMULATING THE REPORT

**Pleadings and Court Rulings**

- Complaint
- Answer
- Order re Defendant's Motion to Dismiss

**Federal Statutes and Regulations**

- 12 U.S.C. § 85
- 12 U.S.C. § 1831d
- 15 U.S.C. § 636
- 15 U.S.C. § 1601
- 15 U.S.C. § 1603
- 15 U.S.C. § 1604
- 15 U.S.C. § 1605
- 15 U.S.C. § 1606
- 12 C.F.R. § 1026.4
- 12 C.F.R. § 1026.14
- 12 C.F.R. § 1026.22
- 12 C.F.R. § 1026, Appendices H and J
- 78 Fed. Reg. 79980 (Dec. 31, 2013).

**State Bills, Statutes, and Regulations and Other Regulatory Materials**

- Cal. DFPI, Final Statement of Reasons, PRO 01-18
- SB 1235
- Cal. Fin. Code §§ 22801 *et seq.*
- Cal. Code Reg. title 10, § 901 *et seq.*
- Cal. Senate Judiciary Committee, Report on SB 1235
- N.Y. Fin. Serv. L. §§ 801-812
- N.Y. Comp. Codes R. & Regs., tit. 23, part 600
- Utah Code §§ 7-27-101 to 7-27-301.
- Va. Code tit. 6.2, ch. 22.1
- 10 Va. Admin. Code §§ 5-240-10 to 5-240-40

**Exhibit 16-353**

**ER950**

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

- Consent Order, In the Matter of Commission of Fin. Protection & Innovation vs. Expansion Capital Group, LLC, No. 60DBO-44063 (Apr. 4, 2022)

- Consent Order, In the Matter of Commission of Fin. Protection & Innovation vs. Allup Finance LLC, No. 60DBO-77076 (Nov. 12, 2020)

- OP 7236 CFLL (Letter Declining to Issue Interpretive Opinion, Apr. 29, 2013)

- OP 7222 CFLL (Interpretive Opinion, Jan. 17, 2013)

## Comment Letters on CFDL Rulemaking

- Rapid Advance Comment Letter to DBO on Proposed Rulemaking for Commercial Financing Disclosures [undated]

- SBFA Comment Letter to DBO on Proposed Rulemaking for Commercial Financing Disclosures, dated Jan. 19, 2019

- American Factoring Association and International Factoring Association, Comment on Proposed Rulemaking/Commercial Financing Disclosure Regulations (PRO 01-18), Nov. 22, 2021, *at* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/12/American-Factoring-Association-11.22.21.pdf

## Judicial Decisions

- Nat'l Bank v. Johnson, 104 U.S. 271 (1881)

- Evans v. Nat'l Bank of Savannah, 251 U.S. 108 (1919)

- Daniel v. First Nat'l Bank of Birmingham, 227 F.2d 353 (5th Cir. 1955), *reh'g denied with opinion*, 228 F.2d 803 (5th Cir. 1956)

- West Pico Furniture Co. v. Pac. Fin. Loans (West Pico), 2 Cal.3d 594 (1970).

- CapCall, LLC v. Foster (*In re* Shoot The Moon, LLC), 635 B.R. 797 (Bankr. D. Mont. 2021)

- Davis v. Richmond Capital Group LLC, 194 A.D.3d 516 (N.Y. App. Div. 1st Dept. 2021)

- Lateral Recovery LLC v. Capital Merchant Services, LLC, 2022 U.S. Dist. LEXIS 181044 (S.D.N.Y. Sep. 30, 2022)

- Fleetwood Services v. Ram Capital Funding LLC, *2022* U.S. Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022), *aff'd*, Fleetwood Servs., LLC v. Richmond Capital Grp. LLC, 2023 U.S. App. LEXIS 14241 (2d Cir. 2023)

## Discovery Production

- SBFA 0027-0042 (Forward Financing Future Receipts Sale Agreement)

- SBFA 00084-00096 (Rapid Finance Business Line of Credit)

- SBFA 0097-0106 (Rapid Finance Future Receivables Sales)

- SBFA 00573-00584 (Rapid Finance Business Loan)

- SBFA 00627-00649 (Kapitus LLC Forward Purchase Agreement (Fixed))

- SBFA 00838-00859 (Kapitus LLC Forward Purchase Agreement (Credit Card delivery)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- SBFA 00860-00881 (Kapitus LLC Forward Purchase Agreement (Variable ACH delivery)
- SBFA 00882-00902 (Kapitus LLC Loan)
- SBFA 00903-00923 (Kapitus LLC New Deal Underwriting Policy Manual)
- SBFA 01078-01095 (Rapid Finance Underwriting Manual)

### MCA Provider Websites and SEC filings

- What Is Revenue-Based Financing? *Why It's Different*, at https://whatisrevenuebasedfinancing.com/why-its-different/ (last viewed Sept. 20, 2022, at 9:20am)
- eCapital, *Invoice Factoring vs. Merchant Cash Advances: Choosing the Right Funding Solution*, at https://ecapital.com/blog/invoice-factoring-vs-merchant-cash-advances-choosing-the-right-funding-solution/ (last viewed Sept. 20, 2022, at 9:12am)
- Forward Financing, *Merchant Cash Advances vs. Business Loans — What's the Difference?* , Sept. 13, 2023, *at* https://www.forwardfinancing.com/2023/09/13/merchant-cash-advances-vs-business-loans-whats-the-difference/ (last viewed Sept. 20, 2022, at 9:09am)
- Kapitus, *Financing Your Business with a Merchant Cash Advance,* at https://kapitus.com/guide/financing-your-business-with-a-merchant-cash-advance/ (last viewed Sept. 20, 2022, at 9:09am)
- Kapitus, *Financing Your Small Business With a Merchant Cash Advance*, at https://kapitus.com/wp-content/uploads/2019/11/MCA_eGuide.pdf
- Knight Capital Funding, Future Receivables Sale Agreement, dated August, 8, 2019, *at* https://www.sec.gov/Archives/edgar/data/1300938/000118518519001167/ex_155737.htm
- LG Funding LLC, Standard Merchant Cash Advance Agreement, dated April 12, 2022, *at* https://www.sec.gov/Archives/edgar/data/895665/000149315222010141/ex10-52.htm.
- Rapid Finance, https://www.rapidfinance.com/financing-solutions/merchant-cash-advance/ (last viewed Sept. 20, 2022, at 9:09am)

### Other Sources

- Cal. Dept. of Ins., *FAQ on business interruption insurance and other issues affecting California small businesses*, at https://www.insurance.ca.gov/01-consumers/140-catastrophes/FAQ-on-Business-Interruption-Insurance.cfm.
- CFPB, *My payday lender said my loan would cost 15 percent but my loan documents say the annual percentage rate (APR) is almost 400 percent. What is an APR on a payday loan and how should I use it?*, Jan. 17, 2022, *at* https://www.consumerfinance.gov/ask-cfpb/my-payday-lender-said-my-loan-would-cost-15-percent-but-my-loan-documents-say-the-annual-percentage-rate-apr-is-almost-400-percent-what-is-an-apr-on-a-payday-loan-and-how-should-i-use-it-en-1625/
- Thomas A. Durkin, *Consumers and Credit Disclosures: Credit Cards and Credit Insurance*, FED. RES. BULL. 203 (April 2002)
- Fed. Reserve Sy., *Small Business Credit Survey: 2022 Report on Employer Firms*
- Fed. Reserve Sys., *Small Business Credit Survey, 2023 Report on Employer Firms*

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Adam J. Levitin, *Spurious Pedigree of the "Valid-When-Made" Doctrine*, 71 DUKE L.J. ONLINE 87 (2022)

- Michael A. Mora, *"I'm Ruined": Litigation Trend Takes Aim at Merchant Cash Advance Industry*, N.Y.L.J., Sept. 7, 2022

- NAT'L CONS. L. CENTER, *TRUTH IN LENDING*, § 6.2.3 (11th ed. 2023)

- Jacob H. Nemon & Jeffrey S. Boxer, *Merchant Cash Advance Litigation Is Getting Wilder*, N.Y.L.J., July 2, 2021

- Jordan Stevens, *Comment, The Merchant Cash Advance Industry May Have a Few Bad Apples, But That Does Not Mean It's Time to Empty the Barrel*, 49 TEX. TECH L. REV. 501 (2017)

- Elizabeth Renuart & Diane E. Thompson, *The Truth, The Whole Truth, and Nothing but the Truth: Fulfilling the Promise of Truth in Lending*, 25 YALE J. ON REG. 181 (2008)

- Dock Treece, *Personal Guaranties and Business Loans*, BUS. DAILY NEWS, Feb. 21, 2023, *at* https://www.businessnewsdaily.com/16467-personal-guarantee.html

Exhibit 16-356

*Small Business Finance Association v. Clothilde Hewlett*
22-cv-08775-RGK-SK

# EXHIBIT 17

**Filed Conditionally Under Seal, See Dkt. 53 for Application**

Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 146 of 295
Case 2:22-cv-08775-RGK-SK  Document 52-19  Filed 09/27/23  Page 2 of 2  Page ID #:1160



**ER955**

 (cfpb.gov/)

# Credit cards key terms

## Annual percentage rate (APR)

The APR, or annual percentage rate, is the standard way to compare how much loans cost. It lets you compare the cost of loan products on an "apples-to-apples" basis. Your credit card company must disclose the APR before you agree to the use the card.

To calculate the APR, the interest rate and fees are compared to the amount you borrow and calculated over a one-year period. This allows you to compare the costs of a credit card to a six-month installment loan. It is also why APRs are often different from simple interest rates.

---

## Balance transfer

A balance transfer lets you move an outstanding balance from one credit card to another, sometimes for a fee. The fee is usually a certain percentage of the amount you transfer or a fixed amount, whichever is more. Many credit card companies offer zero-percent or low-interest balance transfers to invite you to consolidate your debt on one credit card. The promotional interest rate for most balance transfers lasts for a limited time. After that, the interest rate on your new credit card may rise, increasing your payment amount.

If you're more than 60 days late on a payment, the credit card company can increase your interest rate on all balances, including the transferred balance.

---

## Credit balance

A credit balance on your billing statement is an amount that the card issuer owes you.

Credits are added to your account each time you make a payment. It may also be added when you return something you bought with a credit card or because of rewards you have earned or a mistake in a prior bill. If the total of the credits exceeds the amount you owe, your statement shows a credit balance.

Read more (cfpb.gov/askcfpb/42)

---

## Daily periodic rate

Some card issuers calculate interest on the account using a daily periodic interest rate, which is used to calculate interest by multiplying the rate by the amount owed at the end of the day. This interest amount is then added to the previous day's balance, which means that interest is compounded on a daily basis.

---

## Grace period

A grace period is the period between the end of a billing cycle and the date your payment is due. During this time, you may not be charged interest as long as you pay your balance in full by the due date. Credit card companies are not required to give a grace period. However, most credit cards provide a grace period on purchases.

**Exhibit 18-358**

**ER956**

Read more (cfpb.gov/askcfpb/47)

---

## Interest rate

A credit card's interest rate is the price you pay for borrowing money. For credit cards, the interest rates are typically stated as a yearly rate, and this is called the annual percentage rate (APR). On most cards, you can avoid paying interest on purchases if you pay your balance in full each month by the due date.

---

## Prescreened credit card offer

A prescreened credit card offer is when credit card companies use information from credit reporting companies to make firm offers of credit to you if your credit history meets the criteria selected by the card company.

Read more (cfpb.gov/askcfpb/1)

---

## Unauthorized use

Generally, unauthorized use is the use of a credit card by a person who does not have the right to use the card. For example, if you lose your card and someone finds and uses it, that would be an unauthorized use.

Read more (cfpb.gov/askcfpb/26)

---

🇺🇸 An official website of the United States government

Exhibit 18-359

ER957

LAST REVIEWED: JAN 17, 2022

# My payday lender said my loan would cost 15 percent but my loan documents say the annual percentage rate (APR) is almost 400 percent. What is an APR on a payday loan and how should I use it?

The APR, or annual percentage rate, is the standard way to compare how much loans cost. It lets you compare the cost of loan products on an "apples-to-apples" basis. Your lender must disclose the APR before you agree to the loan.

To calculate the APR, the interest rate and fees are compared to the amount you borrow and calculated over a one-year period. This allows you to compare the costs of a credit card to a six-month installment loan, or a two-week payday loan. It is also why APRs are often different from simple interest rates.

For example, if your payday lender is charging you a $15 fee for every $100 borrowed, that would be a simple interest rate of 15 percent. But if you have to repay the loan in two weeks, that 15 percent finance charge equates to an APR of almost 400 percent because of the very short term.

Here's why: Consider the daily interest cost, $1.07 (or $15 divided by 14 days), then multiply that out for a full year (365 days, so $390.55). So, borrowing $100 would cost you $391 if the term were extended to one year – that's 391 percent of the borrowed amount.

By comparison, the cost of borrowing the same $100 on a credit card with a 15 percent APR is $15 for one year, or about 57 cents for two weeks.

You don't need to worry about the math. Just keep in mind that the APR does matter because it provides a shorthand way for you to compare the cost of two or more loans. Remember, your lender must disclose the annual percentage rate (APR) and other costs before you agree to the loan. If you were not given this information, your lender violated the law. You can file a complaint with your state regulator (cfpb.gov/askcfpb/1637) and attorney general ⧉ (http://www.naag.org/naag/attorneys-general/whos-my-ag.php). You can also submit a complaint with the CFPB online (cfpb.gov/complaint/) or by calling (855) 411-

## Don't see what you're looking for?

### Browse related questions

What is a payday loan? (cfpb.gov/askcfpb/1567)

What is the difference between a mortgage interest rate and an APR? (cfpb.gov/askcfpb/135)

What is the difference between a fixed APR and a variable APR? (cfpb.gov/askcfpb/45)

Learn more about payday loans (cfpb.gov/consumer-tools/payday-loans/)

Exhibit 19-360

ER958

Ver página en español (cfpb.gov/es/obtener-respuestas/el-prestamista-de-dia-de-pago-dice-que-mi-prestamo-me-costaria-un-15-por-ciento-pe ro-los-documentos-del-prestamo-indican-que-la-tasa-efectiva-anual-apr-es-de-casi-400-por-ciento-que-es-la-apr-en-un-prestamo-de-dia-de-pag o-y-como-debo-usarl-es-1625/)

## About us

We're the Consumer Financial Protection Bureau (CFPB), a U.S. government agency that makes sure banks, lenders, and other financial companies treat you fairly.

Learn how the CFPB can help you (cfpb.gov/about-us/the-bureau/)

## Legal disclaimer

The content on this page provides general consumer information. It is not legal advice or regulatory guidance. The CFPB updates this information periodically. This information may include links or references to third-party resources or content. We do not endorse the third-party or guarantee the accuracy of this third-party information. There may be other resources that also serve your needs.

An official website of the United States government

Exhibit 19-361

ER959

(151 of 295), Page 151 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 151 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-22   Filed 09/27/23   Page 1 of 35   Page ID
#:1165

JUSTIN BAKES                                          August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                        1

1   JUSTIN BAKES                                    August 16, 2023
    S.B.F.A. vs CLOTHILDE HEWLETT

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
2                       WESTERN DIVISION

3             CASE NO.:  22-cv-08775-RGK-SK

4

5   SMALL BUSINESS FINANCE          )
    ASSOCIATION,                    )
6                                   )
                    Plaintiff,      )
7                                   )
    vs.                             )
8                                   )
                                    )
9   CLOTHILDE HEWLETT, solely in    )
    her official capacity as        )
10  Commissioner of the             )
    California Department of        )
11  Financial Protection and        )
    Innovation,                     )
12                                  )
                    Defendant.      )
13

14

15           DEPOSITION OF JUSTIN BAKES

16               APPEARING REMOTELY

17                  VIA ZOOM

18          Wednesday, August 16, 2023

19           10:04 a.m. to 5:38 p.m.

20

21

22  Reported by:  Dawn Mack-Boaden

23  Registered Professional Reporter; CSR# 153120

24  APPEARING REMOTELY FROM NORFOLK COUNTY, MA

                                    800.211.DEPO (3376)
                                    EsquireSolutions.com



Exhibit 20-362                                        ER960

(152 of 295), Page 152 of 295    Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 152 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-22   Filed 09/27/23   Page 2 of 35   Page ID
#:1166

JUSTIN BAKES                                        August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                2

1   REMOTE APPEARANCES:

JUSTIN BAKES                                    August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT

2

    Rachel J. Yoo, Esquire
3   Douglas J. Beteta, Esquire
       State of California Department of Justice
4      Office of the Attorney General
       300 South Spring Street, Suite 1702
5      Los Angeles, California  90013
       rachel.yoo@doj.ca.gov
6      douglas.beteta@doj.ca.gov
          Counsels for Defendant
7

8   Benjamin H. Brodsky, Esquire
       BRODSKY FOTIU-WOJTOWICZ, PLLC
9      200 SE 1st Street, Suite 400
       Miami, Florida  33131
10     (305) 503-5054
       bbrodsky@bfwlegal.com
11        Counsel for Plaintiff

12

13  ALSO PRESENT:

14  Alexis Shapiro

15

16

17

18

19

20

21

22

23

24



**Exhibit 20-363**                                    **ER961**

JUSTIN BAKES                                                    August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                              6

1      Q.   Great.  So I am sure Ben prepared you well

2  for this deposition, so I'm just going to get right

3  into the -- the first thing is the deposition

4  notice that we sent to you.

5           MR. BRODSKY:  Rachel, can I ask just in

6           terms of the administrative, are you going

7           to be putting it in the chat or emailing

8           exhibits?  How do you want to deal with

9           that?

10          MS. YOO:  Can we go off the record.

11

12          (Brief off-the-record discussion took place

13          in the proceedings.)

14

15          MS. YOO:  So we're back on the record.

16          So I'm going to share Exhibit Number 1.

17

18          (Exhibit Number 1 was marked for

19          identification.)

20

21  BY MS. YOO:

22      Q.   Okay.  Do you see this, Mr. Bakes?

23      A.   Yes.

24      Q.   So have you seen this document?



Exhibit 20-364                                              ER962

(154 of 295), Page 154 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 154 of 295
Case 2:22-cv-08775-RGK-SK  Document 52-22  Filed 09/27/23  Page 4 of 35  Page ID
#:1168

JUSTIN BAKES                                                    August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                              7

1      A.    Yes.

2      Q.    Okay.  So this was our 30(b)(6) notice to

3  SBFA, and your understanding is that you're going to

4  be SBFA 30(b)(6) witness on Topic Number 3, which is

5  this one; am I correct?

6      A.    Yes.

7      Q.    And Number 5?

8      A.    Uh-huh.

9      Q.    Is that correct?

10            MR. BRODSKY:  Don't say uh-huh.  Say

11        yes.

12            THE WITNESS:  Yes.

13  BY MS. YOO:

14      Q.    Did I move too fast?

15      A.    No.  I didn't say yes.  I said uh-huh.

16            MR. BRODSKY:  You need to verbally say

17        it.

18            THE WITNESS:  Yes.

19  BY MS. YOO:

20      Q.    And then Number 31; is that correct?

21      A.    Comments you or each of your members

22  submitted to --

23            MR. BRODSKY:  So this is one thing I

24        wanted to talk to you guys about.  Justin



Exhibit 20-365                                      ER963

(155 of 295), Page 155 of 295  Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 155 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-22   Filed 09/27/23   Page 5 of 35   Page ID
#:1169

JUSTIN BAKES                                                    August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                                  8

1   can testify about what -- do you want to go

2   off the record?

3   JUSTIN BAKES                                      August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT

4

5   (Brief off-the-record discussion took place

6   in the proceedings.)

7

8          MR. BRODSKY:  So based on our

9   off-the-record conversation, Justin Bakes is

10  going to testify for Forward Financing and

11  SBFA as to the comments that Forward

12  Financing made to the Department in

13  Topic 31.

14        Rapid will testify both on behalf of

15  itself and SBFA for Rapid's comments.

16        Kapitus will testify on behalf of the

17  SBFA and itself for Kapitus comments and any

18  comment letters that the SBFA itself sent.

19        MS. YOO:  Great.  And then is he going

20  to be testifying here for 30 -- as 30(b)(6)

21  witness for SBFA on Topic Number 32?

22        MR. BRODSKY:  Yes.

23        MS. YOO:  Okay.  Great.  Then that's

24  that.



Exhibit 20-366                                                        ER964

JUSTIN BAKES                                                    August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                                 9

1              And do you want me to attach your

2         objections to the transcript, too, Ben or

3         JUSTIN BAKES                                    August 16, 2023
          S.B.F.A. vs CLOTHILDE HEWLETT

4              MR. BRODSKY:  Only if you want to

5         discuss it.

6              MS. YOO:  I don't have to discuss, but I

7         can attach it.

8              So Number 2 is -- Exhibit Number 2 is

9         SBFA's objections to the 30(b)(6) witness

10        depo notice, which is attached as Exhibit 1.

11

12        (Exhibit Number 2 was marked for

13        identification.)

14

15             MS. YOO:  And then Exhibit Number 3 is

16        our notice to Forward regarding this

17        deposition.

18

19        (Exhibit Number 3 was marked for

20        identification.)

21

22   BY MS. YOO:

23        Q.   Mr. Bakes, did you see this document

24   before?



Exhibit 20-367                                              ER965

(157 of 295), Page 157 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 157 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-22   Filed 09/27/23   Page 7 of 35   Page ID
#:1171

JUSTIN BAKES                                                     August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                              16

1    they're still active.

2        Q.    Okay.  So you're their hired CEO; right?

3        A.    Correct.

4        Q.    And then you found Forward Financing?

5        A.    Correct.

6        Q.    Okay.  What year was it?

7        A.    I started Forward in 2012.

8        Q.    So 11, 12 years ago?

9        A.    Eleven years ago, yes.

10       Q.    Okay.  Great.  So let's talk about Forward

11   a bit.  How many employees do you have currently?

12       A.    Around 400.

13       Q.    And my understanding is that Forward does

14   only Sales-Based Financing contracts; is that

15   correct?

16       A.    That's correct.

17       Q.    Is there reason why Forward only does

18   Sales-Based Financing when other companies do other

19   products?

20       A.    Yes.  It's -- we started doing Sales-Based

21   Financing.  It works really well for our customers,

22   the flexibility; and we -- we believe in the

23   product.  So we think it's an advantage and a

24   benefit for small businesses.



Exhibit 20-368                                                         ER966

(158 of 295), Page 158 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 158 of 295
Case 2:22-cv-08775-RGK-SK Document 52-22 Filed 09/27/23 Page 8 of 35 Page ID
#:1172

JUSTIN BAKES                                                August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                            19

JUSTIN BAKES                                            August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT

1        revenue-based financing and are much larger.

2              I think PayPal does some revenue-based

3        financing.

4              Amazon does revenue-based financing,

5        Sales-Based Financing.

6              Shopify is a public Canadian company

7        that uses revenue-based financing.

8              So I think there's a number that are --

9        that's why I said -- and those are not

10       brick-and-mortar.  Those are -- they do

11       online and others, but there's much more

12       than just us, and I think those are bigger

13       than us.

14   BY MS. YOO:

15       Q.   Thank you for explaining.  I did not know

16   Amazon does revenue-based financing.

17             Okay.  So can you describe -- describe,

18   like, what Sales-Based Financing is in general.

19       A.   Sure.  Sales-Based Financing is the --

20   where -- what we do in Sales-Based Financing, we

21   provide up-front capital to a small business, and we

22   purchase the rights of their future receivables.  So

23   we purchase -- it's a purchase and sale transaction

24   where we buy their future revenue at a discount



**Exhibit 20-369**                                              **ER967**

(159 of 295), Page 159 of 295  Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 159 of 295
Case 2:22-cv-08775-RGK-SK  Document 52-22  Filed 09/27/23  Page 9 of 35  Page ID
#:1173

JUSTIN BAKES                                               August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                           20

JUSTIN BAKES                                           August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT

1    today.

2         And the way we collect it is through a

3    percentage of their revenue stream -- an agreed-upon

4    percentage of their revenue stream that fluctuates

5    based on the future revenues that they generate.

6    Q.    Okay.  So what are the -- some of the

7    biggest appeals of Sales-Based Financing to

8    customers?

9    A.    I would say first is the ability to use

10   revenue and future revenue to access capital.  So

11   it's unsecured; there's no collateral.

12        Second is that the payments fluctuate.  So

13   there's no fixed repayment term; that they can -- if

14   their business slows, their repayments slow.  And so

15   there's no fixed term -- there's no fixed repayment

16   period.

17        The other benefits include that if their

18   revenue is -- a receipt is never generated or the

19   sales are never generated, they don't have to make

20   payment.  So there's no ultimate for payability.

21        There's no explicit personal guarantee.  So

22   it's specifically from the business.  So if the

23   business closes, if they file for bankruptcy and

24   they don't violate the agreement or breach the

800.211.DEPO (3376)
EsquireSolutions.com



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 20-370                                          ER968

1    agreement, there's no personal guarantee, which is

2    very attractive to a small business.

3          There's no interest rate.  So it's a fixed

4    fee.  The amount does not change regardless of the

5    term.  So if we advance a customer or purchase the

6    receivables for $10,000, they agree to sell it to us

7    for $12,000, they know that that's all they have to

8    pay and there's no chance that goes up or down

9    regardless of how long it takes for them.

10          In the Forward Financing contract as well,

11   I think one of the benefits is if they -- if they do

12   not generate the future receipt within a three-year

13   period of the contract, they no longer have to -- we

14   no longer collect on that -- that -- those receipts.

15   So they get the benefit of knowing we don't have a

16   fixed payment period, but, also, if it takes over

17   three years to repay it, we don't have to pay after

18   three years.  Everything else past three years is

19   ours, and so the contract ends.

20          And I would say other things that benefit,

21   just from a process, we're able to finance them much

22   faster.  So we're much faster than a bank.  So we're

23   able to review and approve a small business within

24   -- most of the time within three hours or less and



Exhibit 20-371                                              ER969

JUSTIN BAKES                                August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                         136

1      Q.    Okay.  And let's move on.  <u>Here you have</u>
2   <u>$5,425 finance charge.  Can you tell me how you got</u>
3   <u>that number?</u>
4      A.    <u>The finance charge is the difference</u>
5   <u>between the amount sold and the purchase price, less</u>
6   <u>fees -- plus fees, excuse me</u>.
7      Q.    So how did you get 5,425?
8      A.    I don't have the calculation in front of me
9   now, but what it is is the difference -- it's
10  basically the discount rate for how we -- when we
11  purchase the receivables, which is the amount sold
12  versus the purchase price.
13     Q.    So your discount is 6,120; right?
14     A.    Yes.
15     Q.    Okay.  And then what?  Is this -- what else
16  did you?
17     A.    I would have to look at the -- I would have
18  to look at the -- I would have to look at the
19  background calculation in our system to get that
20  number.
21     Q.    Yeah, but what do you need?  What number do
22  you need to calculate the number?
23     A.    I don't know.  Where -- where we talk about
24  it in our contract is the -- it's the discount rate,



Exhibit 20-372                                    ER970

JUSTIN BAKES                                          August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                      238

 1   personal guarantee means that it's a sign that the

 2   contract is a loan?

 3        A.   It's one of the signs that it would be a

 4   loan.

 5        Q.   Okay.  Then you have a kind of prepayment

 6   schedule, right, that early performance discount?

 7        A.   Yes.  Early performance discount.

 8             MR. BRODSKY:  I'm going to object to the

 9        form.

10             MS. YOO:  You object to what?

11             MR. BRODSKY:  To the form.

12             MS. YOO:  Okay.

13   BY MS. YOO:

14        Q.   Have you always offered an early payment

15   discount?

16        A.   For as long as I can remember, yes.

17        Q.   Would you say --

18        A.   Early performance discount, yes.

19        Q.   Would you say this is a common feature of

20   Sales-Based Financing?

21        A.   Yes.

22        Q.   Can you tell me what percentage of your

23   customers take advantage of this early performance

24   discount?



Exhibit 20-373                                    ER971

JUSTIN BAKES                                                August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                        241

1            MR. BRODSKY:  I'm trying to focus the

2       question.

3  BY MS. YOO:

4       Q.   Okay.  So does Rapid finance Sales-Based

5  Financing product allow payment adjustments?

6       A.   Yes.  I think -- my understanding is every

7  Sales-Based Financing contract allows for payment

8  adjustments.

9       Q.   Okay.  So when you say "every," that

10  applies to all of SBFA members; is that correct?

11       A.   That's my understanding, yes.

12       Q.   Okay.  Does SBFA members Sales-Based

13  Financing product charge any up-front fees similar

14  to the processing fees Forward charges?

15       A.   Yes, most likely they do.

16       Q.   Okay.

17       A.   It might be some instances where they don't

18  or they waive it, but I think the majority of

19  members would charge some up-front fee.

20       Q.   Okay.  Does SBFA members Sales-Based

21  Financing products have a three-year term limit?

22       A.   No, I don't think so.

23       Q.   Does SBFA's Sales-Based Financing products

24  file a UCC statement against its customers?



Exhibit 20-374                                              ER972

1    contracts have a performance guarantee?

2         A.   My understanding is yes.

3         Q.   Okay.  Let's talk about steps that you've

4    taken to comply with the regulation.  What have you

5    done?

6         A.   Hired outside counsel, hired consultants,

7    set up internal technology teams, legal teams,

8    research, invested a lot of money to understand the

9    regulations and then to calculate, then to embed the

10   regulations in our technology and all the specifics.

11   A lot of different actions and investment.

12        Q.   So your investment or steps that you've

13   taken, they cost money; right?

14        A.   Yes.

15        Q.   How much did they cost you?

16        A.    Hundreds of thousands of dollars would be

17   my estimate.

18        Q.   Can you be more specific?

19        A.   I don't have the -- I don't have an exact

20   amount, but hundreds of thousands of dollars.  Both

21   investment and time spent, internal costs and

22   external third-party costs.

23        Q.   So one of the things that SBFA said in

24   their complaint is that this regulation burdened



Exhibit 20-375                                          ER973

JUSTIN BAKES                                              August 16, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                      292

1                    C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS
     Norfolk, SS.
3

4            I, DAWN MACK-BOADEN, CSR #153120, RPR, and
     a Notary Public duly qualified in and for the
5    Commonwealth of Massachusetts, do hereby certify
     that:
6
             JUSTIN BAKES, the witness whose testimony
7    is hereinbefore set forth, was duly sworn by me
     pursuant to Mass. R. Civ. 27, 29, 30, 30A, and 31,
8    and that such testimony is a true and correct
     transcription of my original stenographic notes
9    taken in the forgoing matter, to the best of my
     knowledge, skill and ability.
10
             I further certify that I am neither
11   attorney or counsel for, nor related to or employed
     by any of the parties to the action in which this
12   deposition is taken; and furthermore, that I am not
     a relative or employee of any attorney or counsel
13   employed by the parties thereto or financially
     interested in the action.
14
             IN WITNESS WHEREOF, I have hereunto set my
15   hand and affixed my Notarial seal this 23rd day of
     August, 2023.
16

17              *Dawn Mack-Boaden*

18              Dawn Mack-Boaden, RPR
                Notary Public
19

20
     My Commission Expires:  August 26, 2027
21

22
     THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES
23   NOT APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF
     THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
24   CONTROL AND/OR SUPERVISION OF THE CERTIFYING COURT
     REPORTER.



**Exhibit 20-376**                                       **ER974**

1   ROB BONTA
    Attorney General of California
2   LISA W. CHAO
    CRAIG D. Rust
3   Supervising Deputy Attorneys General
    DOUGLAS J. BETETA (SBN: 260377)
4   RACHEL J. YOO (SBN: 293598)
    Deputy Attorneys General
5     300 South Spring Street, Suite 1702
      Los Angeles, CA  90013-1230
6     Telephone:  (213) 269-6622
      Fax:  (916) 731-2128
7     E-mail:  Douglas.Beteta@doj.ca.gov
              Rachel.Yoo@doj.ca.gov
8   *Attorneys for Defendant*
    *Clothilde Hewlett, solely in her official capacity as*
9   *Commissioner of the California Department of*
    *Financial Protection and Innovation*

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                     WESTERN DIVISION

14

15  | **SMALL BUSINESS FINANCE** | Case No.: 22-cv-08775-RGK-SK |
16  | **ASSOCIATION,** | |
    | | **DEFENDANT'S NOTICE OF** |
17  | Plaintiff, | **DEPOSITION AND PRODUCTION** |
    | | **OF DOCUMENTS AT** |
18  | v. | **DEPOSITION PURSUANT TO** |
    | | **FRCP 30(b)(6)** |
19  | |
20  | **CLOTHILDE HEWLETT, solely in** |
    | **her official capacity as Commissioner** |
21  | **of the California Department of** |
    | **Financial Protection and Innovation,** |
22  | |
23  | Defendant. |
24

25

26          PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure

27  30(b)(6), Defendant Clothilde Hewlett, solely in her official capacity as

28  Commissioner of the California Department of Financial Protection and Innovation

                                        1

Exhibit 20-377

ER975

EXHIBIT
1

1  (DFPI), will take the deposition upon oral examination of Plaintiff Small Business
2  Finance Association.  The deposition will take place at the following times and
3  places:
4
5

| Date and Time | Location |
|---|---|
| 8/16/23 at 10 a.m. (Justin Bakes) | Via a remote video conference platform at a link to be provided by DFPI's counsel. |
| 8/18/23 at 9 a.m. (Jeremy Brown) | Via a remote video conference platform at a link to be provided by DFPI's counsel. |
| 8/18/23 at 1 p.m. (Will Tumulty) | Via a remote video conference platform at a link to be provided by DFPI's counsel. |
| 8/31/23 at 10 a.m. (Jesse Carlson) | 11150 Santa Monica Blvd, Ste 1670, Los Angeles, CA 90025-3392 |
| 9/1/23 at 10 a.m. (Arun Narayan) | 11150 Santa Monica Blvd, Ste 1670, Los Angeles, CA 90025-3392 |

17  The deposition will be recorded by stenographic means and may be videotaped.
18  Plaintiff is requested to designate the person or persons most knowledgeable and
19  prepared to testify on behalf of Plaintiff Small Business Finance Association
20  concerning the subject matter described on **Attachment A**.
21       PLEASE TAKE FURTHER NOTICE that Plaintiff and its deponent(s) are
22  requested to produce at or before the scheduled deposition the documents identified
23  in **Attachment B**.

2

Exhibit 20-378                                                                    ER976

Dated:  August 8, 2023

ROB BONTA
Attorney General of California
LISA W. CHAO
CRAIG D. RUST
Supervising Deputy Attorneys General
RACHEL J. YOO
Deputy Attorney General

*/s/ Rachel J. Yoo*

Rachel J. Yoo
Deputy Attorney General

*Attorneys for Defendant Clothilde
Hewlett, solely in her official
capacity as Commissioner of the
California Department of Financial
Protection and Innovation*

## **DEFINITIONS**

1.     The terms "YOU" and "YOUR" refer to the plaintiff Small Business Finance Association, and any of its employees, officers, directors, agents, or persons acting under its direction or control or on its behalf.

2.     The term "MEMBER(S)" means YOUR members as of December 2, 2022, the date the underlying action was filed.

3.     The term "PERSON(S)" means any individuals, partnership, firm, association, corporation, public interest group or any other business, governmental or legal entity.

4.     The term "CUSTOMER(S)" refers to PERSONS seeking commercial financing of $500,000 or less in California.

5.     The term "PARTICULAR PAYMENT CHANNEL OR MECHANISM" is defined as provided for in 10 Cal. Code Regs. § 900(a)(20).

6.     The term "REGULATIONS" refers to Cal. Code Regs., tit. 10, ch. 3, subch. 3.

3

**Exhibit 20-379**

**ER977**

(169 of 295) Page 169 of 295 Case: 24-50 05/24/2024, DktEntry: 14.6, Page 169 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-22   Filed 09/27/23   Page 19 of 35   Page ID
#:1183

7.    The term "SALES-BASED FINANCING" is defined as provided for in 10 Cal. Code Regs. § 900(a)(28) and includes merchant cash advance and revenue-based financing.

8.    The terms "COMMUNICATE(S)" and "COMMUNICATION(S)" mean every manner of written, recorded, or transcribed transmission or communication, including letters, reports, notes, telegrams, telex, facsimiles, voicemails, web postings, text messages, electronic mail, social media, and any other written memorandum of oral communications.

9.    The term "DOCUMENT(S)" means all documents, writings, electronically stored information, or things within the scope of Rule 34 of the Federal Rules of Civil Procedure, including notes, correspondence, messages, minutes, memoranda, reports, communications, letters, photographs, images, models, telegrams, microfilm, data, data compilations, calendars, appointment books, diaries, drafts (whether used or not), electronic media, facsimiles, text files, charts, maps, web postings, web pages, ledgers, sound or image recordings, computer discs, computer printouts, electronic mail, or any other form of "writing" as defined in Rule 1001 of the Federal Rules of Evidence. The term "DOCUMENT(S)" further include all copies where the copy is not identical to the original.

10.    "ANY" shall be understood to include and encompass "ALL." The word "ALL" also includes "EACH" and vice versa.

11.    The term "RELATING" as to ANY subject means evidencing, supporting, proving, disproving, negating, refuting, including, referring to, relating to, constituting, memorializing, embodying, containing, identifying, stating, in connection with, and/or relevant to, either directly or indirectly, that subject.

12.    The term "SEARCH PERIODS" refers to the following: November 2018, October 2019, April 2020, May 2021, August 2022, and March 2023.

4

Exhibit 20-380

**ER978**

1

**Attachment A**

2    1.    Each of YOUR MEMBERS' close-end credit product.

3    2.    Each of YOUR MEMBERS' open-end credit product.

4    3.    Each of YOUR MEMBERS' SALES-BASED FINANCING product.

5    4.    The ways in which each of YOUR MEMBERS' close-end credit

6    differs from traditional bank loans.

7    5.    The ways in which each of YOUR MEMBERS' SALES-BASED

8    FINANCING differs from each of YOUR MEMBERS' close-end credit.

9    6.    The ways in which each of YOUR MEMBERS' open-end credit

10   differs from each of YOUR MEMBERS' close-end credit.

11   7.    Each of YOUR MEMBERS' marketing or advertising to potential

12   CUSTOMERS.

13   8.    The number of agreements each of YOUR MEMBERS entered into

14   with their CUSTOMERS with respect to SALES-BASED FINANCING, open-end

15   credit, and close-end credit, respectively, after the effective date of the

16   REGULATIONS.

17   9.    Each of YOUR MEMBERS' general CUSTOMER base, including but

18   not limited to their number of employees, annual revenues, and industries.

19   10.    Disclosures provided by each of YOUR MEMBERS to their

20   CUSTOMERS pursuant to the REGULATIONS.

21   11.    Disclosures provided by each of YOUR MEMBERS to their

22   CUSTOMERS prior to the REGULATIONS.

23   12.    Steps taken by each of YOUR MEMBERS to comply with the

24   REGULATIONS and any burden the REGULATIONS have imposed on each of

25   YOUR MEMBERS.

26   13.    Each of YOUR MEMBERS' policy, practices, or manual

27   REGARDING the disclosures required by the REGULATIONS.

28   14.    Each of YOUR MEMBERS' policy, practices, or manual

5

**Exhibit 20-381**

**ER979**

REGARDING an early payment of an advance or obligation under SALES-BASED FINANCING agreements.

15. Each of YOUR MEMBERS' policy, practices, or manual REGARDING true-ups.

16. Each of YOUR MEMBERS' policy, practices, or manual REGARDING CUSTOMERS who stopped remitting payments or whose income received through a PARTICULAR PAYMENT CHANNEL OR MECHANISM decreases.

17. Each of YOUR MEMBERS' policy, practices, or manual REGARDING CUSTOMERS who are suspected, determined, or believed to have violated the terms of the agreements, including but not limited to diverting revenue from a PARTICULAR PAYMENT CHANNEL OR MECHANISM.

18. Each of YOUR MEMBERS' employee training policy, practices, or manual REGARDING SALES-BASED FINANCING, open-end credit, and close-end credit.

19. The ways in which each of YOUR MEMBERS COMMUNICATE with its potential or current CUSTOMERS.

20. DOCUMENT retention policy of each of YOUR MEMBERS.

21. COMMUNICATIONS between each of YOUR MEMBERS and their potential or current CUSTOMERS REGARDING an obligation to pay YOUR MEMBERS.

22. COMMUNICATIONS between each of YOUR MEMBERS and their potential or current CUSTOMERS REGARDING the disclosures required by the REGULATIONS.

23. The number of CUSTOMERS who complained of or expressed confusion about the REGULATIONS or the disclosures required by the REGULATIONS to each of YOUR MEMBERS and the nature of their complaints or confusion.

6

**Exhibit 20-382**

ER980

24.     The number of SALES-BASED FINANCING agreements each of YOUR MEMBERS entered into with CUSTOMERS from 2018 to the effective date of the REGULATIONS.

25.     The number of collection actions each of YOUR MEMBERS filed against their CUSTOMERS with respect to SALES-BASED FINANCING agreements from 2018 to the present, and the basis for such actions.

26.     YOUR or YOUR MEMBERS' assessment of the REGULATIONS, including but not limited to their impact on each of YOUR MEMBERS' business and the accuracy of the disclosures required by the REGULATIONS.

27.     Each of YOUR MEMBERS' underwriting methodologies for SALES-BASED FINANCING, including but not limited to methodologies for calculating future receipts, sales, renewals, and the amount of time customers will take to repay their obligations.

28.     The renewal rate of CUSTOMERS who entered into SALES-BASED FINANCING agreement with each of YOUR MEMBERS and the reason(s) for renewals.

29.     Any testing, survey, or market research performed by YOU or on YOUR behalf REGARDING customers' understanding of SALES-BASED FINANCING or open-end credit and associated disclosures.

30.     The allegations of YOUR complaint in this action, including but not limited to paragraphs 55 and 57 and of YOUR complaint: "Th[e] difference [between the REGULATIONS and TILA] may result in different APRs for the exact same product" and "small business owners often finance their businesses through a combination of commercial finance products and consumer finance products available to them individually."

31.     Comments YOU or each of YOUR MEMBERS submitted to the legislature REGARDING SB-1235 or during the rulemaking process REGARDING the REGULATIONS.

7

**Exhibit 20-383**

**ER981**

32.     YOUR discovery responses and the DOCUMENTS YOU have produced in this action.

**Attachment B**

1.     Sample marketing or advertising materials each of YOUR MEMBERS generated or used to solicit CUSTOMERS REGARDING SALES-BASED FINANCING, open-end credit, or close-end credit.

2.     Representative sample SALES-BASED FINANCING agreements, open-end credit agreements, and closed-end credit agreements each of YOUR MEMBERS has used with their CUSTOMERS, including but not limited to any attachments and addendums thereto, for each of the years 2018, 2019, 2020, 2021, 2020, and 2023.

3.     Sample disclosures each of YOUR MEMBERS provided to their CUSTOMERS pursuant to the REGULATIONS.

4.     Sample disclosures each of YOUR MEMBERS provided to their CUSTOMERS prior to the REGULATIONS.

5.     DOCUMENTS showing steps taken by each of YOUR MEMBERS to comply with the REGULATIONS and any burden the REGULATIONS have imposed on each of YOUR MEMBERS.

6.     Each of YOUR MEMBERS' policy or manual REGARDING the disclosures required by the REGULATIONS.

7.     Each of YOUR MEMBERS' policy or manual REGARDING an early payment of an advance or obligation under SALES-BASED FINANCING agreements.

8.     Each of YOUR MEMBERS' policy or manual REGARDING true-ups.

9.     Each of YOUR MEMBERS' policy or manual REGARDING CUSTOMERS who stopped remitting payments or whose income received through a PARTICULAR PAYMENT CHANNEL OR MECHANISM decreases.

8

**Exhibit 20-384**                    **ER982**

10.     Each of YOUR MEMBERS' policy or manual REGARDING CUSTOMERS who are suspected, determined, or believed to have violated the terms of the agreements, including but not limited to diverting revenue from a PARTICULAR PAYMENT CHANNEL OR MECHANISM.

11.     Each of YOUR MEMBERS' employee training policy or manual REGARDING SALES-BASED FINANCING, open-end credit, and close-end credit.

12.     DOCUMENTS showing each of YOUR MEMBERS' DOCUMENT retention policy.

13.     COMMUNICATIONS between each of YOUR MEMBERS and their potential or current CUSTOMERS REGARDING the disclosures required by the REGULATIONS during the SEARCH PERIODS.

14.     DOCUMENTS showing contact information of each of YOUR MEMBERS' CUSTOMERS who complained of or expressed confusion about the REGULATIONS and DOCUMENTS showing the nature of their complaints.

15.     DOCUMENTS showing contact information of each of YOUR MEMBERS' CUSTOMERS who received the disclosures required by the REGULATIONS.

16.     DOCUMENTS showing YOUR or each of YOUR MEMBERS' assessment of the REGULATIONS, including but not limited to their impact on YOUR MEMBERS' business and the accuracy of the disclosures required by the REGULATIONS.

17.     DOCUMENTS showing each of YOUR MEMBERS' underwriting methodologies for SALES-BASED FINANCING, including but not limited to methodologies for calculating future receipts, sales, renewals, and the amount of time customers will take to repay their obligations.

18.     DOCUMENTS REGARDING ANY testing, survey, or market research performed by YOU or on YOUR behalf REGARDING customers'

9

**Exhibit 20-385**

ER983

understanding of SALES-BASED FINANCING or open-end credit and associated disclosures.

19.    DOCUMENTS that support YOUR allegations in paragraphs 55 and 57 and of YOUR complaint: "Th[e] difference [between the REGULATIONS and TILA] may result in different APRs for the exact same product" and "small business owners often finance their businesses through a combination of commercial finance products and consumer finance products available to them individually."

10

Exhibit 20-386

ER984

<u>**DECLARATION OF SERVICE BY E-MAIL**</u>

Case Name:   **Small Business Finance Association v. Clothilde Hewlett**
Case No.:    **22-cv-08775-RGK-SK**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter; my business address is: 300 South Spring Street, Suite 1702, Los Angeles, CA 90013-1230.

On <u>August 8, 2023</u>, I served the attached **DEFENDANT'S NOTICE OF DEPOSITION AND PRODUCTION OF DOCUMENTS AT DEPOSITION PURSUANT TO FRCP 30(b)(6)** by transmitting a true copy via electronic mail addressed as follows:

| | |
|---|---|
| **Benjamin H. Brodsky (Pro Hac Vice)** | **Paul Levin, Esq.** |
| **Philip T. Merenda (Pro Hac Vice)** | **Lauren M. Gibbs, Esq.** |
| Brodsky Fotiu-Wojtowicz, PLLC | Mark Migdal And Hayden |
| 200 SE 1ST St., Suite 400 | 80 SW 8th Street, Suite 1999 |
| Miami, FL 33131 | Miami, Florida 33130 |
| | |
| **Emails :** bbrodsky@bfwlegal.com | **Emails :** paul@markmigdal.com |
| phil@bfwlegal.com | lauren@markmigdal.com |
| | |
| | *Attorneys for Plaintiff* |

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on August 8, 2023, at Los Angeles, California.

| | |
|---|---|
| _____ | _____ |
| Norma L. Herrera-Gilbody | *Norma L. Herrera-Gilbody* |
| Declarant | Signature |

SA2022803044
POS.docx

**Exhibit 20-387**        **ER985**

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| Small Business Finance Association | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 22-cv-08775-RGK-SK |
| Clothilde Hewlett | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Forward Financing LLC c/o Benjamin H. Brodsky, Brodsky Fotju Wojtowciz, 200 SE 1st St., Suite 400, Miami, FL 33131
*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters: See Attachment A.

| Place: | Via a remote video conference platform at a link to be provided by issuing counsel. | Date and Time: 08/16/2023 10:00 am |
|---|---|---|

The deposition will be recorded by this method: stenographic and may be videotaped

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Attachment B.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/11/2023

CLERK OF COURT

OR

_____        _____
*Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Defendant Clothilde Hewlett
_____, who issues or requests this subpoena, are:
Douglas Beteta, CA DOJ, 300 S. Spring St., Ste. 1702, Los Angeles, CA 90013, Douglas.Beteta@doj.ca.gov, (213) 269-6014

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT
3

**Exhibit 20-388**

**ER986**

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 22-cv-08775-RGK-SK

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

&#9633; I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

&#9633; I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____        _____
                                        *Server's signature*

                                        _____
                                        *Printed name and title*

                                        _____
                                        *Server's address*

Additional information regarding attempted service, etc.:

**Exhibit 20-389**        **ER987**

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Exhibit 20-390**

**ER988**

1  ROB BONTA
   Attorney General of California
2  LISA W. CHAO
   CRAIG D. Rust
3  Supervising Deputy Attorneys General
   DOUGLAS J. BETETA (SBN: 260377)
4  RACHEL J. YOO (SBN: 293598)
   Deputy Attorneys General
5   300 South Spring Street, Suite 1702
    Los Angeles, CA  90013-1230
6   Telephone:  (213) 269-6622
    Fax:  (916) 731-2128
7   E-mail:  Douglas.Beteta@doj.ca.gov
             Rachel.Yoo@doj.ca.gov
8  *Attorneys for Defendant*
   *Clothilde Hewlett, solely in her official capacity as*
9  *Commissioner of the California Department of*
   *Financial Protection and Innovation*
10

11           IN THE UNITED STATES DISTRICT COURT

12           FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                    WESTERN DIVISION

14

15  
    **SMALL BUSINESS FINANCE**          Case No.: 22-cv-08775-RGK-SK
16  **ASSOCIATION,**
                                         **ATTACHMENTS TO SUBPOENA**
17                           Plaintiff,  **TO TESTIFY AT A DEPOSITION**
                                         **IN A CIVIL ACTION TO NON-**
18       v.                              **PARTY FORWARD FINANCING**
                                         **LLC**
19  
    **CLOTHILDE HEWLETT, solely in**
20  **her official capacity as Commissioner**
    **of the California Department of**
21  **Financial Protection and Innovation,**

22  
                            Defendant.
23  

24  

25  

26  

27  

28  

                              1

                       **Exhibit 20-391**                    **ER989**

## **DEFINITIONS**

1.     The terms "YOU" and "YOUR" refer to the entity responding to this subpoena, and any of its employees, officers, directors, agents, or persons acting under its direction or control or on its behalf.

2.     The term "PERSON(S)" means any individuals, partnership, firm, association, corporation, public interest group or any other business, governmental or legal entity.

3.     The term "CUSTOMER(S)" refers to PERSONS seeking commercial financing of $500,000 or less in California.

4.     The term "PARTICULAR PAYMENT CHANNEL OR MECHANISM" is defined as provided for in 10 Cal. Code Regs. § 900(a)(20).

5.     The term "REGULATIONS" refers to Cal. Code Regs., tit. 10, ch. 3, subch. 3.

6.     The term "SALES-BASED FINANCING" is defined as provided for in 10 Cal. Code Regs. § 900(a)(28) and includes merchant cash advance and revenue-based financing.

7.     The terms "COMMUNICATE(S)" and "COMMUNICATION(S)" mean every manner of written, recorded, or transcribed transmission or communication, including letters, reports, notes, telegrams, telex, facsimiles, voicemails, web postings, text messages, electronic mail, social media, and any other written memorandum of oral communications.

8.     The term "DOCUMENT(S)" means all documents, writings, electronically stored information, or things within the scope of Rule 34 of the Federal Rules of Civil Procedure, including notes, correspondence, messages, minutes, memoranda, reports, communications, letters, photographs, images, models, telegrams, microfilm, data, data compilations, calendars, appointment books, diaries, drafts (whether used or not), electronic media, facsimiles, text files, charts, maps, web postings, web pages, ledgers, sound or image recordings,

2

Exhibit 20-392

ER990

1    computer discs, computer printouts, electronic mail, or any other form of "writing"
2    as defined in Rule 1001 of the Federal Rules of Evidence. The term
3    "DOCUMENT(S)" further include all copies where the copy is not identical to the
4    original.
5        9.    "ANY" shall be understood to include and encompass "ALL."  The word
6    "ALL" also includes "EACH" and vice versa.
7        10.    The term "RELATING" as to ANY subject means evidencing,
8    supporting, proving, disproving, negating, refuting, including, referring to, relating
9    to, constituting, memorializing, embodying, containing, identifying, stating, in
10   connection with, and/or relevant to, either directly or indirectly, that subject.

11                              **Attachment A**

12       1.    YOUR close-end credit product.
13       2.    YOUR open-end credit product.
14       3.    YOUR SALES-BASED FINANCING product.
15       4.    The ways in which YOUR close-end credit differs from traditional
16   bank loans.
17       5.    The ways in which YOUR SALES-BASED FINANCING differs from
18   YOUR close-end credit.
19       6.    The ways in which YOUR open-end credit differs from YOUR close-
20   end credit.
21       7.    YOUR marketing or advertising to potential CUSTOMERS.
22       8.    The number of agreements YOU entered into with YOUR
23   CUSTOMERS with respect to SALES-BASED FINANCING, open-end credit, and
24   close-end credit, respectively, after the effective date of the REGULATIONS.
25       9.    YOUR general CUSTOMER base, including but not limited to their
26   number of employees, annual revenues, and industries.
27       10.    Disclosures YOU provided to YOUR CUSTOMERS pursuant to the
28   REGULATIONS.

3

**Exhibit 20-393**                                                    **ER991**

11.     Disclosures YOU provided to YOUR CUSTOMERS prior to the REGULATIONS.

12.     Steps YOU have taken to comply with the REGULATIONS and any burden the REGULATIONS have imposed upon YOU.

13.     YOUR policy, practices, or manual REGARDING the disclosures required by the REGULATIONS.

14.     YOUR policy, practices, or manual REGARDING an early payment of an advance or obligation under SALES-BASED FINANCING agreements.

15.     YOUR policy, practices, or manual REGARDING true-ups.

16.     YOUR policy, practices, or manual REGARDING CUSTOMERS who stopped remitting payments or whose income received through a PARTICULAR PAYMENT CHANNEL OR MECHANISM decreases.

17.     YOUR policy, practices, or manual REGARDING CUSTOMERS who are suspected, determined, or believed to have violated the terms of the agreements, including but not limited to diverting revenue from a PARTICULAR PAYMENT CHANNEL OR MECHANISM.

18.     YOUR employee training policy, practices, or manual REGARDING SALES-BASED FINANCING, open-end credit, and close-end credit.

19.     The ways in which each of YOU with potential or current CUSTOMERS.

20.     YOUR DOCUMENT retention policy.

21.     COMMUNICATIONS between YOU and YOUR potential or current CUSTOMERS REGARDING an obligation owed to YOU pursuant to a SALES-BASED FINANCING product.

22.     COMMUNICATIONS between YOU and YOUR potential or current CUSTOMERS REGARDING the disclosures required by the REGULATIONS, including but not limited to the CUSTOMERS identified in the spreadsheet produced in this action as SBFA 01112 a true and correct copy of which is attached

4

Exhibit 20-394

1    as Exhibit 1.

2        23.    The number of CUSTOMERS who complained of or expressed

3    confusion about the REGULATIONS or the disclosures required by the

4    REGULATIONS to YOU and the nature of their complaints or confusion.

5        24.    The number of SALES-BASED FINANCING agreements YOU

6    entered into with CUSTOMERS from 2018 to the effective date of the

7    REGULATIONS.

8        25.    The number of collection actions each of YOUR filed against YOUR

9    CUSTOMERS with respect to SALES-BASED FINANCING agreements from

10   2018 to the present, and the basis for such actions.

11       26.    YOUR assessment of the REGULATIONS, including but not limited

12   to their impact on YOUR business and the accuracy of the disclosures required by

13   the REGULATIONS.

14       27.    YOUR underwriting methodologies for SALES-BASED

15   FINANCING, including but not limited to methodologies for calculating future

16   receipts, sales, renewals, and the amount of time customers will take to repay their

17   obligations.

18       28.    The renewal rate of CUSTOMERS who entered into SALES-BASED

19   FINANCING agreement with YOU and the reason(s) for renewals.

20       29.    Any testing, survey, or market research performed by YOU or on

21   YOUR behalf REGARDING customers' understanding of SALES-BASED

22   FINANCING or open-end credit and associated disclosures.

23       30.    The allegations of the complaint in this action, including but not

24   limited to paragraphs 55 and 57 and of the complaint: "Th[e] difference [between

25   the REGULATIONS and TILA] may result in different APRs for the exact same

26   product" and "small business owners often finance their businesses through a

27   combination of commercial finance products and consumer finance products

28   available to them individually."

5

Exhibit 20-395

1       31.    Comments YOU submitted to the legislature REGARDING SB-1235

2  or during the rulemaking process REGARDING the REGULATIONS.

3       32.    The DOCUMENTS YOU have produced in this action.

4                            **Attachment B**

5       1.    The disclosures YOU made to comply with the REGULATIONS and

6  any agreements and other documents YOU provided to the CUSTOMERS

7  identified in the spreadsheet produced in this action as SBFA 01112 a true and

8  correct copy of which is attached as Exhibit 1.

6

**Exhibit 20-396**

**ER994**

JEREMY BROWN                                      August 18, 2023
S.B.F.A. vs CLOTHILDE HEWLETT

1            IN THE UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4    SMALL BUSINESS FINANCE          :

5    ASSOCIATION,                    :

6              Plaintiff,    : Case 22-cv-08775-RGK-SK

7        v.                          :

8    CLOTHILDE HEWLETT,              :

9    solely in her official          :

10   capacity as Commissioner       :

11   of the California              :

12   Department of Financial        :

13   Protection and Innovation, :

14             Defendant.     :

15         Pursuant to Notice, the remote video

16   conference deposition of JEREMY BROWN, was taken on

17   Friday, the 18th day of August, 2023, commencing at

18   9:01 a.m., Eastern, before Brian M. McDonald, a

19   Court Reporter and Notary Public.

20

21

22

23

24

25



Exhibit 21-397                                    ER995

JEREMY BROWN                                                 August 18, 2023
S.B.F.A. vs CLOTHILDE HEWLETT

1                         A P P E A R A N C E S:

2     ON BEHALF OF THE PLAINTIFF:

3          BENJAMIN H. BRODSKY, ESQUIRE (Pro Hac Vice)

4          Brodsky Fotiu-Wojtowicz, PLLC

5          200 SE 1st Street, Suite 400

6          Miami, Florida 33131

7          email:  bbrodsky@bfwlegal.com

8     and

9          NATALIE PAPPAS, ESQUIRE

10         In-House Counsel

11         NataliePappas@rapidfinance.com

12    ON BEHALF OF THE DEFENDANT:

13         RACHEL J. YOO, ESQUIRE

14         and DOUG BETETA, ESQUIRE

15         Deputy Attorneys General

16         300 South Spring Street, Suite 1702

17         Los Angeles, California 90013-1230

18         Email: Rachel.Yoo@doj.ca.gov

19

20

21

22

23

24

25



**Exhibit 21-398**                                        **ER996**

JEREMY BROWN                                              August 18, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                          22

JEREMY BROWN                                              August 18, 2023
S.B.F.A. vs CLOTHILDE HEWLETT

1       BY MS. YOON:    So what are some core

2   features of closed-end credit?

3       A.    Well, core features would be it has a

4   fixed term.  It has a specified repayment term,

5   typically expressed as daily, weekly or monthly

6   amount of repayment.  It has a fixed fee.  So, in

7   other words, we are going to loan you X amount of

8   money.  We're going to charge you Y amount of fee.

9   You're going to repay us a total amount of some

10  number.  And here are the repayment terms.

11      Q.    Let's compare that with sales-based

12  financing.  So what are some of the core features of

13  sales-based financing?

14      A.    Sales-based financing, the product is

15  structured as we are going to receive a specified

16  portion of the future revenues of a company.  That

17  can either be all revenues of the company or a

18  specific portion of the revenues, like say their

19  credit card processing receipts.

20          We purchase those receivables or future

21  receivables at a discount to their total future

22  value.  And then we will receive our value through a

23  percentage of the actual daily collections of

24  revenue by the company.

25          And that, again, can be broadly based if



**Exhibit 21-399**                                        **ER997**

JEREMY BROWN                                        August 18, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                    23

JEREMY BROWN                                        August 18, 2023
S.B.F.A. vs CLOTHILDE HEWLETT

1    is a version of their total revenue, or it could

2    be more narrowly based in the interest of let's say

3    all we're doing or a company is doing is getting a

4    percentage of just the credit card receipts but not

5    all revenues of the business.

6        Q.    So that's the core feature of sales-based

7    financing product?

8        A.    Right.  And the other thing that's also

9    very important with the sales-based financing

10   product is because it's all contingent upon a

11   business's future success, if you will, there's no

12   personal guarantee by the business or by the owner

13   of the business; so it's one of the reasons it's

14   attractive is that if the business goes out of

15   business, you know, without diverting payments or

16   otherwise, you know, committing an act that's in

17   violation of the contract, the company, whether it's

18   Rapid or anybody else, has no right to collect

19   against the owner of the business for the portion

20   that it didn't receive.

21            And there's also no fixed term; so if the

22   business sees that the revenues decline naturally,

23   then, then, you know, the expected period of time

24   that, that the company will get their -- the

25   provider will get their money back extends.

800.211.DEPO (3376)
EsquireSolutions.com



800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit 21-400**

**ER998**

1   disclosure in sales-based financing is burdensome to

2   providers because the calculations are impossible,

3   right, if not like -- plus very complicated, cause

4   confusion to customers, and there is a litigation

5   risk about the variance of the APR range.

6   Therefore, it's burdensome to providers.  Am I

7   correct?

8        A.    Yes.

9        Q.    Any other burden that you can think of

10  regarding APR disclosure?

11       A.    Not that I can think of at this moment,

12  no.

13       Q.    Okay.  Let's move on to finance charge.

14  What is wrong with the finance charge in disclosure?

15       A.    If you were to present this number

16  correctly, the terminology should be purchase

17  discount, which is the difference between the future

18  receivables sold and the amount purchased.

19       Q.    Okay.  What else?  What else is wrong with

20  this disclosure?

21       A.    Well, this is, this is the dollar cost of

22  your financing.  Again, that's not an accurate

23  statement.

24       Q.    How should it be written?

25       A.    Okay.  You're asking me to think about



Exhibit 21-401                                    ER999

JEREMY BROWN                                                    August 18, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                               124

1   monthly costs and then we have estimated payment.

2   I'm not sure the reason for that.  I'm assuming that

3   in this -- I just don't know the reason for it.

4        Q.    Other than you don't understand why,

5   anything wrong with this disclosure?

6        A.    Again, terminology.  Shouldn't be payment.

7        Q.    Should be remittance?

8        A.    Yeah, remittance of, estimated remittance

9   of weekly sales, or something like that.

10       Q.    As I see it, as a consumer, right, so this

11  tells me my weekly payment, the estimated payment

12  tells me my weekly.

13            Estimated monthly cost tells me, again,

14  for entire month how much that's going to cost me.

15  So, yeah, I can't calculate the monthly by month by,

16  you know, four, but it gives me -- it saves me the

17  two seconds that I have to use my phone to get a

18  monthly cost.

19            So to me there is a value to it.  But you

20  don't think that is not necessary, there is no value

21  to that?

22       A.    Well, you said as a consumer.  Remember,

23  this is not the consumer, this is a small business

24  owner.  I mean, if it's -- if the State of

25  California thinks it's helpful to have more numbers



800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit 21-402**                                              **ER1000**

JEREMY BROWN                                                August 18, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                                          138

1    confusion to customers?

2        A.    Yes.

3        Q.    Anything other than that in terms of

4    burden?

5        A.    Nothing else that I can think of at this

6    time.

7        Q.    So it's not burdensome for providers to

8    calculate 273 days, whatever the period is.  Do you

9    think that could be burdensome?

10       A.    I can't think of any reason why that would

11   be burdensome at this time.

12       Q.    Last one, prepayment.  What's wrong with

13   this disclosure?

14       A.    Again, there's no concept of prepayment

15   in, in this, in this, in a sales-based financing

16   contract, just like there's no concept of late

17   payment.

18             I mean, it's, it's a sale and purchase for

19   a fixed amount.  It performs over the term that it

20   actually does based upon, you know, actual revenues.

21   So I'm not sure what the benefit of this language

22   is.  Again, it's just more word salad to me.

23       Q.    So prepayment doesn't exist in sales-based

24   financing.  Is that your opinion?

25       A.    I think that's factual.  It's not my



Exhibit 21-403                                              ER1001

JEREMY BROWN                                         August 18, 2023
S.B.F.A. vs CLOTHILDE HEWLETT                 230

```
 1              CERTIFICATION OF NOTARY
 2    I, Brian M. McDonald, the officer before whom the
 3    foregoing deposition was taken, do hereby certify
 4    that the witness whose testimony appears in the
 5    foregoing deposition was duly sworn by me; that the
 6    testimony of said witness was taken by me
 7    stenographically and thereafter reduced to
 8    typewriting by me; that said deposition is a true
 9    record of the testimony given by said witness; that
10    I am neither counsel for, related to or employed by
11    any of the parties to the action in which this
12    deposition is taken and further, that I am not a
13    relative or employee of any attorney or counsel
14    employed by the parties thereto, nor financially or
15    otherwise interested in the outcome of this action.
16
17
18              Brian M. McDonald
19              Notary Public
20       My Commission Expires:  July 1, 2024
21        Dated this 25th day of August 2023
22
23
24
25
```



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit 21-404**                    **ER1002**

(194 of 295), Page 194 of 295
Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 194 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-24   Filed 09/27/23   Page 1 of 19   Page ID
#:1208

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                              1

```
1              IN THE UNITED STATES DISTRICT COURT
```
JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT
```
2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION
     _____
4                                     )
     SMALL BUSINESS FINANCE           )CASE NO.:
5    ASSOCIATION,                     )
                                      )22-cv-08775-RGK-
6                     Plaintiff,      )SK
                                      )
7          v.                         )
                                      )
8    CLOTHILDE HEWLETT, solely in her )
     official capacity as            )
9    Commissioner of the California   )
     Department of Financial          )
10   Protection and Innovation,       )
                                      )
11                    Defendant.      )
     _____)
12

13

14      ** THIS TRANSCRIPT IS MARKED CONFIDENTIAL **

15

16            DEPOSITION OF JESSE CARLSON

17                     VOLUME I

18             LOS ANGELES, CALIFORNIA

19            THURSDAY, AUGUST 31, 2023

20

21

22

23

24   REPORTED BY:   NATALIE PARVIZI-AZAD, CSR, RPR, RSR
                    CSR NO. 14125
25   JOB NO.:       J10100899-B
```

800.211.DEPO (3376)
EsquireSolutions.com



800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit 22-405**                                    **ER1003**

(195 of 295), Page 195 of 295
Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 195 of 295
Case 2:22-cv-08775-RGK-SK  Document 52-24  Filed 09/27/23  Page 2 of 19  Page ID #:1209

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                              2

JESSE CARLSON Vol. I Confidential                 August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT

1            UNITED STATES DISTRICT COURT

2       FOR THE CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4    _____
                                      )
5    SMALL BUSINESS FINANCE           )CASE NO.:
     ASSOCIATION,                     )
6                                     )22-cv-08775-RGK-
                    Plaintiff,        )SK
7                                     )
             v.                       )
8                                     )
     CLOTHILDE HEWLETT, solely in her )
9    official capacity as            )
     Commissioner of the California   )
10   Department of Financial          )
     Protection and Innovation,       )
11                                    )
                    Defendant.        )
12   _____)

13

14

15      DEPOSITION OF JESSE CARLSON, VOLUME I

16      TAKEN ON BEHALF OF THE DEFENDANT

17      REMOTELY VIA ZOOM VIDEOCONFERENCING, IN

18      LOS ANGELES, CALIFORNIA, BEGINNING AT

19      11:26 P.M. AND ENDING AT 6:46 P.M., ON

20      THURSDAY, AUGUST 31, 2023, BEFORE

21      NATALIE PARVIZI-AZAD, CERTIFIED SHORTHAND

22      REPORTER NUMBER 14125.

23

24

25
                                    800.211.DEPO (3376)
                                    EsquireSolutions.com



Exhibit 22-406                          ER1004

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF, SMALL BUSINESS FINANCE
     ASSOCIATION:
 4
         BRODSKY FOTIU-WOJTOWICZ, PLLC
 5       BY:  BENJAMIN H. BRODSKY, ESQ.
         BY:  PHILIP T. MERENDA, ESQ. (REMOTELY)
 6       200 SE 1ST STREET
         SUITE 400
 7       MIAMI, FLORIDA  33131
         (305) 503-5054
 8       BBRODSKY@BFWLEGAL.COM
         PHIL@BFWLEGAL.COM
 9

10   FOR THE DEFENDANT, CLOTHILDE HEWLETT, SOLELY IN
     HER OFFICIAL CAPACITY AS COMMISSIONER OF THE
11   CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND
     INNOVATION:
12
         ATTORNEYS GENERAL
13       BY:  DOUGLAS J. BETETA, ESQ. (REMOTELY)
         BY:  RACHEL J. YOO, ESQ.
14       300 SOUTH SPRING STREET
         SUITE 1702
15       LOS ANGELES, CALIFORNIA  90013
         (213) 269-6622
16       DOUGLAS.BETETA@DOJ.CA.GOV
         RACHEL.YOO@DOJ.CA.GOV
17

18

19   ALSO PRESENT:

20       JULIE GORCHKOVA, IN-HOUSE COUNSEL FOR KAPITUS

21

22

23

24

25
```



**Exhibit 22-407**                                              **ER1005**

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                              136

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT

1   this level, you would look at

2   whether the cost to comply with the regulations

3   imposed by whatever governmental or

4   quasi-governmental entity is imposing those

5   regulations, outweigh the benefit, in terms of

6   profitability, of offering that product or

7   service.

8        Q.   So if cost to comply outweigh benefits,

9   that requirement, that regulation is too

10  burdensome; correct?

11            MR. BRODSKY:   I'm going to object to the

12  form.

13       A.   I mean, you would just choose not to

14  offer the product in order to comply.  I mean,

15  Kapitus' policy is to comply with the laws, rules,

16  and relations in every jurisdiction.  If we look

17  at it and the cost to offer a particular product

18  or the regulatory burden for a particular product

19  is too high, at that point you would reconsider

20  whether to offer that product or service.

21       Q.   Has Kapitus made that decision in terms

22  of California regulations?

23       A.   As I testified earlier, we have entered

24  into 950-some-odd financing contracts since the

25  regulation went into effect, so clearly the cost



**Exhibit 22-408**                                    **ER1006**

(198 of 295), Page 198 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 198 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-24   Filed 09/27/23   Page 5 of 19   Page ID
#:1212

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                              137

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT

1    to our business because the cost of complying with the

2    disclosure regulations in California did not

3    outweigh the benefit of providing our products and

4    services in the State of California.

5         Q.   So there are two metrics in your

6    statement, cost to comply and benefits; right?

7         A.   Correct.

8         Q.   How do you quantify those?  So let's

9    start with cost to comply, how do you quantify

10   that?

11        A.   You would look at the time, effort, and

12   expense needed to comply with the regulation and

13   you would compare that expense on an individual or

14   ongoing basis to the profitability of the

15   customers in the state of California and you would

16   make a judgment as to whether to modify your

17   business practices to avoid the cost to comply or

18   you would take the steps necessary to implement

19   the changes needed in order to comply.

20        Q.   So how much the cost to comply has been

21   to Kapitus?

22        A.   We have not quantified it to a dollar

23   level, but it did take at least -- Kapitus was

24   engaged in the regulatory process that led to the

25   disclosure regulations from 2018 through their



**Exhibit 22-409**                                   **ER1007**

(199 of 295), Page 199 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 199 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-24   Filed 09/27/23   Page 6 of 19   Page ID
#:1213

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                              153

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT

1    your customer and the periodic

2    payments you make."

3             Is this sentence factual or nonfactual?

4        A.   Not in the context of sales-based

5    financing.

6        Q.   Which part?

7        A.   You are not required to make periodic

8    payments in the context of sales-based financing.

9    You are required to deliver the percentage of

10   receipts purchased, as and when created.

11       Q.   So the periodic payments you make is

12   inaccurate?

13       A.   You don't make payments.  Under a

14   sales-based financing arrangement you do not have

15   a repayment obligation, because there is no

16   absolute right to repayment under the terms of a

17   sales-based financing contract.

18       Q.   So what you've saying is that the term

19   payments implies absolute obligation to pay; is

20   that correct?

21       A.   Yes, and periodic implies that there's a

22   schedule of payments that are required to be made.

23       Q.   What is your basis of that understanding,

24    that payments implies an absolute obligation to

25    pay?

                                  800.211.DEPO (3376)
                                  EsquireSolutions.com



                                  800.211.DEPO (3376)
                                  EsquireSolutions.com

Exhibit 22-410                                  ER1008

JESSE CARLSON Vol. I Confidential                        August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                                   154

JESSE CARLSON Vol. I Confidential                        August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT

1       MR. BRODSKY:  Object to the form.

2       A.   Generally my knowledge of the English

3   language -- it's just -- payment implies an

4   obligation, because you make a payment when you

5   have an obligation.  I mean, it's sort of basic

6   English, so...

7       Q.   Okay.  So as opposed to remittance, what

8   does that mean to you?

9       A.   Remittance is the -- again, that is the

10  delivery of receipts to the purchaser.  It's

11  fundamentally at odds with the first page of the

12  contract, which is the sale confirmation which

13  describes the transaction accurately.

14      Q.   So the term payments is inaccurate in the

15  sales-based finance context; right, because it

16  implies obligation -- absolute obligation to pay,

17  correct?

18      A.   I believe that's correct.  That's what I

19  testified to previously, yes.

20      Q.   How about the word "remittance;" is that

21  okay in the context of sales-based financing?

22          MR. BRODSKY:  Objection to the form.

23      A.   I mean, as I stated, given the -- I would

24  use the term set forth in the sale confirmation

25  that we have, which would be -- the more accurate



**Exhibit 22-411**                                      **ER1009**

(201 of 295), Page 201 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 201 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-24   Filed 09/27/23   Page 8 of 19   Page ID
#:1215

JESSE CARLSON Vol. I Confidential                          August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                                    161

1  make this entire row a factual statement, because

2  the entire concept of a rate or an estimated rate

3  is inconsistent with the nature of a sales-based

4  financing transaction.

5      Q.   So this entire second row is not factual;

6  correct?

7      A.   Correct.

8      Q.   Is it burdensome to make the second row

9  estimated APR rate disclosure?

10         MR. BRODSKY:  Objection to the form.

11     A.   Creating a calculation that was compliant

12  with reg Z, given all of the variability in a

13  sales-based financing, essentially putting a

14  square peg of sales-based financing into the round

15  hole of APR, was burdensome and took a significant

16  number of man hours to do.

17     Q.   So the third row, "finance charge;" how

18  did you calculate that $11,250?

19     A.   That is the difference between the

20  purchased amount and the purchase price plus the

21  closing fee.

22     Q.   Is there any -- so there are two

23  sentences on the third column.  The first one:

24  "This is the dollar cost of your financing."

25         Is this statement factual or nonfactual?



Exhibit 22-412                                              **ER1010**

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                          178

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT

1    regulation took effect December of

2    last year, it's been like eight, nine months since

3    the regulations took effect; right?

4        A.    Yes.

5        Q.    Do you have formulas or some sort of

6    method that you populate these numbers to comply

7    with the California regulations?

8        A.    Yes, those were developed over the course

9    of six months last year when the final regulation

10   was promulgated in June of 2022.

11       Q.    So you have a system in place to comply

12   with the California regulations?

13       A.    Yes.

14       Q.    So once you have that system, making

15   these disclosures add any additional burden to you

16   given the fact that you have a system in place

17   already?

18            MR. BRODSKY:  Objection to form.

19       A.    Yes.  There remains a burden in requiring

20   to describe the sales-based financing products

21   inaccurately.  That is difficult to quantify but

22   that remains a burden in addition to the

23   significant cost to build the systems necessary to

24   make these disclosures as required by the

25   California regulation.  I would add that we need



Exhibit 22-413                                    ER1011

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                              179

1  to our systems and there are ongoing

2  compliance cost, not just building and then

3  letting it go because in order to remain compliant

4  any good compliance system will include internal

5  audit and testing of the systems to ensure that,

6  for whatever reason, the disclosures continue to

7  be generated and continue to be generated

8  accurately.

9       Q.   How much did it cost for you to build the

10 system initially?

11      A.   As I previously testified, we did not

12 translate the man hours to a dollar cost.

13 Although, it would -- estimating, it would likely

14 be tens if not hundreds of thousands of dollars.

15      Q.   How about the maintenance cost?

16      A.   Again, we have not translated the time

17 and effort necessary to a dollar figure, but it is

18 significant and would likely be measured in the

19 tens of thousands of dollars.

20      Q.   The next row, estimated payment.  How did

21 you get that number?

22      A.   That is based on our estimate of the

23 receipts on a weekly basis and it is 3.7 percent

24 of our estimate of the average weekly receipts

25 generated.



(204 of 295) Page 204 of 295 Case: 24-50 05/24/2024, DktEntry: 14.6 Page 204 of 295
Case 2:22-cv-08775-RGK-SK  Document 52-24  Filed 09/27/23  Page 11 of 19  Page ID
#:1218

1   to the revenue that the business is generating.

2       Q.   So when I -- when we went through the

3   disclosure forms, I got the impression that you

4   are very particular about word choices that the

5   department made, certain words you think that it

6   implies a loan, therefore it's misleading,

7   inaccurate, causing confusion, all that stuff;

8   right?

9       A.   Correct.

10      Q.   So I want to just run down certain terms

11  and what you think that term implies, whether, you

12  know, a loan that has absolute obligation to pay

13  or sales-based financing or revenue-based

14  financing?

15      A.   Okay.

16      Q.   A borrower?

17      A.   Loan.

18      Q.   Lender?

19      A.   Loan.

20      Q.   Collateral?

21      A.   That is neither -- that could be any

22  product.

23           MR. BRODSKY:  I'm going to object to the

24  form of those last few questions probably on an

25  ongoing basis.



Exhibit 22-415                    ER1013

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                              217

1    Q.    Collection?

2          MR. BRODSKY:  Objection to the form.

3    A.    That term is not specific.

4    Q.    Owe?

5    A.    Loan.

6    Q.    Due?

7    A.    That term is not specific.

8    Q.    Payment?

9    A.    Generally a loan.

10         MR. BRODSKY:  I'm going to object to the

11   form.

12   Q.    Secure interest?

13   A.    That term is not specific.

14   Q.    APR?

15   A.    Loan.

16   Q.    Interest rate?

17   A.    Loan.

18   Q.    Finance charge?

19   A.    Loan.

20   Q.    Fees?

21   A.    That term is not specific.

22   Q.    Remittance?

23   A.    That term is not specific to any product.

24   Q.    Discount?

25   A.    That term is not specific to any



Exhibit 22-416                                          ER1014

JESSE CARLSON Vol. I Confidential                         August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                                    225

1    pick and choose.

2        Q.   But you just said that Kapitus does you

3    not report to consumer credit bureaus; right?

4        A.   Correct.

5        Q.   Next page is 1.10 UCC.

6        A.   Yes.

7        Q.   So do you file a UCC statement against

8     all customers?

9        A.   Yes.

10       Q.   When do you file it?

11       A.   At the time we provide funding to a

12   customer.

13       Q.   Do you file a UCC statement against all

14   closed-end customers?

15       A.   Yes.

16       Q.   When do you do it?

17       A.   At the time they're -- we fund the

18   contract.

19           THE CERTIFIED STENOGRAPHER:  Can we take

20   a quick break?

21           (Recess.)

22   BY MS. YOO:

23       Q.   So we're talking about the UCC statement

24   and you testified that you filed UCC statement

25   against all Kapitus customers at the outset?



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 22-417                                              ER1015

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                              226

1      A.    Correct.

2      Q.    So I assume filing means you record the

3  statement where the customers reside, the state

4  where they reside?

5      A.    Yes.

6      Q.    I'll hand you Exhibit 7.

7           (Exhibit 7 marked.)

8  BY MS. WOO:

9      Q.    So I just handed you Exhibit 7.  This is

10  a UCC statement that I pulled from the State of

11  California official website.  Can you take a look

12  at it and tell me if this looks like a Kapitus UCC

13  financing statement?

14      A.    I haven't compared it, but yes, this

15  generally looks like the type of UCC statement we

16  would file.

17      Q.    So by looking at this, can you tell me

18  whether this customer had a sales-based financing

19  with you or a closed-end?

20      A.    The -- the collateral we're taking is the

21  same.  So I don't think that we would be able to

22  tell from the description of the security interest

23  or the collateral, what type of contract it is.

24           I do know that the Gindi's, Allan and

25  Carol, were -- I don't remember what contract they



Exhibit 22-418                                    ER1016

JESSE CARLSON Vol. I Confidential                          August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                                     240

1   evaluates the circumstances and information

2   presented JESSE CARLSON Vol. I Confidential          August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT to Kapitus, and determines what

3   steps to take as a result of the information

4   provided.

5        Q.   In other words, Kapitus determines that;

6   correct?

7             MR. BRODSKY:  Objection, to the form.

8   Like they're god and they -- I mean, they just

9   take a position.

10       Q.   Yeah, so Kapitus --

11       A.   Kapitus -- I mean, Kapitus is not

12  determining that it does not have the final word

13  in whether there's been a default.  We assess the

14  information provided and based on the information

15  provided, make an assessment.  As we saw earlier

16  in the lawsuit you filed with respect to Jewelry

17  Connect, it was evident that the customer had

18  falsely represented that they ran a jewelry store

19  when they were in an apartment above a strip mall

20  in south central Los Angeles.

21       Q.   Okay.  Can we go to subsection M.

22       A.   Yes.

23       Q.   So the last part, I am having a hard time

24  understanding it.  It says:  "Seller shall default

25  under any of the terms with purchaser, any of the



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 22-419                                    ER1017

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                         241

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT

1    terms, covenants, and conditions of any other

2    agreement of seller, including those between

3    purchaser and any business that is affiliated or

4    associated with seller."

5              So what does that -- the last part any

6    business that is affiliated or associated with

7    seller; what does that mean?

8        A.    It is a cross-default provision so that

9    if a customer owns two businesses and we have

10   purchase receipts from each of them and they stop

11   payment on our attempt to collect the receipts

12   under a fixed ACH contract on one of them, but are

13   continuing to deliver receipts under the other,

14   that both contracts are in default.

15       Q.    Why?

16       A.    Because that is a common condition to the

17   extension of credit or the purchase of receipts

18   throughout the world.  Most lenders have

19    cross-default provisions so that if you have a

20    credit card and a line of credit, and you stop

21   making payments on the credit card you

22    automatically are under default under the line of

23   credit, even if you're still making payments.

24       Q.    Okay.  Well, Kapitus claims that it's not

25   a lender?



Exhibit 22-420                                    ER1018

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                              242

1          MR. BRODSKY:  Objection to the form.

2     JESSE CARLSON Vol. I Confidential          August 31, 2023
     SMALL BUSINESS FINANCE V. HEWLETT an example outside the

3  context.  And Kapitus is a lender and to the

4  extent that it offers loan products as a licensed

5  lender by the DFPI in the State of California.

6     Q.   Yeah, but we're talking about sales-based

7  financing, so...

8     A.   We're talking about what this provision

9  means, and this is a common contractual provision

10  in any context.  So that you're -- a contractual

11  counter-party is not allowed to pick and choose

12  the obligations it has with the party that it's

13  going to comply with.

14          So in context of sales-based financing,

15  in the context of leasing, in the context of

16  loans, in the context of the delivery of widgets.

17  If you default on one contract you're going to be

18  in default on the rest of them.

19     Q.   Page 8 usual proceeds certification?

20     A.   Yes.

21     Q.   So under the certification, customer

22  basically promised to not to use the advance that

23  it obtained from Kapitus for consumer purposes;

24  right?

25     A.   In sum and substance, yes.

800.211.DEPO (3376)
EsquireSolutions.com



Exhibit 22-421                                    ER1019

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT                              255

JESSE CARLSON Vol. I Confidential                    August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT

```
1              REPORTER/TRANSCRIBER'S CERTIFICATE

2    STATE OF CALIFORNIA   )
                           ) SS.
3    COUNTY OF LOS ANGELES )

4

5         I, NATALIE PARVIZI-AZAD, HERBY CERTIFY:

6         I AM A DULY QUALIFIED CERTIFIED SHORTHAND

7    REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF

8    CERTIFICATE NUMBER CSR 14125 ISSUED BY THE COURT

9    REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL

10   FORCE AND EFFECT.  (BUS. & PROF. § 8016)

11        I AM NOT FINANCIALLY INTERESTED IN THIS

12   ACTION AND NOT A RELATIVE OR EMPLOYEE OF ANY

13   ATTORNEY OF THE PARTIES, OR OF ANY OF THE PARTIES.

14   (CIV. PROC. § 2025.320(A))

15        I AM AUTHORIZED TO ADMINISTER OATHS OR

16   AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL

17   PROCEDURE, SECTION 2093 (B) AND PRIOR TO BEING

18   EXAMINED, THE DEPONENT WAS FIRST PLACED UNDER OATH

19   OR AFFIRMATION BY ME.  (CIV. PROC. §§ 2025.320,

20   2025.540(A))

21        I AM THE CERTIFIED OFFICER THAT

22   STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

23   FOREGOING PROCEEDING AND THE FOREGOING TRANSCRIPT

24   IS A TRUE RECORD OF THE TESTIMONY GIVEN.  (CIV.

25   PROC. §  2025.540(A))
```

800.211.DEPO (3376)
EsquireSolutions.com



JESSE CARLSON Vol. I Confidential August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT 256

JESSE CARLSON Vol. I Confidential August 31, 2023
SMALL BUSINESS FINANCE V. HEWLETT

1    PARTIES AND SHALL NOT, OFFER OR PROVIDE

2    ANY SERVICES OR PRODUCTS TO ANY PARTY'S ATTORNEY

3    OR THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

4    ACTION WITHOUT FIRST OFFERING SAME TO ALL PARTIES

5    OR THEIR ATTORNEYS ATTENDING THE PROCEEDING AND

6    MAKING SAME AVAILABLE AT THE SAME TIME TO ALL

7    PARTIES OR THEIR ATTORNEYS.  (CIV. PROC §

8    2025.320(B))

9         I SHALL NOT PROVIDE ANY SERVICE OR PRODUCT

10   CONSISTING OF THE CERTIFIED STENOGRAPHER'S

11   NOTATIONS OR COMMENTS REGARDING THE DEMEANOR OF

12   ANY WITNESS, ATTORNEY, OR PARTY PRESENT AT THE

13   PROCEEDING TO ANY PARTY OR ANY PARTY'S ATTORNEY OR

14   THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

15   ACTION, NOR SHALL I COLLECT ANY PERSONAL

16   IDENTIFYING INFORMATION ABOUT THE WITNESS AS A

17   SERVICE OR PRODUCT TO BE PROVIDED TO ANY PARTY OR

18   THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

19   ACTION.  (CIV. PROC. § 2025.320(C))

20

21   DATED: _____

22

23

24   _____
     NATALIE PARVIZI-AZAD, CSR NO.14125

25

800.211.DEPO (3376)
EsquireSolutions.com



800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit 22-423**                    **ER1021**

JESSE CARLSON 30B6 CON. Vol I                    September 01, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                    1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA

 3                 WESTERN DIVISION

 4    _____
                                     )
 5    SMALL BUSINESS FINANCE          )CASE NO.:
      ASSOCIATION,                    )
 6                                    )22-cv-08775-RGK-
                     Plaintiff,       )SK
 7                                    )
              v.                      )
 8                                    )
      CLOTHILDE HEWLETT, solely in her )
 9    official capacity as           )
      Commissioner of the California  )
10    Department of Financial         )
      Protection and Innovation,      )
11                                    )
                     Defendant.       )
12    _____)

13

14

15       ** THIS TRANSCRIPT IS MARKED CONFIDENTIAL **

16

17       DEPOSITION OF JESSE CARLSON, 30(B)(6)

18                    VOLUME I

19            LOS ANGELES, CALIFORNIA

20          FRIDAY, SEPTEMBER 1, 2023

21

22

23

24    REPORTED BY:   NATALIE PARVIZI-AZAD, CSR, RPR, RSR
                      CSR NO. 14125
25    JOB NO.:        J10100906-B
```



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 23-424                    ER1022

JESSE CARLSON 30B6 CON. Vol I                    September 01, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                    2

1            IN THE UNITED STATES DISTRICT COURT

2 JESSE CARLSON 30B6 CON. Vol I        September 01, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT   DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION

4    _____
                                     )
5  SMALL BUSINESS FINANCE           )CASE NO.:
   ASSOCIATION,                      )
6                                    )22-cv-08775-RGK-
                   Plaintiff,        )SK
7                                    )
           v.                        )
8                                    )
   CLOTHILDE HEWLETT, solely in her )
9  official capacity as             )
   Commissioner of the California    )
10 Department of Financial           )
   Protection and Innovation,        )
11                                   )
                   Defendant.        )
12 _____)

13

14

15    DEPOSITION OF JESSE CARLSON, 30(B)(6), VOLUME I

16    TAKEN ON BEHALF OF THE DEFENDANT

17    REMOTELY VIA ZOOM VIDEOCONFERENCING, IN

18    LOS ANGELES, CALIFORNIA, BEGINNING AT

19    11:07 A.M. AND ENDING AT 5:32 P.M., ON

20    FRIDAY, SEPTEMBER 1, 2023, BEFORE

21    NATALIE PARVIZI-AZAD, CERTIFIED SHORTHAND

22    REPORTER NUMBER 14125.

23

24                          *800.211.DEPO (3376)*
                            *EsquireSolutions.com*
25



(215 of 295), Page 215 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 215 of 295

```
 1              A P P E A R A N C E S

 2       JESSE CARLSON 30B6 CON. Vol I              September 01, 2023
         SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

 3    FOR THE PLAINTIFF, SMALL BUSINESS FINANCE
      ASSOCIATION:
 4

 5       BRODSKY FOTIU-WOJTOWICZ, PLLC
         BY:   BENJAMIN H. BRODSKY, ESQ.
         BY:   PHILIP T. MERENDA, ESQ. (REMOTELY)
 6       200 SE 1ST STREET
         SUITE 400
 7       MIAMI, FLORIDA  33131
         (305) 503-5054
 8       BBRODSKY@BFWLEGAL.COM
         PHIL@BFWLEGAL.COM
 9

10    FOR THE DEFENDANTS, CLOTHILDE HEWLETT, SOLELY IN
      HER OFFICIAL CAPACITY AS COMMISSIONER OF THE
11    CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND
      INNOVATION:
12

13       ATTORNEY GENERAL
         BY:   DOUGLAS J. BETETA, ESQ. (REMOTELY)
         BY:   RACHEL J. YOO, ESQ.
14       300 SOUTH SPRING STREET
         SUITE 1702
15       LOS ANGELES, CALIFORNIA  90013
         (213) 269-6622
16       DOUGLAS.BETETA@DOJ.CA.GOV
         RACHEL.YOO@DOJ.CA.GOV
17

18

19    ALSO PRESENT:

20
         JULIE GORCHKOVA, IN-HOUSE COUNSEL FOR KAPITUS
21

22

23

24                              800.211.DEPO (3376)
                                EsquireSolutions.com
25
```



Exhibit 23-426                    ER1024

(216 of 295), Page 216 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 216 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-25   Filed 09/27/23   Page 4 of 19   Page ID
#:1230

JESSE CARLSON 30B6 CON Vol I                    September 01, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                    9

1    when we go back to the record --

2            THE CERTIFIED STENOGRAPHER:  We never

3    went off.  Are we off?

4            MR. BRODSKY:  That's fine.  If we never

5    went off, then we're fine.

6            MS. YOO:  So I'll just say he, Jesse, is

7    testifying as SBFA's 30(b)(6) witness for this

8    number of topics.

9            MR. BRODSKY:  Correct.

10           MS. YOO:  So Jesse is here --

11           MR. BRODSKY:  Subject to the objections,

12   but --

13           MS. YOO:  Yes, of course, yeah.

14   BY MS. YOO:

15       Q.   So Jesse is here to testify on behalf of

16   SBFA for topic numbers 1, 2, 4, 6, 9, 10, 11, 12,

17   26, 27, 29, and 30.

18       A.   Yes, that is correct.

19       Q.   Okay.  Okay.  So SBFA has members; right?

20       A.   Correct.

21       Q.   Does Kapitus have special -- you know,

22   like a title within SBFA?

23       A.   Kapitus has been on the board of SBFA

24   since its inception, and I have served as Kapitus'

25   representative to the SBFA since I joined Kapitus



Exhibit 23-427                    ER1025

(217 of 295), Page 217 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 217 of 295
Case 2:22-cv-08775-RGK-SK Document 52-25 Filed 09/27/23 Page 5 of 19 Page ID
#:1231

JESSE CARLSON 30B6 CON. Vol I                    September 01, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT              17

JESSE CARLSON 30B6 CON. Vol I                    September 01, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

1    talking about Enterprise nonbank commercial

2    finance.

3        Q.   Next exhibit is 3.

4        A.   3.

5             (Exhibit 3 marked.)

6    BY MS. YOO:

7        Q.   I just handed you Exhibit 3.  Can you

8    take a look at and tell me -- see if you have seen

9    this exhibit.

10            MR. BRODSKY:  I'm sorry.  I have 1 is the

11   notice.  What's 2?

12            THE WITNESS:  The objection.

13            MS. YOO:  The objection.

14            MR. BRODSKY:  Oh, the objection.

15       A.   This appears to be a printout of the

16   Small Business Finance Association website.

17       Q.   So have you seen this web page?

18       A.   Yes.

19       Q.   So on the first page, the second column

20   where it says, "We offer efficient lending

21   platforms" --

22       A.   Yes.

23       Q.   -- so I'm going to break down -- there

24   are three sentences.  I'm going to break down each

25   sentence and ask your opinion about it.



Exhibit 23-428                                ER1026

JESSE CARLSON 30B6 CON. Vol I                    September 01, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                    18

JESSE CARLSON 30B6 CON. Vol I                    September 01, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

1        The next sentence says, "Our

2   members have developed efficient lending platforms

3   and underwriting models that allow them to provide

4   financing to small businesses in a matter of hours

5   or even minutes."

6           Do you agree this statement?

7   A.    As a general statement, yes.

8   Q.    Is there anything add -- you want to add?

9   A.    I would note --

10       MR. BRODSKY:  Objection to form.

11  A.    I mean, I would note that most of the

12  members -- not every member of SBFA offers

13  closed-end credit products, so lending is being

14  used in a colloquial sense and is not necessarily

15  applicable to every member.  It's easier to say

16  they have an efficient lending platform as opposed

17  to saying an efficient lending and sales-based

18  financing platform since it's easier to refer to

19  the lending product which a majority of the

20  members offer.

21  Q.    Second sentence.  "The backbone of our

22  industry is efficiency."

23          Do you agree with that statement?

24  A.    Yes, nonbank providers of commercial

25  credit are more efficient at providing credit to



**Exhibit 23-429**                    ER1027

JESSE CARLSON 30B6 CON Vol I                          September 01, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                        227

1    CERTIFIED SHORTHAND REPORTER'S CERTIFICATE

2    STATE OF CALIFORNIA   )
                           ) SS.
3    COUNTY OF LOS ANGELES )

4

5         I, NATALIE PARVIZI-AZAD, HERBY CERTIFY:

6         I AM A DULY QUALIFIED CERTIFIED SHORTHAND

7    REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF

8    CERTIFICATE NUMBER CSR 14125 ISSUED BY THE COURT

9    REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL

10   FORCE AND EFFECT.   (BUS. & PROF. § 8016)

11        I AM NOT FINANCIALLY INTERESTED IN THIS

12   ACTION AND NOT A RELATIVE OR EMPLOYEE OF ANY

13   ATTORNEY OF THE PARTIES, OR OF ANY OF THE PARTIES.

14   (CIV. PROC. § 2025.320(A))

15        I AM AUTHORIZED TO ADMINISTER OATHS OR

16   AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL

17   PROCEDURE, SECTION 2093 (B) AND PRIOR TO BEING

18   EXAMINED, THE DEPONENT WAS FIRST PLACED UNDER OATH

19   OR AFFIRMATION BY ME.  (CIV. PROC. §§ 2025.320,

20   2025.540(A))

21        I AM THE CERTIFIED OFFICER THAT

22   STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

23   FOREGOING PROCEEDING AND THE FOREGOING TRANSCRIPT

24   IS A TRUE RECORD OF THE TESTIMONY GIVEN.  (CIV.

25   PROC. §  2025.540(A))



Exhibit 23-430                                    ER1028

JESSE CARLSON 30B6 CON Vol I                    September 01, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                   228

JESSE CARLSON 30B6 CON Vol I                    September 01, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

1    PROCEEDING. I SHALL NOT OFFER OR PROVIDE

2    ANY SERVICES OR PRODUCTS TO ANY PARTY'S ATTORNEY

3    OR THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

4    ACTION WITHOUT FIRST OFFERING SAME TO ALL PARTIES

5    OR THEIR ATTORNEYS ATTENDING THE PROCEEDING AND

6    MAKING SAME AVAILABLE AT THE SAME TIME TO ALL

7    PARTIES OR THEIR ATTORNEYS.  (CIV. PROC §

8    2025.320(B))

9         I SHALL NOT PROVIDE ANY SERVICE OR PRODUCT

10   CONSISTING OF THE CERTIFIED STENOGRAPHER'S

11   NOTATIONS OR COMMENTS REGARDING THE DEMEANOR OF

12   ANY WITNESS, ATTORNEY, OR PARTY PRESENT AT THE

13   PROCEEDING TO ANY PARTY OR ANY PARTY'S ATTORNEY OR

14   THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

15   ACTION, NOR SHALL I COLLECT ANY PERSONAL

16   IDENTIFYING INFORMATION ABOUT THE WITNESS AS A

17   SERVICE OR PRODUCT TO BE PROVIDED TO ANY PARTY OR

18   THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

19   ACTION.  (CIV. PROC. § 2025.320(C))

20

21   DATED:  _____9-5-2023_____

22

23

24   _____
             NATALIE PARVIZI-AZAD, CSR NO.14125
25



Exhibit 23-431                                   ER1029

1   ROB BONTA
    Attorney General of California
2   LISA W. CHAO
    CRAIG D. RUST
3   Supervising Deputy Attorneys General
    DOUGLAS J. BETETA (SBN: 260377)
4   RACHEL J. YOO (SBN: 293598)
    Deputy Attorneys General
5     300 South Spring Street, Suite 1702
      Los Angeles, CA 90013-1230
6     Telephone: (213) 269-6622
      Fax: (916) 731-2128
7     E-mail: Douglas.Beteta@doj.ca.gov
           Rachel.Yoo@doj.ca.gov
8   *Attorneys for Defendant*
    *Clothilde Hewlett, solely in her official capacity as*
9   *Commissioner of the California Department of*
    *Financial Protection and Innovation*
10

11                  IN THE UNITED STATES DISTRICT COURT

12                 FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                            WESTERN DIVISION

14

15  
    **SMALL BUSINESS FINANCE**            Case No.: 22-cv-08775-RGK-SK
16  **ASSOCIATION,**
                                          **DEFENDANT'S NOTICE OF**
17                         Plaintiff,     **DEPOSITION AND PRODUCTION**
                                          **OF DOCUMENTS AT**
18           v.                           **DEPOSITION PURSUANT TO**
                                          **FRCP 30(b)(6)**
19  
    **CLOTHILDE HEWLETT, solely in**
20  **her official capacity as Commissioner**
    **of the California Department of**
21  **Financial Protection and Innovation,**

22  
                           Defendant.              **Exhibit 1**
23                                                 Deponent: Jesse Carlson
                                                   Date: September 1, 2023
24                                                 CSR No: 14125

25

26           PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure

27  30(b)(6), Defendant Clothilde Hewlett, solely in her official capacity as

28  Commissioner of the California Department of Financial Protection and Innovation

                                        1

**Exhibit 23-432**                                    **ER1030**

1    (DFPI), will take the deposition upon oral examination of Plaintiff Small Business

2    Finance Association.  The deposition will take place at the following times and

3    places:

| Date and Time | Location |
| --- | --- |
| 8/16/23 at 10 a.m. (Justin Bakes) | Via a remote video conference platform at a link to be provided by DFPI's counsel. |
| 8/18/23 at 9 a.m. (Jeremy Brown) | Via a remote video conference platform at a link to be provided by DFPI's counsel. |
| 8/18/23 at 1 p.m. (Will Tumulty) | Via a remote video conference platform at a link to be provided by DFPI's counsel. |
| 8/31/23 at 10 a.m. (Jesse Carlson) | 11150 Santa Monica Blvd, Ste 1670, Los Angeles, CA 90025-3392 |
| 9/1/23 at 10 a.m. (Arun Narayan) | 11150 Santa Monica Blvd, Ste 1670, Los Angeles, CA 90025-3392 |

The deposition will be recorded by stenographic means and may be videotaped.
Plaintiff is requested to designate the person or persons most knowledgeable and
prepared to testify on behalf of Plaintiff Small Business Finance Association
concerning the subject matter described on **Attachment A**.

        PLEASE TAKE FURTHER NOTICE that Plaintiff and its deponent(s) are
requested to produce at or before the scheduled deposition the documents identified
in **Attachment B**.

Exhibit 23-433                                    ER1031

1  Dated: August 8, 2023

ROB BONTA
Attorney General of California
2  LISA W. CHAO
CRAIG D. RUST
3  Supervising Deputy Attorneys General
RACHEL J. YOO
4  Deputy Attorney General

5

6  _/s/ Rachel J. Yoo_____

Rachel J. Yoo
7  Deputy Attorney General

8  *Attorneys for Defendant Clothilde Hewlett, solely in her official*
9  *capacity as Commissioner of the California Department of Financial*
10  *Protection and Innovation*

11

12  ## DEFINITIONS

13  1.  The terms "YOU" and "YOUR" refer to the plaintiff Small Business

14  Finance Association, and any of its employees, officers, directors, agents, or

15  persons acting under its direction or control or on its behalf.

16  2.  The term "MEMBER(S)" means YOUR members as of December 2,

17  2022, the date the underlying action was filed.

18  3.  The term "PERSON(S)" means any individuals, partnership, firm,

19  association, corporation, public interest group or any other business, governmental

20  or legal entity.

21  4.  The term "CUSTOMER(S)" refers to PERSONS seeking commercial

22  financing of $500,000 or less in California.

23  5.  The term "PARTICULAR PAYMENT CHANNEL OR MECHANISM"

24  is defined as provided for in 10 Cal. Code Regs. § 900(a)(20).

25  6.  The term "REGULATIONS" refers to Cal. Code Regs., tit. 10, ch. 3,

26  subch. 3.

27

28

**Exhibit 23-434**

**ER1032**

7.     The term "SALES-BASED FINANCING" is defined as provided for in 10 Cal. Code Regs. § 900(a)(28) and includes merchant cash advance and revenue-based financing.

8.     The terms "COMMUNICATE(S)" and "COMMUNICATION(S)" mean every manner of written, recorded, or transcribed transmission or communication, including letters, reports, notes, telegrams, telex, facsimiles, voicemails, web postings, text messages, electronic mail, social media, and any other written memorandum of oral communications.

9.     The term "DOCUMENT(S)" means all documents, writings, electronically stored information, or things within the scope of Rule 34 of the Federal Rules of Civil Procedure, including notes, correspondence, messages, minutes, memoranda, reports, communications, letters, photographs, images, models, telegrams, microfilm, data, data compilations, calendars, appointment books, diaries, drafts (whether used or not), electronic media, facsimiles, text files, charts, maps, web postings, web pages, ledgers, sound or image recordings, computer discs, computer printouts, electronic mail, or any other form of "writing" as defined in Rule 1001 of the Federal Rules of Evidence. The term "DOCUMENT(S)" further include all copies where the copy is not identical to the original.

10.   "ANY" shall be understood to include and encompass "ALL." The word "ALL" also includes "EACH" and vice versa.

11.   The term "RELATING" as to ANY subject means evidencing, supporting, proving, disproving, negating, refuting, including, referring to, relating to, constituting, memorializing, embodying, containing, identifying, stating, in connection with, and/or relevant to, either directly or indirectly, that subject.

12.   The term "SEARCH PERIODS" refers to the following: November 2018, October 2019, April 2020, May 2021, August 2022, and March 2023.

4

Exhibit 23-435                                    ER1033

1                  **Attachment A**

2     1.     Each of YOUR MEMBERS' close-end credit product.

3     2.     Each of YOUR MEMBERS' open-end credit product.

4     3.     Each of YOUR MEMBERS' SALES-BASED FINANCING product.

5     4.     The ways in which each of YOUR MEMBERS' close-end credit

6 differs from traditional bank loans.

7     5.     The ways in which each of YOUR MEMBERS' SALES-BASED

8 FINANCING differs from each of YOUR MEMBERS' close-end credit.

9     6.     The ways in which each of YOUR MEMBERS' open-end credit

10 differs from each of YOUR MEMBERS' close-end credit.

11     7.     Each of YOUR MEMBERS' marketing or advertising to potential

12 CUSTOMERS.

13     8.     The number of agreements each of YOUR MEMBERS entered into

14 with their CUSTOMERS with respect to SALES-BASED FINANCING, open-end

15 credit, and close-end credit, respectively, after the effective date of the

16 REGULATIONS.

17     9.     Each of YOUR MEMBERS' general CUSTOMER base, including but

18 not limited to their number of employees, annual revenues, and industries.

19     10.     Disclosures provided by each of YOUR MEMBERS to their

20 CUSTOMERS pursuant to the REGULATIONS.

21     11.     Disclosures provided by each of YOUR MEMBERS to their

22 CUSTOMERS prior to the REGULATIONS.

23     12.     Steps taken by each of YOUR MEMBERS to comply with the

24 REGULATIONS and any burden the REGULATIONS have imposed on each of

25 YOUR MEMBERS.

26     13.     Each of YOUR MEMBERS' policy, practices, or manual

27 REGARDING the disclosures required by the REGULATIONS.

28     14.     Each of YOUR MEMBERS' policy, practices, or manual

5

**Exhibit 23-436**

(226 of 295), Page 226 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 226 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-25   Filed 09/27/23   Page 14 of 19   Page ID
#:1240

REGARDING an early payment of an advance or obligation under SALES-BASED FINANCING agreements.

15. Each of YOUR MEMBERS' policy, practices, or manual REGARDING true-ups.

16. Each of YOUR MEMBERS' policy, practices, or manual REGARDING CUSTOMERS who stopped remitting payments or whose income received through a PARTICULAR PAYMENT CHANNEL OR MECHANISM decreases.

17. Each of YOUR MEMBERS' policy, practices, or manual REGARDING CUSTOMERS who are suspected, determined, or believed to have violated the terms of the agreements, including but not limited to diverting revenue from a PARTICULAR PAYMENT CHANNEL OR MECHANISM.

18. Each of YOUR MEMBERS' employee training policy, practices, or manual REGARDING SALES-BASED FINANCING, open-end credit, and close-end credit.

19. The ways in which each of YOUR MEMBERS COMMUNICATE with its potential or current CUSTOMERS.

20. DOCUMENT retention policy of each of YOUR MEMBERS.

21. COMMUNICATIONS between each of YOUR MEMBERS and their potential or current CUSTOMERS REGARDING an obligation to pay YOUR MEMBERS.

22. COMMUNICATIONS between each of YOUR MEMBERS and their potential or current CUSTOMERS REGARDING the disclosures required by the REGULATIONS.

23. The number of CUSTOMERS who complained of or expressed confusion about the REGULATIONS or the disclosures required by the REGULATIONS to each of YOUR MEMBERS and the nature of their complaints or confusion.

6

Exhibit 23-437

ER1035

1      24.    The number of SALES-BASED FINANCING agreements each of

2  YOUR MEMBERS entered into with CUSTOMERS from 2018 to the effective

3  date of the REGULATIONS.

4      25.    The number of collection actions each of YOUR MEMBERS filed

5  against their CUSTOMERS with respect to SALES-BASED FINANCING

6  agreements from 2018 to the present, and the basis for such actions.

7      26.    YOUR or YOUR MEMBERS' assessment of the REGULATIONS,

8  including but not limited to their impact on each of YOUR MEMBERS' business

9  and the accuracy of the disclosures required by the REGULATIONS.

10      27.    Each of YOUR MEMBERS' underwriting methodologies for SALES-

11  BASED FINANCING, including but not limited to methodologies for calculating

12  future receipts, sales, renewals, and the amount of time customers will take to repay

13  their obligations.

14      28.    The renewal rate of CUSTOMERS who entered into SALES-BASED

15  FINANCING agreement with each of YOUR MEMBERS and the reason(s) for

16  renewals.

17      29.    Any testing, survey, or market research performed by YOU or on

18  YOUR behalf REGARDING customers' understanding of SALES-BASED

19  FINANCING or open-end credit and associated disclosures.

20      30.    The allegations of YOUR complaint in this action, including but not

21  limited to paragraphs 55 and 57 and of YOUR complaint: "Th[e] difference

22  [between the REGULATIONS and TILA] may result in different APRs for the

23  exact same product" and "small business owners often finance their businesses

24  through a combination of commercial finance products and consumer finance

25  products available to them individually."

26      31.    Comments YOU or each of YOUR MEMBERS submitted to the

27  legislature REGARDING SB-1235 or during the rulemaking process

28  REGARDING the REGULATIONS.

7

(228 of 295), Page 228 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 228 of 295
Case 2:22-cv-08775-RGK-SK Document 52-25 Filed 09/27/23 Page 16 of 19 Page ID
#:1242

1    32.    YOUR discovery responses and the DOCUMENTS YOU have

2    produced in this action.

3                            **Attachment B**

4    1.    Sample marketing or advertising materials each of YOUR MEMBERS

5    generated or used to solicit CUSTOMERS REGARDING SALES-BASED

6    FINANCING, open-end credit, or close-end credit.

7    2.    Representative sample SALES-BASED FINANCING agreements,

8    open-end credit agreements, and closed-end credit agreements each of YOUR

9    MEMBERS has used with their CUSTOMERS, including but not limited to any

10   attachments and addendums thereto, for each of the years 2018, 2019, 2020, 2021,

11   2020, and 2023.

12   3.    Sample disclosures each of YOUR MEMBERS provided to their

13   CUSTOMERS pursuant to the REGULATIONS.

14   4.    Sample disclosures each of YOUR MEMBERS provided to their

15   CUSTOMERS prior to the REGULATIONS.

16   5.    DOCUMENTS showing steps taken by each of YOUR MEMBERS to

17   comply with the REGULATIONS and any burden the REGULATIONS have

18   imposed on each of YOUR MEMBERS.

19   6.    Each of YOUR MEMBERS' policy or manual REGARDING the

20   disclosures required by the REGULATIONS.

21   7.    Each of YOUR MEMBERS' policy or manual REGARDING an early

22   payment of an advance or obligation under SALES-BASED FINANCING

23   agreements.

24   8.    Each of YOUR MEMBERS' policy or manual REGARDING true-

25   ups.

26   9.    Each of YOUR MEMBERS' policy or manual REGARDING

27   CUSTOMERS who stopped remitting payments or whose income received through

28   a PARTICULAR PAYMENT CHANNEL OR MECHANISM decreases.

8

**Exhibit 23-439**                                    **ER1037**

10. Each of YOUR MEMBERS' policy or manual REGARDING CUSTOMERS who are suspected, determined, or believed to have violated the terms of the agreements, including but not limited to diverting revenue from a PARTICULAR PAYMENT CHANNEL OR MECHANISM.

11. Each of YOUR MEMBERS' employee training policy or manual REGARDING SALES-BASED FINANCING, open-end credit, and close-end credit.

12. DOCUMENTS showing each of YOUR MEMBERS' DOCUMENT retention policy.

13. COMMUNICATIONS between each of YOUR MEMBERS and their potential or current CUSTOMERS REGARDING the disclosures required by the REGULATIONS during the SEARCH PERIODS.

14. DOCUMENTS showing contact information of each of YOUR MEMBERS' CUSTOMERS who complained of or expressed confusion about the REGULATIONS and DOCUMENTS showing the nature of their complaints.

15. DOCUMENTS showing contact information of each of YOUR MEMBERS' CUSTOMERS who received the disclosures required by the REGULATIONS.

16. DOCUMENTS showing YOUR or each of YOUR MEMBERS' assessment of the REGULATIONS, including but not limited to their impact on YOUR MEMBERS' business and the accuracy of the disclosures required by the REGULATIONS.

17. DOCUMENTS showing each of YOUR MEMBERS' underwriting methodologies for SALES-BASED FINANCING, including but not limited to methodologies for calculating future receipts, sales, renewals, and the amount of time customers will take to repay their obligations.

18. DOCUMENTS REGARDING ANY testing, survey, or market research performed by YOU or on YOUR behalf REGARDING customers'

9

**Exhibit 23-440**

**ER1038**

(230 of 295), Page 230 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 230 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-25   Filed 09/27/23   Page 18 of 19   Page ID
#:1244

1  understanding of SALES-BASED FINANCING or open-end credit and associated
2  disclosures.
3       19.     DOCUMENTS that support YOUR allegations in paragraphs 55 and
4  57 and of YOUR complaint: "Th[e] difference [between the REGULATIONS and
5  TILA] may result in different APRs for the exact same product" and "small
6  business owners often finance their businesses through a combination of
7  commercial finance products and consumer finance products available to them
8  individually."
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 23-441

ER1039

(231 of 295) Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 231 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-25   Filed 09/27/23   Page 19 of 19   Page ID
#:1245

## DECLARATION OF SERVICE BY E-MAIL

Case Name:  **Small Business Finance Association v. Clothilde Hewlett**
Case No.:   **22-cv-08775-RGK-SK**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the
California State Bar, at which member's direction this service is made.  I am 18 years of age or
older and not a party to this matter; my business address is: 300 South Spring Street, Suite 1702,
Los Angeles, CA  90013-1230.

On <u>August 8, 2023</u>, I served the attached **DEFENDANT'S NOTICE OF DEPOSITION AND
PRODUCTION OF DOCUMENTS AT DEPOSITION PURSUANT TO FRCP 30(b)(6)** by
transmitting a true copy via electronic mail addressed as follows:

**Benjamin H. Brodsky (Pro Hac Vice)**
**Philip T. Merenda (Pro Hac Vice)**
Brodsky Fotiu-Wojtowicz, PLLC
200 SE 1ST St., Suite 400
Miami, FL 33131

**Emails :** bbrodsky@bfwlegal.com
    phil@bfwlegal.com

**Paul Levin, Esq.**
**Lauren M. Gibbs, Esq.**
Mark Migdal And Hayden
80 SW 8th Street, Suite 1999
Miami, Florida 33130

**Emails :** paul@markmigdal.com
    lauren@markmigdal.com

*Attorneys for Plaintiff*

I declare under penalty of perjury under the laws of the State of California and the United States
of America the foregoing is true and correct and that this declaration was executed on August 8,
2023, at Los Angeles, California.

| Norma L. Herrera-Gilbody | *Norma L. Herrera Gilbody* |
|---|---|
| Declarant | Signature |

SA2022803044
POS.docx

**Exhibit 23-442**                **ER1040**

WILL TUMULTY                                          August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

```
 1  SMALL BUSINESS FINANCE            UNITED STATES DISTRICT
    ASSOCIATION                       COURT
 2                                    CENTRAL DISTRICT OF
                                      CALIFORNIA
 3                                    WESTERN DIVISION
            Plaintiff
 4  vs.

 5  CLOTHILDE HEWLETT, solely in
    her official capacity as
 6  Commissioner of the California
    Department of Financial
 7  Protection and Innovation

 8          Defendant              CASE NO.
                                   22-cv-08775-RGK-PLA
 9
    _____/
10

11

12

13          The deposition of WILL TUMULTY was held on

14  Friday, August 25, 2023 commencing at 10:19 a.m. Via

15  Zoom before Eric Leichter, Notary Public.

16

17

18

19

20

21  REPORTED BY:  Eric Leichter
```

800.211.DEPO (3376)
EsquireSolutions.com



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 24-443                                    ER1041

```
 1   APPEARANCES:            WILL TUMULTY                          August 25, 2023
                             SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

 2

 3        ON BEHALF OF THE PLAINTIFF:

 4        BENJAMIN H. BRODSKY, ESQUIRE

 5            Brodsky Fotiu-Wojtowicz, PLLC

 6            200 SE 1st Street, Suite 400

 7            Miami, Florida 33131

 8            305-503-5054

 9            bbrodsky@bfwlegal.com

10

11        ON BEHALF OF THE DEFENDANT:

12        RACHEL J. YOO, ESQUIRE

13            Deputy Attorneys General

14            300 South Spring Street, Suite 1702

15            Los Angeles, CA 90013-1230

16            Rachel.yoo@doj.ca.gov

17

18   ALSO PRESENT:  NATALIE PAPPAS
                     DOUG BETETA
19                   PHIL MERENDA

20

21
```



**Exhibit 24-444**                                             ER1042

WILL TUMULTY                                                 August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                        135

1    less than our total business.

2         Q      So the cost of complying with the

3    California regulations is not worth the return.  Is that

4    what you're saying?

5         A      No, I'm not saying it's not worth the

6    return.  If it totally wasn't worth the return, we just

7    wouldn't do business in California.  It's just a lot for

8    a -- and the complication of this is a lot for -- for

9    the volume, particularly of sales-based finance

10   transactions, that we do in California.

11        Q      So you think this APR disclosure is

12   burdensome to Rapid.  Right?

13        A      Yes.

14        Q      And I am not sure I understood perfectly

15   regarding why it is burdensome, other than, you know,

16   these are things that you're required to do.  With your

17   MCA, you don't have a lot of volume, but you kind of

18   have to do so.  Can you give me a, I don't know, clearer

19   reason or another reason for me to understand why is

20   this burdensome to you?

21        A      You know, maybe you can help me out with a



Exhibit 24-445                                              ER1043

**WILL TUMULTY**                                                                 August 25, 2023
**SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT**                          138

1   comparing of products?  Is this estimated APR still has

2   no value?

3        A      I think it's actually worse than no value.

4   I think it's misleading based on the structure of the

5   product.

6        Q      And then next one is the finance charge.

7   How did you calculate that $14,350.01?

8        A      That is the difference between the purchase

9   price and the amount sold.

10       Q      But that's like basically a discount?

11       A      Yeah.  Yeah.  That's the purchase discount.

12   Sure.

13       Q      So if you look at the -- the disclosure

14   form, it says $14,350.01.  Right?  Do you see it?

15       A      I do.

16       Q      But if you look at your contract, it just

17   say 14,350.  There is no 1 cent.  Do you know where that

18   difference came from?

19       A      I don't.  I would have to check.  But my

20   guess is it is something that happens in rounding in

21   terms of the way the finance charge is calculated based



**Exhibit 24-446**                                                    **ER1044**

(236 of 295), Page 236 of 295    Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 236 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-26   Filed 09/27/23   Page 5 of 19   Page ID
#:1250

WILL TUMULTY                                           August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                        143

1        Q       So this is basically the amount sold under

2    the contract.

WILL TUMULTY                                August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

3        A       That's right.

4        Q       So it -- we have the same problem, that 1

5    cent.  Is that -- the explanation for that is the same?

6    You tested --

7        A       Right.

8        Q       -- some schedule rounding problem?

9        A       Basically, that's carrying through from the

10   finance charge, yes.

11       Q        Anything not factual about this particular

12   disclosure?

13       A       Well, I think the main thing that's not

14   factual is if we -- if we sort of ignore the 1 cent for

15   a moment, that is not an estimated total payment amount.

16   That's not an estimate.  That is the amount sold.

17   Right?  That is the actual expectation that we have of

18   the assets that are going to be delivered to us for the

19   purchase price.

20       Q        So if you just word -- your phrase that's

21   your actual expectation.  Right?  You expect to receive



800.211.DEPO (3376)
EsquireSolutions.com

800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit 24-447**

**ER1045**

WILL TUMULTY                                           August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                        144

1   $48,350 from this particular customer.

2        A     That's right.

WILL TUMULTY                                    August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

3        Q     Right?  Is there a guarantee that you'd

4   receive that amount?

5        A     There is not a guarantee.  So the example

6   that I gave earlier about the business that goes under

7   because of a hurricane but they did not breach the

8   agreement, right, they would no longer be producing any

9   revenue through their credit card machine, and so,

10  right, they would fulfill their contract, and we would

11  not get 49,000.  That's why this is an expectation and

12  it is not an absolute obligation.

13       Q     So if it's an expectation, what's wrong

14  with saying it's an estimate?

15             MR. BRODSKY:  Objection to form.

16       A     So an estimate connotes that, hey, this is

17  going to be 49 -- you know, about $49,350, meaning maybe

18  it will be $48,700, maybe it'll be $50,020.  It's an

19  estimate.  It's going to be around $49,350.  When in

20  reality, it is going to be exactly $49,350 unless

21  something happens where the business is unable to



Exhibit 24-448                                    ER1046

(238 of 295), Page 238 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 238 of 295
Case 2:22-cv-08775-RGK-SK  Document 52-26  Filed 09/27/23  Page 7 of 19  Page ID
#:1252

WILL TUMULTY                                          August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                    145

1    generate, you know, the $49,350 at a 28 percent split.

2    Right?  So it's going to be an exact figure unless the

3    -- basically they stop generating revenue through their

4    credit card machine.

5         Q      So there is this unless condition that you

6    just mentioned, right, which nobody can, you know, know

7    for sure.  So because there's an unless condition where

8    they cannot fully remit the entire amount sold, so first

9    of all, you agree that there is a -- this condition

10   where a business may not be able to remit -- fully remit

11   the amount sold.  Correct?

12        A      That's right.

13        Q      Nonetheless, the word estimate is

14   misleading.  That is your position.

15        A      Yeah.  I think this is an expectation more

16   than an estimate.

17        Q      What's the difference between expectation

18   and estimate?

19        A      So unless circumstances occur that nobody

20   is anticipating, right, at the outset of the contract

21   or that no one is expecting, right, nobody is expecting



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 24-449                                      ER1047

WILL TUMULTY                                              August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                         146

1    for the business to get hit by a hurricane, right, when

2    we close this contract, and so that, you know, $49,350,

3    it's not like there's a -- it's going to be slightly

WILL TUMULTY                    August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

4    different than that.  It's either going to be exactly

5    that number or it's going to be something materially

6    different than that in practice because something

7    happened to the business.

8              And maybe we're just quibbling over

9    expectation versus estimate.  When I look at the word

10   estimate, it's like, ah, well, this is close.  And it's

11   like, well, no, it's not so much that it's going to be

12   close.  It's going to be exactly that number unless

13   something that, you know, is not anticipated occurs.

14             MR. BRODSKY:  Rachel, can I ask you?  Can

15   we take a quick bathroom break?

16             MS. YOO:  Sure.  So it's, what, 1:50 there?

17             MR. BRODSKY:  Yeah.  You want me to come

18   back in five minutes?  I don't need a long time.

19             MS. YOO:  Sure.  Yeah.

20             THE WITNESS:  Okay.  Thanks.  800.211.DEPO (3376)
                                           EsquireSolutions.com

21             MS. YOO:  Mm-hmm.

(240 of 295), Page 240 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 240 of 295
Case 2:22-cv-08775-RGK-SK Document 52-26 Filed 09/27/23 Page 9 of 19 Page ID
#:1254

WILL TUMULTY                                            August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                      149

1        Q        This number, 43,000, that's an actual

2    expectation.  So to that end, if the State of California

3    were to change its disclosure and say expected total

4    payment amount instead of estimated total payment

5    amount, would that be not misleading?

6                 MR. BRODSKY:  Objection to the form.

7        A        That would -- I think that would be better.

8    I -- I --

9        Q        Better than -- mm-hmm.

10       A        That -- that would be better for -- and

11   that would be fine for the question about the estimated.

12   Right?  The other piece here is it says payment which

13    again implies that it's a loan when really these are

14   remittances of assets that we have purchased.  Right?

15   So, you know, I think this could be better if it said

16   expected total remittance amount.

17       Q        And so better in the sense that it's better

18   than current form, but do you think you'd -- it would

19   not rise to the level of, like, legal challenge.

20   Because you're suing us, right, so I want to know if we

21   change that, you're not going to sue us.



**Exhibit 24-451**                                        **ER1049**

WILL TUMULTY                                                    August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                          158

WILL TUMULTY                                                    August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

1

2    Q      So regarding this estimated monthly cost

3    disclosure, is there anything not factual?

4    A      Well, I would agree that this is an

5    estimate.  I think calling this a cost is misleading

6    because these are -- it is -- these are remittances.

7    Right?  These are remittances of assets that we bought.

8    Right?  So estimated monthly remittance, I think, would

9    be better.  The commentary on -- in the third column,

10   right, again it refers to payments.  We would say those

11   are remittances.

12   Q      Anything else?

13   A      I think that's it.

14   Q      Is it burdensome for Rapid to make this

15   disclosure?

16   A      It -- so what I'll say is not incrementally

17   after all the other work we've done for everything else.

18   Right?  We built this machine that projects everything

19   out day by day, so we create an expectation and all

20   that, you know.  Doing a couple of arithmetic

21   calculations to get this figure is not terribly

800.211.DEPO (3376)
EsquireSolutions.com



800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit 24-452**                                    **ER1050**

WILL TUMULTY                                          August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

1    because those -- what I've done

2        Q      So currently, do you have a -- like a

3    software?

4        A      Yes.  We have software.  We built the

5    software to do this.

6        Q      So you can just, like, put in numbers, and

7    you'll automatically calculate all these numbers for

8    you.  Correct?

9        A      Yes.  Now that it's built, right, we get

10   all those numbers, and it runs through, and it produces

11   these figures.

12       Q      Next one, estimated payment, how did you

13   calculate this number?

14       A      Right.  Again, that starts from the same

15   place.

16       Q      The schedule?

17       A      It starts from the schedule.

18       Q      Okay.

19       A      And it just says, okay, well -- well, what

20   am I -- you know, on average, what would I expect that

21   payment to be every day?  Right?  But again, this



**Exhibit 24-453**                                    **ER1051**

WILL TUMULTY                                              August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                          286

1    1108, is it authentic, you know, true and correct copy?

2    Okay.

3         A     Yes.

4         Q     So 1109 (7), authentic, true and correct

5    copy?

6         A     Yes.

7         Q     What does this show?

8         A     Let me take a look at -- well, yeah.  So --

9    can we scroll down a little bit?  I just want to see how

10   many records we're talking about here.  Okay. 103.  All

11   right.  So this is for sales-based finance products --

12        Q     Mm-hmm.

13        A     -- that were originated in the date ranges

14   shown.

15        Q     Mm-hmm.

16        A     Right.  So you can see column C is the year

17   originated.  Column D is the date that it was

18    originated.  Right?  You can see column E is the date of

19   the first payment, the -- yeah, the first remittance.

20   Then there was a last remittance date.  The estimated

21   term based on, right, what the estimation would require.



Exhibit 24-454                                            ER1052

WILL TUMULTY                                              August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                          288

WILL TUMULTY                                              August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

1        MR. BRODSKY:  Yeah.  It's the number of

2   business days in the estimated term.  And the business

3   days paid in full is the number of days until Rapid

4   collected the full amount it was entitled to under the

5   contract.

6              THE WITNESS:  Right.  That makes sense.

7   Thanks, Ben.

8        Q     Hold on.  Again, so K, what does K mean?

9        A     K is the actual business days, and L is the

10  estimated business days.

11       Q     So the second row.  Right?  So you -- it

12  took 4,538 business days for Rapid to receive the amount

13  sold.  That's what this means?

14       A     Yeah.  It -- it means this one has not --

15  this one hasn't -- we have not actually gotten the

16  amount sold.  Right?  So see column J?

17       Q     Uh-huh.

18       A     It's a 0.

19       Q     So they're still making a remittance.

20  Right?

21       A     They're still making some remittance out



**Exhibit 24-455**                                          **ER1053**

WILL TUMULTY                                                    August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                              289

1    thsmue WILL TUMULTY                                    August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

2         Q      So this 4,538 means it has been that many

3    days since you made a advance.  Is that what that means?

4         A      That's what I would think.  I would want to

5    check that because that's an awful long number of days.

6         Q      Okay.

7         A      I would -- I -- we can check that data

8    point.

9         Q      Let's use number three.  Right?

10        A      Okay.

11        Q      So that -- this merchant paid in full, yes.

12   Right?  No. Under J is number 1.  Right?

13        A      Yes.

14        Q      So this merchant paid in full.  Under K,

15   there's two -- so that means it took 243 business days

16   for this merchant to pay you in full.

17        A      Yes.

18        Q      Is that -- okay.  And then 264 days was

19   Rapid's internal estimate of how long it would take?

20        A      Yes.

21        Q      So what did not available means then?

*800.211.DEPO (3376)*
*EsquireSolutions.com*



*800.211.DEPO (3376)*
*EsquireSolutions.com*

**Exhibit 24-456**                                          **ER1054**

(246 of 295) Page 246 of 295 Case: 24-50 05/24/2024, DktEntry: 14.6, Page 246 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-26   Filed 09/27/23   Page 15 of 19   Page ID
#:1260

WILL TUMULTY                                                    August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                              310

1        Q      So that's a very general proposition.  And

2   everybody, of course, like to pay less.  Right?  But for

3   the purpose of this litigation, I need a concrete

4   evidence.  <u>Do you -- is there any customer that you can</u>

5   <u>tell me, you know, because of these California</u>

6   <u>regulations, they decided not to choose Rapid</u>.  Is there

7   any such data or e-mail or something that you can share

8   it with me?

9        A      Yeah.  <u>I -- I don't have anything like that</u>

10  right now.  I'm sure we could get it.

11       Q      Yeah.  I think you should get it and give

12  it to Ben because discovery's closing very soon.  Okay.

13  So you think you are losing customers because of the

14  California regulations.  Right?  That's one harm.

15       A      That's correct.

16       Q      What's the other harm?

17       A      The other harm would be the number of

18  customers who don't continue a relationship with us

19  because they were confused early on in the -- about what

20  this was and it works differently than they thought, and

21  so they're like, hey, you told me one thing, and this



Exhibit 24-457                                                     ER1055

WILL TUMULTY                                          August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                      311

WILL TUMULTY                                          August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

1   was a misrepresentation, and they're looking at the

2   California regulation, and they say I feel like they've

3   pulled a bait-and-switch on me.  Right?  And so they

4   don't continue.  Right?

5        Q     That's similar to, like, losing customers?

6        A     Well, so the first one is not getting a

7   customer.  The second one would be actually losing a

8   customer.  And in some cases, it's possible that we not

9   only lose that customer, they stop paying us altogether.

10  Right?  And so it's not like we have lost the customer.

11  We lost all the money that we have extended to them.

12       Q     Again, to me, I'm very sorry to be lawyer

13  here, but I need a -- like a number.  Right?  If you

14  tell me, hey, we lost X number of customers because of

15  this and they paid us in, like, full and then went

16  somewhere else, that caused us harm, that's more

17  concrete that I can understand.  But just general --

18  other than just general proposition, like, do you have

19  anything like concrete number or data that you can give

20  it to me?

21       A     Yeah.  I -- I don't.  I don't have concrete



Exhibit 24-458                                              ER1056

WILL TUMULTY                                              August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT

1    number something that I made available to you.  What I would

2    say is, right, you have to have customer relationships

3    for a while.  This regulation has been into effect less

4    than a year.  Right?  And so, right, that's the kind of

5    stuff that we would build over time.  So, you know, to

6    really get statistically significant samples on all

7    those kinds of things, it would take time.  And it

8    sounds like we should start doing that.

9        Q    And you should've waited before you sued

10   because you are the one that sued me.  Okay.  And so any

11   other --

12              MR. BRODSKY:  We didn't --

13              MS. YOO:  Huh?  What?

14              MR. BRODSKY:  We didn't sue you.

15       Q    You sued -- SBFA sued us.  We didn't sue

16   you.  So that -- that -- any other harm?

17       A    You know, you -- Yeah.  I don't have a

18   specific dataset that I can give to you for that.

19       Q    So any other harm that you want to discuss

20   with me?  Not getting customers or losing customers.

21   Anything else?



**Exhibit 24-459**                                          **ER1057**

Case 2:22-cv-08775-RGK-SK Document 52-26 Filed 09/27/23 Page 18 of 19 Page ID #:1263

WILL TUMULTY                                              August 25, 2023
SMALL BUSINESS FINANCE vs CLOTHILDE HEWLETT                        322

1        Q     So when you say this, it's only referring

2    to Rapid MCA?  It does not extend to other MCA products?

3        A     So --

4              MR. BRODSKY:  I'm going to object to the

5    form of that question.

6        A     So in the sales-based financing

7    transactions or MCA products, there are some differences

8    in the way that they are implemented.  They're

9    fundamentally the same product.  But for instance, Rapid

10   does not have a true-up mechanism because we get repaid

11   directly on the split from the processing company, so

12   there is nothing to true-up.  Right?  We are actually

13   getting paid the percentage of the credit card

14   receivables that are generated each time that the

15   merchant batches out.  Right?  So that is historically

16   how MCA products have been structured, with that direct

17   split and that sort of thing.  There are some I'm aware

18   of that have products that base it on business revenue

19   and, rather than getting paid from a split from the

20   merchant processor, they are debiting from the business

21   bank account.  And if they are over-debiting or



1   City of Baltimore, to wit:

2       I, Eric Leichter, a Notary Public of the State of

3   Maryland, Baltimore City, do hereby certify that the

4   within-named witness personally appeared before me at

5   the time and place herein set out, and after having been

6   duly sworn by me, according to law, was examined by

7   counsel.

8       I further certify that the examination was recorded

9   stenographically by me and this transcript is a true

10  record of the proceedings.

11      I further certify that I am not of counsel to any

12  of the parties, nor in any way interested in the outcome

13  of this action.

14      As witness my hand this 9th day of August, 2023.

15

16                          Eric Leichter

17                          Notary Public

18  My Commission Expires:

19  January  13, 2024

20

21



Exhibit 24-461                                                                    ER1059

DocuSign Envelope ID: CF982192-4B2D-44BE-84B5-77EC39E2831C

# OFFER SUMMARY FOR LOAN

| | | |
|---|---|---|
| Funding Provided | $146,250.00 | This is how much funding Kapitus LLC will provide. Due to deductions or payments to others, the total funds that will be provided to you directly is $64,568.20. For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed." The amount you receive directly may change if, per the attached "Itemization of Amount Financed," the amount financed will be used to pay down or pay off other financial obligations (to us or to a third party), and those amounts are not known or may change. |
| Annual Percentage Rate (APR) | 30.04% | APR is the cost of your financing expressed as a yearly rate. APR includes the amount and timing of the funding you receive, fees you pay and payments you make.<br><br>Your APR is not an interest rate. The cost of this financing is based upon fees charged rather than interest that accrues over time. |
| Finance Charge | $104,250.00 | This is the dollar cost of your financing. |
| Total Payment Amount | $250,500.00 | This is the total dollar amount of payments you will make during the term of the contract. |
| Average Monthly Cost | $5,220.00 | Although this financing does not have monthly payments, this is our calculation of your average monthly cost for comparison purposes. |
| Payment | $2,411.00/Every Two Weeks | Payments will be ACH debited from the designated deposit account on a Every Two Weeks basis on a business day. |
| Term | 4 years, 0 months | |
| Prepayment | If you pay off the financing early, you still must pay all or a portion of the finance charge, up to $100,500.00. | |
| | If you pay off the financing early you will not pay additional fees. | |

Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.

| | |
|---|---|
| ██████████ | 12/30/2022 |
| Recipient's Signature | Date |

CONFIDENTIAL
Exhibit 25-462

SBFA 00882
ER1060

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

Contract# 9207611

**CA**



### LOAN SUMMARY

**BORROWER:**

BORROWER'S LEGAL NAME: ▬▬▬▬▬▬▬▬▬▬▬   TRADE NAME: ▬▬▬▬▬▬▬▬▬

TYPE OF ENTITY: ▬▬▬▬▬

PHYSICAL ADDRESS: ▬▬▬▬▬▬▬   CITY: ▬▬▬▬   STATE: ▬▬   ZIP: ▬▬▬

MAILING ADDRESS: ▬▬▬▬▬   CITY: ▬▬▬▬   STATE: ▬▬   ZIP: ▬▬▬

TELEPHONE: ▬▬▬   EMAIL ADDRESS: ▬▬▬▬▬

| | |
|---|---|
| **LENDER:** | **STRATEGIC FUNDING SOURCE, INC. D/B/A KAPITUS**<br>**2500 WILSON BOULEVARD SUITE 350, ARLINGTON, VA 22201**<br>**CALIFORNIA FINANCE LENDER LICENSE NO. 603G807** |
| **SERVICER:** | **KAPITUS SERVICING, INC.**<br>**2500 WILSON BOULEVARD, SUITE 350, ARLINGTON, VA 22201** |
| **PRINCIPAL AMOUNT:** | **$150,000.00** |
| **ORIGINATION FEE:** | $3,750.00 (2.5% OF PRINCIPAL AMOUNT) |
| **DISBURSEMENT AMOUNT:**<br><br>PRINCIPAL LESS CONTRACT FEES | **$146,250.00**<br><br>*Note that the Disbursement Amount will be reduced by the Origination Fee, and any amounts owed to Lender from a prior agreement or paid to a third party on Borrower's behalf* |
| **TOTAL INTEREST CHARGED:** | **$100,500.00** |
| **Total Repayment Amount:**<br><br>Principal plus Interest | $250,500.00<br><br>$150,000.00 in Principal and $100,500.00 in Interest. |
| **PAYMENT SCHEDULE:** | **Term (Months) 48, 104** payments of **$2,411.00** |
| **PRE-PAYMENT OPTION:** | Borrower ha  the option to prepay at any time, and a prepayment di count may apply ba ed on the time elapsed since disbursement, the Borrower's repayment history, and the remaining amount due. |

Each signatory represents and warrants that: (1) he or she is authorized by Borrower to enter into this loan, legally binding the Borrower to repay the loan as agreed; and (2) all information provided in the Transaction Documents, in the applications provided, documents submitted, financial information provided, and in any interviews conducted during underwriting is true, accurate and complete in all respects. Borrower and Guarantor expressly acknowledge and agree that Lender and Kapitus Servicing, Inc. ("Kapitus Servicing") are relying on such representations and warranties when determining to provide this loan and that the accuracy thereof is a material condition of the Transaction Documents. **If any information provided is false or misleading, Borrower and Guarantor(s) will be held liable for fraud in the inducement and fraud.**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

**IT IS UNDERSTOOD THAT ANY REPRESENTATIONS OR ALLEGED PROMISES BY INDEPENDENT BROKERS OR AGENTS ARE NULL AND VOID IF NOT INCLUDED IN THE TRANSACTION DOCUMENTS. ANY MODIFICATION OR OTHER ALTERATION TO THE TRANSACTION DOCUMENTS MUST BE IN WRITING AND DULY EXECUTED BY THE PARTIES.**

### CONSENT TO RECEIVE AUTODIALED AND PRERECORDED CALLS AND MESSAGES

LENDER, Kapitus Servicing and their subsidiaries and affiliates (collectively, "KAPITUS") may from time to time notify applicant(s) of various promotional offers and other marketing information, or contact Borrower(s) and Guarantor(s) in connection with the servicing of the Transaction Documents, or in connection with any default under the Transaction Documents. By signing this Agreement, Borrower(s) and Guarantor(s) expressly consent and authorize KAPITUS to call, send text messages, and/or send other electronic messages (including prerecorded or artificial voice messages) using an automatic telephone dialing system to any telephone number provided by Borrower(s) or Guarantor(s) in the Transaction Documents, any and all applications or any administrative form or other means, including cellular phone numbers and landlines, regardless of their inclusion on any do not call list, for purposes of servicing, collections, marketing or promoting any product offered by KAPITUS. Borrower(s) and Guarantor(s) further expressly consent and authorize KAPITUS to record all calls with KAPITUS. Please note that you are not required to consent to be called for marketing or promotional purposes in order to qualify for financing or obtain any other products or services from KAPITUS. If you do not agree to be called for marketing or promotional purposes, please call (844) 547-9396 or email DNC@kapitus.com.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "LOAN AGREEMENT", "SECURITY AGREEMENT" AND THE "GUARANTY" (AS APPLICABLE) ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS LOAN SUMMARY. CAPITALIZED TERMS NOT DEFINED IN THIS LOAN SUMMARY, SHALL HAVE THE MEANING SET FORTH IN THE "LOAN AGREEMENT," "SECURITY AGREEMENT" OR "GUARANTY," AS APPLICABLE.

**BORROWER**

By ▇▇▇▇▇▇▇▇▇▇▇ _____        ▇▇▇▇▇▇▇ _____
    (Print Name and Title)                       (Signature)

**LENDER**

By **Steve Podhorzer** _____        _____
    (Company Officer or Designee)                       (Signature)

**GUARANTOR**

By ▇▇▇▇▇▇ _____        ▇▇▇▇▇▇▇ _____
    (Print Name)                       (Signature)

**GUARANTOR**

By _____        _____
    (Print Name)                       (Signature)

**GUARANTOR**

By _____        _____
    (Print Name)                       (Signature)

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72



## AUTHORIZED SUB-SERVICING AGENT

Lender, as Agent, may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents. Kapitus Servicing is the Authorized Sub-Servicing Agent and the General Agent of the Lender. Kapitus Servicing will initiate all debits and credits to Borrower's account, provide customer service and administrative support to Lender and Borrower, initiate any necessary collection actions in the event of default under the Transaction Documents, initiate and defend legal actions related to the Transaction Documents, and provide legal support and collection services to Lender. Any and all authorizations and/or rights granted to Lender under the Transaction Documents are granted to Kapitus Servicing, as servicer and general agent of the Lender.

### SERVICER FEES

| 1. | Banking Fees | $50.00 for outgoing wire transfers or payment by check. |
|---|---|---|
| 2. | Bank Account Changes | $75.00 |
| 3. | UCC Terminations | $250.00 |
| 4. | Default Fee | $2,500.00 |
| 5. | Returned Payment Fee | $15.00 |

*OTHER THAN THE ORIGINATION FEE, IF ANY, AND THE SERVICER FEES SET FORTH ABOVE, NEITHER LENDER NOR KAPITUS SERVICING IS CHARGING ANY FEES TO BORROWER. IF BORROWER IS CHARGED ANY ADDITIONAL FEE IN CONNECTION WITH THE LOAN, IT IS NOT BEING AUTHORIZED OR CHARGED BY KAPITUS AND BORROWER SHOULD INFORM KAPITUS IF ANY UNAUTHORIZED FEE HAS BEEN CHARGED IN CONNECTION WITH THE TRANSACTION DOCUMENTS.*

*IF YOUR APPLICATION FOR BUSINESS CREDIT IS DENIED, YOU HAVE THE RIGHT TO A WRITTEN STATEMENT OF THE SPECIFIC REASONS FOR THE DENIAL. TO OBTAIN THE STATEMENT, PLEASE CONTACT KAPITUS LLC AT THE ABOVE ADDRESS OR PHONE NUMBER WITHIN 60 DAYS FROM THE DATE YOU ARE NOTIFIED OF THE CREDIT DECISION. YOU HAVE THE RIGHT TO OBTAIN A WRITTEN STATEMENT OF REASONS FOR THE DENIAL WITHIN 30 DAYS OF RECEIVING YOUR REQUEST FOR THE STATEMENT.*

*NOTICE: THE FEDERAL EQUAL CREDIT OPPORTUNITY ACT PROHIBITS CREDITORS FROM DISCRIMINATING AGAINST CREDIT APPLICANTS ON THE BASIS OF RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, MARITAL STATUS, AGE (PROVIDED THE APPLICANT HAS THE CAPACITY TO ENTER INTO A BINDING CONTRACT); BECAUSE ALL OR PART OF THE APPLICANT'S INCOME DERIVES FROM ANY PUBLIC ASSISTANCE PROGRAM; OR BECAUSE THE APPLICANT HAS IN GOOD FAITH EXERCISED ANY RIGHT UNDER THE CONSUMER CREDIT PROTECTION ACT. THE FEDERAL AGENCY THAT ADMINISTERS COMPLIANCE WITH THIS LAW CONCERNING THIS CREDITOR IS THE FEDERAL TRADE COMMISSION, 600 PENNSYLVANIA AVENUE, NW, WASHINGTON, DC 20580, FTC.GOV.*

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

2500 Wilson Boulevard, Suite 350, Arlington, Virginia 22201; Tel. 844-547-9396

**CONTRACT# 9207611**

## LOAN AGREEMENT

This Loan Agreement (the "Agreement" or the "Loan Agreement") dated December 30, 2022 ("Agreement Date") between STRATEGIC FUNDING SOURCE, INC D/B/A KAPITUS ("Lender") and ██████████████████████████████ ("Guarantor"). The Loan Summary, the Loan Agreement, the Security Agreement, and the Guaranty are collectively referred to as the "Transaction Documents."

For value received, Borrower hereby promises to pay to LENDER the Repayment Amount specified below, which is comprised of the Principal plus Interest, in lawful money of the United States:

| Principal: $150,000.00 | Interest: $100,500.00 | Payment: $2,411.00 | Repayment Amount: $250,500.00 |
|---|---|---|---|

The Repayment Amount shall be paid to LENDER by Borrower using and irrevocably authorizing Automated Clearing House ("ACH") debits from one bank account acceptable to LENDER (the "Account") to remit the Payment until such time as LENDER receives payment in full of the Repayment Amount plus any other amounts owed to LENDER under this Agreement. Borrower hereby authorizes LENDER to ACH debit payment from the Account on a Every Two Weeks basis on a business day. Borrower understands that it is responsible for en uring that the Payment to be debited by LENDER remain in the Account, or Borrower will be charged an ACH return fee a pecified in the Loan Summary. LENDER is not responsible for any overdrafts or rejected transactions that may result from LENDER ACH debiting any amounts under the terms of this Agreement. Notwithstanding anything to the contrary in this Loan Agreement or any other agreement between LENDER and Borrower, upon the occurrence of an Event of Default under Section 3 of the Loan Agreement, the entire Repayment Amount and any other amounts or fees due, less any amounts already paid, shall become immediately due and payable.

## I. GENERAL TERMS

**1.1 AUTHORIZATION TO DEBIT.** Borrower hereby authorizes LENDER and/or its agents to obtain any amounts due to LENDER by ACH debit of the Account or of any other Borrower account as provided under this Agreement.

**1.2 EFFECTIVE DATE.** This Agreement begins on the date that funds are disbursed to Borrower.

**1.3 LOAN TERM.** The Loan shall have a 48 month term.

**1.4 PROMISE TO PAY.** Borrower agrees to pay LENDER the Repayment Amount in accordance with the Payment Schedule set forth in the Loan Summary as well as any other fees, costs and interest authorized hereunder as incurred.

**1.5 FINANCIAL CONDITION.** Borrower and Guarantor authorize LENDER to investigate their creditworthines , financial re ponsibility and history, and agree to provide LENDER any financial statements, tax returns, references, or other financial information, a LENDER deem necessary prior to or after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of credit and financial information. Borrower and Guarantor authorize LENDER to update their credit and financial profile from time to time in the future, as LENDER deems appropriate, including by obtaining investigative, consumer, and personal or business credit reports. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**1.6. FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower and Guarantor authorize LENDER to obtain business and personal credit bureau and consumer reports at any time and from time to time for purposes of deciding whether to approve the requested loan or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's or Guarantor's request, LENDER will advise Borrower or Guarantor if LENDER obtained a credit report and LENDER will give Borrower or Guarantor the credit bureau's name and address. Borrower and Guarantor agree to submit current financial information, update any credit application, or both, at any time promptly upon LENDER's request. LENDER may report LENDER'S credit experiences with Borrower and Guarantor to third parties as permitted by law. Borrower and Guarantor also agree that LENDER may release information to comply with governmental reporting or legal process that LENDER believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss, and/or seeking recovery for such loss. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**1.7 TRANSACTIONAL HISTORY.** Borrower and Guarantor authorize LENDER to act as Borrower' and Guarantor' agent, respectively, for purposes of accessing and retrieving transaction history information regarding Borrower and/or Guarantor from Borrower's and Guarantor's financial institutions, banks, banking accounts, and/or credit card processing accounts. Borrower and

Guarantor authorize their respective financial institutions to provide LENDER with Borrower's and Guarantor's transaction history, and any and all information regarding Borrower and Guarantor's accounts, balances, or transfers, for any purpose, including for purposes of collection. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**1.8 INDEMNIFICATION.** Borrower and Guarantor jointly and severally will indemnify and hold LENDER, and its officers, directors, shareholders, members, managers, employees, owners, partners, affiliates, subsidiaries, parent company, successors, transferees, assigns, purchasers, investors, financiers, agents, representatives, attorneys and professionals, (collectively, the "LENDER PARTIES") harmless from all losses, costs, damage, liabilities or expenses (including, without limitation, court costs and attorneys' fees) that the LENDER PARTIES may sustain or incur by reason of defending claims asserted by Borrower and/or Guarantor, and all persons and entities claiming by, through or under them, to the fullest extent permitted by law, in protecting the security interest conveyed pursuant to the Security Agreement or the priority thereof, in enforcing any other term of the Transaction Documents, and/or in the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with the Transaction Documents and/or any other documents now or hereafter executed in connection with the Transaction Documents, the Collateral and/or the Additional Collateral, including without limitation any legal or dispute resolution proceeding, bankruptcy proceeding, receivership, and/or any other insolvency proceeding or other proceeding for

**CONFIDENTIAL**
**Exhibit 25-466**

SBFA 00886
**ER1064**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

2500 Wilson Boulevard, Suite 350, Arlington, Virginia 22201; Tel. 844-547-9396

relief for debtors or creditors.

In no event will the LENDER PARTIES be liable for any claims asserted by Borrower and/or Guarantor, and all persons and entities claiming by, through or under them, under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Borrower and Guarantor(s). This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**1.9 POWER OF ATTORNEY.** Borrower and Guarantor irrevocably appoint LENDER a it agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to LENDER from Borrower and Guarantor's respective financial institutions, or upon the occurrence of an Event of Default under Section III hereof, to settle all obligations due to LENDER from Borrower and Guarantor, under the Transaction Documents, including without limitation: (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral and/or Additional Collateral (as defined in the Security Agreement and the Guaranty); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Borrower and Guarantor's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to LENDER; and (v) to file any claims or take any action or institute any proceeding which LENDER may deem necessary for the collection of any of the unpaid Repayment Amount , and any other fees, costs and interest authorized hereunder, from the Collateral and/or Additional Collateral, or otherwise to enforce its rights with respect to payment of the Repayment Amount , and any other fees, costs and interest authorized hereunder. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**1.10 DISCLOSURE OF CREDIT INFORMATION.** Borrower and each person signing this Agreement on behalf of Borrower and/or as Guarantor, in re pect of him elf or her elf personally, authorizes LENDER to disclose to any third party information concerning Borrower and Guarantor' credit tanding (including credit bureau reports that LENDER obtains) and business conduct. Borrower and Guarantor hereby waive to the maximum extent permitted by law any claim for damages against the LENDER PARTIES relating to any (i) investigation undertaken by or on behalf of LENDER as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement. This provision shall survive, in its

entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**1.11 PUBLICITY.** Borrower and Guarantor authorize LENDER to use its, his or her name in a listing of clients and in advertising and marketing materials. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**1.12 UCC Agent & D/B/A's.** Borrower and Guarantor hereby acknowledge and agree that LENDER may be using affiliates, representatives, agents, "doing business as," "d/b/a," and/or fictitiou name in connection with various matters relating to the transaction between LENDER and Borrower and Guarantor, and may file UCC financing statements and other notices or filings using such entities or names on its own behalf or through LENDER'S UCC agent. LENDER shall have no obligation to terminate any UCC financing statement filed in connection with this Agreement absent a written request by Borrower after repayment in full of the Borrower's obligation under the Agreement and payment of the UCC termination fee as stated in the Loan Summary. Notwithstanding any terms to the contrary contained herein, and except as may be required under applicable law, LENDER shall have no obligation to terminate any UCC financing statement while there is a pending: (i) petition for bankruptcy protection under Title 11 of the United States Code or any state-law analogue filed by or against LENDER, Borrower, Guarantor, or any other guarantor; (ii) insolvency proceeding or other proceeding instituted against LENDER, Borrower, Guarantor, and/or any other guarantor for relief for debtors or creditors; (iii) receivership proceeding brought by or against LENDER, Borrower, Guarantor, and/or any other guarantor; and/or (iv) any other legal proceeding or alternative dispute resolution proceeding between any of the Borrower and/or Guarantor, on the one hand, and the LENDER PARTIES, on the other hand. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**1.13 LOAN FOR SPECIFIC PURPOSES ONLY.** The proceed of the loan may be u ed only for the specific purposes as set forth in a Use of Proceeds Certification Addendum, and not for any other purpo e Under no circum tance will the loan be used for personal, family or household purposes. Borrower and Guarantor understand that Borrower's agreement not to use the loan for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer or personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to

the loan or Transaction Documents. Borrower and Guarantor agree that a breach by Borrower and/or Guarantor of the provisions of this section will not affect LENDER'S right to (i) enforce Borrower's and Guarantor's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the loan is in fact obtained or (ii) use any remedy legally available to LENDER, even if that remedy would not have been available had the loan been made for con umer purpo e

**1.14 ALTERNATIVE PAYMENT METHODS.** If Borrower or Guarantor knows that for any reason LENDER will be unable to receive payment from Borrower's bank account as described in the Loan Agreement, then Borrower and/or Guarantor must promptly set up another arrangement for payment that is authorized by LENDER. Borrower and Guarantor understand and agree that alternate payments made at any other address or method than as specified by LENDER may result in a delay in processing and/or crediting payments from Borrower and/or Guarantor.

**1.15 OPTION TO PREPAY.** Borrower shall have the option to prepay the Repayment Amount at any time by paying to LENDER the sum of the entire Repayment Amount and any fees incurred under this Agreement, less payments previously made. LENDER may, from time to time, and in the LENDER's sole discretion, offer discounts for prepayment of the loan communicated to Borrower through or more customer web interfaces, emails or addenda to this Agreement. Such prepayment discounts will be based on the time elapsed since disbursement of the Funded Amount, the Borrower's repayment history, and the remaining amount due under the loan.

**1.16 APPLICATION OF PAYMENTS.** LENDER reserves the right to allocate payments received between principal, interest and fees in any manner LENDER chooses and in LENDER'S sole discretion. Borrower and Guarantor understand and agree that fees incurred and interest will generally be paid first, in the case of fees, or earlier in term, in the case of interest.

**1.17 CONSENT TO JURISDICTION AND VENUE.** Borrower and Guarantor agree that any suit, action or proceeding to enforce or arising out of the Transaction Documents shall be brought in any court in Orange County, California or in the United States District Court for the Central District of California (the "Acceptable Forums"). Borrower and Guarantor agree that the Acceptable Forums are convenient to them, ubmit to the juri diction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. In the event a legal proceeding concerning the Transaction Documents is initiated in any other forum, Borrower and Guarantor waive any right to oppose any motion or application made by LENDER to transfer such proceeding to an Acceptable Forum, or to dismiss the action on the

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

2500 Wilson Boulevard, Suite 350, Arlington, Virginia 22201; Tel. 844-547-9396

grounds of *forum non conveniens*. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**1.18 GOVERNING LAW.** The Transaction Documents and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to the Transaction Documents is governed by, and the Transaction Documents will be construed in accordance with the law of the State of California (to the extent not preempted by federal law) without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of the Transaction Documents and the amounts contracted for, charged and reserved under this Agreement will be governed by the laws of the State of California. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**II. REPRESENTATIONS, WARRANTIES AND COVENANTS.** Borrower and Guarantor represent, warrant and covenant that as of this date and during the term of this Agreement:

**2.1 BORROWER INFORMATION, FINANCIAL CONDITION AND FINANCIAL INFORMATION.** The information and financial statements which have been furnished to LENDER by Borrower and Guarantor, and such future statements which will be furnished hereafter at the request of LENDER, fairly represent the ownership and operations of the Borrower's business and the financial condition of Borrower and Guarantor at such dates, and since those dates, there has been no material adverse change, financial or otherwise, in such condition, operation or ownership of Borrower or Guarantor (as applicable). Borrower and Guarantor are current on any and all lease, rent or mortgage payments due. Borrower and Guarantor are currently in compliance with all loans, financing agreements, promissory notes, and/or other obligations of indebtedness, except as disclosed to LENDER. No material changes, financial or otherwise, in the condition, operation or ownership of Borrower and Guarantor (as applicable) are in any way expected or anticipated and Borrower and Guarantor do not anticipate closing or selling the business of Borrower. Neither the Borrower nor the Guarantor are party to any pending litigation that is expected to have a material impact on the Borrower or Guarantor. Borrower has a continuing, affirmative obligation to advise LENDER of any material adverse change in its financial condition, operation, or ownership. Borrower's failure to do so is a material breach of this Agreement.

**2.2 COMPLIANCE WITH LAW.** Borrower is in compliance and shall comply with all laws, including possession of all necessary permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**2.3 AUTHORIZATION.** Borrower, and each person signing the Transaction Documents on behalf of Borrower and/or as Guarantor, in respect of himself or herself personally and the person(s) signing the Transaction Documents on behalf of Borrower, have full power and authority to execute the Transaction Documents and to incur and perform the obligations under the Transaction Documents, all of which have been duly authorized

**2.4 INSURANCE.** Borrower will maintain property, liability and business-interruption in urance and name LENDER a certificate holder, loss payee and additional insured in amounts and against risks as are satisfactory to LENDER and shall provide LENDER proof of such insurance.

**2.5. TAX OBLIGATIONS.** Borrower and Guarantor are currently in compliance with all federal, state, and local tax laws, have filed all returns, and have paid all taxes due, except as disclosed to LENDER. No federal, state, or local taxing authority has filed any lien against the assets of the Borrower and/or Guarantor. Borrower or Guarantor shall pay all taxes owed to federal, state, or local governments when due.

**2.6 BORROWER DEPOSITING ACCOUNT AGREEMENT AND ARRANGEMENTS.** Without LENDER' prior written con ent, Borrower will not (i) change the Account through which Borrower's receivables are settled; (ii) set up multiple bank accounts into which any of the Borrower's receivables are deposited or otherwise transferred; (iii) block or stop payment on LENDER debits initiated under this Agreement; (iv) permit any event to occur that could cause diversion of any of Borrower's receivables to another Account; (v) or take any other action that could have any adverse effect upon Borrower's obligations under the Transaction Documents. Borrower will batch out receipts with all payment processors on a daily basis.

**2.7 CHANGE OF NAME, LOCATION OR JURISDICTION OF ORGANIZATION.** Borrower will not conduct Borrower's businesses under any name other than as disclosed to LENDER, change any of its places of business, or change it juri diction of organization without ten (10) days prior written notice to LENDER.

**2.8 NO BANKRUPTCY OR INSOLVENCY.** Borrower and Guarantor are olvent, and no transfer of property is being made by Borrower or Guarantor and no obligation is being incurred by Borrower or Guarantor in connection with the Transaction Documents with the intent to hinder, delay, or defraud either present or future creditors of Borrower or Guarantor. Neither Borrower nor Guarantor has as of the date of this Agreement, filed any petition for bankruptcy protection under Title 11 of the United States Code or any state-law analogue, and there has been no involuntary petition, insolvency proceeding or other proceeding for relief for debtors or creditors, or receivership proceeding brought or pending against Borrower and/or Guarantor (the "Insolvency Proceeding"). Borrower and Guarantor further and respectively warrant that neither anticipate filing or having any such voluntary or involuntary Insolvency Proceeding filed.

**2 9 OTHER FINANCING** Borrower hall not enter into any arrangement, agreement or commitment, whether in the form of a purchase and sale of receivables (such as a merchant cash advance or factoring contract), a loan against, or the sale or purchase of credits against, any receipts, receivables, cash deposits or future card or mobile payment sales with any party other than LENDER without LENDER's written permission.

**2.10 UNENCUMBERED ASSETS.** Other than as previously disclosed to LENDER in writing, Borrower has good and marketable title to all assets, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, LENDER.

**2.11 DEFAULT UNDER OTHER CONTRACTS** Borrower's and/or Guarantor's execution of or performance under this Agreement will not cause or create an event of default by Borrower and/or Guarantor under any contract with another person or entity.

**2.12 AUTHORIZATION TO OBTAIN LEASE INFORMATION.** Borrower and Guarantor authorize LENDER to receive pertinent information regarding the commercial lease or mortgage for the physical location of Borrower's business (the "Premises") from any applicable lender, leasing company or agent. Upon any Event of Default under this Agreement, as security for the Borrower's obligations set forth herein, Borrower and/or Guarantor shall deliver to LENDER an executed Assignment of Lease covering the Premises in favor of LENDER.

**2.13 SALE OR DISSOLUTION OF BUSINESS.** Borrower shall not: (a) sell, dispose, transfer or otherwi e convey it bu ines , as et and/or any equity interest in Borrower; or (b) effectuate the suspension, dissolution, or termination or Borrower's business without the express prior written consent of LENDER, and (ii) the written agreement of any purchaser, assignee, or transferee assuming all of Borrower's and Guarantor's obligations under this Agreement

**CONFIDENTIAL**
**Exhibit 25-468**

SBFA 00888
**ER1066**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

2500 Wilson Boulevard, Suite 350, Arlington, Virginia 22201; Tel. 844-547-9396

pursuant to documentation satisfactory to LENDER (as applicable).

**2.14 ACCURACY OF INFORMATION.** All information provided by Borrower and Guarantor to LENDER in the Transaction Documents, in any application for financing, in all other LENDER forms and in response to any request by Lender for information whether oral or in writing, is true, accurate and complete in all respects.

## III EVENTS OF DEFAULT AND REMEDIES

3.1 **EVENTS OF DEFAULT.** The occurrence of any of the following event hall con titute an "Event of Default" hereunder:

(a) Borrower obtains, or Guarantor obtains on Borrower's behalf, another loan, factoring agreement, or other financing, whether secured or unsecured during the performance of this Agreement.

(b) Borrower or Guarantor violate any term, covenant, or condition in the Transaction Documents;

(c) Borrower or Guarantor use the funds for any household or non-business purpose;

(d) any representation or warranty by Borrower or Guarantor in the Transaction Documents is incorrect, incomplete, false or misleading in any material respect when made and/or not promptly updated in accordance with this Agreement;

(e) Borrower or Guarantor admits its inability to pay its debts, or makes a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Borrower or Guarantor seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts (as applicable); or any receivership proceeding shall be instituted by or against Borrower or Guarantor;

(f) Borrower or Guarantor, and/or all persons and entities claiming by, through or under Borrower and Guarantor, sends a notice of termination of the Security Agreement, Guaranty and/or of any UCC financing statement;

(g) Borrower and/or Guarantor, and/or all persons and entities claiming by, through or under Borrower or Guarantor, suspends, dissolves or terminates Borrower's business;

(h) Borrower or Guarantor, and/or all persons and entities claiming by, through or under Borrower or Guarantor, sells, assigns and/or transfers Borrower's business, and/or any interest therein that constitutes a change of control in such business, or sells, assigns and/or transfers all or

substantially all of Borrower's assets without prior written consent of LENDER;

(i) Borrower or Guarantor, and/or all persons and entities claiming by, through or under Borrower or Guarantor, makes or sends notice of any intended assignment, bulk sale or transfer by Borrower;

(j) Borrower or Guarantor, and/or all persons and entities claiming by, through or under Borrower or Guarantor, performs any act that encumbers the cash flow of the Borrower's business or reduces the value of the Collateral or the security interest granted in the Collateral under the Security Agreement;

(k) Borrower or Guarantor, and/or all persons and entities claiming by, through or under Borrower or Guarantor, perform any act that reduces the value of the Additional Collateral or the security interest granted in the Additional Collateral under the Security Agreement;

(l) Borrower or Guarantor fail to pay taxes to any federal, state, or local government when due;

(m) Borrower or Guarantor defaults under any of the terms, covenants and conditions of any other agreement with LENDER including those affiliated or associated businesses with the Borrower or Guarantor; or

(n) Borrower fails to make any payment as agreed.

3.2 **REMEDIES FOR DEFAULT** Upon the occurrence of an Event of Default that is not waived pursuant to Section 4.1 hereof, LENDER may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Borrower and Guarantor's obligations under the Transaction Documents, or pursuant to any other legal or equitable right or remedy. Upon any Event of Default, the entire Repayment Amount and unpaid fees not already paid to LENDER shall become immediately due and payable to LENDER. In addition, upon an Event of Default, and without limitation, (i) LENDER may enforce the provisions of the Transaction Documents against the Borrower and Guarantor; (ii) LENDER may enforce its security interest in the Collateral, the Additional Collateral and the Cross-Collateral; (iii) LENDER may debit Borrower's and/or Guarantor's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Borrower's and/or Guarantor's respective bank accounts or otherwise; (iv) LENDER may receive funds directly from any credit card processor of

Borrower; (v) LENDER may exercise its rights under the Assignment of Lease; and (vi) LENDER may exercise its rights pursuant to the Power of Attorney granted under Section 1.9 above. All rights, powers and remedies of LENDER in connection with the Transaction Documents may be exercised at any time by LENDER after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedie provided by law or equity Borrower and Guarantor acknowledge and agree that there may be no adequate remedy at law with respect to a breach of the Tran action Document Accordingly, Borrower and Guarantor agree that LENDER shall have the right, in addition to any other rights and remedies existing in LENDER'S favor at law or in equity, to enforce LENDER'S rights and obligations under the Transaction Documents not only by an action or actions for damages, but also for an action or actions for specific performance, injunctive and/or other equitable relief without posting of a bond or other security. To the extent authorized by applicable law, Borrower and Guarantor hereby agree to toll or waive any relevant statute of limitations in respect of any claims arising under, and/or relating to the Transaction Documents. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

3.3 **COSTS.** Borrower and Guarantor shall pay to LENDER all reasonable costs associated with (a) a breach by Borrower or Guarantor of the representations, warranties and covenants in the Transaction Documents, and the enforcement thereof, and (b) the enforcement of LENDER's remedies set forth in Section 3.2 above, including but not limited to (i) court costs (ii) attorneys' fees of twenty-five percent (25%) of the total balance due or the actual attorney fees incurred, whichever is greater; and (iii) default interest of 10% from the date of default or such other amount as allowed by law.

3.4 **REQUIRED NOTIFICATIONS.** Borrower and Guarantor are required to give LENDER fourteen (14) days prior written notice of: (a) any change in control of the Borrower or the sale, transfer or assignment of all or substantially all of the Borrower's assets or equity interests; and (b) the suspension, dissolution or termination of its business.

3.5 **SERVICE AND DEFAULT FEES.** Borrower shall pay certain fee for ervice related to the origination and servicing of the loan as detailed in the Loan Summary. Upon the occurrence of any Event of Default, Borrower and Guarantor shall be liable to LENDER for a default fee in the amount stated in the Loan Summary, payable on demand in addition to any other fees or charges due under the Transaction Documents.

**CONFIDENTIAL**
**Exhibit 25-469**

SBFA 00889
**ER1067**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

2500 Wilson Boulevard, Suite 350, Arlington, Virginia 22201; Tel. 844-547-9396

## IV. MISCELLANEOUS

**4.1 MODIFICATIONS; AGREEMENTS.** No modification, amendment, waiver or consent of any provision of the Transaction Documents shall be effective unless the same shall be in writing and signed by LENDER. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**4.2 LENDER ACTING AS AGENT.** LENDER has entered into the Tran action Document a agent (in such capacity, "Agent") for itself and one or more third parties as "co-lenders" (each a "Principal") Agent and each Principal have elected to treat the transaction consummated under the Transaction Documents (the "Transaction") as a single transaction on behalf of separate Principals, and Agent hereby certifies that the portion of the Transaction allocable to the account of each of the Principals for which it is acting as Agent (to the extent that any such Transaction is allocable to the account of more than one Principal) is set forth in one or more addenda to the Transaction Documents, which may be provided to Borrower upon request, shall be subject to this Section 4.2 as detailed below.

All references to "LENDER" or "Borrower" or "Guarantor(s)," as the case may be, in the Transaction Documents shall be subject to the provisions of this Section 4.2 and shall be construed to reflect that (i) each Principal shall have, in connection with the Transaction entered into by the Agent on its behalf, all of the rights, responsibilities, privileges and obligations of a "LENDER" directly entering into such Transaction with the other parties under each of the Transaction Documents and (ii) Agent's Principals have designated Agent (acting through the Authorized Subservicing Agent) as their sole agent for performance of LENDER'S obligations to Borrower and for receipt of performance by Borrower of its obligations to LENDER in connection with the Transaction (including, among other things, as Agent for each Principal in connection with transfers of cash or other property and as agent for giving and receiving all notices under the Transaction Documents), either directly or indirectly. Both Agent and its Principals shall be deemed "parties" to the Transaction Documents and all references to a "party" or "either party" in any Transaction Document shall be deemed revised accordingly.

The parties hereto acknowledge and agree that any assignment, pledge and/or grant to LENDER by the Borrower or a Guarantor of a security interest in and to any property and assets pursuant to any of the applicable Transaction Documents to secure the payment and/or performance of any of their respective and/or joint obligations, shall be deemed to have been made to the LENDER for and on behalf of itself and any other Principal. LENDER hereby agrees

to hold all Collateral and Additional Collateral hereafter delivered to it pursuant to the Transaction Documents, for itself and for the benefit of the Principals, on and subject to the terms and conditions set forth in the Transaction Documents. In its capacity, the Agent and Sub-Servicing Agent is a "representative" of each of the Principals within the meaning of the term "secured party" as defined in the UCC. In addition to the representations and warranties set forth in the Transaction Documents, Agent hereby makes the following representations and warranties, which shall continue during the term of any Transaction: Principal has duly authorized Agent to execute and deliver the Transaction Documents on its behalf, has the power to so authorize Agent and to enter into the Transaction. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**4.3 SUB-SERVICING AGENT.** LENDER may contract with one or more general agents to service the Transaction Documents (the "Sub-Servicing Agent") that will provide customer service, treasury, administrative, bookkeeping, reporting, collections, and support services, including, but not limited to, background checks, credit checks, general underwriting review, filing UCC-1 security interests and any other UCC documentation, for the LENDER. Borrower and Guarantor acknowledge and agree that LENDER has granted the Sub-Servicing Agent all rights and authority as its general agent to take any and all actions to enforce the Transaction Documents through legal actions in the name of the LENDER or otherwise, and to assert and/or defend against any and all claims arising from or relating to the Transaction Documents. Any and all authorizations and rights granted to LENDER under the Transaction Documents are hereby granted to Sub-Servicing Agent, as servicer and general agent of LENDER. In no event will the Sub-Servicing Agent be liable for any claims made against the LENDER or under any legal theory for lost profits, lost revenues, lost business opportunity, exemplary, punitive, actual, special, incidental, indirect or consequential damages, each of which is waived by the Borrower and Guarantor(s). This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**4.4 NOTICES.** All notices, requests, consent, demands and other communications under the Transaction Documents and any addendum shall be delivered by ordinary mail to the respective parties at the addresses set forth on Page 1 of this Agreement and shall become effective upon delivery. The Parties hereto may also send such notices, requests, consent, demands and other communications via facsimile or electronic mail at such numbers

and email addresses communicated by the parties hereto in writing or as reflected in the records of the Sub-Servicing Agent. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**4.5 COUNTERPARTS; ELECTRONIC SIGNATURES.** Each of the Transaction Documents may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original of each uch Tran action Document, and all such counterparts for the respective Transaction Document shall constitute one and the ame uch Tran action Document For purposes of the execution of each of the Transaction Documents, electronically transmitted PDFs, facsimile copies of signatures, or electronically transmitted copies of signatures complying with the US Federal ESIGN Act of 2000 (e.g. www.docusign.com) shall be treated as original signatures for all purposes. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**4.6 WAIVER OF REMEDIES.** No failure on the part of LENDER to exercise, and no delay in exercising, any right under the Transaction Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right under the Transaction Documents preclude any other or further exercise thereof or the exercise of any other right. The remedies provided under the Transaction Documents are cumulative and not exclusive of any remedies provided by law or equity. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**4.7 SOLICITATIONS.** Borrower and Guarantor authorize the LENDER PARTIES to communicate with, solicit and/or market to Borrower and Guarantor via regular mail, telephone, electronic mail and facsimile in connection with the provision of goods or services by the LENDER PARTIES, its affiliates or any third party that THE LENDER PARTIES share, transfer, exchange, disclose or provide information with and will hold the LENDER PARTIES harmless against any and all claims pursuant to the federal CAN-SPAM ACT of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003), the Telephone Consumer Protection Act (TCPA), and any and all other state or federal laws relating to transmissions or solicitations by and any of the methods described above. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**4.8 SURVIVAL OF REPRESENTATION, ETC.** Except as otherwise provided herein, all representations, warranties and covenants herein, including those in the Security Agreement and the

CONFIDENTIAL
**Exhibit 25-470**

SBFA 00890
**ER1068**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

2500 Wilson Boulevard, Suite 350, Arlington, Virginia 22201; Tel. 844-547-9396

Guaranty shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated. Notwithstanding any terms to the contrary contained herein: (i) the Security Agreement and the Guaranty shall survive, in their entirety, the repayment of the Repayment Amount and the termination of this Agreement; and (ii) in the event that LENDER mu t return any amount paid by Borrower, Guarantor, any other guarantor, entity or person with respect to the obligations arising under the Tran action Document , including without limitation, arising from or relating to, Borrower, Guarantor, any other guarantor, entity or person becoming subject to a proceeding under the United States Bankruptcy Code or any similar law (whether arising under Federal or State law), and/or any other legal proceeding or alternative dispute resolution proceeding, all representations, warranties and covenants and other obligations under the Transaction Documents and any addendum thereof (if any) shall remain in full force and effect and Borrower and Guarantor shall be obligated for any such amounts repaid, as well attorneys' fees, costs and interest in connection with such proceeding. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement

**4.9 SEVERABILITY; SAVINGS.** In case any of the provisions in the Transaction Documents are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained therein shall not in any way be affected or impaired and the Transaction Documents shall be construed as if such provision had not been included. In no event shall the aggregate amount of interest charged or collected hereunder exceed the highest rate permissible at law. In the event that a court determines that LENDER has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and LENDER shall promptly refund to Borrower any interest received by LENDER that is found to be in excess of the maximum lawful rate. If any provisions of this Agreement are in conflict with

any other agreement to which any parties are subject, the provisions hereof shall control. Should any provision of the Transaction Documents require judicial interpretation, the court interpreting or construing the provision shall not apply the rule of construction that a document is to be construed more strictly against one Party. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**4.10 ENTIRE AGREEMENT.** The Tran action Documents embody the entire agreement between Borrower, Guarantor and LENDER and uper ede all prior agreement and understandings relating to the subject matter hereof. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**4.11 JURY TRIAL WAIVER.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTION DOCUMENTS OR THE ENFORCEMENT THEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS. THIS PROVISION SHALL SURVIVE, IN ITS ENTIRETY, THE REPAYMENT OF THE REPAYMENT AMOUNT AND THE TERMINATION OF THIS AGREEMENT.

**4.12 CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION

AGAINST ANOTHER PARTY, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THE TRANSCATION DOCUMENTS); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION. THIS PROVISION SHALL SURVIVE, IN ITS ENTIRETY, THE REPAYMENT OF THE REPAYMENT AMOUNT AND THE TERMINATION OF THIS AGREEMENT.

**4.13 SUCCESSORS; ASSIGNS; AMENDMENT.** The Transaction Documents shall be binding upon and inure to the benefit of the heir , executors, trustees, administrators, legal representatives, successors, transferees and assigns of the Parties. The Transaction Documents shall not be assignable or otherwise transferrable by Borrower or Guarantor without LENDER'S prior written consent to be exercised solely in LENDER'S discretion. LENDER may assign or otherwise transfer the Transaction Documents. This provision shall survive, in its entirety, the repayment of the Repayment Amount and the termination of this Agreement.

**4.14 ARBITRATION.** *PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY.* **A SEPARATE AGREEMENT BETWEEN THE PARTIES PROVIDES THAT DISPUTES MAY BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT.**

SIGNATURES ON NEXT PAGE

CONFIDENTIAL
Exhibit 25-471

SBFA 00891
ER1069

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

2500 Wilson Boulevard, Suite 350, Arlington, Virginia 22201; Tel. 844-547-9396

**Contract# 9207611**

Borrower and Guarantor acknowledge that by signing below, Borrower and Guarantor agree to be bound by the terms, definitions, conditions and information in this Loan Agreement.

THE TERMS, DEFINITIONS, CONDITIONS, AND INFORMATION SET FORTH IN THE "LOAN SUMMARY", "SECURITY AGREEMENT", AND THE "GUARANTY" (AS APPLICABLE) ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS LOAN AGREEMENT. CAPITALIZED TERMS NOT DEFINED IN THIS LOAN AGREEMENT, SHALL HAVE THE MEANING SET FORTH IN THE "LOAN SUMMARY," "SECURITY AGREEMENT" OR "GUARANTY," AS APPLICABLE.

**BORROWER**
By _____                    ████████████
    (Print Name and Title)                        (Signature)
**GUARANTOR**
By _____                    ████████████
    (Print Name)                                  (Signature)
**GUARANTOR**
By   N/A
    (Print Name)                                  (Signature)
**GUARANTOR**
By   N/A
    (Print Name)                                  (Signature)

### USE OF PROCEEDS CERTIFICATION

*This Use of Proceeds Certification is part of (and incorporated by reference into) the Loan Agreement. All parties should retain a copy of this document for their records.*

Each signatory below, on behalf of each Borrower or Guarantor, hereby certifies the following to the LENDER

1. The entirety of the loan will be used in the ordinary course of business.
2. The entirety of the loan will be used exclusively for a Business Purpose and no other. A Business Purpose as applied to use of proceeds obtained under this Loan Agreement, refers solely to the purchase and acquisition of specific products or services used for the following purposes only:  (i) working capital, (ii) business insurance (but not self-insurance programs), (iii) franchise fees, (iv) employee training, (v) the purchase of equipment, (vi) inventory, (vii) business supplies and raw materials, and (viii) the construction, renovation or improvement of facilities (but not the purchase of real estate).  Business Purpose does not include: (a) payment for, or purchase of, any items, goods, materials real property, personal property or services for personal, individual or household use; or (b) use of funds for any proceeding under the United States Bankruptcy Code or any similar law (whether arising under Federal or State law) and/or any other legal proceeding or alternative dispute resolution proceeding.

**BORROWER**
By _____                    ████████████
    (Print Name and Title)                        (Signature)
**GUARANTOR**
By _____                    ████████████
    (Print Name)                                  (Signature)
**GUARANTOR**
By   N/A
    (Print Name)                                  (Signature)
**GUARANTOR**
By   N/A
    (Print Name)                                  (Signature)

Kapitus-CA Loan 2021-04-27                 7

CONFIDENTIAL                SBFA 00892

**Exhibit 25-472**                          **ER1070**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

2500 Wilson Boulevard, Suite 350, Arlington, Virginia 22201; Tel. 844-547-9396

**Contract# 9207611**

# SECURITY AGREEMENT

**SECURITY INTEREST**. To secure Borrower's payment and performance obligations to Lender under the Transaction Documents, Borrower hereby grants to Lender a security interest in: (i) all accounts, accounts receivable, contracts, real property leases, notes, bills, acceptances, chooses in action, chattel paper, instruments, documents and other forms of obligations at any time owing to the Borrower arising out of goods sold or leased or for services rendered by Borrower, the proceeds thereof and all of Borrower's rights with respect to any goods represented thereby, whether or not delivered, goods returned by customers and all rights as an unpaid vendor or lienor, including rights of stoppage in transit and of recovering possession by proceedings including replevin and reclamation, together with all customer lists, books and records, ledger and account cards, computer tapes, software, disks, printouts and records, whether now in existence or hereafter created, relating thereto (collectively referred to hereinafter as "Receivables"); (ii) all inventory, including without limitation, all goods manufactured or acquired for sale or lease, and any piece goods, raw materials, work in process and finished merchandise, findings or component materials, and all supplies, goods, incidentals, office supplies, packaging materials and any and all items used or consumed in the operation of the business of Borrower or which may contribute to the finished product or to the sale, promotion and shipment thereof, in which Borrower now or at any time hereafter may have an interest, whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of Borrower or is held by Borrower or by others for Borrower's account (collectively referred to hereinafter as "Inventory"); (iii) goods, including without limitation, all machinery, equipment, parts, supplies, apparatus, appliances, tools, fittings, furniture, furnishings, fixtures and articles of <u>tangible personal property of every description now or hereafter owned by the Borrower or</u> in which Borrower may have or may hereafter acquire any interest, at any location (collectively referred to hereinafter as "Equipment"); (iv) general intangibles in which the Borrower now has or hereafter acquires any rights, including but not limited to, causes of action, corporate or business records, inventions, designs, patents, patent applications, trademarks, trademark registrations and applications therefor, goodwill, trade names, trade secrets, trade processes, copyrights, copyright registrations and applications therefor, licenses, permits, franchises, customer lists, computer programs, all claims under guaranties, tax refund claims, rights and claims against carriers and shippers, leases, claims under insurance policies, all rights to indemnification and all other intangible personal property and intellectual property of every kind and nature (collectively referred to hereinafter as "Intangibles"); (v) all the capital stock, bonds, notes, partnership interests, member interests in limited liability companies, and other securities, if any, held of record or beneficially by the Borrower, including without limitation the capital stock of all subsidiaries of the Borrower, and the Borrower's interests in all securities brokerage accounts (collectively referred to hereinafter as "Investments"); (vi) all cash on hand and on deposit in banks, trust companies and similar institutions, and all property accounted for in the Borrower's financial statements as "cash equivalents" (collectively referred to hereinafter as "Cash"); (vii) all other assets, proceeds and items not directly referred to herein as those terms are defined in Article 9 of the Uniform Commercial Code under applicable federal and state law (collectively referred to hereinafter as "UCC Article 9 Items"); (viii) all accessions to, substitutions for, and all replacements, products and proceeds of the Receivables, Inventory, Equipment, Intangibles, Investments, Cash and UCC Article 9 Items (collectively referred to hereinafter as "Collateral"), including without limitation proceeds of insurance policies insuring the Collateral; and (ix) books and records relating to any of the Collateral (including without limitation, customer data, credit files, computer programs, printouts, and other computer materials and records of the Borrower pertaining to any of the Collateral), <u>whether now or hereafter owned or acquired by Borrower and wherever located; and all proceeds of the foregoing</u>. If the Transaction Documents or any addenda identify more than one Borrower, this Security Agreement applies to each Borrower, jointly and severally.

Borrower and Guarantor acknowledge and agree that any security interest granted to Lender under any other agreement between Borrower and Lender will secure the obligations hereunder, and that the Borrower's obligations

CONFIDENTIAL
Exhibit 25-473

SBFA 00893
ER1071

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

2500 Wilson Boulevard, Suite 350, Arlington, Virginia 22201; Tel. 844-547-9396

**Contract# 9207611**

secured by this Security Agreement, and the Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting Lender's interest in the Collateral.

Borrower and Guarantor further acknowledge and agree that if, in the future, Borrower enters into any agreement with Lender, any security interest granted to Lender under such future agreements will relate back to this Security Agreement, and that the Borrower and/or Guarantor's obligations, and the Collateral granted, under such future agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting Lender's interest in the Collateral.

**CROSS-COLLATERAL**.  To secure the payment and performance obligations to the Lender under the Loan Agreement, Borrower and each Guarantor hereby grants Lender a security interest in all assets and equity interests in the following collateral **: N/A** (the "Additional Collateral")  Borrower and each Guarantor understands that Lender will have a security interest in the aforesaid Additional Collateral upon execution of this Security Agreement.

Each of Borrower and each Guarantor acknowledges and agrees that any security interest granted to Lender under any other agreement between Borrower and/or Guarantor and Lender will secure the obligations hereunder, and that the Borrower and/or Guarantor's payment and performance obligations under the Loan Agreement, and secured by this Security Agreement, and the Collateral and Additional Collateral granted hereunder, shall be perfected under any previously filed UCC-1 or UCC-3 statement, perfecting Lender's interest in the Collateral and Additional Collateral.

Each of Borrower and each Guarantor further acknowledges and agrees that, if Borrower and/or Guarantor enter into future agreements with Lender, any security interest granted to Lender under such future agreements will relate back to this Security Agreement, and that the Borrower and/or Guarantor's obligations, and the Collateral and Additional Collateral granted, under any such future agreements, shall relate back to, be perfected under, and made a part of, any previously filed UCC-1 or UCC-3 statement, perfecting Lender's interest in the Collateral and Additional Collateral.

Each of Borrower and each Guarantor agree to execute any documents or take any action in connection with this Security Agreement as Lender deems necessary to carry out the purpose of such agreements including, without limitation, to perfect or maintain Lender's security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements.  Each of Borrower and each Guarantor hereby authorizes Lender to file any financing statements deemed necessary by Lender to perfect or maintain Lender's security interest, which financing statement may contain notification that Borrower and Guarantor have granted a negative pledge to Lender with respect to the Collateral and the Additional Collateral, and that any subsequent lender or lienor may be tortiously interfering with Lender's rights.  Each Borrower and each Guarantor shall be jointly and severally liable for and shall pay to Lender upon demand all costs and expenses, including but not limited to attorney's fees and costs, which may be incurred by Lender in protecting, preserving and enforcing Lender's security interest and rights.

**NEGATIVE PLEDGE.**  Borrower and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional financings, loans, lien or other encumbrance of any kind with respect to any of the Collateral or the Additional Collateral, as applicable, without the prior written permission of Lender.

 **CERTIFICATED COLLATERAL.**  If any of the Collateral and/or Additional Collateral is now or in the future evidenced or represented by a certificate or certificates, each Borrower and each Guarantor shall immediately, and without the

Case 2:22-cv-08775-RGK-SK Document 52-27 Filed 09/27/23 Page 14 of 21 Page ID #:1278

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

2500 Wilson Boulevard, Suite 350, Arlington, Virginia 22201; Tel. 844-547-9396

Contract# 9207611

need to be notified, deliver such certificate(s) to Lender, duly endorsed in a manner satisfactory to Lender, to be held as Collateral and/or Additional Collateral pursuant to this Security Agreement.

**CONSENT TO ENTER PREMISES AND ASSIGN LEASE**.  Lender shall have the right to cure Borrower's default in the payment of rent for the Premises on the following terms: In the event Borrower or Guarantor are served with papers in an action against Borrower for nonpayment of rent or for summary eviction, Borrower or Guarantor shall promptly provide Lender with such papers and Lender may execute its rights and remedies under the Assignment of Lease pursuant to Section 2.12 of the Loan Agreement.  Borrower also agrees that Lender may enter into an agreement with Borrower's landlord giving Lender the right to: (a) enter Borrower's Premises and to take possession of the fixtures, equipment and other Collateral therein for the purpose of protecting and preserving same; and (b) to assign Borrower's lease to another qualified Borrower capable of operating a business comparable to Borrower's at such Premises.

**REMEDIES**.  Upon any Event of Default, Lender may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "LOAN SUMMARY", "LOAN AGREEMENT", AND THE "GUARANTY" (AS APPLICABLE) ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT.  CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT, SHALL HAVE THE MEANING SET FORTH IN THE "LOAN SUMMARY," "LOAN AGREEMENT" OR "GUARANTY," AS APPLICABLE.

**BORROWER**
By _____
(Print Name and Title)                                  (Signature)
**GUARANTOR**
By _____
(Print Name)                                  (Signature)
**GUARANTOR**
By  N/A _____
(Print Name)                                  (Signature)
**GUARANTOR**
By  N/A _____
(Print Name)                                  (Signature)

CONFIDENTIAL                    SBFA 00895

**Exhibit 25-475**

**ER1073**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

**Contract# 9207611**

# GUARANTY

**PERSONAL GUARANTY**.  Guarantor hereby unconditionally guarantees to Lender the Borrower's payment and performance of all of the obligations of, and representations, warranties, and covenants made by, Borrower in the Transaction Documents, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations").  The Guaranteed Obligations are due (i) at the time of any breach and/or Event of Default by Borrower of any of the obligations and covenants in the Transaction Documents;  (ii) at the time Borrower or Guarantor admits its inability to pay its debts, or makes a general assignment for the benefit of creditors; (iii) at the time any proceeding shall be instituted by or against Borrower or Guarantor seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts (as applicable); and/or (iv) at the time any receivership proceeding shall be instituted by or against Borrower or Guarantor.

**GUARANTOR WAIVERS**   In the event that Borrower fails to make a payment or perform any obligation or covenant under the Transaction Documents, Lender may enforce its rights under this Guaranty or any of the other Transaction Documents without first seeking to obtain payment from the Borrower, any other guarantor, or through the Security Agreement.

Lender does not have to notify Guarantor of any of the following events, and Guarantor will not be released from its obligations under this Guaranty, if it is not notified of: (i) Borrower's failure to pay timely any amount owed under the Loan Agreement; (ii) any material or adverse change in Borrower's financial condition or business operations; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations, including all collateral listed in the Security Agreement, or any other guarantee of the Guaranteed Obligations; (iv) Lender's acceptance of this Guaranty; (v) any renewal, extension or other modification of any of the Transaction Documents and/or Borrower's other obligations to Lender; and (vi) the Lender's pursuit and/or enforcement of any rights and remedies, available at law and in equity, relating to, and/or arising from, the Transaction Documents.

In addition, Lender may take any of the following actions without releasing Guarantor from any of its obligations under this Guaranty: (i) renew, extend or otherwise modify any of the Transaction Documents  or Borrower's other obligations to Lender; (ii) release Borrower from its obligations to Lender; (iii) sell, release, impair, waive or otherwise fail to realize upon, any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Guaranty; and (v) pursuit and/or enforcement of any rights and remedies, available at law and in equity, relating to, and/or arising from, the Transaction Documents.  Until all of Borrower's obligations to Lender under any of the Transaction Documents are paid in full, Guarantor shall not seek reimbursement from Borrower or any other guarantor for any amounts paid by Guarantor under any of the Transaction Documents.

Guarantor permanently waives and shall not seek to exercise the following rights that Guarantor may have against Borrower, any other guarantor or third party, any collateral, or any other real or personal property for any amounts paid by Guarantor, any other guarantor, or third party, or acts performed by Guarantor, any other guarantor, or third party, under the Transaction Documents including, without limitation: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.  In the event that Lender must return any amount paid by Borrower, any guarantor, entity, or person with respect to the Guaranteed Obligations, including, without limitation, any Borrower, guarantor, entity or person becoming subject to a proceeding under the United States

1

**CONFIDENTIAL**
**Exhibit 25-476**

SBFA 00896
**ER1074**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

**Contract# 9207611**

Bankruptcy Code or any similar law, (whether arising under Federal or State law), and/or any other Insolvency Proceeding, legal proceeding or alternative dispute resolution proceeding, the Guaranteed Obligations under this Guaranty shall remain in full force and effect and Guarantor shall be obligated for any such amounts repaid as well as attorneys' fees, costs, and interest in connection with such proceeding.

**GUARANTOR ACKNOWLEDGEMENT**.  Guarantor acknowledges that: (i) he/she understands the seriousness of the provisions of this Guaranty; (ii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iii) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.

**JOINT AND SEVERAL LIABILITY**.  The obligations hereunder of the persons or entities constituting Guarantor under this Guaranty are joint and several.

### CONSENT TO RECEIVE AUTODIALED AND PRERECORDED CALLS AND MESSAGES

LENDER, Kapitus Servicing and their subsidiaries and affiliates (collectively, "KAPITUS") may from time to time notify applicant(s) of various promotional offers and other marketing information, or contact Borrower(s) and Guarantor(s) in connection with the servicing of the Transaction Documents, or in connection with any default under the Transaction Documents.  By signing this Agreement, Borrower(s) and Guarantor(s) expressly consent and authorize  KAPITUS to call, send text messages, and/or send other electronic messages (including prerecorded or artificial voice messages) using an automatic telephone dialing system to any telephone number provided by Borrower(s) or Guarantor(s)  in the Transaction Documents, any and all applications or any administrative form or other means, including cellular phone numbers and landlines, regardless of their inclusion on any do not call list, for purposes of servicing, collections, marketing or promoting any product offered by KAPITUS.  Borrower(s) and Guarantor(s) further expressly consent and authorize KAPITUS to record all calls with KAPITUS.  Please note that you are not required to consent to be called for marketing or promotional purposes in order to qualify for financing or obtain any other products or services from KAPITUS.  If you do not agree to be called for marketing or promotional purposes, please call (844) 547-9396 or email DNC@kapitus.com.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN "LOAN SUMMARY", "LOAN AGREEMENT", AND THE "SECURITY AGREEMENT" (AS APPLICABLE) ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTY.  CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTY SHALL HAVE THE MEANING SET FORTH IN THE "LOAN SUMMARY," "LOAN AGREEMENT" OR "SECURITY AGREEMENT," AS APPLICABLE.

**GUARANTOR**
By _____
                    (Print Name)                                    (Signature)
**GUARANTOR**
By  N/A _____
                    (Print Name)                                    (Signature)
**GUARANTOR**
By  N/A _____
                    (Print Name)                                    (Signature)

CONFIDENTIAL                          SBFA 00897

**Exhibit 25-477**                          **ER1075**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

## AGREEMENT TO ARBITRATE

***PLEASE READ THIS AGREEMENT CAREFULLY.  THIS AGREEMENT TO ARBITRATE ("AGREEMENT") PROVIDES THAT DISPUTES BETWEEN STRATEGIC FUNDING SOURCE, INC. D/B/A KAPITUS AND ITS SUBSIDIARIES AND AFFILIATES, INCLUDING BUT NOT LIMITED TO KAPITUS LLC AND KAPITUS SERVICING, INC. (COLLECTIVELY, "KAPITUS"), ON ONE HAND, AND SAUSALITO CRAFTWORKS, INC., D/B/A OMNIRAX FURNITURE  COMPANY AND PHILIP ZITTELL,  (COLLECTIVELY, "YOU" OR "MERCHANT") (EACH A "PARTY" AND TOGETHER WITH KAPITUS, "THE PARTIES") MAY BE RESOLVED BY BINDING ARBITRATION.***

***ARBITRATION REPLACES THE RIGHT TO GO TO COURT, HAVE A JURY TRIAL OR INITIATE OR PARTICIPATE IN A CLASS ACTION.  IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY.  ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN IN COURT.  THIS AGREEMENT IS GOVERNED BY THE FEDERAL ARBITRATION ACT ("FAA"), AND SHALL BE INTERPRETED IN THE BROADEST WAY THAT LAW WILL ALLOW.***

**I.**   **Covered Claims.**

**a.**   You or Kapitus may arbitrate any claim, dispute or controversy between the Parties arising out of and/or related to: (i) this Agreement; (ii) any other agreement between the Parties; and/or (iii) the relationship between the Parties, whether or not related to a contract between them ("Claims").

**b.**   **If arbitration is chosen by any Party in accordance with Section III below, no Party will have the right to litigate the Claims in court or to have a jury trial on the Claims.**

**c.**   Except as stated below, all Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, Merchant's or Kapitus's negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims.  This also includes Claims made by or against anyone connected with Kapitus or Merchant or claiming through Kapitus or Merchant, or by someone making a claim through Kapitus or Merchant, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company.  Threshold issues of whether any claim is arbitrable also are subject to arbitration in accordance with this Agreement.

**II.**   **Arbitration Limits.**

**a.**   Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis.  The arbitrator has no authority to arbitrate any claim on a class or representative basis and may award relief only on an individual basis.  If arbitration is chosen by any Party, neither Merchant nor Kapitus may pursue a Claim as part of a class action or other representative action.

**b.**   Claims of two or more persons may not be combined in the same arbitration.  However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates or entities under common ownership or control of a Party are deemed one person for purposes of this Agreement.

SBFA 00898
**ER1076**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

### III.  How Arbitration Works.

**a.**  Arbitration shall be conducted by the American Arbitration Association ("AAA") according to this arbitration provision and the applicable AAA Commercial Arbitration Rules in effect when the claim is filed ("AAA Rules"), except where those rules conflict with this arbitration provision.  Merchant can obtain copies of the AAA Rules at the AAA's website (www.adr.org).  Merchant or Kapitus may choose to have a hearing, appear at any hearing by phone or other electronic means, and/or be represented by counsel.  Notwithstanding any terms to the contrary, any in-person hearing will be held in Arlington, Virginia.  The arbitration shall be conducted and the award shall be rendered in English.

**b.**  Arbitration may be requested any time, even where there is a pending lawsuit, unless discovery has fully and finally concluded, and/or a final judgment entered.  Neither Merchant nor Kapitus waives the right to arbitrate by filing or serving a complaint, answer, counterclaim, or motion in a lawsuit.  To choose arbitration, a Party must file a motion to compel arbitration in a pending matter or commence arbitration by submitting the required AAA forms and requisite filing fees to the AAA.

**c.**  The arbitration shall be conducted by a single arbitrator agreed to by the Parties within twenty (20) days of receipt by respondent of the request for arbitration (unless an extended time period is agreed to by the Parties).  In the event the Parties are unable to agree upon the selection of the arbitrator, the arbitrator shall be selected in accordance with this arbitration provision and the AAA Rules for appointing an arbitrator from the AAA National Roster.  The selected arbitrator may limit discovery.  The arbitrator shall not apply any federal or state rules of civil procedure for discovery, but the arbitrator shall honor claims of privilege recognized at law and shall take reasonable steps to protect account information and other confidential information of any Party if requested to do so.  Except as may be required by law, neither a Party nor the arbitrator may disclose the existence, content or results of any arbitration without the prior written consent of both parties, unless to protect or pursue a legal right.  The arbitrator shall apply the substantive laws of the jurisdiction specified in any contract between the parties.  If no jurisdiction is specified or if multiple jurisdictions are specified in various contracts among the Parties, the substantive laws of the Commonwealth of Virginia shall apply, without regard to any applicable principals of conflicts of law.

**d.**  The arbitrator shall make any award in writing and, if requested by Merchant or Kapitus, shall include a reasoned opinion for the award.  An arbitration award shall decide the rights and obligations only of the parties named in the arbitration, and shall not have any bearing on any other person or dispute.

**e.**  The arbitrator shall have no authority to award punitive damages, consequential damages, or other damages not measured by the prevailing Party's actual damages, except as required by statute or allowed under any agreement between the Parties.

### IV.  Paying for Arbitration Fees.

**a.**  Arbitration fees will be allocated according to the applicable AAA Rules.  All parties are responsible for their own attorney's fees, expert fees and any other expenses unless the arbitrator awards such fees or expenses to Kapitus based on a contract between the parties or applicable law.

**b.**  The Parties agree that failure or refusal of a Party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that Party to present evidence or cross-examine witnesses.  In such event, the other Party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award.  Such waiver shall not allow for a default judgment against the non-paying Party in the absence of evidence presented as provided for above.

**CONFIDENTIAL**

**Exhibit 25-479**

SBFA 00899

**ER1077**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

**V.**      **The Final Award.**

**a.**      Any award rendered by the arbitrator shall be final, and binding on the Parties, and may be entered and enforced in any court having jurisdiction, and any court where a Party or its assets is located (to which jurisdiction the Parties consent for the purposes of enforcing such award) unless a Party appeals such award in writing to the AAA within 30 days of notice of the award pursuant to the AAA's Optional Appellate Arbitration Rules. The arbitration appeal shall be determined by a panel of 3 arbitrators. The panel will consider all facts and legal issues anew based on the same evidence presented in the prior arbitration and will make decisions based on a majority vote. Arbitration fees for the arbitration appeal shall be allocated according to the applicable AAA Rules. An award by a panel on appeal is final. A final award is subject to judicial review as provided by applicable law.

**VI.**      **Miscellaneous.**

**a.**      <u>Survival.</u>   This Agreement shall survive: (i) termination of the account or the relationship between Merchant and Kapitus; (ii) repayment of any amounts owed by Merchant to Kapitus; (iii) the termination of any other agreement between Merchant and Kapitus; (iv), the filing of any petition or institution of any proceeding by or against any Party under any provisions of the Bankruptcy Reform Act, Title 11 of the United States Code, or any other similar law relating to bankruptcy, insolvency or other relief for debtors, or general affecting creditor's rights or seeking the appointment of a receiver, trustee, custodian, administrator or liquidator of or for any Party's assets; (v) any sale, transfer and/or assignment of Merchant's account with Kapitus, or amounts owed on Merchant's account, to another person or entity; (vi) the closure, suspension, dissolution or termination of Merchant's business; and (vi) the sale, transfer, and/or assignment of Merchant's business, any interest therein that constitutes a change of control in such business, and/or substantially all of Merchant's assets.

**b.**      <u>Severability.</u>   If any part of this Agreement is deemed invalid or unenforceable, the other terms shall remain in force, except that there can be no arbitration and/or litigation of a class or representative Claim.

**c.**      <u>Entire Agreement, Amendment, Successors, and Assigns.</u>   This Agreement contains the entire understanding among the Parties concerning the subject matter hereof. No representation, promise, statement of intention has been made by any Party concerning the subject matter hereof that is not embodied in this Agreement, and no Party shall be bound by, or liable for, any such alleged representation, promise or statement of intention not set forth herein. This Agreement may not be amended, modified, severed or waived, except through a written agreement between Merchant and Kapitus. All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, executors, trustees, administrators, representatives, receivers, liquidators, successors, transferees, and assigns of the Parties. This Agreement shall not be assignable or otherwise transferrable by Merchant without Kapitus's prior written consent to be exercised solely in Kapitus's discretion. Kapitus may assign or otherwise transfer this Agreement.

**d.**      <u>Counterparts: Electronic Signatures.</u>   This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one instrument. Electronically transmitted PDFs, facsimile copies of signatures, or electronically transmitted copies of signatures complying with the US Federal ESIGN Act of 2000 (e.g. www.docusign.com) shall be treated as original signatures for all purposes.

**e.**      <u>Authorization.</u> Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**CONFIDENTIAL**                                                                      SBFA 00900
**Exhibit 25-480**                                                                      **ER1078**

DocuSign Envelope ID: A2F83FE5-A1F4-46FE-8B73-F2AE124BCD72

**f.**     **Waiver.** No failure on the part of Kapitus to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**g.**     **Further Assurances**. Each Party agrees to take all reasonable steps necessary to effectuate the terms of this Agreement. The Parties agree that they will take all actions, execute, and deliver any and all documents reasonably necessary to carry out the intent and purpose of this Agreement, including, without limitation any documents and fees necessary for the commencement and conduct of arbitration as set forth herein.

**h.**     **No Interpretation of Captions or Headings**. The captions and headings within this Agreement are for ease of reference only and are not intended to create any substantive meaning or to modify the terms and clauses either following them or contained in any other provision of this Agreement

**i.**     **Notices.** All notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to Kapitus at 2500 Wilson Boulevard, Suite, 350, Arlington, VA 22201, and to Merchant and/or Guarantor at the address(es) provided by Merchant or Guarantor to Kapitus and as reflected in Kapitus's system of record, and shall become effective only upon receipt. In addition, all notices, requests, consent, demands and other communications must be emailed to generalcounsel@kapitus.com and ████████████████████

**MERCHANT**
By  _____████████████_____
          (Print Name and Title)

**KAPITUS**
By  Steve Podhorzer
          (Company Officer)

**GUARANTOR**
By  ____████____
          (Print Name)

**GUARANTOR**
By  N/A
          (Print Name)

**GUARANTOR**
By  N/A
          (Print Name)

(Signature)

(Signature)

(Signature)

(Signature)

4
CONFIDENTIAL

SBFA 00901

**Exhibit 25-481**

**ER1079**

DocuSign Envelope ID: CF982192-4B2D-44BE-84B5-77EC39E2831C



| | ITEMIZATION OF AMOUNT FINANCED | | |
|---|---|---|---|
| 1 | Amount Given Directly to You | | $64,568.20 |
| 2 | Amount Paid on Your Account with CAN Capital | | $81,681.80 |
| 3 | Amount Paid on Your Account with Kapitus (Contract ID #N/A) | | N/A |
| 4 | Wire Fee | | N/A |
| 5 | Amount Provided to You or on Your Behalf (1+2+3+4) | | $146,250.00 |
| 6 | Prepaid Finance Charge: Origination/Closing Fee | | $3,750.00 |
| 7 | Principal Balance (5+6) | | $150,000.00 |

(272 of 295), Page 272 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 272 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-28   Filed 09/27/23   Page 1 of 19   Page ID
#:1286

1  ROB BONTA
   Attorney General of California
2  LISA W. CHAO
   MICHAEL D. GOWE
3  Supervising Deputy Attorneys General
   DOUGLAS J. BETETA (SBN: 260377)
4  RACHEL J. YOO (SBN: 293598)
   Deputy Attorneys General
5   300 South Spring Street, Suite 1702
    Los Angeles, CA  90013-1230
6   Telephone:  (213) 269-6622
    Fax:  (916) 731-2128
7   E-mail:  Douglas.Beteta@doj.ca.gov
             Rachel.Yoo@doj.ca.gov
8  *Attorneys for Defendant*
   *Clothilde Hewlett, solely in her official capacity as*
9  *Commissioner of the California Department of*
   *Financial Protection and Innovation*
10

11            IN THE UNITED STATES DISTRICT COURT

12           FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                     WESTERN DIVISION

14

15
   **SMALL BUSINESS FINANCE**            Case No.: 22-cv-08775-RGK-SK
16 **ASSOCIATION,**
                                         **DEFENDANT'S STATEMENT OF**
17                         Plaintiff,    **UNCONTROVERTED FACTS AND**
                                         **CONCLUSIONS OF LAW IN**
18          **v.**                       **SUPPORT OF MOTION FOR**
                                         **SUMMARY JUDGMENT, OR IN**
19 **CLOTHILDE HEWLETT, solely in**      **THE ALTERNATIVE SUMMARY**
   **her official capacity as commissioner**  **ADJUDICATION**
20 **of the California Department of**
   **Financial Protection and Innovation,**
21
                                         Date:         October 30, 2023
22                         Defendant.    Time:         9:00 a.m.
                                         Courtroom:    850
23                                       Judge:        Hon. R. Gary Klausner
                                         Trial Date:   December 12, 2023
24                                       Action Filed: December 2, 2022

25

26

27         Pursuant to Local Rule 56-1, Defendant Clothilde Hewlett, solely in her

28 official capacity as Commissioner of the California Department of Financial

                                    1

**ER1081**

(273 of 295), Page 273 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 273 of 295
Case 2:22-cv-08775-RGK-SK   Document 52-28   Filed 09/27/23   Page 2 of 19   Page ID
#:1287

Protection and Innovation (Department), submits the following Statement of
Uncontroverted Facts.

### UNCONTROVERTED FACTS

| No. | Uncontroverted Fact | Supporting Evidence |
|-----|---------------------|---------------------|
| 1. | The purpose of Senate Bill-1235 is to "help small businesses better understand the terms and costs of the financing available to them in the commercial financing market."  The Regulations are designed to protect vulnerable small businesses that, often lacking access to traditional bank loans, turn to the Internet to find non-traditional and complex financing products to help keep their businesses afloat. | ▪ Yoo Decl., ¶ 3 (Dkt. 52-6)<br>▪ Ex. 6 at p. 52: Purpose, Author's Statement (Dkt. 52-8) |
| 2. | In most sales-based financing, a borrower (i.e., the business) "sells" a portion of its future sales receipts to a lender in exchange for a lump sum advance. | ▪ Compl., ¶ 9 (Dkt. 1)<br>▪ Ex. 20 at p. 369: Bakes Depo., pp. 19:17-20:5 (Dkt. 52-22)<br>▪ Ex. 21 at p. 399: Brown Depo., pp. 22:12-23:5 (Dkt. 52-23)<br>▪ Ex. 12 at p. 194: 1. Sales (Dkt. 52-14)<br>▪ Ex. 13, at p. 216: Key Terms (Dkt. 52-15)<br>▪ Ex. 14 at p. 230: Sale Confirmation (Dkt. 52-16)<br>▪ Ex. 10 at p. 102: Purchase and Sale of Future Receivables (Dkt. 52-12) |

2

| No. | Uncontroverted Fact | Supporting Evidence |
|-----|---------------------|---------------------|
| | | ▪ Ex. 11 at p. 167: ¶ 1 (Dkt. 52-13)<br>▪ Ex. 9 at p. 87: Sale and Assignment of Future Receivables (Dkt. 52-11)<br>▪ Ex. 16 at pp. 304-305: Levitin Expert Report, ¶¶ 34, 41 (Dkt. 52-18) |
| 3. | The lender charges the borrower a "discount," which is the difference between the sold future receivables and the advanced amount. | ▪ Ex. 20 at p. 372: Bakes Depo., p. 136:4-6 (Dkt. 52-22)<br>▪ Ex. 21 at p. 401: Brown Depo., p. 114:16-18 (Dkt. 52-23)<br>▪ Ex. 24 at p. 446: Tumulty Depo., p. 138:8-12 (Dkt. 52-26)<br>▪ Ex. 16 at p. 305: Levitin Expert Report, ¶ 41 (Dkt. 52-18) |
| 4. | The discount is fixed and does not grow over the term of the financing. | ▪ Ex. 20 at p. 371: Bakes Depo., p. 21:3-9 (Dkt. 52-22) |
| 5. | Lender often deducts an up-front fee from the advanced amount. | ▪ Ex. 20 at p. 374: Bakes Depo., p. 241:12-15 (Dkt. 52-22)<br>▪ Ex. 22 at p. 412: Carlson Depo., p. 161:17-21 (Dkt. 52-24)<br>▪ Ex. 13 at p. 216: Processing Fee (Dkt. 52-15)<br>▪ Ex. 14 at p. 230: Closing Fee (Dkt. 52-16)<br>▪ Ex. 10 at p. 113: Underwriting Fees (Dkt. 52-12)<br>▪ Ex. 16 at p. 306: Levitin Expert Report, ¶ 42 (Dkt. 52-18) |

3

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 6. | The borrower then pays the lender a certain percentage of its sales from a designated account, approved by the lender, on a daily or weekly basis until the borrower pays back the advanced amount plus the "discount." | <ul><li>Compl., ¶ 9 (Dkt. 1)</li><li>Ex. 20 at p. 369: Bakes Depo., pp. 19:17-20:5 (Dkt. 52-22)</li><li>Ex. 21 at p. 399: Brown Depo., pp. 22:12-23:5 (Dkt. 52-23)</li><li>Ex. 12 at pp. 194, 102: Daily Percentage (Dkt. 52-14)</li><li>Ex. 13 at pp. 216, 217: Monthly Percentage, Approved Account (Dkt. 52-15)</li><li>Ex. 14 at pp. 230, 231: Specified Percentage, Fixed ACH Terms (Dkt. 52-16)</li><li>Ex. 10 at p. 102: Specified Percentage, Purchase and Sale of Future Receivables (Dkt. 52-12)</li><li>Ex. 11 at pp. 166, 167, 168: Primary Terms, ¶ 6 (Dkt. 52-13)</li><li>Ex. 9 at pp. 86-87: Specified Percentage, Your Bank Account (Dkt. 52-11)</li></ul> |
| 7. | A fixed payment contract specifies both a fixed percentage and fixed payment amount that the lender collects. | <ul><li>Ex. 13 at p. 216: Monthly Percentage, Daily Amount (Dkt. 52-15)</li><li>Ex. 14 at pp. 230-231: Specified Percentage, Fix ACH Terms (Dkt. 52-16)</li><li>Ex. 10 at p. 102: Specified Percentage, Specified Weekly Amount (Dkt. 52-12)</li><li>Ex. 9 at p. 86: Specified Percentage, Remittance Amount (Dkt. 52-11)</li></ul> |

ER1084

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 8. | Because the fixed payment amount is a dollar estimate of the fixed percentage based on past sales, the contract allows the borrower to seek adjustments, often called true-ups, when the fixed payment amount exceeds the contracted fixed percentage. | <ul><li>Ex. 9 at p. 88: Reconciliations and Adjustments to the Weekly Remittance Amount (Dkt. 52-11)</li><li>Ex. 10 at pp. 102, 111: Purchase and Sale of Future Receivables, Variability Acknowledgement (Dkt. 52-12)</li><li>Ex. 13 at p. 218: Reconciliations (Dkt. 52-15)</li><li>Ex. 14 at p. 231: Reconciliation (Dkt. 52-16)</li></ul> |
| 9. | To seek a true-up, the borrower is required to prove the decrease in sales by collecting and submitting months of bank statements, all while continuing to make daily or weekly payments. | <ul><li>Ex. 9 at p. 88: Reconciliations and Adjustments to the Weekly Remittance Amount (Dkt. 52-11)</li><li>Ex. 13 at p. 218: Adjustment of Daily Amount (Dkt. 52-15)</li><li>Ex. 14 at p. 231: Reconciliation (Dkt. 52-16)</li></ul> |
| 10. | The contract is usually silent as to how quickly the lender must respond to the borrower's request, and whether to make an adjustment is within the sole discretion of the lender. | <ul><li>Ex. 9 at p. 88: Reconciliations and Adjustments to the Weekly Remittance Amount (Dkt. 52-11)</li><li>Ex. 10 at p. 102: Purchase and Sale of Future Receivables, (Dkt. 52-12)</li><li>Ex. 13 at p. 218: Reconciliations (Dkt. 52-15)</li><li>Ex. 14 at p. 231: Reconciliation (Dkt. 52-16)</li><li>Ex. 16: Levitin Expert Report, ¶¶ 47-48 (Dkt. 52-18)</li></ul> |

ER1085

(277 of 295), Page 277 of 295 Case: 24-50, 05/24/2024, DktEntry: 14.6, Page 277 of 295
Case 2:22-cv-08775-RGK-SK Document 52-28 Filed 09/27/23 Page 6 of 19 Page ID
#:1291

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 11. | Oftentimes the lender limits an adjustment to once a month or forfeits the borrower's right to ask for an adjustment unless it receives a timely request. | ▪ Ex. 9 at p. 88: Reconciliations at Your Request (Dkt. 52-11)<br>▪ Ex. 10 at p. 102: Purchase and Sale of Future Receivables (Dkt. 52-12)<br>▪ Ex. 13 at p. 218: Return of Overages (Dkt. 52-15)<br>▪ Ex. 14 at p. 231: Reconciliation (Dkt. 52-16) |
| 12. | Some lender also requires a showing of 20% or more decrease in sales. | ▪ Ex. 9 at p. 88: Adjustments to the Weekly Remittance Amount (Dkt. 52-11) |
| 13. | Adjustments are usually temporary and the borrower must continue to prove its decrease in sales as often as every 14 days. | ▪ Ex. 10 at p. 102: Purchase and Sale of Future Receivables (Dkt. 52-12)<br>▪ Ex. 13 at p. 218: Adjustment of Daily Amount (Dkt. 52-15)<br>▪ Ex. 14 at p. 231: Reconciliation (Dkt. 52-16) |
| 14. | When the borrower fails to submit supporting documents, the percentage returns to the original. | ▪ Ex. 13 at p. 218: Adjustment of Daily Amount (Dkt. 52-15) |
| 15. | Unlike a fixed payment contract, a variable payment contract does not specify a fixed payment amount and instead only states a fixed percentage. | ▪ Ex. 11 at p. 166: Primary Terms (Dkt. 52-13)<br>▪ Ex. 12 at p. 194: Daily Percentage (Dkt. 52-14) |
| 16. | The borrower is required to give the lender almost real-time access to a designated account where its sales receipts accumulate, which allows the | ▪ Ex. 11 at p. 168: ¶ 6 (Dkt. 52-13)<br>▪ Ex. 12 at p. 196: Daily Percentage (Dkt. 52-14) |

ER1086

| No. | Uncontroverted Fact | Supporting Evidence |
|-----|---------------------|---------------------|
|  | lender to take the exact agreed-upon percentage, without the need of any adjustment, on a daily or weekly basis. | ▪ Ex. 24 at p. 460: Tumulty Depo., p. 322-9-15 (Dkt. 52-26) |
| 17. | Many sales-based financing contracts allow prepayment and often encourage it by offering a prepayment discount. | ▪ Ex. 9 at p. 98: Repurchase Addendum (Dkt. 52-11)<br>▪ Ex. 10 at p. 115: Early Remittance Discount Offer (Dkt. 52-12)<br>▪ Ex. 11 at p. 171: ¶ 17 (Dkt. 52-13)<br>▪ Ex. 13 at p. 227: Future Receipts Sale Agreement Addendum (Dkt. 52-15)<br>▪ Ex. 14 at p. 236: Early Delivery Option (Dkt. 52-16)<br>▪ Ex. 20 at p. 373: Bakes Depo., p. 238:14-21 (Dkt. 52-22) |
| 18. | Sales-based financing contracts contain extensive representations, warranties, and covenants where the borrower promises, among other things, that it will not cause any diversion of its sales receipts from the account where the lender monitors and takes payments. | ▪ Ex. 9 at pp. 89-90: Merchant's Representations, Warranties, and Covenants, Bad Acts (Dkt. 52-11)<br>▪ Ex. 10 at p. 105: Protections Against Default (Dkt. 52-12)<br>▪ Ex. 12 at p. 101: Merchant's Representations, Warranties, and Covenants (Dkt. 52-14)<br>▪ Ex. 13 at p. 2710: Customer's Representations, Warranties, and Covenants (Dkt. 52-15)<br>▪ Ex. 14 at p. 237: Event of Default (Dkt. 52-16)<br>▪ Ex. 16 at pp. 309-310: Levitin Expert Report, ¶¶ 62-69 (Dkt. 52-18) |

**ER1087**

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 19. | If it does so, the borrower is considered in breach and the lender is entitled to various contractual remedies such as monetary damages, a default fee, an accelerated payment schedule where the full outstanding amount becomes due immediately, and a personal guarantee by the owner. | • Ex. 9 at p. 91: Remedies for Bad Acts (Dkt. 52-16)<br>• Ex. 10 at pp. 105, 113: Protections Against Default, Default Waiver Fee (Dkt. 52-12)<br>• Ex. 11 at p. 170: ¶13 (Dkt. 52-13)<br>• Ex. 12 at p. 105: Individual Liability of Guarantors (Dkt. 52-14)<br>• Ex. 13 at pp. 218, 222: Principal's  Guarantee of Performance, Remedies (Dkt. 52-15)<br>• Ex. 14 at pp. 233, 237: Default Fee, Remedies for Default (Dkt. 52-16) |
| 20. | Some lenders take security interests in any and all future receipts the borrower has and will ever have as well as the owner's personal property and deem the borrower in breach on all contracts with the lender that are not current. | • Ex. 10 at pp. 110, 111 : Security Interest, Cross-Collateral, Guarantor Waiver (Dkt. 52-12)<br>• Ex. 11 at p. 171: ¶ 18 (Dkt. 52-13)<br>• Ex. 14 at pp. 242-243: Security Agreement, Cross-Collateral (Dkt. 52-16) |
| 21. | Closed-end credit is identical to a traditional loan where the borrower makes regular payments with interest until the principal and interest are paid off. | • Compl., ¶ 9 (Dkt. 1)<br>• Ex. 12 at p. 203: Business Loan and Security Agreement (Dkt. 52-14)<br>• Ex. 10 at. 120: Loan Details (Dkt. 52-12)<br>• Ex. 25 at p. 463: Loan Summary (Dkt. 52-27) |
| 22. | Open-end credit is a line of credit where the borrower gets approved up to a | • Compl., ¶ 9 (Dkt. 1)<br>• Ex. 12 at p. 179: Business Line of Credit and |

8

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | credit limit and is free to withdraw and pay back within that limit as it chooses. | Security Agreement (Dkt. 52-14) |
| 23. | Rapid and Rewards Network do not offer true-ups. | ▪ Ex. 4 at p. 2 (Dkt. 52-6)<br>▪ Ex. 24 at p. 460: Tumulty Depo., p. 322-9-15 (Dkt. 52-26)<br>▪ Carrier Decl., ¶ 6 (Dkt. 52-1) |
| 24. | SBFA has argued that the word "payment" indicates that the product is a loan while the word "remittance" does not, and thus, all references to "payment" should be replaced by "remittance." | ▪ Ex. 24 at p. 451: Tumulty Depo., p. 149:12-14 (Dkt. 52-26)<br>▪ Ex. 21 at p. 402: Brown Depo., p. 124:6-8 (Dkt. 52-23)<br>▪ Ex. 22 at p. 415: Carlson Depo., pp. 216:2-217:9 (Dkt. 52-24) |
| 25. | SBFA has alleged that "owe" implies "an absolute payment obligation" whereas "due" can be used in any product. | ▪ Compl., ¶ 28, p. 17:2-4 (Dkt. 1)<br>▪ Ex. 22 at p. 416: Carlson Depo., p. 217:4-7 (Dkt. 52-24) |
| 26. | When asked about the basis of such implications and alleged costumer understanding for certain terms, the representative of Kapitus testified that "it's sort of basic English." | ▪ Ex. 22 at p. 410: Carlson Depo., pp. 153: 23-154:10 (Dkt. 52-24) |
| 27. | "Pay" means "to discharge a debt or obligation." | ▪ https://www.merriam-webster.com/dictionary/pay |
| 28. | "Remit" means "to send (money) to a person or place especially in payment of a demand, account, or draft." | ▪ https://www.merriam-webster.com/dictionary/remit |

9

**ER1089**

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 29. | "Owe" means "to be under obligation to pay or repay in return for something received." | ▪ https://www.merriam-webster.com/dictionary/owe |
| 30. | "Due" is defined as "owed or owing as a debt." | ▪ https://www.merriam-webster.com/dictionary/due |
| 31. | Kapitus' contract states "*repayment* of any amounts *owed* by Merchant to Kapitus" and "any sale, transfer and/or assignment of … amounts *owed* on Merchant's account." Forward "may share information regarding the Amount Sold and/or *payment* made or *owed* by Customer to Purchaser in accordance with this agreement…." | ▪ Ex. 14 at p. 249: Survival (Dkt. 52-16)<br>▪ Ex. 13 at p. 222: Financial Condition and History (Dkt. 52-15) |
| 32. | SBFA asserts that "Estimated Total Payment" should be replaced by "Expected Total Remittance" because the word "estimate" connotes that the delivered amount would be within certain ranges whereas the word "expected" suggest an exact amount. | ▪ Ex. 24 at p. 447: Tumulty Depo., pp. 143:11-146:13, 149:1- 16. (Dkt. 52-26) |
| 33. | SBFA admitted that there is no guarantee that customers will pay back the entire amount owed. | ▪ Ex. 24 at p. 448: Tumulty Depo., pp. 144:3-5, 145:5-12. (Dkt. 52-26) |
| 34. | "Estimate" is defined as "a rough or approximate calculation. | ▪ https://www.merriam-webster.com/dictionary/estimate |

ER1090

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 35. | SBFA's members utilize the word "estimate" in its contracts: "The Specified Amount is an *estimate* of the Specified Percentage", "[T]he Daily Amount represents the parties' best *estimate* of the amount of Future Receipts." | • Ex. 14 at p. 231: Fixed ACH Terms (Dkt. 52-16)<br>• Ex. 13 at p. 218: Return of Overages (Dkt. 52-15) |
| 36. | Multiple SBFA's members stated that not a single customer has complained of or expressed confusion about the Regulations: Q: "Is there any customer that you can tell me … because of these California regulations, they decided not to choose Rapid[?]" A: "I don't have anything like that…." | • Ex. 24 at p. 457: Tumulty Depo., p. 310:4-10, 311:14-312:1 (Dkt. 52-26)<br>• Ex. 11 at p. 162: Rewards Network's Response to Agreed Request No. 3 (Dkt. 52-13)<br>• Ex. 9 at p. 78: Coast Funding's Declaration ¶ 5 (Dkt. 52-11)<br>• Ex. 10 at p. 2: Credibly's Declaration, Paragraph 4 (Dkt. 52-12) |
| 37. | In Forward's contract (Exhibit 13) where the daily payment amount is $240, it would take 100 days for Forward to collect the $24,000 "Amount Sold." | • Ex. 13 at p. 216: Key Terms (Dkt. 52-15) |
| 38. | Rapid commonly estimates payment terms for its own internal projections and analyses. | • Ex. 24 at p. 454: Tumulty Depo., pp. 286:4-21; 288:8-10; 289:14-19 (Dkt. 52-26)<br>• Ex. 17: Columns G, K, and L (Dkt. 52-19) |
| 39. | In Forward's contract (Exhibit 13), a borrower sold its future receipts of | • Ex. 13 at pp. 216, 218: Key Terms, Adjustment of Daily Amount (Dkt. 52-15) |

**ER1091**

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | $24,000 to Forward in exchange for $16,000. It agreed to pay 16% of its monthly receipts, which Forward estimated to be $240 per every business day. If sales lag and the borrower needs to lower the monthly percentage (and daily payment), it needs to collect "three months" bank statements to show its decrease in sales. The contract is silent as to how quickly Forward must make a decision, and even if Forward finds the adjustment is warranted, it only makes a temporary adjustment "for 14 days." The adjusted percentage "revert[s] back" unless the borrower continues to submit its bank statements "every 14 days." | |
| 40. | If the borrower does not have enough money to pay Forward because it used its sales receipt for other, necessary business costs, such as payroll, or blocks Forward's debit to pay its employee, the borrower is in breach. "Customer will not take any action to reduce … prevent the deposit of all Future Receipts into the Approved Account." | ▪ Ex. 13 at p. 219: Customer's Representations, Warranties and Covenants (Dkt. 52-15) |

**ER1092**

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 41. | Once the borrower breaches the contract, it triggers a whole host of remedies Forward can seek including $2,500 in "liquidated damages" and a collection action as well as a personal guarantee against the owner. | ▪ Ex. 13 at pp. 218, 219, 222: Principal's Guarantee of Performance and Liability for Breach of Representation, Warranty, or Covenant; Blocked Account Damages, Remedies (Dkt. 52-15) |
| 42. | Kapitus limits a reconciliation to "once every 30 days" regardless of whether the payment is due daily or weekly. | ▪ Ex. 14 at pp. 231, 266: Fixed ACH Terms (Dkt. 52-16) |
| 43. | Kapitus's contract states that "[s]eller will not … permit any event to occur that could cause diversion of any of Seller's receipts." | ▪ Ex. 14 at p. 237: Events of Default (Dkt. 52-16) |
| 44. | Upon breach, the outstanding amount is accelerated and "become due and payable in full immediately."  The business owner becomes personally liable to Kapitus. | ▪ Ex. 14 at pp. 237, 643: Remedies for Default, Personal Guaranty of Performance (Dkt. 52-16) <br> ▪ Ex. 16 at 311: Levitin Expert Report, ¶¶ 70-76 (Dkt. 52-18) <br> ▪ Ex. 25 at pp. 469, 476: Remedies for Default, Guaranty |
| 45. | Upon breach, Kapitus can enforce its security interest in all collateral, which includes all receivables, inventory, equipment, intangibles, investment, cash, and UCC Article 9 items "whether now or thereafter owned or acquired by | ▪ Ex. 14 at pp. 237, 640: Remedies for Default, Security Agreement (Dkt. 52-16) <br> ▪ Ex. 16 at 309: Levitin Expert Report, ¶ 61 (Dkt. 52-18) <br> ▪ Ex. 25 at p. 473: Security Agreement (Dkt. 52-27) |

ER1093

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | [the borrower] and wherever located, and all proceeds of them" not just the receivables Kapitus purportedly bought. | |
| 46. | Kapitus records a UCC statement against both its loan and sales-based financing borrowers and the collateral it takes against both borrowers is identical. | ▪ Ex. 14 at pp. 235: UCC Agent (Dkt. 52-16)<br>▪ Ex. 22 at p. 417: Carlson Depo., pp. 225:7-18, 226:9-23. (Dkt. 52-24)<br>▪ Ex. 25 at p. 467: UCC Agent (Dkt. 52-27) |
| 47. | Kapitus' contracts contains a "cross-default" provision when a borrower breaches one contract with Kapitus, it is automatically deemed to have breached any other contract with Kapitus, even if it is fully complying with it. | ▪ Ex. 22 at p. 419: Carlson Depo., pp. 240:23-242:18. (Dkt. 52-24)<br>▪ Ex. 14 at pp. 237, 641: Events of Default, Cross-Collateral (Dkt. 52-24)<br>▪ Ex. 25 at 469, 474: Events of Default, Cross-Collateral (Dkt. 52-27) |
| 48. | Kapitus admits that cross-default is "a common condition" that "[m]ost lenders have." | ▪ Ex. 22 p. at 419: Carlson Depo., pp. 240:23-242:18 (Dkt. 52-24) |
| 49. | According to Kapitus, it is a lender when it enters a loan transaction, but it is not a lender when it signs a sales-based financing contract. | ▪ Ex. 22 at p. 415: Carlson Depo., pp. 216:2-19; 240:23-242:18 (Dkt. 52-24) |
| 50. | Federal Reserve Board's study shows that small business owners "view [sales-based financing] companies … as lenders." | ▪ Yoo Decl., ¶ 2<br>▪ Ex. 5 at p. 14: "Browsing to Borrow: 'Mom & Pop' Small Business Perspectives on Online Lenders" (Dkt. 52-7) |

ER1094

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | ▪ Ex. 16 at pp. 312-313: Levitin Expert Report, ¶¶ 82-88 (Dkt. 52-18) |
| 51. | SBFA's own website states that "Our members have developed efficient lending platforms." | ▪ Ex. 22 at p. 428: Carlson 30(b)(6) Depo., pp. 17:7-18:20 (Dkt. 52-24) |
| 52. | When queried, one of SBFA's 30(b)(6) witnesses stated that the website was using "lending" "in a colloquial sense." | ▪ Ex. 22 at p. 428: Carlson 30(b)(6) Depo., pp. 17:7-18:20 (Dkt. 52-24) |
| 53. | Kapitus requires all borrowers to obtain business interruption insurance and be named as "a loss payee and additional insured." | ▪ Ex. 14 at p. 236: Insurance (Dkt. 52-16) ▪ Ex. 25 at p. 888: Insurance (Dkt. 52-27) ▪ Ex. 16 at p. 312: Levitin Expert Report, ¶ 80 (Dkt. 52-18) |
| 54. | According to the Federal Reserve's study published in 2018, more than half of participant-small businesses "expressed dissatisfaction" with online lenders, and one of the major sources of the complaints was the lack of consistency across products which "ma[de] it difficult for small business owners to estimate [the cost] of the financing and to compare products." According to the study, small businesses "didn't necessarily know—or care— | ▪ Ex. 5 at pp. 15, 24, 33-34, 36 (Dkt. 52-7) ▪ Ex. 16: Levitin Expert Report, ¶¶ 89-111 (Dkt. 52-18) |

15

ER1095

| No. | Uncontroverted Fact | Supporting Evidence |
|-----|---------------------|---------------------|
|  | about technical distinctions between traditional loans and other credit products, such as [sales-based financing]." They simply wanted disclosures containing terms that are "familiar to them; that is, discussed in a manner typically used for traditional credit products" in a "standardized" form that includes "all costs (that is, no hidden fees)." When asked what information was important, they chose "APR, repayment amount, frequency of payments, and prepayment penalties." The vast majority also wanted information early on even though "actual [figures] may vary" because such information would allow them "to compare options and to make decisions on whether to apply." |  |
| 55. | The Regulations employed all four metrics cited by the small businesses in the Federal Reserve's study. | ▪ Cal. Code Regs. tit. 10, §§ 911(a)(4), (a)(6), (a)(7), (a)(10), 914 (a)(3), (a)(5), (a)(7), (a)(9), (a)(10). |
| 56. | Consistent with the survey participants' complaints, some of SBFA members' contracts executed prior to the | ▪ Ex. 14 at p. 252 (Dkt. 52-16)<br>▪ Ex. 10 at p. 146: Purchase and Sale of Future Receivables (Dkt. 52-12)<br>▪ Ex. 11 at p. 166: Primary Purchase and Sale of Future |

ER1096

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | Regulations do not show these metrics and some continue to not disclose them. | Receivables, Terms (Dkt. 52-13) |
| 57. | APR calculates the cost of the financing "over a one-year period" irrespective of the duration of financing products, and thus, allows an "apples-to-apples" comparison across-the-board. | • Yoo Decl., ¶ 15 (Dkt. 52-6)<br>• Ex. 18 (Dkt. 52-20)<br>• Ex. 16 at pp. 317-319, 322-323: Levitin Expert Report, ¶¶ 112-125, 144-148 (Dkt. 52-18) |
| 58. | CFPB recommends borrowers to use APR in comparing financing options: "You don't need to worry about the math.  Just keep in mind that the APR does matter because it provides a shorthand way for you to compare the cost of two or more loans." | • Yoo Decl., ¶ 16 (Dkt. 52-6)<br>• Ex. 19 (Dkt. 52-21) |
| 59. | The length of lenders' contracts vary from 10 pages to 21 pages, and the required disclosures occupy at most 2 pages. | • Yoo Decl., ¶ 23 (Dkt. 52-6) |
| 60. | There is no restriction as to what lenders may provide in addition to the required disclosures or state in those additional documents. | • Ex. 8 at p. 74: Response to Request for Admission No. 13 (Dkt. 52-10)<br>• Yoo Decl., ¶ 5 (Dkt. 52-6)<br>• Carriere Decl., ¶ 3 (Dtk. 52-1) |
| 61. | During the rulemaking process, the Department determined that complying with the Regulations would not be excessively expense and Microsoft | • Carriere Decl., ¶ 5 (Dtk. 52-1)<br>• Ex. 2 at p. 3: Response to Comment 1.2.14 (Dkt. 52-4)<br>• Ex. 3 at pp. 3-63 (Dkt. 52-5) |

ER1097

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | Excel provides an affordable means to calculate APRs pursuant to the Regulations. | ▪ Ex. 15 at p. 7: O'Neil Expert Report (Dkt. 52-17)<br>▪ Yoo Decl., ¶ 12 (Dkt. 52-6) |
| 62. | Kapitus expressly admitted that the cost of providing disclosures does not outweigh the benefits of doing business in California. | ▪ Ex. 22 at p. 408: Carlson Depo., pp. 136:23-137:4 (Dkt. 52-24)<br>▪ Ex. 24 at p. 445: Tumulty Depo. p. 135:2-7 (Dkt. 52-26) |
| 63. | To date, SBFA has failed to state what their members' costs of compliance have been or to otherwise show that those costs are out of line with their operating costs. | ▪ Ex. 22 at p. 413: Carlson Depo., pp. 178:11-179:19 (Dkt. 52-24)<br>▪ Ex. 24 at p. 452: Tumulty Depo., pp. 158:14-159:9 (Dkt. 52-26)<br>▪ Ex. 20 at p. 375: Bakes Depo., p. 252:3-22 (Dkt. 52-24)<br>▪ Ex. 7 at p. 64: SBFA's Response to the Department's Request for Production of Documents No. 102  (Dkt. 52-9)<br>▪  Yoo Decl., ¶ 4 (Dkt. 52-6) |
| 64. | As discovery in this action has shown, the required disclosures are invariably presented to customers with the underlying contracts, but none of the participants in SBFA's survey received the disclosures with the underlying contract. | ▪ Yoo Decl., ¶ 23  (Dkt. 52-8)<br>▪ Dr. Kingsley's Expert Report, pp. 58-63<br>▪ Carriere Decl., ¶ 7 (Dkt. 52-1) |

ER1098

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 65. | Previously, the Department determined that certain recourse options such as business disruption insurance suggests that a transaction is a loan. | ▪ Carriere Decl., ¶ 4 (Dkt. 52-1)<br>▪ Ex. 1: Department's opinion letters (Dkt. 52-2) |

Dated: September 27, 2023

ROB BONTA
Attorney General of California
LISA W. CHAO
MICHAEL D. GOWE
Supervising Deputy Attorneys General

*/s/ Rachel J. Yoo*
_____

Rachel J. Yoo
Douglas J. Beteta
Deputy Attorney General

*Attorneys for Defendant Clothilde Hewlett, solely in her official capacity as Commissioner of the California Department of Financial Protection and Innovation*

ER1099

1

2

3

4

5

6

7

8          **IN THE UNITED STATES DISTRICT COURT**

9       **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10              **WESTERN DIVISION**

11

12

| | |
|---|---|
| **SMALL BUSINESS FINANCE ASSOCIATION,** | Case No.: 2:22-cv-08775-RGK-SK |
| Plaintiff, | **[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **CLOTHILDE HEWLETT, solely in her official capacity as commissioner of the California Department of Financial Protection and Innovation,** | Date:      October 30, 2023<br>Time:      9:00 a.m.<br>Courtroom:  850<br>Judge:     Hon. R. Gary Klausner<br>Trial Date:  December 12, 2023<br>Action Filed: December 2, 2022 |
| Defendant. | |

21

22

23

24

25

26

27

28

1

**ER1100**

1    The Motion for Summary Judgment or in the alternative Summary

2    Adjudication by Defendant Clothilde Hewlett, solely in her official capacity as

3    commissioner of the California Department of Financial Protection and Innovation

4    (Department), came on for hearing on October 30, 2023.

5    Upon careful consideration of the written brief and admissible evidence

6    submitted in support of and in opposition to the motion as well as arguments of

7    counsel, IT IS HEREBY ORDERED THAT the Department's Motion for

8    Summary Judgment, or in the Alternative, Partial Summary Judgment against

9    Plaintiff Small Business Finance Association is GRANTED.

10    As a matter of law, Plaintiff Small Business Finance Association (SBFA)

11    cannot establish associational standing pursuant to *Hunt v. Washington State Apple*

12    *Advert. Comm'n*, 432 U.S. 333 (1977). Specifically, SBFA cannot establish the

13    third-prong of associational standing because its as-applied First Amendment

14    challenge to the Department's commercial finance regulations (the Regulations)

15    requires an individualized inquiry of each of the contracts of SBFA's members and

16    practices. *See, e.g.*, *Free Speech Coal., Inc. v. AG of the United States*, 974 F.3d

17    408, 421-22 (3d Cir. 2020).

18    SBFA's claims also fail on the merits as a matter of law. SBFA's first claim

19    of relief fails because the disclosures compelled by the Regulations meet the

20    standards set forth in *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626

21    (1985). Specifically, the Regulations only require the disclosure of purely factual

22    information concerning the products of SBFA's members. Furthermore, that

23    information is not misleading and SBFA has failed to produce any evidence that its

24    members' customers have been misled by the Regulations-required disclosures. The

25    disclosures are also noncontroversial because they are only estimates based on a

26    transparent set of assumptions and figures found on the contracts. They do not

27    require SBFA's members to state an opinion on a controversial topic or otherwise.

28    Furthermore, the disclosures are neither unjustified nor unduly burdensome. At

ER1101

only two pages, the disclosures are relatively brief and SBFA's members are not restricted from providing additional information to potential customers, even information that directly contradicts the disclosures. Finally, the Regulations advance a substantial government interest in preventing deceptive lending practices and enabling small businesses to navigate complex financing transactions and comparison-shop using a uniform set of metrics.

SBFA's second claim for relief fails because the Consumer Financial Protection Bureau (CFPB) has determined that the Truth in Lending Act (TILA) does not preempt California's financial disclosure law, including the Regulations. Pursuant to *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980) and *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984), the Court must defer to the CFPB's determination. In addition, TILA does not preempt California's financial disclosure law because it is not inconsistent with TILA. TILA only applies to transactions "primarily for personal, family, or household purposes", 15 U.S.C. § 1602(i), whereas the Regulations apply to transactions that are "primarily for other than personal, family, or household purposes," Cal. Fin. Code, § 22800(d)(1).

Any application for costs shall be submitted in accordance with the provisions of Local Rule 54-2.

IT IS SO ORDERED.

Date: _____

THE HONORABLE R. GARY KLAUSNER
UNITED STATES DISTRICT JUDGE

**ER1102**

1

2

3

4

5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10                    **WESTERN DIVISION**

11

| | |
|---|---|
| **SMALL BUSINESS FINANCE ASSOCIATION,** | Case No.: 2:22-cv-08775-RGK-SK |
| Plaintiff, | **[PROPOSED] JUDGMENT** |
| v. | |
| **CLOTHILDE HEWLETT, solely in her official capacity as commissioner of the California Department of Financial Protection and Innovation,** | |
| Defendant. | |

20

21

22

23

24

25

26

27

28

1

**ER1103**

1    After fully considering the papers and evidence submitted in support of and
2    in opposition to the Motion for Summary Judgment filed by Defendant Clothilde
3    Hewlett, solely in her official capacity as commissioner of the California
4    Department of Financial Protection and Innovation (the Department), the issues
5    having been fully heard and a decision having been duly rendered,

6    IT IS ORDERED AND ADJUDGED that the plaintiff take nothing, that the
7    action be dismissed on the merits and that Defendant Department recover its costs.

8

9    Date: _____     _____
                                          THE HONORABLE R. GARY KLAUSNER
10                                        UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ER1104**